# Exhibit 62

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

JOHN WELCH,                                    **FIRST AMENDED**
                                               **COMPLAINT**
                          Plaintiff,

     - against-                                **Docket No.:** 09-CV-04400
                                                              (ADS) (WDW)


**UNITED PARCEL SERVICE, INC.**                <u>**JURY TRIAL DEMANDED**</u>
**d/b/a UPS,**
                          Defendant.
-----------------------------------------------------------------X

Plaintiff, **JOHN WELCH** by and through his attorneys, **FRANK & ASSOCIATES,**

**P.C.,** complains and alleges as follows:

## I.   PRELIMINARY STATEMENT

1. Plaintiff brings this civil action seeking declaratory relief, monetary damages and

   affirmative relief based upon Defendant's violations of the Americans with Disabilities

   Act of 1990 (hereinafter "ADA"), 42 U.S.C. § 12101 *et seq.*, the New York State

   Human Rights Law (hereinafter "NYSHRL"), N.Y. Executive Law § 296 *et seq.*

   (McKinney 1993 and 2001 Supp.), the New York City Human Rights Law (hereinafter

   "NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq.*, and other appropriate rules,

   regulations, statutes and ordinances.

## II.   JURISDICTION AND VENUE

2. This court has subject matter jurisdiction over this action and jurisdiction over Defendant

   **UNITED PARCEL SERVICE, INC.** (hereinafter "UPS"), pursuant to 42 U.S.C. §

   12101 *et seq.*, 8 U.S.C. §§ 1331 and 1337 and 29 U.S.C § 1367.

3. This action properly lies in the United States District Court for the Eastern District of

   New York, pursuant to 28 U.S.C. § 1391, because the unlawful employment practices

1

took place within the state of New York, county of Nassau.

4. This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5. Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC"). Plaintiff brings this action within ninety (90) days of the receipt of a Notice of Right to Sue, issued by the EEOC on July 22, 2009, a true and accurate copy of which is annexed to the original complaint filed in this action as Exhibit A.

6. This Court has the power to issue declaratory relief pursuant to 28 U.S.C §§ 2201 and 2202.

## III.   PARTIES

7. Plaintiff, **JOHN WELCH**, ("Plaintiff") is and was at all times relevant herein, a domiciliary of the State of New York residing in the County of Suffolk.

8. Plaintiff is and has been at all times relevant herein, an "employee" within the meaning of 42 U.S.C. § 12111(4) and a "person" within the meaning of Section 292(1) of the NYSHRL, Section 8-102(1) of the NYCHRL.

9. At all times relevant to the Complaint, Plaintiff was a "qualified individual with a disability" within the meaning of 42 U.S.C § 12111(8) and has suffered from a "disability" within the meaning of Section 292(21) of NYSHRL and Section 8-102(16) of the NYCHRL.

10. Upon information and belief, Defendant **UPS** is a foreign business corporation existing under the laws of the State of Delaware.

11. Upon information and belief, at all times relevant to the Complaint, Defendant does

to Driver Supervisor, a management position in which he trained new drivers.

21. Throughout the many years of Plaintiff's employment at UPS, Plaintiff consistently received positive performance reviews, merit increases and promotions.

22. In or about the summer of 1999, Plaintiff was promoted to Manager of the UPS facility in Brooklyn known as Kensington Center.

## THE DISABILITY BASED HARASSMENT

### Early Evidence of Disability Based Discrimination

23. In or about mid 2000, Tom Soregeroli, a Supervisor subordinate to Plaintiff asked Plaintiff about Atenolol, a medication Plaintiff's cardiologist had prescribed to reduce Plaintiff's heart rate

24. Shortly thereafter, Plaintiff was summoned by Division Manager Cindy Miller who demanded, *"What medications are you taking? I was told it is affecting your intensity."* Plaintiff explained he was required to take medication to reduce his heart rate because of his Hypertrophic Cardiomyopathy.  Miller told Plaintiff she intended to "research" the medication he was taking.

25. In or about August 2000, several weeks after meeting with Miller about his medication, Defendant demoted Plaintiff from Manager to Supervisor, transferred Plaintiff from Brooklyn to Long Island City and assigned Plaintiff to work nights instead of days.

26. Plaintiff requested, but was denied, an explanation for Defendant's decision to demote him.

27. The Supervisor position required Plaintiff to work outside the restrictions imposed by his Cardiologist.  For instance, Plaintiff was required to lift more than 40 lbs., do repetitive lifting, and work long hours.

28. Plaintiff complained about Defendant's refusal to accommodate his disability to Division Manager Gerrais Gary, Human Resource Director Craig Owens, and Chief Executive Officer James P. Kelly, all to no avail.

29. In or about August 2000, Defendant reduced Plaintiff's annual compensation by twenty-one thousand ($21,000) dollars.

### THE DISABILITY-BASED HARASSMENT INTENSIFIES

30. In or about November 2003, Plaintiff consulted with pulmonologist Jonathan M. Waxner, M.D. Dr. Waxner suspected that Plaintiff suffered from obstructive sleep apnea and recommended Plaintiff be evaluated to rule out or confirm the condition. Plaintiff requested a day off from work to participate in a sleep study and was subsequently diagnosed with Sleep Apnea.

31. Shortly thereafter Plaintiff and Paul Turner, a fellow supervisor, were both summoned to a meeting with Division Manager Tom Cucce. Upon information and belief, Turner suffers from Diabetes. Cucce said to Plaintiff and Turner, in sum and substance, *"Your diseases are causing me a huge problem"* and explained that he did not have *"jobs for people like you."* Cucce said that he had to weigh the facts to determine, *"do I feed my children...or feed your children."* Cucce placed Plaintiff on involuntary disability leave until he received clearance to return to work without restrictions.

32. Cucce forced Plaintiff to take an unnecessary six month leave of absence, from December 2003 through May 2004. Plaintiff objected to the forced leave of absence. During this period, Plaintiff's physicians indicated he could return to work with certain reasonable accommodations.

33. When Plaintiff advised Defendant he could return to work, Cucce refused to allow

5

Plaintiff to return so long as he required any kind of accommodation.

34. In or around May 2004, Plaintiff's doctors authorized Plaintiff to return to work with restrictions on heavy and/or repetitive lifting and working excessive hours. Plaintiff provided documentation from his physicians to Defendant stating that he was authorized to return to work with certain restrictions.

35. Thereafter, Defendant's physician, Dr. Ciuffo, evaluated Plaintiff.  Dr. Ciuffo concurred with the findings of Plaintiff's physician.

36. Nevertheless, Defendant failed to accommodate Plaintiff's requests for an accommodation. On Plaintiff's first day of work after his return from medical leave, Defendant required Plaintiff to deliver a full Delivery Driver's route, despite the fact that such activity was strenuous and exceeded Plaintiff's physical limitations.

37. On or around August 23, 2005, Plaintiff submitted a formal written request for accommodation of his disability.

38. Defendant failed to provide Plaintiff with the requested accommodations for at least four months thereafter.

39. In or about the Fall of 2005, Plaintiff's cardiologist, Dr. Sherrid, and Plaintiff's primary care physician, both, provided notification to UPS which advised Defendant the failure to accommodate Plaintiff had placed Plaintiff at considerable risk of sudden death.

40. UPS then sent Plaintiff to its physician for an evaluation.   Dr. Ciuffo agreed with Plaintiff's physicians' assessments that Plaintiff required accommodation for his disability.

41. Defendant failed to accommodate Plaintiff from September, 2005 through January, 2006. The Defendant required Plaintiff to work in the package operations department in a

6

position that required lifting and excessive hours.

42. In January 2006, Defendant reassigned Plaintiff from Package Operations to the Safety Compliance Department.

43. In or about January 2007, Defendant removed Plaintiff's reasonable accommodation, and reassigned him to work on the "pre-load" in the Manhasset Center at the Uniondale facility. This position required Plaintiff to work fourteen (14) hour days, lift heavy boxes and perform repetitive lifting in violation of Plaintiff's medical restrictions.

