JOHN K. WELCH

December 8, 2010

91

Welch

1
2  circadian rhythm or alter my circadian rhythm,
3  which is proper overnight sleep.  So they said
4  it would be in my best interest not to work
5  overnight.
6        Q.   Any other ways in which it limits
7  your ability to work at UPS?
8        A.   No.
9        Q.   Does your bipolar disorder limit
10 your ability to work anywhere else?
11       A.   No.
12       Q.   Is there anything in your personal
13 life that you can't do because of your bipolar
14 disorder?
15       A.   No.
16       Q.   Has your bipolar disorder in any way
17 limited your ability to have physical
18 activity?
19       A.   No.
20       Q.   Do you know if UPS at some point
21 became aware of your bipolar disorder?
22       A.   Yes.
23       Q.   Do you know how they became aware?
24       A.   Through the doctors' notes that were
25 returning me to work.



ESQUIRE
an Alexander Gallo Company

Welch

1

2       Q.    Do you know who those notes went to?

3       A.    Probably the district nurse.

4       Q.    Were they sent directly from the

5  doctor?

6       A.    I believe so.

7       Q.    Have you ever had any surgery for

8  your bipolar disorder?

9       A.    No.

10       Q.    Now I think you also mentioned you

11  have suffered from depression and PTSD.

12       A.    Right.

13       Q.    When were those diagnosed?

14       A.    2007.

15       Q.    Who diagnosed those conditions?

16       A.    Veterans Administration.

17       Q.    Was that in the same visit that the

18  bipolar disorder was diagnosed?

19       A.    Right.

20       Q.    Are there any medications you're on

21  for those two conditions?

22       A.    Same.  Same as the bipolar.

23       Q.    Have the medications been as

24  successful with the depression and PTSD as

25  they have been with the bipolar disorder?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

JOHN K. WELCH

December 8, 2010

93

1                        Welch
2        A.    Yes.
3        Q.    Do you suffer any physical effects
4    from either the depression or the PTSD?
5        A.    No.
6        Q.    Does either the depression or PTSD
7    limit your ability to work at UPS?
8        A.    No.
9        Q.    Does either the depression or PTSD
10   limit your ability to work in another job
11   elsewhere?
12       A.    No.
13       Q.    Is there anything in your life that
14   you are unable to do because of the depression
15   or PTSD?
16       A.    No.
17       Q.    Have you ever had surgery for the
18   depression or PTSD?
19       A.    No.
20       Q.    Did UPS learn of your depression and
21   PTSD at the same time it learned of your
22   bipolar?
23       A.    It was the whole ball of wax.  Kind
24   of, it was the first time I went into any
25   psychiatric unit, and it was there that they



ESQUIRE
an Alexander Gallo Company

JOHN K. WELCH

December 8, 2010

107

            Welch

1

2    Q.    Were you ever suspended?

3    A.    No.

4    Q.    Demoted?

5    A.    No.

6    Q.    Injured?

7    A.    No.

8    Q.    So when did you begin working for

9  UPS?

10   A.    Saint Patty's day.  March 17, 1987.

11   Q.    What position were you hired as?

12   A.    I was a loader.

13   Q.    Full time or part time?

14   A.    Part time.

15   Q.    What facility were you working at?

16   A.    Chase Court, C-h-a-s-e, Court.  It

17 was in Brooklyn.  Off Ralph Avenue.

18   Q.    Who was your manager?

19   A.    George Husted, H-u-s-t-e-d.

20   Q.    What were your general job duties?

21   A.    Load trailers.

22   Q.    Do you recall what hours you worked?

23   A.    Yes, 5:30 to 10:00.  5:30 p.m. until

24 about 10:00 p.m.

25   Q.    And what was your next position



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

                     Welch

1
2    after that?
3         A.   I was part-time supervisor.
4    Part-time operations need part-time
5    supervisors, so they hired me as a part-time
6    supervisor.  That was about nine months later.
7         Q.   So maybe still in '87?  '88?
8         A.   Might have been '89, early.
9         Q.   So you were still part time with
10   UPS?
11        A.   Yes.
12        Q.   Do you remember who your manager
13   was?
14        A.   George Husted.
15        Q.   Still the same manager?
16        A.   Yes.
17        Q.   And still at Chase Court?
18        A.   Yes.
19        Q.   Did your hours remain the same?
20        A.   They went up a little, because you
21   had to be in early to prepare and then, at the
22   end, do some action and be reporting.  All and
23   all, it was maybe another -- you went from
24   like four hours to five hours.
25        Q.   Do you recall if your pay rate



ESQUIRE
an Alexander Gallo Company

JOHN K. WELCH

December 8, 2010

109

1              Welch

2   changed with that supervisor position?

3       A.    Yes.  I went from an hourly employee

4   to a salaried employee.

5       Q.    What were your job duties as the

6   supervisor?

7       A.    Supervise unloading.  Loading.

8   Sorting.

9       Q.    Do you recall how many people you

10  supervised?

11      A.    Maybe 15.

12      Q.    What was your next position?

13      A.    Driver.

14      Q.    When did you become a driver?

15      A.    1989.  October 1989.

16      Q.    What circumstances led you to

17  becoming a driver?

18      A.    They wanted me to be a full-time

19  supervisor, and the only way to become a

20  full-time supervisor is obviously you have to

21  know the driver's job.  So they put me in that

22  job for like four months.  I was a driver for

23  four months.

24      Q.    Do you remember who put you in that

25  job?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

111

1                         Welch

2    George?

3         A.    No.   Now I'm reporting to John

4    Cronan.   John Cronan had the whole building.

5         Q.    So you started as a supervisor at

6    Chase Court, and then you moved to Prospect?

7         A.    Right.

8         Q.    So you became a driver in 1989.

9               What were your job duties with that

10   position?

