JOHN K. WELCH

December 8, 2010

183

1          Welch

2      A.   No.   I would never say I don't want
3  to.

4      Q.   Did you ever volunteer to drive your
5  personal car to help out with packages?

6      A.   No.

7      Q.   Other than driving your personal
8  vehicle, the actual delivery of the package,
9  was any of that outside of your restrictions?

10     A.   Yes.

11     Q.   Which part?

12     A.   When they were exceeding the weight
13 limitations.

14     Q.   Did you ever object to Mr. Martini,
15 Mr. Charles, Mr. Krauss, Mr. Mazzola or
16 Mr. Cergorolli that these packages that they
17 were asking you to deliver were too heavy and
18 outside of your restrictions?

19     A.   No.

20     Q.   Did you ever complain to anyone in
21 human resources or occupational health that
22 you were being required to deliver packages
23 that were outside of your medical
24 restrictions?

25     A.   I believe I have.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH
December 8, 2010

185

                    Welch
1  are you participating in when you're not
2  telling your managers that these assignments
3  are outside of your medical restrictions?
4       A.    What part am I not --
5       Q.    Are you participating?  Do you
6  consider yourself to be participating in the
7  interactive process that you've described in
8  the ADA?
9       A.    Well, from 2008 forward I informed
10 my attorney, who informs UPS.
11      Q.    But when your manager assigns you a
12 task, do you feel that it's necessary to maybe
13 let him know that certain tasks are beyond
14 your medical restrictions?
15      A.    Yes.   Should be my responsibility.
16      Q.    Now, after you had started talking
17 about driving your personal vehicle, you then
18 started talking about an on-car supervisor
19 position at the Garden City center in July,
20 August, September.
21      A.    Yes.
22      Q.    Is this another example where you
23 feel you were working outside of your medical
24 restrictions?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

1                    Welch
2        A.    Well, I continued to do that on a
3    regular basis.
4        Q.    What were you doing in that
5    position?
6        A.    Supervisors used to supervise.  Now
7    they chase problems.  And our problems are
8    related to errors that occur on the preload,
9    packages that go on the wrong vehicle,
10   packages in the wrong town.  And we don't want
11   to have service failures, so we dispatch
12   supervisors to move them between drivers and
13   from the building when they are not dispatched
14   to drivers.
15        So while I can serve in other
16   capacities, do safety or something else that
17   the company could choose within the
18   restrictions, they keep, like I said,
19   rerouting me back to where I'm at the
20   beginning of the problem, instead of moving
21   forward towards everyone understanding.
22        Q.    What about that job, the on-car
23   supervisor in Garden City, was beyond your
24   medical restrictions?
25        A.    Moving packages.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

187

Welch

1

2    Q.    Were all of the packages over your
3  medical restriction limit?

4    A.    No.  Some days there were none.

5    Q.    So then some days the job was not
6  outside your medical restrictions?

7    A.    Right.

8    Q.    On the days when it was outside your
9  medical restrictions or a package was beyond
10  your medically allowable weight limit, did you
11  notify a coworker or a supervisor?

12    A.    No.

13    Q.    Any other comment or conduct by any
14  employees or supervisors or managers that you
15  felt have been discriminatory on the basis of
16  your disability?

17    A.    I was told to do road tests in
18  the -- with new employees.

19    Q.    When was that?

20    A.    2007.

21    Q.    Why did you feel that was
22  discriminatory, based upon your disability?

23    A.    I didn't think it was
24  discriminatory, because I was never in the
25  vehicle.  But I was chastised by a human


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    Welch

2        Q.    What year was that?

3        A.    2007.

4        Q.    Any other personal issues that may

5    have caused you stress or affected your work

6    performance?

7        A.    No.

8        Q.    I'm going to show you what's been

9    marked as Exhibit G for identification.  You

10   can just take a look at that.

11       A.    OK.

12       Q.    Do you recognize that document?

13       A.    Yes.

14       Q.    Is that a document that you

15   prepared?

16       A.    Yes.

17       Q.    The Bob that is addressed at the

18   top, is that Bob Rizzo?

19       A.    Yes.

20       Q.    Do you have any recollection, do you

21   see any marking on the document that indicates

22   when this was sent to Mr. Rizzo?

23       A.    It was probably in 2007.

24       Q.    Was Mr. Rizzo your manager at the

25   time?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

1

2    A.    Yes.

3    Q.    Do you recall why you wrote this

4 note to Mr. Rizzo?

5    A.    Well, it was a daunting task,

6 because that job had been left vacant for

7 three months.

8    Q.    What job?

9    A.    CHSP.  And I earlier said you can't

10 take a week off without your head spinning on

11 that job.

12         Bob would like to paint the picture

13 that he sent people in to help me.  He sent no

14 one.  Bob would like to paint the picture that

15 I had not communicated time off from him when

16 necessary, and I had.  Even to disrespect his

17 boss upon leaving his office and say he has

18 ADD.

19    Q.    So why did you write this letter to

20 Bob?

21    A.    To inform him that the issues I have

22 in my life are only being compounded by the

23 issues presented by my job.