44. In or about April 2007, while working at the pre-load, Plaintiff lost consciousness due to his disability and fell backwards from the elevated loading platform onto a concrete floor. When Plaintiff reported the incident to Defendant's Health & Safety Manager, Michael Ridolfi, Ridolfi responded, *"We may not have a job for someone like you."*

45. On July 10, 2007, Plaintiff submitted a second formal written request for accommodation of his disability.

46. About ten days later, Human Resources Division Manager, Kevin DiLibero threatened to demote Plaintiff from Supervisor to Specialist. Upon information and belief, this would have resulted in a $50,000 decrease in Plaintiff's salary.

47. On July 23, 2007, DiLibero informed Plaintiff that he was reassigned to the Safety Compliance Department in the Melville facility. This position required Plaintiff to work more than ten (10) hours per day in violation of Plaintiff's medical restrictions.

48. In December 2007, Ridolfi told Plaintiff, *"the clock is ticking,"* and suggested that the Defendant would no longer accommodate Plaintiff's disability after the new year.

49. In January 2008, Plaintiff developed an infection at the site of his defibrillator and required surgery. He returned to work on or around January 22, 2008.

50. On or around January 4, 2008, Defendant unjustifiably suspended the ADA interactive process and never acted upon Plaintiff's 2007 request for an accommodation.

51. On or about January 23, 2008, Ridolfi told Plaintiff to "go home," until he could return without restriction as to the number of hours he could work each week.

52. Beginning January through June 2008, Defendant forced Plaintiff to take an involuntary short term disability leave for six (6) months, even though Plaintiff continued to work as a Package Inside Supervisor.

53. Defendant also denied Plaintiff's request for employee tuition reimbursement, purportedly because Plaintiff was not an "active" employee.

54. On May 30, 2008, Plaintiff retained counsel and notified Defendant of an imminent lawsuit based on Defendant's pattern of discrimination against Plaintiff.

55. On June 11, 2008, Defendant assigned Plaintiff to the UPS Uniondale Clerical Department.  This job required Plaintiff to work nine (9) hours per day in violation of Plaintiff's medical restrictions.

56. On August 25, 2008, Plaintiff was admitted to the Psychiatric Unit of the Northport Veterans Administration Medical Center due to his disability.  Plaintiff remained in the hospital for approximately one month.

57. On or about September 26, 2008 Plaintiff filed a Charge of Discrimination with the EEOC.

58. On October 16, 2008, UPS informed Plaintiff that he would not receive his salary for the time he was on medical leave.  Upon information and belief, Plaintiff was entitled to receive six month salary continuation for illness.

59. In November 2008, Defendant removed Plaintiff's reasonable accommodation and

transferred Plaintiff from the Safety Compliance Department to Package Operations in the Nassau Preload, the same job in which Plaintiff was injured and had lost consciousness in the previous year. During this time period, Plaintiff experienced medically documented episodes of arrhythmia due to his HCM.

60. In January 2009, Plaintiff emailed several managers requesting an explanation for the denial of his tuition reimbursement and salary for the period he was on medical leave.

61. On January 26, 2009, DiLibero said to Plaintiff *"I don't have a job for someone like you."*

62. On or after late January 2009, Dilbero gathered his staff in Defendant's conference room and summoned Welch at approximately 5:00 a.m. to interrogate him about his complaints regarding discrimination.

63. On or around late January 2009, Plaintiff was hospitalized again in the Northport Veterans Administration Psychiatric Unit due to the stress and hostility he faced at work. Plaintiff remained at the hospital until mid February 2009.

64. In mid February of 2009, Plaintiff was released from the hospital and cleared to return to work. However, Defendant forced Plaintiff to take involuntary short term disability from January to March 2009.

65. In or around March 2009, Plaintiff returned to work as an On Car Supervisor.

66. Upon information and belief, since early May 2009 Defendant has subjected Plaintiff to excessive scrutiny in retaliation for Plaintiff's filing of an EEOC charge of discrimination against Defendant.

67. In or around June 22, 2009 through July 8, 2009, Defendant placed Plaintiff on another involuntary leave of absence.

9

Case 2:09-cv-04400-ADS -WDW   Document 9   Filed 11/17/10   Page 10 of 18

68. In or around the Fall of 2009, Plaintiff returned to work as an On Car Supervisor. Plaintiff's job duties included the transport of heavy packages from Defendant's Garden City facility to on-the-road drivers. Since Defendant's own physician Dr. Bigman had denied Plaintiff clearance under the Federal Motor Carrier Safety Regulations (FMCSR) to operate commercial vehicles in 2006, Plaintiff was required to deliver said packages out of his own personal vehicle to expedite the delivery process.

69. Plaintiff worked as much as twelve hours per day and was required to lift, lower, carry, leverage, push, pull and manipulate equipment and/or packages weighing as much as seventy pounds (70 lbs) in violation of Plaintiff's medical restrictions. Plaintiff also assisted in moving packages in excess of one hundred and fifty pounds (150 lbs).

70. Beginning late 2009 through 2010, Defendant failed to recognize Plaintiff's request for accommodations during "operational difficulties" to adhere to his medical restrictions in the following New York boroughs: Manhattan, Maspeth and Brooklyn.

71. On September 29, 2009, Defendant required Plaintiff to report to the Foster Avenue facility in Brooklyn to supervise operations.

72. Upon Plaintiff's arrival, Joe Reimo, Division Manager stated, "You are not here to supervise, you are here to work!"

73. For two days Plaintiff transported and delivered packages that had accumulated as a result of the Yom Kippur Holiday. Plaintiff worked twelve hour shifts and repeatedly lifted packages that weighed in excess of forty (40 lbs) in violation of his medical restrictions.

74. In or around December 2009 Defendant reassigned Plaintiff to Package Operations in the Garden City facility. Plaintiff was required to assist in the loading of about three

10

thousand (3000) packages per day from one trailer and five furniture vans. After the completion of the loading process, Defendant required Plaintiff to offload and distribute the packages to helpers. This position violated Plaintiff's medical restrictions insofar as the job required Plaintiff to work approximately twelve (12) hours each day (and in one instance seventeen (17) hours), lift heavy boxes and perform repetitive lifting.

75. On January 6, 2010, Plaintiff's cardiologist found that Plaintiff experienced over sixty (60) medically documented cardiac episodes since November 2009.

76. On or around March 2010 Plaintiff submitted a third formal written request for an eight (8) hour workday and restriction on the requirement to lift packages that weigh 20 lbs or more.

77. On April 23, 2010 Plaintiff attended a meeting with Human Resources District Workforce Planning Manager, Karen Francis and Irene Gordon, District Nurse regarding Plaintiff's ADA request.  At the meeting Francis referred to Plaintiff's medical condition as a "self-perceived medical illness."

78. On August 2010 Defendant reassigned Plaintiff to the Spring Street Facility in Manhattan to work as a Preload Assist in the Industrial Engineering Department.

79. Two months later, during the Rosh Hashanah Holiday, Defendant required Plaintiff to "assist" the sort at the Island City Division in Maspeth. Although it was Defendant's customary practice to provide two men to load/unload one trailer, Defendant provided Plaintiff two men (as opposed to six (6) men) to load a total of three trailers during the Rosh Hashanah Holiday.

80. Defendant's employee Kevin Fallon (Industrial engineering), instructed Plaintiff to "get in the truck."  Plaintiff was required to load two trailers between the hours of 3:00 a.m. to

11

10:00 a.m. everyday.

81. Moreover, each trailer contained approximately twelve hundred (1200) to two thousand (2000) packages or a total of six thousand (6,000) packages to sort each day. As a result, Plaintiff was forced to lift heavy packages in violation of his medical restrictions and request for an accommodation under the Americans with Disabilities Act.