11        A.    Deliver, pick up packages for

12   training route in the Midwood section of

13   Brooklyn.

14        Q.    When you went from supervisor to

15   driver, did your rate of pay change?

16        A.    Yes, it went up.

17        Q.    Do you recall --

18        A.    Because I was a part-time

19   supervisor, and I went up to full-time driver,

20   so it went up to I believe like $17 an hour.

21        Q.    How long were you a driver?

22        A.    Four months.

23        Q.    What position did you have after you

24   were a driver?

25        A.    On-car supervisor.   Basically that's



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    Welch

2    the supervisor of drivers.

3         Q.    Do you remember when you became

4    on-car supervisor?

5         A.    January 1.

6         Q.    Of '90?

7         A.    Of '90.

8         Q.    Who was your manager at that time?

9         A.    John Cronan.

10        Q.    Do you remember what hours you were

11   working?

12        A.    They were unspecified, but probably

13   65 hours.

14        Q.    What was your shift?

15        A.    Oh, like 7:00, 6:30 a.m. until -- if

16   you were the late supervisor, you would be

17   there until 9 o'clock at night, but we try and

18   stagger it where we take care of the unload

19   stuff, and then the early guys would leave

20   6:00 or 5:30, if you were lucky.  Some earlier

21   days.

22        Q.    Going from driver to on-car

23   supervisor, that involved a change in your

24   rate of pay?

25        A.    Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

1               Welch

2      Q.    Were you supervising preload?

3      A.    Yes.

4      Q.    And still on a full-time basis?

5      A.    Yes.

6      Q.    During that time, do you recall what

7   facilities you worked at?

8      A.    Yes.  I worked at -- well, I got you

9   from Chase Court to 29th Street, and

10  29th Street moved to 36th Street, because

11  there was a bigger building there.  We were

12  growing so much through those years, we were

13  just closing buildings left and right and

14  opening up bigger ones.

15             I went to Chase Court, to 29th, to

16  36th Street, then to, finally, to the Foster

17  Avenue facility that's still there today.

18      Q.   Is it at the Foster Avenue facility

19  where you were promoted to manager in 1999?

20      A.    Yes.

21      Q.    Do you know who promoted you to

22  manager?

23      A.    Bruce Pace.  I guess ultimately it

24  was the district manager that Bruce -- I don't

25  know if he had -- you have to bring someone,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

115

```
 1                    Welch
 2   you'd have to explain that, why you want this
 3   person; and the district manager will, along
 4   with I guess the HR manager, would give the
 5   nod.  And so I reported to Bob McCormack, who
 6   was the district manager at the time who
 7   promoted me.
 8        Q.    You reported to Bob in your on-car
 9   supervisor role?
10        A.    No.  He was the district manager
11   responsible for the whole district, all the
12   buildings in the West Long Island district.
13        Q.    Do you recall if you ever had any
14   conversations with Bruce about your promotion?
15        A.    No.  He just said, wear a suit
16   tomorrow, and I did.  And then we went there.
17        Q.    You went where?
18        A.    To the district office in Maspeth.
19   And he was there, and I was promoted.
20        Q.    Was anyone else there, other than
21   Bruce?
22        A.    And Bob McCormack.
23        Q.    The years where you were on-car
24   supervisor from 1990 to 1999, was John your
25   supervisor the entire time?
```



Toll Free: 888.486.4044

ESQUIRE
an Alexander Gallo Company

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    Welch
2        A.    John Cronan?
3        Q.    Yes.
4        A.    No.
5        Q.    At what point did your supervisor
6    change?
7        A.    John Cronan, and then I had Hank
8    Drum.
9        Q.    Do you remember what year he became
10   your supervisor?
11       A.    '92.
12       Q.    1992?
13       A.    And I had Lester Nelson in '93.  I
14   had Anthony Caputo after that, probably in
15   '94.  Bill Burgess, that was probably for two
16   years.  I had -- what year are we up to now?
17   '92, '94?
18       Q.    '96.
19       A.    And then I believe I was on the
20   preload.  Preload manager was Jimmy Collins
21   for a year.  And then I was a supervisor on
22   the local sort, when I was promoted in 1990,
23   and I replaced Leo Cummings.
24       Q.    So what was your official title
25   after the promotion?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

117

Welch

2   A.    Local sort manager.

3   Q.    What were your responsibilities in
4   that position?

5   A.    Local sort manager was responsible
6   for the unloading of all the pickups from the
7   drivers' vehicles.  It was about 300 vehicles,
8   280, maybe, in that building.  The drivers go
9   out in the morning, deliver, they empty their
10  vehicles.  And then at night they come back in
11  full, from doing their pickups.

12          Once they get done with their
13  deliveries they are doing pickups or
14  throughout their day until the point where the
15  deliveries are done and then the vehicle just
16  has pickups in it and the packages that were
17  not delivered, those packages would come back.
18  The ground packages would go to the ground
19  trailers and the air packages would be sorted
20  separately into a trailer that's bound for the
21  airport.  And it also has a small sort, rewrap
22  area, dangerous goods area.