24    Q.    Just looking at some of the issues

25 going on in your life, I think the first



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH                                December 8, 2010

200

1                     Welch
2    bullet refers to what you mentioned earlier,
3    troubles with your wife?
4         A.   Yes.
5         Q.   You mentioned she had you arrested.
6              On what grounds did she have you
7    arrested?
8         A.   I went to the hospital, and she
9    called the hospital and said he's having
10   issues, psychological issues that need to be
11   addressed, from her perception.  But the
12   issues I was receiving are the issues greatly
13   in part to the pressure receiving at work, the
14   ADA requests not being accommodated.  It only
15   made matters worse.  It felt like my whole
16   world was pressing in on me.
17             And this job.  I have never taken a
18   job at UPS where I couldn't handle it.
19        Q.   So what was her false allegation to
20   the police?
21        A.   She said that he checked himself out
22   of the hospital.
23        Q.   Was this when you were in the
24   Veterans Administration Hospital?
25        A.   Prior to that.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

201

Welch

1

2      Q.    Why were you in the hospital prior

3   to that?

4      A.    I had an arrythmia that scared me.

5      Q.    When was that?

6      A.    March '07 --

7      Q.    How long were you in the hospital?

8      A.    -- and May.

9            I was there a day.  Not even

10  overnight.

11     Q.    And it also mentions in the document

12  that you have been investigated for child

13  abuse.

14     A.    Right.

15     Q.    What were the circumstances

16  surrounding that?

17     A.    Totally false.

18     Q.    Who pressed those charges?

19     A.    She did.  She got an order of

20  protection.  She had -- it was almost like she

21  took it out of the textbook of things to do

22  when you want a divorce.  Child abuse, order

23  of protection, removal by the police.

24           The police took me to the hospital.

25  They didn't take me to the police station,



ESQUIRE
an Alexander Gallo Company

1                        Welch
2      they took me to the hospital.
3           Q.    You mention problems with your
4      nephew.
5                What was going on with him?
6           A.    My nephew, he's probably going to
7      die soon.  He should have been dead already.
8      He has a web in the side of his heart as well
9      as having this disease that took his father's
10     life at 43 years old.
11          Q.    And that caused you great stress?
12          A.    Yeah, it does.
13          Q.    And then you mention your mother,
14     was she ill?
15          A.    Yeah.  She's dead now.
16          Q.    What was wrong with her?
17          A.    Heart failure.
18               And upon informing my district,
19     division manager of the details of this, UPS
20     responded forthwith with no response, as
21     expected.
22          Q.    I'm sorry, can you repeat that?
23          A.    It's customary that UPS send out
24     emails.  It's customary that UPS sent flowers.
25     UPS did nothing.  Further and to make me



ESQUIRE
an Alexander Gallo Company

1                    Welch

2        A.    Yes.

3        Q.    When is the first time you made a

4    request for accommodation?

5        A.    2005.

6              MS. GRAZIOSO:  Can you mark this.

7              (Defendant's Exhibit I,

8        Accommodation Request, marked for

9        identification, as of this date.)

10       Q.    I'm going to show you what's been

11   marked as Exhibit I.  If you could just take a

12   look at that.

13       A.    OK.

14       Q.    Do you recognize the paperwork?

15       A.    Yes, ma'am.

16       Q.    It says this request is a request

17   for accommodation you made in September of

18   2005.

19       A.    Yes.

20       Q.    What accommodation were you seeking?

21       A.    To meet the restrictions of my

22   doctors.

23       Q.    Which were what?

24       A.    Not to lift packages in excess of 30

25   pounds.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

A.    Yes.

Q.    And it says, "On August 23 we received notification that you requested a job related accommodation."

Is that not accurate?

A.    That's accurate.

Q.    So whom did you request a job-related accommodation from?

A.    I would think that it was James Kirk, who I reported to.

Q.    Do you recall what precipitated your request for an accommodation?

A.    The fact that I couldn't get a DOT card and ride the on-car job in its entirety.

Q.    What accommodation were you seeking with this request?

A.    I would have stayed as an on-car supervisor and stayed within my restriction limits successfully, just because of my relationship with the rank and file, teamsters and their leadership.

Q.    Do you recall what your doctor certified to be your medical restrictions at this time?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    Welch

2        A.   Yes.

3        Q.   What were they?

4        A.   They're right here.  Not able to

5   lift more than 30 pounds.  Should avoid

6   extremes of exertion.  Light duties.

7        Q.   Did you ever meet with anyone in HR

8   to discuss this accommodation request?

9        A.   Franco, the only one.

10            Actually upon being -- this came

11   after my transfer to the CHSP, which was my

12   accommodation, so, so I was told.  I was told

13   by Kevin, you got a job that's going to be in

14   line with your restrictions.  This is going to

15   be a good job for you.  You have a lot of

16   experience, well-liked, and people will

17   respond well, and you'll be successful in it.

18        Q.   Did you feel that that was an

19   accommodation in response to your request,

20   that position?

21        A.   Yes.  And then this came weeks

22   afterwards.

23        Q.   So the documentation kind of

24   postdated the actual discussion?

25        A.   Right.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

1                    Welch

2       Q.   So what was your understanding of

3  the resolution of your September 2005 request

4  for accommodation?

5       A.   That I was accommodated.

6       Q.   That it was granted?

7       A.   Yes.

8       Q.   Did you, in fact -- were you, in

9  fact, transferred to a CHSP position?

10      A.   Yes.

11      Q.   Did that position meet your medical

12  restrictions?