82. Defendant has changed Plaintiff's work hours at least six (6) times, has failed to accommodate Plaintiff's ADA requests for an eight (8) hour workday and has failed to accommodate Plaintiff's request for job duties that do not require him to lift packages that weigh 20 lbs or more.

83. Defendant has continued to fail to accommodate Plaintiff's requests for a reasonable accommodation based on his disability.

**FIRST CLAIM FOR RELIEF**
(Americans with Disabilities Act - Disability Discrimination)

84. Plaintiff repeats and realleges each and every allegation contained herein.

85. Defendant unlawfully discriminated against Plaintiff on the basis of his disability in violation of the ADA.

86. Defendant failed to make reasonable accommodations for Plaintiff based upon his record of impairment.

87. As a proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer substantial loss of past and future earnings, deferred compensation, bonuses and other employment benefits.

88. As a further and proximate result of Defendant's actions, Plaintiff suffered and continues to suffer severe and lasting embarrassment, humiliation, mental and physical anguish and other incidental and consequential damages and expenses

89. The conduct of the Defendant was outrageous and done in conscious disregard of Plaintiff's rights. Therefore, Plaintiff is entitled to equitable and injunctive relief, an award of compensatory damages, punitive damages, expenses and attorneys' fees in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Americans with Disabilities Act - Disability Harassment)

90. Plaintiff repeats and re-alleges each and every allegation contained herein.

91. Plaintiff is a qualified individual with a disability.

92. Plaintiff was subjected to unwelcome harassment on the basis of his disability in violation of the ADA.

93. The harassment of Plaintiff was so distracting as to interfere with Plaintiff's ability to work.

94. The harassment of Plaintiff made it more difficult for Plaintiff to perform his job.

95. The harassment was sufficiently severe or pervasive such that a reasonable employee would find the conditions of employment altered adversely.

96. Defendant knew or should have known of the harassment and failed to take prompt, remedial action.

97. As a proximate result of Defendants' harassing conduct, Plaintiff has suffered and

98. continues to suffer substantial loss of past and future earnings, bonuses, and other

99. employment benefits.

100. As a further proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses, all to Plaintiff's damage in an amount to be determined at trial.

101. Defendant conducted itself in conscious disregard of Plaintiff's rights.

## THIRD CLAIM FOR RELIEF
### (NYSHRL - Disability Discrimination)

102. Plaintiff repeats and realleges each and every allegation contained herein.

103. Defendant unlawfully discriminated against Plaintiff on the basis of his disability in violation of the NYSHRL.

104. Defendant failed to provide a reasonable accommodation based upon his record of

105. impairment.

106. As a proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer substantial loss of past and future earnings, deferred compensation, bonuses and other employment benefits.

107. As a further and proximate result of Defendant's actions, Plaintiff suffered and continues to suffer severe and lasting embarrassment, humiliation, mental and physical anguish and other incidental and consequential damages and expenses.

108. The conduct of Defendant was done in conscious disregard of Plaintiff's rights.

109. Therefore, Plaintiff is entitled to an award of compensatory damages in amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (NYCHRL - Disability Discrimination)

110. Plaintiff repeats and realleges each and every allegation contained herein.

111. Plaintiff has been discriminated against by Defendant on the basis of his disability in violation of the New York City Human Rights Law based on Defendant's failure to provide a reasonable accommodation of Plaintiff's disability or perceived disability all the while giving Plaintiff pretextual or untrue reasons for the failure to accommodate.

14

112. As a proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer substantial loss of past and future earnings, deferred compensation, bonuses and other employment benefits.

113. As a further proximate result of Defendant's actions, Plaintiff suffered and continues to suffer severe and lasting embarrassment, humiliation, mental and physical anguish and other incidental and consequential damages and expenses.

114. The conduct of the Defendant was done in conscious disregard of Plaintiff's rights. Therefore, Plaintiff is entitled to relief, an award of compensatory damages, punitive damages and reasonable attorneys' fees in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### (NYSHRL - Retaliation)

115. Plaintiff repeats and realleges each and every allegation contained herein.

116. Plaintiff has been retaliated against by Defendant on the basis of his complaints of disability discrimination in violation of the NYSHRL.

117. As a proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer substantial loss of past and future earnings, bonuses, and other employment benefits.

118. As a further proximate result of Defendant's actions, Plaintiff has suffered and continued to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

119. The conduct of Defendant was done in conscious disregard of Plaintiff's rights.

120. Therefore, Plaintiff is entitled to equitable and injunctive relief, an award of punitive damages, compensatory damages, expenses and attorneys' fees from Defendant in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

121. Plaintiff repeats and realleges each and every allegation contained herein.

122. Plaintiff hereby demands a trial by jury.

**WHEREFORE**, as a result of the unlawful conduct and actions of Defendant alleged herein, Plaintiff demands judgment:

a.    Declaring Defendant violated the aforementioned statutes;

b.    Issuing a permanent injunction enjoining Defendant, their agents, employees, officers, and successors in interest, and those acting in concert with Defendant from engaging in the illegal and unlawful customs, policies, and practices described herein and to provide Plaintiff with a reasonable accommodation;

c.    On the First Claim for Relief, Defendant pays Plaintiff compensatory and punitive damages, where applicable, in an amount to be determined at trial;

d.    On the Second Claim for Relief, Defendant pays Plaintiff compensatory damages, where applicable, in an amount to be determined at trial;

e.    On the Third and Fourth Claims for Relief, Defendant pays Plaintiff compensatory damages, where applicable, in an amount to be determined at **trial**;

f.    On the Fifth Claim for Relief, Defendant pays Plaintiff compensatory damages, where applicable, in an amount to be determined at trial;

g.    Plaintiff be made whole in the form of back pay and front pay, and afforded all benefits that would have been afforded Plaintiff but for Defendant's unlawful acts resulting in a failure to accommodate;

h.    An award of Plaintiff's cost of this suit, including reasonable attorney's fees;

i.    Defendant is ordered to pay Plaintiff pre- and post-judgment interest;

j.      Such other and further relief as the court deems just and proper.


Dated: Farmingdale, New York
        November 17, 2010

                                        **FRANK & ASSOCIATES, P.C.**
                                        *Attorneys for Plaintiff*

                        By:     _Rashmee Sinha_
                                Rashmee Sinha (RS 6252)
                                500 Bi-County Blvd., Suite 112N
                                Farmingdale, New York 11735
                                (631) 756-0400
                                rsinha@laborlaws.com

17

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2010, I electronically filed the forgoing First Amended Complaint with the Clerk of the District Court using the CM/ ECF System.

I affirm that the foregoing statements are true, under penalty of perjury.

Dated: Farmingdale, New York
       November 17, 2010

Rashmee Sinha (RS 6252)

# Exhibit 63



## Overview Of The Program

The UPS Education Assistance Program is available to active, full-time UPS employees based in the United States who are seeking to improve existing skills and educational knowledge through outside study. UPS will provide financial assistance to qualified employees who wish to attend courses or participate in degree programs that enhance their current responsibilities or support career development goals that meet the business needs of UPS.

The goal of the Program allows you to enhance your job skills and responsibilities and/or career development while adding value to the company.

## Eligibility

The UPS Education Assistance Program is available to active, full-time UPS employees from the date of employment. Employees must be on the payroll actively working when they apply for assistance and still employed by UPS when they submit the necessary documents for reimbursement.

Employees on leave of absence, short- or long-term disability, or not actively employed and on the payroll are not eligible for the Program until they return to "active" status.

Eligibility for reimbursement is canceled upon termination of employment.