23          So it's kind of -- it's a part-time
24  operation, but it's a full-time need of
25  management on it to the preparation and, you



**ESQUIRE**
an Alexander Gallo Company

1                  Welch
2  know, prior and after it.
3       Q.   When you were promoted to local sort
4  manager, was there an associated rate of pay
5  change?
6       A.   Yeah.  I think my pay went up $400 a
7  month.
8       Q.   Who was your direct manager when you
9  were local sort manager?
10      A.   Bruce Pace.
11      Q.   Do you know who his manager was?
12      A.   Bob McCormack.
13      Q.   Approximately how many people were
14  you supervising in that role?
15      A.   About 175.  Maybe 150.
16      Q.   How long were you in that position?
17      A.   Probably less than a year, because
18  then I had to take over the package center
19  that I was once an on-car supervisor in, the
20  Kensington center.
21      Q.   So was that a job change or just a
22  location change?
23      A.   Just a job change.
24           Prior to becoming a manager on the
25  local sort, I see you got a gap in your page



Welch

there.   That would be Gerrais Gary, who I
reported to prior, that year prior, 19 --

Q.   '98?

A.   Right.

Q.   So '99, local sort manager.  You're
in that position for less than a year.

What was your next position?

A.   Business manager of the Kensington
center.

Q.   What were your job responsibilities
in that role?

A.   Responsible for the daily functions
of the center, the dispatch of about 60
drivers, the delivery, the pickup and all the
controls required to run efficiently auditing,
checking, reports, meetings, things of that
nature.

Q.   What year did you take on that role?

A.   That was nine months after I was
promoted, approximately.  And then nine months
on the local sort and then back to the center.

Q.   So early 2000?

A.   I would think late '99.

Q.   Who was your manager?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Welch

A.   Bruce Pace.

Q.   Was his manager Bob?

A.   Bob McCormack.

Q.   In that change, was there any effect to your pay?

A.   No.  That was a lateral.

Q.   How long were you business manager for the Kensington center?

A.   Maybe about five months, and then I had to go back to the local sort.

Q.   When you say "go back to the local sort"?

A.   Return back.  Take -- giving the Kensington center up and going back to the job I was in prior to the Kensington center.

Q.   So back to the local sort manager job.

A.   Right.

Q.   At what facility?

A.   Same one, Foster Avenue.

Q.   How long were you back at Foster Avenue as local sort manager?

A.   Until August 28, 2000, when I was reduced to supervisor.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

Welch

1

2     Q.    And that was a demotion?

3     A.    Yes.

4     Q.    What position were you moved into?

5     A.    I was moved into preload in Maspeth.

6  The Greenpoint center.

7     Q.    What was your job title?

8     A.    Preload supervisor for the

9  Greenpoint center.

10    Q.    Was there a change of pay associated

11  with that move?

12    A.    No.  There was a -- just a change in

13  the compensation, when you get from supervisor

14  to manager.  A supervisor gets one unit of

15  stock versus where a manager gets two units of

16  stock at the end of the year.

17          And my salary remained the same.

18    Q.    So you were a two unit manager, and

19  then you were demoted to a one unit position?

20    A.    Right.

21    Q.    But the rate of pay was the same?

22    A.    Right.

23    Q.    What's your understanding of the

24  reason for your demotion?

25    A.    I don't know.  I was told because of



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1          Welch

2      A.    A letter I wrote.

3      Q.    Well, it looks like it was something

4 written by Dan Daly on 8/25/2000.

5      A.    Oh, this document here?

6      Q.    Yes, that document.  Exhibit F.  In

7 the to line it's to Jerry McDonough.

8          Do you know who that is?

9      A.    Yes.

10     Q.    Who's Jerry McDonough?

11     A.    He is the district manager who

12 replaced Bob McCormack.

13     Q.    And it looks like Craig Owen is also

14 cc'd.  And then who is G. Gary?

15     A.    Gerrais Gary.  He was the division

16 manager for the Foster Avenue facility.

17     Q.    And this looks like maybe a summary

18 of what we had talked about earlier about the

19 meeting you had had with them.  In the maybe

20 fifth paragraph it says, "I asked John what

21 was the procedure for processing," and it

22 references someone named Rocky Elliott.