13      A.   Yes, but it did not stand on its

14  own.

15      Q.   What does that mean?

16      A.   This, this accommodation did not

17  follow the proper channels in its entirety,

18  and, therefore, the attention it required did

19  not get, which led to the subsequent

20  violations of my request.  As proof of the

21  document needing signatures in 17 boxes, and

22  yet it only received two.  So the level of,

23  the level of involvement of human resources

24  was, once again, superficial from the

25  beginning of the ADA process.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH
December 8, 2010

211

1              Welch
2       through D0572, marked for
3       identification, as of this date.)
4       Q.   I'm going to show you what's been
5   marked as Exhibit J for identification.  If
6   you could take a look at it.
7       A.   Yes.
8       Q.   What is this document?
9       A.   It's a subsequent accommodation
10  request precipitated by my blackout,
11  facilitated by being moved out of the job
12  which originally provided me restrictions.
13      Q.   What accommodation were you seeking?
14      A.   So if I identified condition
15  hypertropic cardiomyopathy, sleep apnea,
16  restless leg syndrome.  Current limitations,
17  the HCM.  No lifting of over 40-pound package.
18  Not to include --
19          MS. SINHA:  Speak up.
20      A.   (Continuing) No lifting over
21  40-pound packages and not to include
22  repetitious lifting.  Sleep apnea.  Sleep
23  study at St. Luke's.  Restless leg syndrome.
24      Q.   The question was, what accommodation
25  were you seeking?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

1                           Welch
2          A.    Relief from excess hours.  Relief
3    from lifting.
4          Q.    Who did you request this
5    accommodation from?
6          A.    Mike Ridolfi.
7                Well, I didn't request it.  He
8    requested it.
9          Q.    He gave you the ADA paperwork?
10         A.    He said, you have to fill out
11   another one.
12         Q.    Which physician of yours filled out
13   this document?
14               It looks like there might be a
15   signature on page 5.
16         A.    Mark Sherrid.
17         Q.    Did you visit with Dr. Sherrid, in
18   response to this request, before he filled out
19   the form?
20         A.    No.
21         Q.    Did you have a conversation with
22   Mr. Sherrid?
23         A.    No.
24         Q.    Did you suggest to Mr. Sherrid what
25   your restrictions should be?


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

213

Welch

1

2      A.    No.   He already knew what they were,
3  because he had communicated numerous times.
4      Q.    Did you have any meeting with anyone
5  at HR, a checklist meeting to discuss your
6  request for accommodation?
7      A.    I believe after this was filled out,
8  then we had a checklist meeting.
9      Q.    Who was at the meeting?
10     A.    The original meeting was Wendy
11 Marshall and Mike Ridolfi, and I don't believe
12 that Wendy was there for the second one.
13     Q.    There was two separate meetings?
14     A.    There's -- the checklist meeting was
15 after that.
16     Q.    After what?
17     A.    After the initial filling out of the
18 ADA.
19     Q.    So you met with someone at HR when
20 you filled out the forms?
21     A.    Yes.
22     Q.    And that was Wendy Marshall?
23     A.    Wendy Marshall and Mike Ridolfi.
24     Q.    And then later there was a checklist
25 meeting?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

214

                        Welch

1

2       A.    Yes.

3       Q.    Who attended that?

4       A.    I know Mike Ridolfi was involved in

5  the checklist.  It might not have been Wendy

6  Marshall on a second one.  It might have been

7  Irene Gordon, I'm not sure.

8            I've filled out numerous of these.

9       Q.    What do you recall having been

10  discussed during the checklist meeting?

11      A.    I don't really recall anything.  I'm

12  sorry.

13      Q.    Do you recall mentioning at all that

14  your sleep apnea had been resolved, at any

15  point during the meeting?

16      A.    Yes.  I believe it had, because I

17  had the sleep study, and they adjusted the

18  airway pressure, and it seemed to be resolved.

19      Q.    Do you recall mentioning anything

20  about your restless leg syndrome and the

21  status of that impairment?

22      A.    Restless leg is -- speaks just

23  solely to the fact that when I take the

24  Mirapex, I don't have restless legs.

25      Q.    Do you recall if you mentioned that



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

JOHN K. WELCH

December 8, 2010

215

1              Welch

2    at all during the checklist meeting?

3        A.    Perhaps.

4        Q.    What do you recall as the resolution

5    of this request for accommodation?

6        A.    I remained working in the capacity

7    of doing the safety training of drivers.

8        Q.    When you say you "remained," when

9    did you start doing that?

10       A.    About July.

11       Q.    Of 2007?

12       A.    Yes.

13       Q.    Before or after you requested the

14   accommodation?

15       A.    After.

16       Q.    So were you placed back into a

17   health and safety training role --

18       A.    Right.

19       Q.    -- in response to your --

20       A.    It wasn't CHSP, where I would be

21   doing the compliance end of it, but actually

22   the on-road annual certification of drivers.

23   Following up on some accidents, going out with

24   drivers that had accidents and injuries.

25       Q.    Were you transferred to that



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1              Welch

2    position as a result of your request for

3    accommodation?

4         A.   Either that, or it was a temporary

5    thing until something else was made available.

6         Q.   Did that position meet your medical

7    restrictions?

8         A.   Yes.

9         Q.   Did you file any other requests for

10   accommodation with UPS?