## Approved Courses

Course(s) will be considered for approval if taken at an accredited school*, earns college credits, and in the Human Resources Manager's opinion, are related to the business of UPS.



confidential

upsers.com - Printer Friendly View

## UPS Education Assistance Program for full-time employees

**Full-time employees can receive financial assistance to continue their college education.**

UPS tuition assistance is offered within the employee benefit package as part of the overall effort to recruit, retain, and develop qualified individuals in meeting the business objectives of our company. In the US, tuition assistance is offered to all full-time employees regardless of employment type or work location, all part-time management employees, and for part-time hourly employees at selected locations within the UPS system. Coverage levels within programs vary by geography, employment type, and business unit. Coop and intern employees are not eligible for tuition assistance.

1.  **School Quality**
    a.  For all coursework started after January 1, 2008, all schools must meet minimum quality standards: US Dept of Education Title IV certification, and Regional Academic accreditation, with some exceptions made for selected trade/technical schools providing key part-time hiring sources at specific UPS locations. UPS is selective on which schools are allowed to participate within its tuition program. Selection is based on a variety of criteria and is constantly monitored and updated by the tuition program administrator.

2.  **Employee Responsibilities**
    a.  UPS Tuition assistance is available only to active employees. Employees leaving UPS forfeit eligibility.
    b.  Application
        i.  For all coursework starting after April 1, 2007: all tuition program activity must pass through the established all-electronic application, approval, and reimbursement processes as determined by the program administrator.
        ii.  The employee must file an electronic application with the tuition program administrator prior to the start of the course, or within 30 days of the start of the course through the appeal process. Certain part-time employees are eligible to file mid-course applications when their information appears within the system after hire. Applications received after established deadlines may be declined and the employee ineligible for tuition program coverage.
    c.  Reimbursement
        i.  You must complete the course and receive a passing grade. All reimbursement documentation must be received within 60 days of the end of the term and include Grades, proof of payment, and itemized bill from the school. Employees lose tuition program eligibility when they depart UPS for any reason.
        ii.  All reimbursement processing (grades, receipts, proof or purchase, etc) must be received, processed, and paid prior to employee separation. ALL reimbursement paperwork must be received, approved, and completely processed PRIOR to leaving UPS. Once twelve (12) months have passed from the start of a course, reimbursement opportunity is forfeited.

3.  **Grades**
    a.  FULL-TIME employee minimum grade requirement is C- or better
    b.  "W" (withdrawn), "F" (failed), or "I" (incomplete) grades are not eligible for reimbursement. In certain situations, "P" (passing) grades may not also be eligible for reimbursement.

4.  **Book Reimbursement**
    a.  FULL-TIME employee program does not cover textbooks.

5.  **Mandatory Payback requirement for FULL-TIME Employees Leaving UPS**
    a.  All FULL-TIME employee coursework starting after January 1, 2006 carry a payback requirement, covering the previous two-years of tuition program-use. If a full-time employee quits for any reason other than retirement, UPS requires the employee to repay any tuition program reimbursement made during the previous two years. UPS reserves the right to pursue this reimbursement policy through court action or garnishment of the wages. FT employees staying two-years after their last tuition program reimbursement are released from the payback obligation.
    b.  An employee (or former employee) shall be obligated to repay UPS for all tuition reimbursement received for a

confidential

D0412

course or courses under this program in any of the following events:

   i.    The employee voluntarily terminates employment with UPS or is terminated for gross misconduct at any time prior to the expiration of [ ] year[s] after satisfactory completion of the course;
   ii.   The employee voluntarily elects to change employment status from full-time to part-time or becomes subject to a collective bargaining agreement.
c.  UPS shall have the right to deduct from the employee's paycheck(s) (in the case of a former employer, the final paycheck) the full amount of all tuition reimbursement owed to UPS in accordance with this policy. If the paycheck is insufficient to fulfill an employee's reimbursement repayment obligation, the employee shall remit to UPS the full remaining balance no later than thirty (30) days after resignation, termination, or change in employment status from full-time to part-time.

6.  **Tuition Program Limits**
    a.  Lifetime, yearly, term/semester caps vary by workgroup, employment location, and business unit. Specific information is available on the tuition program administrator's website.
    b.  For FULL-TIME employees, for all new academic programs starting after January 1, 2006, out-of-network school cost per credit hour cap of $150 applies. Tuition rates at in-network schools are covered at higher rates. See below information concerning in-network schools.

7.  **Grandfathering Rules concerning FULL-TIME employees**
    a.  Full-time employees currently active in either a bachelor or masters academic program (with at least one (1) approved and reimbursed application during calendar year 2005) are grandfathered into their existing program under then-current, subject to periodic reviews.
    b.  Grandfathered programs are exempt from the $150 per credit hour requirement but are still subject to School Quality, Grade, Leaving UPS, Lifetime Cap, and Annual Cap policies.
    c.  In order to maintain grandfather status, the employee must exhibit continued progress toward their academic goal as evidenced by at least one (1) approved and reimbursed application during each calendar year.
    d.  Failure to maintain grandfather status converts the employee to updated program rules.

8.  **Access to Masters Degrees Restricted for FULL-TIME employees**
    a.  Starting January 1, 2006 new master degree requests are limited to FULL-TIME Management (MIP or SIP) employees.
    b.  All master degree requests must be accompanied by a detailed business justification and reviewed by local UPS management up to and including the District Manager.
    c.  Any employee currently in a masters program (with at least one approved and reimbursed application during 2005) may continue under existing rules, as noted above.
    d.  Executive MBA, PhD, and Juris Doctor Law degrees are not offered within full-time UPS tuition programs. e UPS' tuition program generally does not provide coverage for multiple degrees.

9.  **Tuition Program Policy Concerning Employee Leave of Absence Situations .**
    a.  UPS tuition programs are constructed around the concept of active employment... where an employee cannot file an application, or receive a reimbursement without showing as actively employed. When it comes to employees on leave-of-absence (LOA), the same principles apply.
    b.  A person needs to show "Active" in order to access the tuition program. In situations where a person is LOA at the start of a course, the tuition application will be rejected. No application at the start of the term means no right to reimbursement at the end of the semester. We will not pre-date late applications in order to accommodate employee LOA situations and the only place where front-end application pro-rating occurs would be within selected part-time tuition programs where we handle mid-semester hiring situations.

          i.    Employees experiencing a LOA situation after a course has started are blocked from filing a reimbursement request until such time as they return to active status, and are then required to document and process their reimbursement request through the established appeal process. While awaiting access to the reimbursement system, employees need to work out a hardship delay payment arrangement with their school.
          ii.   All employee leave-of-absence situation requests are handled through an electronic appeal process as established by the tuition program administrator.

confidential

D0413

Case 2:09-cv-04400-ADS -WDW Document 29-11 Filed 05/16/11 Page 23 of 41

10. **In-Network Negotiated Tuition Programs.**
   a. UPS has a series of negotiated in-network tuition program arrangement with Thomas Edison State College
   b. Distance-learning undergraduate degree programs from a New Jersey state institution meeting all UPS school requirements
   c. Cost/credit fully covered under UPS Tuition program, up to established program guidelines
   d. Convenient system of transferring credit from multiple schools and opportunity to convert selected UPS-training classes into college credit
   e. Wide network of partner schools tied to Thomas Edison State College
   f. Customized Operations Management Certificate and Bachelor of Operations Management degrees offered
   g. Complete information on UPSers.com

Published : Jun 09, 2005 09:19 AM
Last Updated : Nov 11, 2008 05:02 PM

☒ Close

confidential

D0414

# Exhibit 64



**Position:**

Operations Supervisors/Managers/unless otherwise listed
    Operations Supervisor/Manager                    I.E. Supervisor/Manager