23     A.    Right.

24     Q.    Who was Rocky Elliott?

25     A.    Rocky Elliott was a full-time clerk



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

```
 1                    Welch
 2   on the local sort.  He was a damage guy that
 3   just he in my opinion they, I thought they
 4   just taped packages.  That's all he did.  He
 5   went around the building and taped packages.
 6        Q.    Who did Rocky report to?
 7        A.    Me.
 8        Q.    After your demotion, did you ever
 9   complain to anyone about this, the situation
10   and your demotion?
11        A.    Yes.
12        Q.    Who did you complain to?
13        A.    Kent Nelson.
14        Q.    I'm sorry?
15        A.    Nelson.
16        Q.    Who was that?
17        A.    He is the chairman of the board.
18   Chief executive officer.
19              And Leah Sepada.
20        Q.    How did you complain to those two
21   individuals?
22        A.    By way of letter, and I also
23   complained at the point of being demoted.  I
24   said, I explained to Craig Owen and Gerrias
25   Gary that I felt it was, there was unnecessary
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

1  action and that given the training I received
2  and understanding of the whole facts, because
3  none of these packages were packages that were
4  under the charge of Rocky Elliott.  They were
5  packages that Anthony Fisher did.  Packages
6  coming off the road, packages from the preload
7  left over.
8      Q.    What was Anthony Fisher's position?
9      A.    He worked the damage cage.
10     Q.    What was his job title?
11     A.    Clerk.
12     Q.    And who did he report to?
13     A.    James Edgette.  He quit.
14     Q.    Did you replace James?
15     A.    No.  No, James was not replaced.
16     Q.    The letters you sent to Mr. Nelson
17  and Ms. Sepada, do you have copies of those
18  letters?
19     A.    I believe I do, yes.
20  RQ    MS. GRAZIOSO:  I'm just going to
21  request production of those two letters.
22        MS. SINHA:  Yes, taken under
23  advisement.
24     Q.    Do you have any recollection of the



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    Welch
2      chain of command.
3            Q.    So Jerry was Cindy's boss?
4            A.    Yes.
5            Q.    Did she report to him?
6            A.    Yes.
7            Q.    So after your demotion, you were in
8      what roll?
9            A.    Preload supervisor.
10           Q.    How long were you in that position?
11           A.    Probably about eight months.
12           Q.    What facility were you at?
13           A.    Maspeth.  The Island City facility,
14     which is in Maspeth, Queens.
15           Q.    Who were you reporting to?
16           A.    Tony Santoro.
17           Q.    What was your next position after
18     that?
19           A.    I'd like to say something about that
20     job.  I was -- as well as running the preload,
21     I was given Saturday air operation.  My days
22     off were Monday and Wednesday, so every day I
23     worked -- every day I was off, I had to be in
24     bed early to get up to be in work at 9 o'clock
25     in the morning.  My days off were Wednesday



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

135

1                    Welch
2   and Monday.   And I never had two days off
3   together during that period that I was on the
4   preload.
5        Q.   So this is now around 2000, 2001?
6        A.   Yes.
7        Q.   You were there for eight months, and
8   what was your next position?
9        A.   On-car supervisor in the Greenpoint
10  center.
11       Q.   Who was your manager?
12       A.   Manager was Victor, Victor Martini.
13       Q.   How long were you in that role?
14       A.   I was in that role for three years.
15       Q.   What was your role after that?
16       A.   Preload supervisor.   Chase Court.
17  Chase Court.   The long close building.   Foster
18  Avenue.
19       Q.   What year was that?
20       A.   Foster Avenue facility, in 2005.
21       Q.   Who was your manager?
22       A.   Roberto Charles.
23       Q.   How long were you in that role?
24       A.   I was in that role for, I believe it
25  was the remainder of 2000 -- probably midway


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

                        Welch

1
2  of 2005, and then I went back to Greenpoint.
3        Q.    In what position?
4        A.    I worked for Joe Conforti, to do
5  audits at night.
6        Q.    What was your job title?
7        A.    I guess it was p.m. supervisor.
8  Almost like an on-car supervisor but that
9  works later in the day and does p.m. audits.
10       Q.    And that was in 2005?
11       A.    Yes.
12       Q.    How long were you in that role?
13       A.    Probably until the end of 2005.
14       Q.    What position were you in next?
15       A.    CHSP.
16       Q.    What does that stand for?
17       A.    Comprehensive health and safety
18  program.
19       Q.    When did you start in that role?
20       A.    I think January.  It was after the
21  new year.  I don't know how late after the new
22  year, maybe the first or second week.
23       Q.    First or second week of January of
24  2006?
25       A.    Yes.



Toll Free: 888.486.4044

ESQUIRE
an Alexander Gallo Company

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

137

1                          Welch
2          Q.    What was your official job title?
3          A.    CHSP supervisor.
4          Q.    Who did you report to?
5          A.    I reported to Bob Rizzo.
6          Q.    What were your job duties?
7          A.    To ensure the proper compliance and
8    regulatory training of all personnel in the
9    Long Island City facility.
10         Q.    How long were you in that role?
11         A.    Probably ten months.
12         Q.    What was your next position?
13         A.    I was CHSP supervisor of the
14   Melville division.
15         Q.    Same job duties?
16         A.    Yes.
17         Q.    Same supervisor?
18         A.    Yes.
19         Q.    How long were you in that role?
20         A.    Again, it was about maybe seven
21   months.
22         Q.    What was your next position?
23         A.    I worked for the division for a few
24   months doing safety, training drivers of the
25   Melville division.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

December 8, 2010

JOHN K. WELCH

138

1              Welch

2      Q.   Was this in 2007?

3      A.   Yes.

4      Q.   And you said that was for a couple

5  months?

6      A.   Right.

7      Q.   Who did you report to during that

8  time period?

9      A.   Steve Wiederhold, division manager.

10     Q.   What was your next position?

11     A.   Preload supervisor, Manhasset

12  center.

13     Q.   When did you begin in that role?

14     A.   October of that year.

15     Q.   Of '07?

16     A.   Yes.

17     Q.   Who was your supervisor?

18     A.   Joe -- no, Chris Travaglia.  And he

19  was only there for a few weeks before he was

20  replaced by Joe Mero, M-e-r-o.

21     Q.   Do you know who Chris and later Joe

22  reported to?

23     A.   Steve Wiederhold.  Initially James

24  Kirk, and then later on Steve Wiederhold came

25  from Melville, back to the Nassau building



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

1                    Welch
2    where that center is.
3         Q.    How long were you in that role?
4         A.    I was in that role for maybe six
5    months.
6         Q.    What was your next position?
7         A.    The next position, I provided safety
8    training to drivers in the Nassau facility.
9         Q.    What was your official job title?
10        A.    I don't know if there was one,
11   because it was kind of like tailor made for
12   me.
13        Q.    What were your job duties?
14        A.    I was a package inside supervisor.
15        Q.    That's what --
16        A.    That's what the --
17        Q.    -- official?
18        A.    Right.
19        Q.    But you were providing safety
20   training to drivers?