11        A.   No, I don't believe I did.

12             I know that they're requesting one

13   now, that I fill out another one.

14        Q.   When was that?

15        A.   I've just been made aware of it

16   through Rashmee.

17        Q.   So was that this year?

18        A.   Yes.

19             (Continued on the following page.)

20

21

22

23

24

25



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

**Certified Copy**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOHN WELCH,

       Plaintiff(s),

   vs.

                                   09-CV-04400(ADS)(WDW)

UNITED PARCEL SERVICE, INC.,
d/b/a UPS,

       Defendant(s).

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF**

**JOHN K. WELCH**

**VOLUME II**

January 11, 2011
10:05 a.m.

Seven Times Square
New York, New York

Steven Neil Cohen, RPR



Toll Free: 888.486.4044
Telephone:

2700 Centennial Tower
101 Marietta Street
Atlanta GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

229

1                         Welch
2      your ability to testify truthfully?
3            A.     No.
4            Q.     Prior to when we started the
5      deposition on the first day I gave you a set
6      of instructions about answering orally and
7      using verbal words rather than any gestures
8      that the court reporter can't pick up.
9                  Do you have any questions about
10     those instructions or do you remember them?
11           A.     I remember them.
12           Q.     Now, when we left off last time we
13     had been talking about in 2007 you had made
14     a request for accommodation with UPS and had
15     been put into a position doing safety
16     training for drivers?
17           A.     Yes.
18           Q.     Do you recall how long you were in
19     that position?
20           A.     Six months.
21           Q.     Do you recall the span of time
22     that that was?
23           A.     July to December.
24           Q.     Of 2007?
25           A.     Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

John K. Welch - Volume II

January 11, 2011

230

Welch

1
2  Q.      What happened in December of 2007?
3  A.      It was approaching the end of the
4  period unbeknown to me that I was told I
5  was -- by human resources manager Mike
6  Ridolfi, I believe health and safety manager
7  at the time, said the clock was ticking and
8  that I had to present documentation to
9  support my ongoing disability.
10  Q.      Do you know what he meant by the
11  clock is ticking?
12  A.      I now know.  It was later
13  explained to me.
14  Q.      Who explained it to you?
15  A.      Mike.
16  Q.      And what did he explain that to
17  mean?
18  A.      I was on restrictive duty at the
19  time and that I would now be required to go
20  on long-term disability when that period
21  expired, I believe early January or late
22  December.
23  Q.      During the time that you were on
24  restrictive duty were you receiving any
25  income supplement from Aetna or UPS?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

1

2    A.    I was receiving my regular

3    paychecks in each period.

4        Q.    Full pay?

5        A.    Yes.

6        Q.    When did these conversations with

7    Mr. Ridolfi occur?

8        A.    December.

9        Q.    2007?

10       A.    Yes.

11       Q.    Did you go -- did you take any

12   leave of absence from work in January of

13   2008?

14       A.    Yes.

15       Q.    Do you recall from what time to

16   what time?

17       A.    January, I believe it was the

18   early period, early portion of the month to

19   around the 22nd.

20       Q.    What was the reason for that leave

21   of absence?

22       A.    Well, initially I had -- the ADA

23   request was specific to what we have already

24   spoken about but this was something that was

25   unrelated.  The device that I have in my



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

1          Welch

2     Defendant's Exhibit N.

3          (Request for accommodation of

4     January 2010 was marked Defendant's Exhibit

5     N for identification)

6     BY MS. GRAZIOSO:

7          Q.    I will show you what has been

8     marked as DN.  You can take a minute to look

9     it over.  It might just refresh your

10    recollection as to when you requested the

11    accommodation.

12          Looking at that do you recall when

13    you may have requested an accommodation in

14    2010?

15          A.    It says January.

16          Q.    Okay.  Do you recall who you

17    requested an accommodation to?

18          A.    No.

19          Q.    Okay.  What job were you working

20    in at that time for UPS?

21          A.    Safety.

22          Q.    CHSP?

23          A.    CHSP.

24          Q.    Who were you reporting to?

25          A.    2010 -- let me back that statement



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

off.   I was package inside supervisor but doing safety training.

Q.      Who were you reporting to?

A.      Steve Wiederhold.

Q.      And did that job meet your medical restrictions?

A.      When they allowed it barring bringing out packages, being taken from that job to go to other places to work like Brooklyn during the holidays and Maspeth during the holidays.

Q.      When were you taken from that job to work on other jobs?

A.      Routinely.  Just to bring out packages.

Q.      On a one-day basis, on an assignment basis?

A.      Yes.  Just when problems arise.

Q.      Do you know how frequently that occurred?

A.      At some points, everyday.

Q.      Can you give me any examples of times you were asked to go work somewhere else?


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

1

2      A.    While assigned to the centers

3  doing safety they had operational

4  difficulties and they told me to not do

5  safety and to handle those situations.

6      Q.    What situations?

7      A.    Packages not dispatched, packages

8  on wrong vehicles, go to Brooklyn and work

9  for Rosh Hashanah, Yom Kippur.

10      Q.    Who would tell you to do these

11  things?

12      A.    Steve.  Well, in general it would

13  be centers, it would be the center manager

14  and when I had to leave the building it

15  would be Steve that would tell me to go

16  there, Steve Wiederhold.