**Essential Job Functions:**

- Meet D.O.T. requirements and/or be CDL qualified as required by job assignment
- Bend, sit, stoop, crouch, squat, crawl, climb, stand, walk and turn/pivot
    - Part-time: up to 5 ½ hours per day, 5 days per week
    - Full-time: 9-10 hours per day, 5 days per week
    - extended hours may be required as service needs dictate
- Report to work on a regular and timely basis
- Ability to work varying shifts and extended hours as business needs dictate
- Must be able to travel by car and plane to attend meetings at other locations and call on non-UPS locations and customers
- Must be able to supervise and train employees effectively
- Perform office tasks using simple hand grasping, fine hand manipulation and reach associated with assigned tasks such as paperwork, typing, and/or use of a computer, filing, calculating and use of telephone
- Lift, lower, push, pull, leverage and manipulate equipment and/or packages weighing up to 70 pounds
- Assist in moving packages weighing up to 150 pounds
- Grasp, reach, and demonstrate activities associated with delivering, loading and unloading packages including operation of the Delivery Information Acquisition Device (DIAD), the DIAD Vehicle Adapter (DVA), the In-Vehicle Information System (IVIS) and other hand-held scanning devices
- Meet all requirements to be Power Industrial Truck Operations (PITO) certified
- Lift packages to heights above the shoulder and lower to foot level as appropriate
- Have a sufficient ability to communicate, through sight, hearing, and/or otherwise, to perform assigned tasks and maintain proper job safety conditions
- Work in an environment with:
    - variable temperatures and humidity
    - exposure to dust, dirt, and noise
    - enclosed work area
    - outside inclement weather
    - elevated heights and uneven work surfaces
- Work cooperatively in a diverse work environment
- Demonstrate cognitive ability to:
    - follow directions and routines
    - work independently with appropriate judgment
    - exhibit spatial awareness
    - read words and numbers
    - concentrate, memorize, and recall
    - identify logical connections and determine sequence of response
    - processing up to 2-3 steps ahead

            1/1/2008

D0001

**Position:**

Non-Operations Specialists/Supervisors/Managers/unless otherwise listed

**Essential Job Functions:**

- ~~Meet all of the applicable requirements as specified by the D.O.T.~~ *— MET THIS REQUIREMENT. # NO be ABLE TO BEND*
- Work in a seated position during a portion of the day
  - Part-time:  up to 5 ½ hours per day, 5 days per week
  - ~~Full-time: 9-10 hours per day, 5 days per week~~
- Report to work on a regular and timely basis
- Ability to work varying shifts and additional hours depending on service needs *But NOT PERFORMED.*
- Bend, lift/carry, stoop/squat, crouch/kneel, climb stairs and walk intermittently throughout the workday
- Perform office tasks using simple hand grasping, fine hand manipulation and reaching associated with assigned tasks such as paperwork, typing, and/or use of a computer, filing, calculating and use of telephone
- Must be able to supervise and train employees effectively
- Must be able to travel by car or plane to attend meetings at other locations (travel by car can be extensive as required by job and overnight stays may be required)
- Work in an environment with:
  - variable temperatures and humidity (climatic conditions)
  - outside inclement weather
  - exposure to dust, dirt and noise
  - enclosed work areas
- Have a sufficient ability to communicate, through sight, hearing, and/or otherwise, to perform assigned tasks and maintain proper job safety conditions
- Work with and manage other employee's time and activities.
- Work cooperatively in a diverse environment
- Demonstrate cognitive ability to:
  - follow directions and routines
  - work independently with appropriate judgment
  - exhibit spatial awareness
  - read words and numbers
  - concentrate, memorize, and recall
  - analyze and interpret data/reports
  - identify logical connections and determine sequence of response
  - processing up to 2-3 steps ahead
- Other functions that may be assigned

*The essential functions of this job may vary greatly depending upon the size and location of the UPS facility.  At some locations, employees may not perform all of the essential job functions listed above.  At other locations, employees may perform some or all of the functions listed above and, in addition, may be required to perform other jobs or tasks as directed.  In addition, given the nature of the business, UPS retains the right to modify the essential functions of this position at any time.*

— 40# LIMIT = NOT RIGOROUS, ∦ SECTION

— SLEEP APNEA §

D0003

# Exhibit 65


**ORIGINAL**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

**520-2009-00051**

CHARGE NUMBER

AGENCY
☐ FEPA
X EEOC

State or local Agency, if any _____ and EEOC

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. John Welch | (631) 462-0695 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 109 Dovecote Lane, Commack, New York 11725 | September 2, 1963 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME United Parcel Service, Inc. | NUMBER OF EMPLOYEES, MEMBERS over 20 | TELEPHONE (Include Area Code) |
|---|---|---|

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 55 Glenlake Parkway, NE          Atlanta, GA 30328 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE     ☐ COLOR     ☐ SEX     ☐ RELIGION     AGE
☐ RETALIATION   ☐ NATIONAL ORIGIN   ☒ DISABILITY   ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST (   )     LATEST (   )
**Continuing Violation**
X☐ CONTINUING ACTION

THE PARTICULARS ARE (if additional paper is needed, attach extra sheet(s)):

See attached Affidavit

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

*John K. Welch* (signature)

Date 9-26-08     Charging Party (Signature)

SIGNATURE OF COMPLAINT

*John F. Welch* (signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year) 26th of Sept, 2008

EEOC FORM 5 (Test 10/94)

*Patricia M. Pastor* (signature)

PATRICIA M. PASTOR
Notary Public, State of New York
No. 02PA6190534
Qualified in Suffolk County
Commission Expires July 28, 2012

520 2009 00051

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
----------------------------------------------------------------X
JOHN WELCH,

                        Complainant,

      -against-

UNITED PARCEL SERVICE, INC.,

                        Respondents.
----------------------------------------------------------------X
STATE OF NEW YORK)
                ss):
COUNTY OF NEW YORK)

      JOHN WELCH, being duly sworn, deposes and says:

      1.      I am the Complainant in this matter, and I submit this affidavit in support of my charge of discrimination, charging United Parcel Service, Inc. ("UPS") with unlawful employment discrimination on the basis my disability in violation of the Americans With Disabilities Act, 42 U.S.C. §12101 *et seq.* (the "ADA").

      2.      I currently reside at 109 Dovecote Lane, Commack, New York 11725.

      3.      Respondent is engaged in an industry affecting commerce that has fifteen or more employees for each working day in each of the twenty or more calendar weeks in the current or preceding calendar year, and is an "employer" within the meaning of the ADA.

      5.      I am a forty-five year old male, who is disabled within the meaning of the ADA.

      6.      I was born September 2, 1963. Upon graduation from high school, I enlisted the armed services and served for eight (8) years in the United States Marine Corps.

7.     I commenced employment with Respondent UPS on or about March 17, 1987 as a part-time loader at its Chase Court facility in Brooklyn, New York.

8.     After approximately nine (9) months, I was hired by Defendant as a full-time driver and began working at the UPS facility located on 29th Street, Brooklyn, New York.

9.     During this period, I was a member of the union which represented Respondent's non-management employees and was paid an hourly wage of $17.00.

10.    Approximately six (6) months later, in or about June 1988, I was promoted to Driver Supervisor, a non-union, salaried management position, in which I trained new drivers.

11.    In or about 1998, I consulted Mark V. Sherrid, M.D., a cardiologist at St. Luke's-Roosevelt Hospital Center, New York, New York, and received a diagnosis of Hypertrophic Cardiomyopathy ("HCM"), a congenital defect that causes a thickening and abnormal function of the heart muscle.  Patients with HCM have diastolic dysfunction due to hypertrophy and myocardial fibrosis.

12.    Symptoms of HCM include shortness of breath, lightheadedness, fainting and chest pain.  Some patients experience cardiac rhythm disturbances which, in some cases, may lead to sudden death.

13.    My two brothers, Robert and Glenn, both died as a result of cardiac rhythm disturbances associated with HCM within twelve (12) months of each other between 1998 and 1999.   At the time, Robert was thirty-six years old, and Glenn was forty-two.

2

14. In May 1998, I underwent a procedure at St. Luke's to have a defibrillator implanted to prevent sudden death caused by electrical disruption. I was admitted to the hospital for approximately two (2) weeks.