21        A.    Right.
22        Q.    So is that exclusively your job
23   duties?
24        A.    Yes.
25        Q.    Is that full time?


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

1                    Welch

2        A.    Yes.

3        Q.    Who was your supervisor?

4        A.    Steve Wiederhold.

5        Q.    Directly?

6        A.    Yeah.  There was no manager in the

7    middle.  I would work for all managers in the

8    building, based on requirements of meeting,

9    helping them meet their goals at getting

10   everybody trained prior to being expired.

11       Q.    How long were you in that position?

12       A.    Until just -- I just recently came

13   off that job and went to Spring Street, in the

14   capacity of PAS supervisor.  I believe that

15   happened September.

16       Q.    Of this year?

17       A.    Might be, yes.  Like mid-September.

18       Q.    Of 2010?

19       A.    Right.  PAS.  Preload assist.  And I

20   was basically assigned to the industrial

21   engineering department, where I'm implementing

22   the PAS to the Manhattan South building, on

23   West Houston Street.

24       Q.    Who is your manager?

25       A.    Frank Torres.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

1                    Welch

2        A.    Yes.

3        Q.    Do you recall when?

4        A.    It was -- I wasn't told I was

5    suspended.  I was told go home, because you

6    can't meet the material and substantial

7    functions of your job.

8        Q.    So you're referring to times you

9    were placed on leave?

10       A.    Right.

11       Q.    Any disciplinary suspensions?

12       A.    No.

13       Q.    And you're still employed by UPS?

14       A.    Yes.

15       Q.    Have you ever been terminated by

16   UPS?

17       A.    No.

18       Q.    The positions that we kind of

19   outlined, coming from 2000 until today, was

20   there ever a decrease in your pay?

21       A.    No.

22             Well, if you want to consider the

23   compensation of two units to one unit, yes.

24       Q.    In 2000 -- since 2000 going forward,

25   has there been any reduction in your



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

143

1                    Welch
2  eligibility or awards or salary?
3       A.    Perhaps just the tuition
4  reimbursement.
5       Q.    But have you received pay increases
6  every year?
7       A.    Yes.
8       Q.    Have you received your bonus every
9  year?
10       A.    Yes.
11       Q.    Has your pay been docked at all?
12       A.    There's pay I have not received.
13       Q.    But for disciplinary reasons?
14       A.    No.
15       Q.    Have you received any verbal
16  warnings, while working for UPS?
17       A.    I don't know if they were verbal
18  warnings or sit-downs, in 2007.
19       Q.    What were they in reference to?
20       A.    My communication towards the --
21  towards my supervisors.
22       Q.    Who had the sit-down meeting with
23  you?
24       A.    Bob Rizzo and Kevin Dilibero.
25       Q.    Do you recall where the meeting was



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

1                    Welch

2     held?

3          A.   Yes.  Melville human resources.

4     Kevin Dilibero's office.

5          Q.   Other than yourself, Kevin and Bob

6     was anyone else present?

7          A.   No.

8          Q.   What was discussed during the

9     meeting?

10         A.   I know it was discussed about me not

11    being at work one day, but I had communicated

12    the need for that day off.  And when we were

13    going in the office, I didn't know why, but I

14    didn't say anything.  I just listened, and I

15    said fine, I will communicate better.

16              And when we left, I said, Bob, I

17    told you I was off.

18              He goes, don't worry about Kevin.

19    He has ADD.

20         Q.   For purposes of just going forward,

21    just because it's a time issue, I'm going to

22    ask that you try to just respond to my

23    question, because your attorney will have a

24    chance to ask you followups, and I'll give you

25    kind of a catch-all at the end.



ESQUIRE
an Alexander Gallo Company

1        Welch
2        But focusing just on the meeting,
3  what was said, do you recall what Kevin said
4  during the meeting?
5        A.    Things about my timeliness of
6  communicating situations I needed addressed.
7        Q.    What type of situations?
8        A.    If I had to go to court, I needed to
9  let them know early, in advance, so that they
10 could be aware of it.  I guess adjust their
11 schedules accordingly.
12        Q.    Did Mr. Rizzo say anything during
13 this meeting, if you recall?
14        A.    Not much, if any.
15        Q.    Did you have an opportunity to speak
16 during the meeting?
17        A.    Yes.
18        Q.    Do you recall what you said?
19        A.    I'll comply.
20        Q.    Did you raise, during the meeting,
21 any concerns that maybe the meeting was based
22 on misinformation or?
23        A.    I was so confused by even why I was
24 there.  I know there's -- there was a gap, I
25 know there was a lot of work to be done, and I



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    Welch

2   knew that it was a monumental task.  CHSP

3   supervisor can barely miss a day of work.

4   When he comes back from vacation, their head

5   is spinning because it's a living, breathing

6   entity of people coming due and expiring.  And

7   that building was months behind where it

8   needed to be, let alone days.  It was months

9   behind upon my arrival.

10       Q.   So that is all you said during the

11  meeting, I'll comply?

12       A.   Yes.

13       Q.   During your employment with UPS have

14  you ever not showed up for work and not

15  notified anyone?

16       A.   No.  If I was out, it was because I

17  was either in the hospital or had made prior

18  arrangements.  As a CHSP supervisor's job, you

19  can work different hours based on a 24-hour

20  operation.  You're the only one responsible

21  for that building.  It's running around the

22  clock.  If you need to do the local sort, you

23  need to adjust your hours to be there for the

24  local sort.

25       Q.   During your employment with UPS,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    Welch

2    made positive contact and informed him.

3         Q.   Do you know about how long that was

4    after you had been admitted?

5         A.   It was after the -- maybe probably

6    on Tuesday.

7         Q.   Going through your employment

8    history, have any managers or supervisors of

9    yours at UPS ever made any comments to you

10   that you felt were discriminatory on the basis

11   of your disability?

12        A.   Yes.

13        Q.   What comments?

14        A.   Cindy Miller asking about my

15   medication.

16        Q.   What did you feel was discriminatory

17   about that?

18        A.   It's inappropriate to ask.  There's

19   HIPAA laws that I could have refused, but felt

20   under duress, and I told her.

21        Q.   Did you feel that after that

22   conversation Ms. Miller treated you any

23   differently?

24        A.   No.

25        Q.   Did you have any other conversations



ESQUIRE
an Alexander Gallo Company

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

1                           Welch

2    with Ms. Miller about your medications or

3    disability at all?

4         A.    Never.  Never.  Never after that.

5         Q.    That was the only conversation?

6         A.    That was it.

7         Q.    Any other UPS manager or supervisors

8    or employees have ever made any comments you

9    felt were discriminatory on the basis of your

10   disability?

11        A.    Tom Cucce.

12        Q.    What was Mr. Cucce's role?

13        A.    Division manager.

14        Q.    When did he make a comment?

15        A.    2005.  Late 2005.

16        Q.    Was anyone else present?