17      Q.    Let's take them one at a time.

18          At the time you were in the center

19  there to do safety and there was an

20  operational problem can you give me an

21  example of a center manager who asked you to

22  assist in the operational problem?

23      A.    Victor Martini, Michael Krause.

24      Q.    Anyone else?

25      A.    David Mazzola, Roberto Charles.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

1
2 The center managers you talked about who had
3 sent you from the center to go do
4 operational work within the building, on any
5 of those occasions when any one of those
6 individuals you listed, five individuals,
7 when they asked you to do that did you tell
8 any of them that you couldn't?
9      A.     I followed their instructions.
10      Q.     Did you notify any of them about
11 your medical restrictions?
12      A.     They all know.
13      Q.     How do you know they know?
14      A.     Because they know I can't drive a
15 commercial vehicle which is why they tell me
16 to go get my car.
17      Q.     Do they know -- is that the only
18 medical restriction they are aware of?
19      A.     I don't know.  You might have to
20 ask them.
21      Q.     Did you ever tell any of those
22 managers that you can't lift packages in
23 excess of 30 or 40 pounds?
24      A.     Yes.
25      Q.     Who did you tell?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

1
2      A.     Dave Mazzola.

3      Q.     Do you recall what Mr. Mazzola's
4  response was?

5      A.     He said, "If you can't do it don't
6  take it."

7      Q.     So did you do the assignment
8  anyway?

9      A.     Those that I could take, yes.   Or
10  they would say have the driver remove it
11  from the vehicle.

12      Q.     Do you recall who specifically
13  said that?

14      A.     Billy Kyles which I didn't mention
15  earlier.

16      Q.     Kyles?

17      A.     K-Y-L-E-S.

18      Q.     Is Mr. Kyles -- did you tell
19  Mr. Kyles about your medical restrictions?

20      A.     Yes.

21      Q.     He instructed you to have the
22  driver lift any packages that were outside
23  of those restrictions?

24      A.     Right.

25      Q.     Did you do that?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

1

2      A.      Yes.

3      Q.      Any of these managers, now six

4  that you mentioned, who you told about your

5  restrictions who didn't give you some sort

6  of suggestion?

7      A.      Most of them don't say anything.

8  They just say take these, bring them out to

9  the driver.

10     Q.      So which of the six managers do

11  you specifically recall telling in light of

12  an assignment that you couldn't do it or

13  that it was beyond your medical

14  restrictions?  You mentioned Dave Mazzola.

15     A.      Mike Krause, Roberto Charles.  The

16  division manager told me -- that told me I

17  am here to work is Joe Reimo, R-E-I-M-O.

18     Q.      What did Mr. Charles say when you

19  told him that the assignment he gave you was

20  outside of his medical restrictions?

21     A.      He said nothing, do it.

22     Q.      Okay.  And what about Mr. Krause?

23     A.      Do it.

24     Q.      Okay.  So only Mr. Mazzola and

25  Mr. Kyles made other suggestions?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

                          Welch
1
2          Q.      Was Mr. Charles available for you
3    to speak to during these times?
4          A.      No.
5          Q.      So after peak what position did
6    you return to?
7          A.      Industrial engineering, PAS,
8    preload assist.
9          Q.      Is that the position you are still
10   currently in?
11         A.      Yes.
12         Q.      Okay.  Going back to your 2010
13   accommodation we looked at that letter which
14   looks to say you submitted your request in
15   January of 2010?
16         A.      Yes.
17         Q.      Do you recall when you submitted
18   the documentation that UPS asked for in
19   order to evaluate your accommodation?
20         A.      No.
21              MS. GRAZIOSO:  Mark this O.
22              (Documentation from Dr. Mark
23   Sherrid of March 11, 2010 was marked
24   Defendant's Exhibit O for identification)
25



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                         Welch

2     BY MS. GRAZIOSO:

3          Q.     I will show you what has been

4     marked as Exhibit O.   If you want to take a

5     minute and look through it.

6          A.     Okay.

7          Q.     Do you recognize this document?

8          A.     Yes.

9          Q.     What is this document?

10         A.     It is a supporting documentation

11    from Dr. Mark Sherrid.

12         Q.     Okay.   And according to the

13    documents Dr. Sherrid provided what are your

14    medical restrictions?

15         A.     No lifting more than 20 pounds.

16    Should not operate heavy machinery.   Should

17    not drive heavy trucks as he has cardiac

18    defibrilator pacemaker.   He has hypertrophic

19    cardiomyopathy also known as HCM, sleep

20    apnea, restless leg syndrome, has internal

21    cardiac defibrilator and pacemaker, reached

22    diagnosis or condition identified in

23    question 3 above, describe in detail the

24    degree or extent of the job restrictions and

25    state the known or expected duration of the



272

Welch

1
2      job restrictions.  HCM cannot do extremes of
3      exertion, lifting which would raise blood
4      pressure and put more stress on the heart.
5      Also lifting weights can -- this is the
6      doctor that wrote this.
7           Q.    Yes.  You don't need to read the
8      whole thing.  I am just trying to get a
9      sense of the restrictions which maybe is in
10     Section B or the first question answered,
11     question 2?
12          A.    No lifting more than 20 pounds.
13     Should not operate heavy machinery.  Should
14     not drive heavy trucks as he has an
15     implanted, internal cardiac defibrilator and
16     pacemaker.
17          Q.    It looks like Dr. Sherrid signed
18     this on March 11, 2010?
19          A.    Yes.
20          Q.    So from getting the paperwork in
21     January to Dr. Sherrid filling this out in
22     March did you visit Dr. Sherrid at all?
23          A.    No.
24          Q.    Did he examine you?
25          A.    No.