15. My cardiologist and physician advised me that I can work with certain restrictions. For instance, my doctor advised me not to lift more than 40 lbs., and to avoid repetitive lifting and working excessive hours.

16. Throughout the many years of my employment at UPS, I consistently received positive annual reviews, merit increases, and promotions. In or about the summer of 1999, I was promoted to Manager of the UPS facility in Brooklyn known as Kensington Center.

17. In or about 2000, Supervisor Tom Soregeroli inquired about medication that my cardiologist had prescribed to reduce my heart rate called Atenolol, which is in a class of medications called beta blockers. It works by slowing the heart rate and relaxing the blood vessels so the heart does not have to pump as hard. A common side effect of Atenolol and other beta blockers is reduced sexual interest.

18. I was then summoned by Division Manager Cindy Miller who demanded, *"What medications are you taking? I was told it is affecting your intensity."* Miller acknowledged that her question was based on information provided to her my Soregeroli. I explained to Miller that I was required to take beta blockers to reduce my heart rate because of my Hypertrophic Cardiomyopathy. Miller told me that she was going to conduct her own research regarding beta blockers.

19. On or about August 28, 2000, approximately five (5) weeks after meeting with Miller about my medication, I was demoted from Manager to Supervisor, transferred

3

from Brooklyn to Long Island City, and assigned to work nights instead of days. The position required me to lift more than 40 lbs., do repetitive lifting, and work long hours against the advice of my cardiologist. I complained to Division Manager Gerrais Gary, Human Resource Director Craig Owens, and Chief Executive Officer James P. Kelly, all to no avail.

20.     In or about 2000, after more than twelve (12) years of loyal dedicated service to UPS, Defendant cut my annual compensation by twenty-one thousand ($21,000) dollars, from $113,737 to $92,666.

21.     In or about November 2003, I consulted with a pulmonologist, Jonathan M. Waxner, M.D. The pulmonologist suspected that I suffered from obstructive sleep apnea, and recommended that I be evaluated to rule out or confirm sleep apnea. I submitted a request to Defendant for one day off to participate in a sleep study, with a note from Dr. Waxner explaining why the time off was necessary.

22.     Shortly after I requested the day off, Paul Turner, a fellow supervisor, and I were both summoned to a meeting with Division Manager Tom Cucce. Turner is an African-American who suffers from Diabetes. Cucce said to us, *"Your diseases are causing me a huge problem"* and explained that he did not have "jobs for people like you." Cucce said that he had to weigh the facts to determine, *"do I feed my children...or feed your children."* As he said this, Cucce held his palms out to his side at shoulder height and mimicked the movement of a scale, with one hand going up while the other went down. Cucce told me that he chose to feed his own children, and that I had to go out on disability until I received a clearance to return to work without any restrictions. I objected to this and explained to Cucce that I only needed one day off in order to

4

participate in a sleep study. The results of the study subsequently confirmed that I suffer from sleep apnea.

23. Cucce forced me to take short term disability for the next six months. During this period, my physicians indicated that I could return to work with minimal restrictions: I was restricted from lifting or working in excess of forty (40) hours per week. Cucce, however, refused to allow me to return to work with any restrictions. After approximately six months, my doctor authorized me to return to work without restrictions, except for lifting packages in excess of 40 lbs. and repetitive lifting.

24. In or about November 2005, my cardiologist, Dr. Sherrid, and my primary care physician both provided letters to UPS, which advised Respondent that the requirements of my position at UPS were putting me at considerable risk for sudden death. Respondent's own physician, Dr. Ciuffo, agreed with this assessment. I was advised by my physicians not to work in excess of forty (40) hours per week, or lift more than 40 lbs., and to avoid repetitive lifting.

25. In January 2006, I was reassigned from package operations to the safety department pursuant to my request for a reasonable accommodation of my disability. My job duties in the safety department, which included conducting training, investigating motor vehicle accidents, and completing regulatory documentation, were within the parameters of my doctors' restrictions. The position did not require physical exertion or any lifting, and the hours were from 6:00 a.m. to 2:00 p.m.

26. In or about January 2007, Defendant removed my reasonable accommodation, and reassigned me to work on the pre-load in the Manhassett Center within the Uniondale facility. This position required me to work 14-hour days, lift heavy

5

boxes, and do repetitive lifting. As explained above, Hypertrophic Cardiomyopathy can cause shortness of breath, lightheadedness, fainting and chest pain. In or about April 2007, while working at the pre-load, I lost consciousness and fell backwards from the elevated loading platform onto a concrete floor. When I reported the incident to Defendant's Health & Safety Manager, Michael Ridolfi, he responded by saying, *"We may not have a job for you."*

27.     In or about June 2007, I was reassigned to the safety department at the Melville facility and resumed working normal hours. This position did not require any lifting. However, in December 2007, Ridolfi told me, *"The clock is ticking,"* and suggested that the reasonable accommodation of my disability would expire after the new year.

28.     In January 2008, I developed an infection to the site where my defibrillator was implanted. On January 14, 2008, I had surgery to remove the infection. I returned to work on January 22. Defendant removed my reasonable accommodation again on January 23, when Ridolfi told me to "go home" until I could return to work without any restriction on working more than forty (40) hours per week. Although I was able to perform the duties of my position in the safety department, which were within the restrictions set by my physician, Respondent forced me to take short term disability from January to June 2008, during which time I did not receive my regular pay.

29.     Although I did not request to be absent from work due to any illness, and in fact, was forced by my supervisor to take short term disability despite being able to work with reasonable accommodation, UPS denied my tuition reimbursement purportedly because I was not on "active status."

30.     Since returning to work on June 3, 2008, Defendant has changed my hours six (6) times.

31.     Based on the foregoing, I charge Respondent with an unlawful discriminatory employment practice in violation of the Americans With Disabilities Act. 42 U.S.C. §12101 *et seq.* (the "ADA").

32.     The ADA prohibits employment discrimination against persons with disabilities who are able to perform the essential functions of their jobs, either with or without reasonable accommodation. It is discriminatory, and a violation of the ADA, when an employer fails to make "reasonable accommodations to the known physical limitations of an otherwise qualified individual with a disability..." Lyons v. Legal Aid Society, 68 F.3d 1512, 1514 (2d cir. 1995); LoveJoy-Wilson v. Noco Motor Fuel, Inc., 263 F.3d 208, 218 (2d Cir. 2001).

I have not commenced any other civil action, nor do I have an action pending before any administrative agency under any other law of this State based upon this same unlawful discriminatory practice.

**JOHN WELCH**, being duly sworn, deposes and says: that I am the Complainant herein; I have read the forgoing charge and know the content thereof; the same is true of my knowledge except as to matters therein stated on information and belief; and as to those matters, I believe the same to be true.

John K. Welch
John Welch

Sworn to before me this
26th day of September, 2008.

Patricia M. Pastor   Notary Public

7

PATRICIA M. PASTOR
Notary Public, State of New York
No. 02PA6190534
Qualified in Suffolk County
Commission Expires July 28, 20 12

# Exhibit 66



1 of 100 DOCUMENTS

**ELISE STUEVECKE, Plaintiff, -against- THE NEW YORK HOSPITAL MEDICAL CENTER OF QUEENS, Defendant.**

**No. 01-CV-326 (FB) (RLM)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 14793*

**August 26, 2003, Decided**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted as to Plaintiff's accommodation and retaliation claims. Court declined to exercise supplemental jurisdiction on Plaintiff's state law claims. Complaint dismissed, but without prejudice as to non-federal claims.

**COUNSEL:** For Plaintiff: MICHAEL J. D'ANGELO, ESQ., Somma, Zabell & Associates, LLP, Farmingdale, NY.

For Defendant: BARBARA E. HOEY, ESQ., K. LESLI LIGORNER, ESQ., Kelley Drye & Warren LLP, New York, NY.