17        A.    Yes.

18        Q.    Who was present?

19        A.    Supervisor Paul Turner.

20        Q.    What did Mr. Cucce say?

21        A.    I had submitted my request to have

22   that sleep -- I had to go to the sleep study.

23   Here's my document for the sleep study.  And

24   Roberto Charles brought it, obviously, to his

25   division manager to inform him.  He said, send



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

                    Welch

1
2   him up.  I came up there and he said send up
3   Turner too.  Paul Turner has diabetes.
4       Q.   How do you know Mr. Turner has
5   diabetes?
6       A.   Because we worked together on the
7   preload.
8            And after leaving that office, I
9   knew, it was without a doubt that I knew that
10  he had diabetes, because in the conversation
11  we had he said, your diseases are causing me a
12  problem.  I got a choice to make here.  And he
13  put his hands out to his side and to replicate
14  a scale.  I have a choice to make here.  Left
15  hand up, right hand down; right hand up, left
16  hand down.  I have to weigh the facts.  Do I
17  feed my kids or do I feed yours?
18      Q.   What did you take him to mean by
19  that?
20      A.   My disease was causing him a problem
21  in that I could no longer provide what I once
22  provided, service I once provided.  But I
23  believe that that, in essence, is a huge
24  problem that we have.  That we require our
25  manager to put their hands on the packages but



Toll Free: 888.486.4044

ESQUIRE
an Alexander Gallo Company

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

157

Welch

1

2     A.    No.

3     Q.    During the conversations did
4   Mr. Kirk ever specifically reference any of
5   your conditions or medications?

6     A.    Later on he did.  In 2007.  But
7   after I informed him I wouldn't get that DOT
8   card, he changed his relationship with me
9   drastically.

10          The next day I was wearing something
11  that was made by my daughter, eight-year-old
12  girl.  She made me a necklace, red necklace.
13  She braided and gave it to me.  And she said
14  to wear it, so I wore it.

15          And he said, "You got a minute?"

16          I said yes.

17          He said are you going queer on me?
18  I said I beg your pardon.  He said that
19  necklace around your neck.

20    Q.    Was Mr. Kirk a supervisor at this
21  time?

22    A.    He was a division manager.

23    Q.    So was he your supervisor's
24  supervisor?

25    A.    Right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

Welch

1   And then he said -- the following

2   day I still had it on.  At that point I wasn't

3   taking it off.  Not when she gave it to me to

4   wear and I was mentioned in that light.   I

5   wasn't taking it off.

6   Q.   Was anyone present when Mr. Kirk

7   asked you about the necklace?

8   A.   Not that day.  The next day someone

9   was.

10   Q.   Who was present?

11   A.   The next day I was again walking off

12   the line and saw him.  He said, you got a

13   minute?

14   Yes, sir.

15   I thought we talked about this

16   necklace yesterday.

17   I said, we did.  I'm not taking it

18   off.  I said, you have a necklace on your

19   neck.

20   He said, mine is a Catholic cross.

21   I said mine was made by a saint so

22   I'm not taking it off.  And he said, what's it

23   going to be tomorrow, a red dress and pumps?

24   What's it going to be tomorrow, a red dress


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    Welch

2    and pumps?

3         Q.    Who was present during that

4    conversation?

5         A.    Bill Lanus.

6         Q.    What was Mr. Lanus' position?

7         A.    He was the district labor relations

8    manager.

9         Q.    What did you respond to Mr. Kirk?

10        A.    I simply walked away.

11        Q.    At the time when you had this

12   conversation with Mr. Kirk, did you report any

13   of his comments to anyone in human resources

14   or through any --

15        A.    No, not at that time.

16        Q.    Are you aware of UPS's policies

17   regarding harassment and discrimination in the

18   workplace?

19        A.    Yes.

20        Q.    Are you aware of any policies or

21   procedures through which employees can voice

22   concerns?

23        A.    Yes.

24        Q.    Do you know what those policies are,

25   procedures are?



ESQUIRE
an Alexander Gallo Company

1                     Welch

2          A.    Management concern hotline.

3          Q.    What's the hotline?

4          A.    It's a number you can call.  It's an

5    800 number you can call.  I believe they --

6    and then we have just the open door policy

7    where you can just go.

8          Q.    Did you utilize any of those

9    mechanisms after Mr. Kirk's comments?

10         A.    No.

11         Q.    Did you utilize any of those after

12   Ms. Miller's comments?

13         A.    No.

14         Q.    Did you utilize any of those methods

15   after Mr. Cucce's comments?

16         A.    No.  Not immediately.

17         Q.    Any other managers, supervisors or

18   employees that made any comments that you felt

19   were discriminatory on the basis of your --

20         A.    I will stay with Jim Kirk for a

21   little while.

22         Q.    This is all, still would have been

23   2006?

24         A.    Yes.

25               Jim Kirk said to me, after reporting



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

1                      Welch

2      today to see if we still have a job for you.

3      Nothing against you, John.   Just what must be

4      done.   So it was made -- Jim Kirk, the

5      division manager at the time, was made aware

6      of it.   Jim Kirk summoned me to his office,

7      said, you made a big mistake again.   I brought

8      you here to protect you.   They are going to

9      get rid of you.   They don't like people like

10     you.   They don't want you here.

11              Q.    Do you know what he was referring to

12     by your mistake?

13              A.    By informing someone other than him.

14     He could have kept it in-house and perhaps

15     adjusted my schedule.

16              Q.    The fact that you reported your fall

17     to Mr. Ridolfi is what he was referring to?

18              A.    Yes.

19              Q.    What did you respond to Mr. Kirk?

20              A.    I said he was the first one I saw at

21     6:30 in the morning, Mike Ridolfi.   He walked

22     right past my box line.   I said Mike, do you

23     have a minute?   I never fell like that at UPS

24     where I didn't even know if I was still

25     standing and I was laying down.   I thought I

Toll Free: 888.486.4044



ESQUIRE
an Alexander Gallo Company

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

163

                    Welch

1
2  was still standing up, but I was laying down.

3       Q.    What else did you tell Mr. Ridolfi

4  when you told him about your fall?

5       A.    I told him I got dizzy and I fell.

6  I was lifting packages, I got dizzy and I

7  fell.

8       Q.    Did you ask to go home?

9       A.    No.

10      Q.    Did you ask for any kind of medical

11 treatment?

12      A.    No.   The reason I don't ask for

13 help, nor do I question the comments that are

14 made by others at UPS, is because it's every

15 day.   It's every day that I'm last.

16      Q.    So other than the comments that

17 we've gone through already, any other managers

18 or employees make any comments to you that you

19 believe are discriminatory, on the basis of

20 your disability?

21      A.    Yes.

22      Q.    What else?

23      A.    Well, subsequent to Mike Ridolfi,

24 not Kevin Dilibero who informed me that he

25 might not have a job for me.



ESQUIRE
an Alexander Gallo Company

1                    Welch

2        A.    I was at the retirement party of

3   someone that worked for UPS.

4        Q.    Do you know the date?

5        A.    They had retired.  It was in -- I