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Welch

1

2   Q.     Did you have any communication

3   with Dr. Sherrid during that three-month

4   period?

5   A.     No.

6   Q.     Send him any letters?

7   A.     No.

8   Q.     Any phone calls?

9   A.     Not to the best of my knowledge.

10  Q.     If you would look at document

11  marked D01032, it has job functions and some

12  handwriting on it.

13  A.     Okay.

14  Q.     This looks to be a listing of job

15  responsibilities for the operation

16  supervisor manager position?

17  A.     Right.

18  Q.     Whose handwriting is on the

19  document?

20  A.     Mine.

21  Q.     Your handwriting.  What was the

22  purpose of your handwriting?

23  A.     Just to validate what I can and

24  can't do based on the essential functions

25  listed here.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

274

Welch

2  Q.    What did you base that
3  determination on?
4  A.    My belief and understanding of my
5  restrictions.
6  Q.    Based upon what?
7  A.    Doctors' notes.
8  Q.    Did you send a copy of this to
9  Dr. Sherrid with the paperwork to be filled
10 out?
11 A.    No.
12 Q.    Did Dr. Sherrid ever see this
13 document?
14 A.    No.
15 Q.    So where you write, "Nine-hour
16 restriction no overnight shifts," that is
17 your handwriting?
18 A.    Yes.
19 Q.    Not Dr. Sherrid's handwriting?
20 A.    Right.  That is mine.
21 Q.    Up top, "John Welch, package
22 inside supervisor" and a number, that is
23 your handwriting?
24 A.    Yes.
25 Q.    Did you ever discuss this list of



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                          Welch
2       job functions with Dr. Sherrid?
3            A.    No.
4            Q.    After you submitted this
5       documentation do you recall having a meeting
6       with anyone from UPS regarding your
7       accommodation request?
8            A.    No.
9            Q.    Did you ever meet with anyone from
10      human resources to discuss the paperwork you
11      submitted?
12           A.    There have been so many, I just
13      have no recollection of this specific event.
14                 I do remember HR representative,
15      Karen Francis meeting with me.
16           Q.    Do you recall when that was?
17           A.    No.  It was I guess subsequent to
18      that.
19           Q.    What did you and Ms. Francis
20      discuss?
21           A.    She was just going over the ADA
22      request.  That is what she said she wanted
23      to do, go over the ADA request.
24           Q.    Okay.  What did you discuss with
25      her?



276

Welch

1

2      A.      Things I can and can't do, self --

3    she said it was a self-perceived disability.

4    I didn't understand that question.

5      Q.      Did you ask her what that meant?

6      A.      No.  I just figured it was jargon

7    that she uses in her field.

8      Q.      Did you discuss the paperwork you

9    had submitted during that meeting?

10     A.      Yes.

11     Q.      Was anyone else present?

12     A.      I think the nurse was there.

13     Q.      Ms. Gordon?

14     A.      Yes.

15     Q.      Do you recall where the meeting

16   took place?

17     A.      It took place in Nassau.

18     Q.      Somebody's office?

19     A.      In the help office.

20     Q.      So Ms. Gordon, Ms. Francis and

21   yourself were the only ones present?

22     A.      Yes.

23     Q.      Did they ask you any type of

24   questions during the meeting?

25     A.      What I believe my restrictions


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

277

                            Welch

2    were.

3        Q.     Okay.  And what did you tell them?

4        A.     I told them about the restriction

5    of my hours, I said I am told I have a

6    nine-hour restriction.

7        Q.     Who told you you had a nine-hour

8    restriction?

9        A.     Irene.

10       Q.     What else did you discuss with

11   them?

12       A.     The lifting and any other jobs

13   that I feel I might be able to do.

14       Q.     They discussed those with you?

15       A.     Yes.

16       Q.     Did they ask you for your input?

17       A.     Yes.

18       Q.     What did you tell them?

19       A.     They asked me, can you do this,

20   can you do that, they asked me if I could

21   work in the hub.  I said I don't see why

22   not.

23       Q.     Do you remember what other ideas

24   they asked you?

25       A.     I threw out there to IE,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

278

1                        Welch
2    industrial engineering.
3        Q.    What other jobs did you discuss
4    during that meeting, hub, IE, anything else?
5        A.    I don't believe any others.
6        Q.    How did that meeting conclude?
7        A.    They said they would -- they said
8    it was just a matter of protocol.  They had
9    to fill it out and send it on its way for
10   approval.
11       Q.    Did you ever have any further
12   conversations with anyone from human
13   resources?
14       A.    No.  I saw Irene from time to
15   time, just asked how I was doing.
16       Q.    Did you get any further
17   communications about your request for
18   accommodation?
19       A.    No.
20       Q.    Did you ever have any
21   conversations with Bev Riddick about your
22   request for accommodation?
23       A.    Yes.  I didn't know if it was a
24   request or if in fact she was telling me
25   that in response to my request for



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Case 2:09-cv-04400-ADS -WDW   Document 29-14   Filed 05/16/11   Page 39 of 50

279

Welch

2  accommodation but she said that she called

3  me up and left a message on my phone.  She

4  said --

5      Q.     When was this?

6      A.     The summer of 2010 probably.

7             She told me that just want to

8  discuss with you a few jobs or opportunities

9  for you and she offered me, when I called

10  her she said we could -- the only thing we

11  have for you is administrative, not stock,

12  not an MIP job and the only thing available

13  would be the PAS in Manhattan.