**JUDGES:** FREDERIC BLOCK, United States District Judge.

**OPINION BY:** FREDERIC BLOCK

**OPINION**

**MEMORANDUM AND ORDER**

 **BLOCK, District Judge:**

 Plaintiff Elise Stuevecke ("Stuevecke") brings this action against her former employer, defendant New York Hospital Medical Center of Queens (the "Medical Center"), alleging that the Medical Center failed to provide accommodations for her foot injury and later terminated her in retaliation for requesting the accommodations. The Medical Center moves for summary judgment. For the reasons stated below, the motion is granted.

**BACKGROUND**

 The following facts, drawn from the pleadings, depositions, affidavits, and Local *Rule 56.1* statements submitted to the Court, [*2] are uncontested. *See Fed. R. Civ. P. 56*. The Court construes them in the light most favorable to Stuevecke, the non-moving party. *See Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)*.

 Stuevecke began her employment with the Medical Center in 1990 and at all times relevant to this action was a secretary in the Medical Center's case management department. As part of her daily duties, Stuevecke was required to transport medical records and often carried approximately thirty pounds of records up stairs and between buildings. Beginning in 1996, Stuevecke began to experience lengthy absences from work due to recurrent foot problems. She underwent surgery for her foot in July, November, and December of 1996, June of 1998, and April, August and November of 1999. With the exception of notations that she had these prolonged

2003 U.S. Dist. LEXIS 14793, *2

absences, Stuevecke consistently received exemplary written reviews from her supervisors.

The Medical Center's Medical Leaves of Absence Policy ("Leaves Policy") authorizes its employees to take up to twenty-six weeks' disability leave. Before returning to work, an employee must receive clearance from the Medical Center's Employee Health [*3] Service and present a doctor's note authorizing return to work. "If the [employee's] disability exceeds 26 weeks and the employee is unable to return to full duty, the employee will be released from payroll." Leaves Policy, P 2.1.2. The Leaves Policy also provides that "if, at a later date, the employee is able to return to the workforce, the Medical Center will accept the employee's application and make every effort to place the individual in a suitable available position for which he/she qualifies." *Id.*, P 3.1. Stuevecke testified at her deposition that she was unaware of the Leave Policy, but acknowledged that she had received a copy of the Medical Center's employee handbook containing the policy.

Following her 1998 surgery, and after receiving the necessary clearance to return to work, the Medical Center permitted Stuevecke to wear an open-toed surgical boot, which was contrary to the Medical Center's usual practice of requiring closed-toe footwear. Stuevecke was also provided with a wheeled filing cabinet to assist her in transporting records within and between buildings. Stuevecke was unable to use the cart on a regular basis, however, because its wheels would fall off [*4] and it could not fit through some of the Medical Center's doorways. Instead, Stuevecke occasionally used shopping bags to carry the records.

After her April 1999 surgery, Stuevecke's treating physician, Dr. Peteris Dzenis ("Dr. Dzenis"), certified that Stuevecke was continuously totally disabled from the date of her surgery (April 19, 1999) through May 31, 1999. On June 9, 1999, Stuevecke met with Ken Praga ("Praga"), a nurse practitioner in Employee Health Services. Stuevecke did not have clearance from Dr. Dzenis to return to work. Calling Stuevecke "a liability," Stuevecke Dep. at 244, Praga refused to clear Stuevecke because her swollen foot did not permit her to wear closed-toe shoes and because she lacked permission from her physician. Praga acknowledged at his deposition that he had permitted at least one other employee to wear an open surgical boot, even though it would also be considered a sandal or open shoe, but claimed that the other employee did not walk as much as Stuevecke.

Stuevecke did not return to work and thereafter underwent the August 1999 surgery. She convalesced throughout September and October of that year, but was not fully healed and required additional [*5] surgery, which was scheduled for November of 1999. Between her June 9, 1999 meeting with Praga and November 16, 1999, Stuevecke did not tell anyone at the Medical Center that she planned to return to work.

By letter dated November 16, 1999, Paul Davin ("Davin"), the Medical Center's director of Human Resources, terminated Stuevecke. Davin testified at his deposition that he terminated Stuevecke after concluding that she had exceeded the amount of leave permitted under the Leaves Policy. Davin had previously terminated two to four dozen other employees for the same reason, although the record before the Court does not disclose over what period of time the other terminations occurred. There is no evidence before the Court that Davin consulted Praga in connection with Stuevecke's termination.

On August 8, 2000, Stuevecke filed a form complaint against the Medical Center with the EEOC and the New York State Division of Human Rights. She checked the form's box for discrimination based on "disability," but not for "retaliation." In the narrative section, Stuevecke alleged that she had requested a cart to transport medical records and that she be relocated to the building containing the [*6] Medical Center's Admissions Department, which had elevators; rather than accommodate her, the Medical Center had placed her on long-term disability and later terminated her. The EEOC issued a right to sue letter on October 23, 2000.

On January 19, 2001, Stuevecke filed this action. Her six-count complaint contains three counts alleging unlawful failure to provide reasonable accommodations under the *Americans with Disabilities Act* ("ADA"), the *New York Human Rights Law* ("NYHRL"), and the *New York City Human Rights Law* ("NYCHRL"), respectively, and three counts alleging unlawful retaliation for having requested these accommodations under the same three statutes.

## DISCUSSION

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue

2003 U.S. Dist. LEXIS 14793, *6

of material fact to be tried and that the moving party is entitled to judgment as a matter of law. *See Fed. R. Civ. P. 56(c)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The burden is on the moving party to identify those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits that [*7] demonstrate the absence of a genuine issue of material fact. *See Celotex Corp., 477 U.S. at 323*. Once the moving party has carried this burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... The non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (quoting *Fed. R. Civ. P. 56(e)*) (other citations omitted).

### 1. Federal Claims

#### A. Reasonable Accommodation

"An employer violates the ADA when it fails to 'make reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability ... unless [the employer] can demonstrate that the accommodation would impose an undue hardship ....'" *Jacques v. DiMarzio, Inc., 200 F. Supp. 2d 151, 161 (E.D.N.Y. 2002)* (quoting *42 U.S.C. § 12112(b)(5)(A)*). "ADA regulations further state that an employer is required to make 'modifications or adjustments to the work environment, [*8] or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position.'" *Id.* (quoting *29 C.F.R. § 1630.2(o)(1)(ii)*).

The Medical Center contends that Stuevecke's failure to accommodate claim is time-barred; alternately, it argues that Stuevecke was not "disabled" within the meaning of the statute, and to the extent she was disabled, did not request nor require an accommodation to perform her essential job duties. The Court need not address the Medical Center's alternate arguments because it concludes that Stuevecke's failure to accommodate claim under the ADA is untimely.

A plaintiff may bring an ADA action in federal court only after timely filing a complaint with the Equal Employment Opportunity Commission ("EEOC") and

receiving a right-to-sue letter. *See Legnani v. Alitalia Linee Aeree Italiane, S.P.A, 274 F.3d 683, 686 (2d Cir. 2001)*; *Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 325 (2d Cir. 1999)* (recognizing that the ADA subjects ADA claims to the same administrative exhaustion [*9] requirement as Title VII claims). In New York, a claimant must file a charge with the EEOC within 300 days of the alleged unlawful act and provide notice of the circumstances and date of the charge. *See 42 U.S.C. § 2000e-5(e)(1)*; *Tewksbury, 192 F.3d at 327-28*. The filing requirement acts as a statute of limitations to bar all claims falling outside the 300-day period. *See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996)*

Stuevecke "alleges that [the Medical Center] failed to reasonably accommodate her in June of 1999[.]" Plaintiff's *Rule 56.1* Counter Statement, P 2, at 1. Thus, she had 300 days from then - until April of 2000 - to file her complaint with the EEOC. She did not do so until August 9, 2000.