6   can't give you the date.  But I do know I

7   wrote a letter to that gentleman, upon his

8   retirement, and I have it in my computer, and

9   you can get that date exactly.

10       Q.    Ballpark year?

11       A.    1988.  I know it was winter.  Late

12  '87, early '88.

13  RQ       MS. GRAZIOSO:  For the record, we're

14       going to request a copy of the letter.

15            THE WITNESS:  The letter?

16       Q.    Yes.

17            You said you had a copy of the

18  letter you wrote to the gentleman on your home

19  computer, which would confirm the date?

20       A.    OK.  Fine.

21       Q.    So what did Mr. Ausili say or do?

22       A.    He told me that Kevin Dilibero was

23  going to administratively terminate me from

24  UPS.

25            I said, what, is that terminated or



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

1                Welch

2  not?  What's administratively?

3             He said, when you can't comply or

4  prove you're out of work.  You can't comply

5  with meeting the needs of Aetna or human

6  resources.

7        Q.   I just want to clarify, I think the

8  date, you said '87 or '88, is that accurate?

9        A.   No.  It wasn't that.

10       Q.   Later?

11       A.   '97, '98.  Sorry.

12       Q.   Did Mr. Ausili tell you how he knew

13  that, how he came to have that information?

14       A.   No.

15       Q.   Did you ask him?

16       A.   I was clearly bothered by it that

17  night.  I spoke to people about it.

18       Q.   Did you ask him how he found out

19  that information?

20       A.   No.

21       Q.   Did he tell you if he had spoken to

22  Mr. Dilibero directly?

23       A.   No.

24       Q.   What about that comment did you find

25  to be discriminatory, on the basis of your



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

1           Prior to my arrival that trailer is
2   delivered.  Prior to me doing that job in the
3   last three years its been a driver assigned to
4   that load.  A driver goes to the mall or is
5   dropped off at the mall.  He is met there with
6   a trailer and five, six, seven helpers to help
7   him deliver the load, but yet now it's
8   important that I have to do that job.
9       Q.   What is your current job title?
10      A.   PAS supervisor.
11      Q.   Who did you say you were reporting
12  to?
13      A.   Reporting to Frank Torres.
14      Q.   So what work are you doing at the
15  Manhasset center on a tractor trailer?
16      A.   I was assigned to Manhasset South on
17  Houston Street from September until now.
18      Q.   Still your job?
19      A.   Doing this implementation of this
20  new system.  But during peak season the team
21  folds, obviously because the Super Bowl of UPS
22  is from November and December, and we need
23  everyone available.  So my counterparts are
24  dispatched as helper coordinators, as was I.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1              Welch
2  I was a helper coordinator for four days, at
3  which point, John, you're assigned to the
4  trailer.
5       Q.   Who were you reporting to when you
6  were a helper coordinator?
7       A.   Roberto Charles, Manhasset center
8  manager.
9       Q.   And after those four days?
10      A.   You're now on the trailer.  That's
11 your job.
12      Q.   Who told you that?
13      A.   Roberto Charles.
14      Q.   Did you tell Mr. Charles that you
15 couldn't do that job, because it was outside
16 of your restrictions?
17      A.   Yes.
18      Q.   What did he say to that?
19      A.   Just break the jams.  Keep them
20 moving.
21      Q.   What is breaking jams?
22      A.   Climb that mountain of packages and
23 break the jams on the conveyer belt and the
24 slide coming down.
25      Q.   Did you feel that that would be



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

1                  Welch
2   outside of your medical restrictions?
3        A.   Yes.
4        Q.   Did you tell Mr. Charles that?
5        A.   I informed him I cannot do that.
6        Q.   What did he say?
7        A.   No response.
8             And I even communicated it to him
9   over the DYAD board.  I cannot continue to do
10  this.  I hurt my shoulder.  I don't feel well.
11  I'm -- this whole trailer is mine.  I can't do
12  it anymore.
13       Q.   Did you contact anyone in
14  occupational health or human resources to let
15  them know that you were being assigned a job
16  that was beyond your medical restrictions?
17       A.   No.  They contacted me.
18       Q.   Who contacted you?
19       A.   Beverly Reddick.
20       Q.   What's Ms. Reddick's position?
21       A.   Human resources manager.
22       Q.   What did Ms. Reddick tell you?
23       A.   You are not to work out of your
24  restrictions.
25       Q.   What did you reply to Ms. Reddick?



ESQUIRE
an Alexander Gallo Company

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

1

2      A.    I have been instructed and placed in

3  circumstances in which they -- beyond my

4  control, and told, this is what I must do.  If

5  I am assigned as a driver on the load, I'm a

6  driver.  What does the driver do?

7      Q.    What did Ms. Reddick respond to you?

8      A.    From now, you are not.  If anyone

9  tells you otherwise, you call me.

10      Q.    Have you followed Ms. Reddick's

11  advice?

12      A.    Yes.

13      Q.    So are you still working on a

14  tractor-trailer --

15      A.    Yes.

16      Q.    -- out of Manhasset?

17      A.    Yes.

18      Q.    But within your restrictions?

19      A.    No.

20      Q.    You just testified that you had

21  followed her advice, which was to not work

22  outside of your restrictions, so I'm confused.

23      A.    My restrictions, I do not lift

24  packages now.  But I am held prisoner at that

25  trailer with no relief for as many as 13-,


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                       Welch
2    14-hour days.
3         Q.    Presently, what --
4         A.    It wouldn't be so bad, if I could --
5         Q.    If you could just limit your
6    response to my specific questions, just for
7    the sake of time.
8              What are your current medical
9    restrictions, with respect to time, hours per
10   day?
11        A.    It's supposed to be eight hours.
12        Q.    How is it that you come to be
13   working 13 or 14 hours?
14        A.    I am being forced by circumstances.
15        Q.    How are you being forced by
16   circumstances?
17        A.    I have to stay at that trailer.
18        Q.    Why do you have to stay?
19        A.    Because there's people that are not
20   UPS employees there, and I should be relieved.
21   If I'm starting at 4 o'clock in the morning,
22   to have me report at 4 o'clock in the morning,
23   by the time the trailer leaves, five hours are
24   gone.  The trailers not done until 4:00 or
25   5 o'clock at night.


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

177

1                    Welch

2      Q.    Have you notified anyone on your

3 shift or working alongside you that you have

4 restrictions, and you must leave after eight

5 hours?

6      A.    Yes.

7      Q.    Who have you notified?

8      A.    Roberto Charles.

9      Q.    Have you spoken to Mr. Charles after

10 having spoken to Ms. Reddick?

11     A.    Yes.

12     Q.    Did you tell Mr. Charles what

13 Ms. Reddick said?

14     A.    Yes.

15     Q.    What was Mr. Charles' response?

16     A.    I told him, I am going to make

17 myself available to you by not coming in at

18 4 o'clock in the morning now.  I'll come in at

19 6:00, 6:30, so then I'll be more available on

20 the delivery end, which seems to be more

21 problematic than the front end.  The front end

22 was problematic at one time, because it was

23 insufficiently staffed.  I've corrected that.

24 So now it's sufficiently staffed where I don't

25 need to baby-sit that operation.  So now I can



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