14      Q.     Okay.

15      A.     So I said I would do that.  She

16  said I will let you think about it.  I said

17  I don't have to think about it.  I just

18  can't go backwards.  I will stay, take what

19  you have to offer in the same capacity.  So

20  she said I will get back to you and she

21  called me back afterward and said, okay, you

22  are going to be going to Manhattan south.

23      Q.     What is the -- this is in PAS?

24      A.     Yes.

25      Q.     What is the PAS position?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

                              Welch

    A.      PAS is IE function.  It is the
implementation of a new technology on
preload and also on road, it basically makes
a package smart.  It improves our system and
it requires a lot of data input and requires
a lot of studying of routes and reorganizing
routes, talking with drivers and it is a
pretty lengthy process but in the end it is
something beneficial to the company.

    Q.      What is your job title?

    A.      PAS supervisor.

    Q.      What are your actual job duties?

    A.      Right now I am assigned to --
there is so much that we do and I am new at
it.  I sit with supervisors and discuss
routes that are presently running, what they
are going to be running in the future.  I
will then map out the new routes.

              I will research the address
ranges, will go into our system and break
down those address ranges, assign pickups,
basically building a loop system.  A loop
system is when we -- it is almost as if the
whole route, the whole center is one



281

                         Welch

1
2       continuous route that feeds into each other.
3       It is a little technical to explain and
4       probably not really of any value here.
5            Q.    So you began in that position
6       around September 2010?
7            A.    Yes.
8            Q.    You are still in that position
9       now?
10           A.    Yes.
11           Q.    Who do you report to?
12           A.    Frank Torres.
13           Q.    Does that job meet your medical
14      restrictions?
15           A.    Yes.
16                 MS. GRAZIOSO:  I will mark this as
17      P.
18                 (Letter from Ms. Riddick was
19      marked Defendant's Exhibit P for
20      identification)
21      BY MS. GRAZIOSO:
22           Q.    I will show you what has been
23      marked as P.
24                 Do you want to take a second and
25      look that over?



ESQUIRE
an Alexander Gallo Company

282

                              Welch

1

2        A.      Okay.

3        Q.      Do you recognize that document?

4        A.      Yes.

5        Q.      What is that document?

6        A.       It is confirming that they would

7    move me to that job.

8        Q.      Does Ms. Riddick make any mention

9    here for a request for accommodation?

10       A.      Yes.

11       Q.      What does she say?

12       A.      Let me read it before I say it out

13   load.

14       Q.      You can paraphrase.  You don't

15   have to read it.

16       A.      This letter is just confirming the

17   telephone conversation in which I had made a

18   request for a job-related accommodation but

19   it says here it is not to be construed as an

20   admission that the company is obligated

21   contractually legally or otherwise to

22   provide you with a job-related

23   accommodation.

24       Q.      Was it your understanding that

25   Ms. Riddick offered you this position in



ESQUIRE
an Alexander Gallo Company

283

                          Welch

1
2    reference to the letter in response to your
3    request for an accommodation?
4         A.    Yes.
5         Q.    You accepted this new position?
6         A.    Yes.
7         Q.    This new position met your medical
8    restrictions?
9         A.    Yes.
10        Q.    So did you feel upon accepting
11   your new position that your 2010 request for
12   accommodation had been granted?
13        A.    Yes.  Maybe it is a culmination of
14   all of them and finally being able to say
15   let's put this to bed after a few years of
16   not being able to get it done.
17             MS. GRAZIOSO:  This is probably a
18        good time for a five-minute break.
19             (Recess)
20   BY MS. GRAZIOSO:
21        Q.    Mr. Welch, we are going to talk a
22   little bit now about some of the allegations
23   that you have in your complaint.
24        A.    Yes.
25             MS. GRAZIOSO:  Would you mark this



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1                    Welch
2          Do you know which managers you
3     e-mailed?
4          A.    Maybe Kevin might have been.
5          Q.    DiLibero?
6          A.    Yes.  Ridolfi.  If any others it
7     would have been Doug Trandiak,
8     T-R-A-N-D-I-A-K.
9          Q.    Do you recall if you got a
10    response from any of the individuals you
11    e-mailed?
12         A.    I believe I got a response but the
13    response was something I didn't expect.  It
14    was an overall response of everything, you
15    know, all my complaints and claims.
16         Q.    Did the response specifically
17    address your tuition reimbursement issue?
18         A.    Yes.  But not to my understanding.
19    There are rules for things such as being out
20    of work but -- which I totally agree but
21    when someone doesn't ask to be out of work
22    or when someone is forced out of work they
23    can't stay in work and therefore be active
24    to receive tuition reimbursement which was
25    my complaint.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

295

Welch

2  Q.    So was their response then that
3  your tuition reimbursement was denied
4  because you were inactive during that time
5  period?