That Stuevecke's November 16, 1999 termination occurred within the 300-day window is immaterial. The Medical Center's alleged failure to provide reasonable accommodations and its termination of her employment are discrete acts. *See AMTRAK v. Morgan, 536 U.S. 101, 113, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002)* (discrete discriminatory acts include termination, failure to promote, denial of [*10] transfer, and refusal to hire); *see also Lovejoy-Wilson v. Noco Motor Fuel, Inc., 263 F.3d 208, 218 (2d Cir. 2001)* (failure to provide reasonable accommodation for an otherwise-qualified employee with a disability). "Discrete discriminatory acts are not actionable if time barred, even when they are related to acts allegedly in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *AMTRAK 536 U.S. at 113*. Thus, a plaintiff cannot "use a termination that [falls] within the limitations period to pull in [a] time-barred discriminatory act." *Id.* (citation omitted).

Stuevecke argues that her reasonable accommodation claim should be considered timely because the Medical Center's repeated failure to accommodate her, culminating in her termination, amounted to a "continuing violation." The continuing violation exception to the 300-day filing period provides that if a plaintiff "files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing

Case 2:09-cv-04400-ADS -WDW   Document 29-11   Filed 05/16/11   Page 40 of 41

Page 4
2003 U.S. Dist. LEXIS 14793, *10

policy of discrimination, all claims of acts of discrimination under that policy will be timely [*11] even if they would be untimely standing alone." *Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993); see also Harris v. City of New York, 186 F.3d 243, 248 (2d Cir. 1999)* ("In that situation the existence of such a continuing discriminatory practice or policy may delay the commencement of the statute of limitations period until the last discriminatory act in furtherance of it.") While the continuing violation doctrine is "usually associated with a discriminatory policy[,] ... [a] continuing violation may be found 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001)* (citing *Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir.1994)).*

Rather than allege a policy or practice of discrimination, Stuevecke's complaint points to three separate instances where the hospital allegedly failed to provide her with an accommodation: failing to provide her with a working cart, failing to move her to an office building that had elevators, and failing [*12] to permit her to wear a surgical boot while on duty. It is undisputed, however, that the Medical Center had previously permitted Stuevecke to wear an open-toed boot, that it provided her with a cart (albeit an allegedly ineffective one), and that Stuevecke did not have her doctor's permission to return to work when Praga refused to clear her in June of 1999. Under the circumstances, there is no factual basis for the Court to infer that defendant's actions arose from any explicit or implicit policy or practice to deny disabled employees reasonable accommodations. Accordingly, there was no continuing violation, and Stuevecke's ADA failure to accommodate claim, filed more than 300 days after the claim arose, is time-barred.

### B. Retaliation

As an initial matter, the Medical Center contends that it is entitled to summary judgment on Stuevecke's retaliation claim because Stuevecke did not raise it in her EEOC complaint. Although the Court generally has "no jurisdiction to hear claims not alleged in an employee's EEOC charge[,] ... claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those [*13] that

were filed with the agency." *Shah v. New York State Dep't of Civ. Serv., 168 F.3d 610, 613-14 (2d Cir. 1999).* "A claim raised for the first time in the district court is 'reasonably related' to allegations in an EEOC charge 'where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 83 (2d Cir. 2001)* (citing *Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1402 (2d Cir.1993)).*

Although Stuevecke did not check the "retaliation" box on the EEOC Charge form, her narrative description of the Medical Center's alleged wrongdoing could reasonably have prompted an investigation of retaliatory conduct based on Stuevecke's allegation that "*Instead of allowing me to return to work my former employer placed me on long term disability and subsequently terminated* my services on or about November 16, 1999." Charge of Discrimination, at 1 (emphases added). The Court concludes that Stuevecke's retaliation claim is reasonably related to her EEOC claim of failure [*14] to provide reasonable accommodations, and fell within the scope of the EEOC investigation. Since Stuevecke's termination occurred within the 300 day period preceding the filing of her EEOC complaint, her retaliation claim is timely.

The ADA prohibits "retaliation against any individual who has asserted rights under the ADA[.]" *Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999).* Retaliation claims under the ADA are analyzed under the familiar *McDonnell-Douglas* burden-shifting framework. *See Treglia, 313 F.3d at 719.* To establish a *prima facie* case for retaliation, plaintiff has a *de minimus* burden to prove that: "(1) she engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* If plaintiff carries this burden, the defendant has a burden of production to demonstrate a non-discriminatory reason for its action. *Id.* "The ultimate question is whether the employer intentionally discriminated, and proof that 'the [*15] employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct.' In other words, 'it is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of

2003 U.S. Dist. LEXIS 14793, *15

intentional discrimination.'" *Reeves Sanderson Plumbing Products, Inc. 530 U.S. 133, 146-47, 147 L. Ed. 2d 105, 120 S. Ct. 2097* (citing *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*)).

Assuming, without deciding, that Stuevecke has satisfied the first three elements, the Court concludes that she has not satisfied the causality element. To establish a causal connection between the adverse employment action (her termination) and the protected activity (seeking reasonable accommodation), Stuevecke "must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent." *Treglia, 313 F.3d at 721.*

Stuevecke has not presented facts which would permit a reasonable jury to infer that the decision to fire her was motivated by her request for accommodations. Davin, **[*16]** the director of the Medical Center's Human Resource Department, testified that he terminated Stuevecke to comport with company policy regarding excessive absences and had terminated between two and four dozen employees for precisely the same reason. The Medical Center's policy in this respect was set forth in the employees' handbook, a copy of which Stuevecke had received. There is no evidence that Davin had any knowledge of Praga's June 9, 1999 meeting with Stuevecke or that he terminated Stuevecke for any reason other than absences from work. And while the Second Circuit "has held that a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation[.]" *id.,* the Medical Center's alleged failure to accommodate and Stuevecke's termination occurred more than five months apart -- a period which is too distant to permit a jury to find a causal connection between the two events based on time proximity. *Cf. id., 313 F.3d at 721* (events occurred a month apart); *Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996)* (events occurred twelve **[*17]** days apart). Having failed to make out a *prima facie* case, the Court grants summary judgment in favor of the Medical Center on Stuevecke's retaliation claim under the ADA.

## 2. State Claims

Stuevecke's remaining failure to accommodate and retaliation claims are based on the NYHRL and NYCHRL. Because the parties are not diverse, the Court would have jurisdiction over these claims only by the exercise of supplemental jurisdiction. *See 28 U.S.C. § 1367.* The Supreme Court and Second Circuit have instructed that district courts ordinarily should decline to decide pendent state claims. *See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 98 L. Ed. 2d 720, 108 S. Ct. 614 (1988)* ("In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity - will point towards declining to exercise jurisdiction over the remaining state-law claims."); *Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001)* ("We think that in the absence of any remaining federal claims, **[*18]** the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left of the courts of the State of New York."); *Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998)* ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well."); *see also Sussle v. Sirina Protection Sys. Corp., 269 F. Supp. 2d 285, 2003 U.S. Dist. LEXIS 9627, 2003 WL 21346935, at *26 (S.D.N.Y. 2003)* (declining to exercise supplemental jurisdiction over NYHRL and NYCHRL disability discrimination claims). The Court recognizes that the state courts are better positioned to "decide for themselves whatever questions of state law this case may present," *Giordano, 274 F.3d at 754,* and will not exercise jurisdiction over the remaining claims.

## CONCLUSION

The Court grants summary judgment in favor of the Medical Center as to Stuevecke's accommodation and retaliation claims grounded in the ADA, and declines to exercise supplemental jurisdiction on her claims under the NYHRL and NYCHRL. Accordingly, the complaint is dismissed, but without prejudice **[*19]** as to the non-federal claims.

SO ORDERED.

FREDERIC BLOCK

United States District Judge

August 26, 2003