```
 1                    Welch
 2   come in at 6:30.
 3              I could probably come in at
 4   9 o'clock, if need be, and I could stay and
 5   make sure that trailer is done appropriately.
 6   And I was going out with two helpers.
 7        Q.   Coming in later at 6:00 or at 9:00,
 8   would that allow you to be working within your
 9   restrictions?
10        A.   Yes.
11        Q.   Was Mr. Charles receptive to that
12   notion?
13        A.   He said, do what you have to do to
14   stay within your restrictions.
15        Q.   How recently was this conversation
16   with Mr. Charles?
17        A.   Last Thursday.
18        Q.   Since last Thursday have you worked
19   within your restrictions?
20        A.   Well, I went from two helpers to now
21   seven, so they've responded with giving me
22   what I need.
23        Q.   So then from last Thursday until
24   today, you have worked within your
25   restrictions?
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

1                   Welch

2        A.   OK.

3        Q.   Was there any other manager who

4   instructed you to drive your personal vehicle

5   containing UPS packages?

6        A.   Michael Krauss, Victor Martini, Dave

7   Mazzola, Tom Cergorolli.

8        Q.   Do you have any approximation of the

9   time period or the years when these --

10       A.   It was throughout those two years.

11       Q.   Throughout '09 and '08?

12       A.   Yes.

13       Q.   All five of them were during those

14  two years?

15       A.   Yes.

16       Q.   When any of those individuals

17  instructed you to drive your own personal car,

18  did you ever tell them no?

19       A.   No.

20       Q.   Did you ever object?

21       A.   No.

22       Q.   Did you ever say, I think this is

23  discriminatory?

24       A.   No.

25       Q.   Did you ever say, I don't want to?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com