6  A.    Yes.

7  Q.    Do you recall what the response
8  was to any of your other complaints?  I
9  think you stated it covered a couple of
10  areas.

11  A.    Yes.  Most of them were just I
12  complained about discrimination,
13  retaliation, specific incidences and every
14  one of them was investigated and found to be
15  untrue.

16  Q.    Do you know who investigated them?

17  A.    I believe Doug Trandiak.

18  Q.    So you made an internal complaint
19  of discrimination based upon some conduct
20  that had happened and do you remember what
21  specifically your complaints were?

22  A.    To start off with being told by
23  the division manager, I don't have a job for
24  someone like you, your disease is causing me
25  a problem.



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

John K. Welch - Volume II                    January 11, 2011

299

                        Welch

1
2    what you are taking, I am understanding you
3    have a lack of intensity and then as soon as
4    the word intensity came out, that was I was
5    told and then it was my -- it was rather
6    Tom's words that had mentioned earlier that
7    it was my lack of intensity.
8        Q.    When about was this, year-wise?
9        A.    2007 -- no.  Let me back it up.
10   2000.
11       Q.    2000.  Any other complaint that
12   you made to Kevin at that time?
13       A.     I think I complained about the ADA
14   process being interactive and me not being
15   able to navigate it and being told I am
16   always doing something wrong and bottom line
17   is when I am asked to do something I
18   shouldn't have to protect myself but rather
19   the company protect me by making sure there
20   is a red flag that happens when they say for
21   me to do something.
22       Q.    Any other complaints?
23       A.    No.
24       Q.    So these complaints you made to
25   Kevin and they were investigated by Doug



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

John K. Welch - Volume II                    January 11, 2011

300

Welch

2  Trandiak?

3      A.      Yes.

4      Q.      The result of Doug's investigation

5  was that he found them to be untrue, I think

6  is the word you used?

7      A.      Right.  Either untrue or not

8  accepting responsibility for having done

9  anything wrong.

10      Q.      How did you learn the outcome of

11  Mr. Trandiak's investigation?

12      A.      In a meeting.

13      Q.      Who was in this meeting?

14      A.      Kevin DiLibero, Steve Wiederhold,

15  Joe Mero, M-E-R-O, Doug Trandiak, myself.

16      Q.      Okay.  Do you recall when the

17  meeting was?

18      A.      2009 January.

19      Q.      Do you know where the meeting took

20  place?

21      A.      In Nassau, division manager's

22  office, Steve Wiederhold's office.

23      Q.      What was discussed during the

24  meeting?

25      A.      I didn't even know there was going



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

John K. Welch - Volume II                    January 11, 2011

301

Welch

2  to be a meeting.  This happened like 6:00,
3  5:30 in the morning, preload was running and
4  I walked in and there was papers all about.
5  Every document was, I had not done my job or
6  I had done something wrong and that these
7  allegations were incorrect and we have bent
8  over backwards for you.  It was just very
9  uncomfortable.  The employee relations
10  manager was.
11      Q.    Is that Mr. Trandiak?
12      A.    Yes.  He -- obviously that job is
13  designed not for employee relations but just
14  to protect the organization because he never
15  even told me there was a meeting.
16      Q.    How did you know to report to the
17  division manager's office that morning?
18      A.    Joe Mero came and got me.
19      Q.    So during that meeting did they
20  let you know that they had investigated your
21  complaints?
22      A.    Yes.
23      Q.    Did someone at the meeting go
24  through kind of each of your complaints and
25  what they had found?



ESQUIRE
an Alexander Gallo Company

302

1                              Welch

2          A.     Yes.

3          Q.     Do you recall who kind of went

4    through the complaints in the meeting?

5          A.     I think Kevin did along with Doug

6    interjecting.

7          Q.     Did you contribute anything to the

8    meeting?

9          A.     Yes.

10         Q.     Do you recall any substance of

11   what you had said during the meeting?

12         A.     I felt it to be an attack.   There

13   was no customary conversation.   It was

14   people standing up and getting red in their

15   face.

16         Q.     Who was standing up?

17         A.     Kevin.

18         Q.     Was everyone else sitting?

19         A.     Yes.

20         Q.     Was there a chair for Kevin?

21         A.     Yes.

22         Q.     So what conversation did you add

23   to the meeting?

24         A.     I said this is a joke.   I said do

25   you have anything left for me.   Do you have



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

303

                           Welch

1

2      anything else to say here but to bother me

3      and attack me because I am done.  I wanted

4      to leave.  All I wanted to do was get out.

5           Q.    Did the meeting make you angry?

6           A.    Made me defensive.

7           Q.    Do you recall what the demeanor

8      was of the other participants in the

9      meeting?

10          A.    They were fine.

11          Q.    How did the meeting conclude?

12          A.    I just left.  They concluded it.

13     I said I just -- really all I want is to be

14     able to function and be left alone.

15          Q.    Going back to your complaint,

16     paragraph 62, which states, "On or after

17     late January 2009 DiLibero gathered his

18     staff in defendant's conference room and

19     summoned Welch at approximately 5:00 a.m. to

20     interrogate him about his complaints

21     regarding discrimination."

22          A.    Yes.

23          Q.    Where you say "his staff" you are

24     referring to Mr. Mero, Mr. Wiederhold,

25     Mr. Trandiak?



ESQUIRE
an Alexander Gallo Company