# Exhibit 68

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

JOHN WELCH,

                            Plaintiff,

    - against-

UNITED PARCEL SERVICE, INC.
d/b/a UPS,

                        Defendant.

-------------------------------------------------------------------X

**FIRST AMENDED
COMPLAINT**

Docket No.: 09-CV-04400
                (ADS) (WDW)

<u>JURY TRIAL DEMANDED</u>

Plaintiff, **JOHN WELCH** by and through his attorneys, **FRANK & ASSOCIATES,**

**P.C.,** complains and alleges as follows:

## I.   PRELIMINARY STATEMENT

1. Plaintiff brings this civil action seeking declaratory relief, monetary damages and

affirmative relief based upon Defendant's violations of the Americans with Disabilities

Act of 1990 (hereinafter "ADA"), 42 U.S.C. § 12101 *et seq.*, the New York State

Human Rights Law (hereinafter "NYSHRL"), N.Y. Executive Law § 296 *et seq.*

(McKinney 1993 and 2001 Supp.), the New York City Human Rights Law (hereinafter

"NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq.*, and other appropriate rules,

regulations, statutes and ordinances.

## II.   JURISDICTION AND VENUE

2. This court has subject matter jurisdiction over this action and jurisdiction over Defendant

**UNITED PARCEL SERVICE, INC.** (hereinafter "UPS"), pursuant to 42 U.S.C. §

12101 *et seq.*, 8 U.S.C. §§ 1331 and 1337 and 29 U.S.C § 1367.

3. This action properly lies in the United States District Court for the Eastern District of

New York, pursuant to 28 U.S.C. § 1391, because the unlawful employment practices

1

took place within the state of New York, county of Nassau.

4. This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5. Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC"). Plaintiff brings this action within ninety (90) days of the receipt of a Notice of Right to Sue, issued by the EEOC on July 22, 2009, a true and accurate copy of which is annexed to the original complaint filed in this action as Exhibit A.

6. This Court has the power to issue declaratory relief pursuant to 28 U.S.C §§ 2201 and 2202.

### III.   PARTIES

7. Plaintiff, **JOHN WELCH**, ("Plaintiff") is and was at all times relevant herein, a domiciliary of the State of New York residing in the County of Suffolk.

8. Plaintiff is and has been at all times relevant herein, an "employee" within the meaning of 42 U.S.C. § 12111(4) and a "person" within the meaning of Section 292(1) of the NYSHRL, Section 8-102(1) of the NYCHRL.

9. At all times relevant to the Complaint, Plaintiff was a "qualified individual with a disability" within the meaning of 42 U.S.C § 12111(8) and has suffered from a "disability" within the meaning of Section 292(21) of NYSHRL and Section 8-102(16) of the NYCHRL.

10. Upon information and belief, Defendant **UPS** is a foreign business corporation existing under the laws of the State of Delaware.

11. Upon information and belief, at all times relevant to the Complaint, Defendant does

2

business in the State of New York in various locations including Brooklyn, Queens, Manhattan, Maspeth, Long Island City, Garden City, Uniondale and Melville.

12. At all times relevant to the Complaint, Defendant has been an "employer" within the meaning of 42 U.S.C. § 12111(5) and Section 292(5) of the NYSHRL.

13. Upon information and belief, at all times relevant to the Complaint, Defendant employed more than fifteen (15) employees.

## IV. BACKGROUND

14. Plaintiff repeats and realleges each and every allegation herein.

15. Plaintiff commenced employment with Defendant UPS on or about March 17, 1987 as a part-time loader at its Chase Court facility in Brooklyn, New York.

16. In September 1988 Plaintiff was hired by Defendant as a full-time driver and began working at the UPS facility located on 29th Street, Brooklyn, New York.

17. In or about February 1997, Plaintiff consulted Mark V. Sherrid, M.D., a cardiologist at St. Luke's-Roosevelt Hospital Center, New York, New York, and was diagnosed with Hypertrophic Cardiomyopathy ("HCM"), a congenital defect that causes a thickening and abnormal function of the heart muscle.

18. On or about March 17, 1997, Plaintiff underwent a surgical procedure at St. Luke's to have a defibrillator implanted to prevent sudden death caused by electrical disruption of his heartbeat.

19. Plaintiff's cardiologist and physician both advised Plaintiff he could work with certain restrictions. Plaintiff's doctor advised Plaintiff not to lift more than 40 lbs. and to avoid repetitive lifting or working long hours.

20. Approximately nine (9) months later, on or about January 1998, Plaintiff was promoted

3

to Driver Supervisor, a management position in which he trained new drivers.

21. Throughout the many years of Plaintiff's employment at UPS, Plaintiff consistently received positive performance reviews, merit increases and promotions.

22. In or about the summer of 1999, Plaintiff was promoted to Manager of the UPS facility in Brooklyn known as Kensington Center.

## THE DISABILITY BASED HARASSMENT

### Early Evidence of Disability Based Discrimination

23. In or about mid 2000, Tom Soregeroli, a Supervisor subordinate to Plaintiff asked Plaintiff about Atenolol, a medication Plaintiff's cardiologist had prescribed to reduce Plaintiff's heart rate

24. Shortly thereafter, Plaintiff was summoned by Division Manager Cindy Miller who demanded, *"What medications are you taking? I was told it is affecting your intensity."* Plaintiff explained he was required to take medication to reduce his heart rate because of his Hypertrophic Cardiomyopathy.  Miller told Plaintiff she intended to "research" the medication he was taking.

25. In or about August 2000, several weeks after meeting with Miller about his medication, Defendant demoted Plaintiff from Manager to Supervisor, transferred Plaintiff from Brooklyn to Long Island City and assigned Plaintiff to work nights instead of days.

26. Plaintiff requested, but was denied, an explanation for Defendant's decision to demote him.

27. The Supervisor position required Plaintiff to work outside the restrictions imposed by his Cardiologist.  For instance, Plaintiff was required to lift more than 40 lbs., do repetitive lifting, and work long hours.

4

28. Plaintiff complained about Defendant's refusal to accommodate his disability to Division Manager Gerrais Gary, Human Resource Director Craig Owens, and Chief Executive Officer James P. Kelly, all to no avail.

29. In or about August 2000, Defendant reduced Plaintiff's annual compensation by twenty-one thousand ($21,000) dollars.

### THE DISABILITY-BASED HARASSMENT INTENSIFIES

30. In or about November 2003, Plaintiff consulted with pulmonologist Jonathan M. Waxner, M.D. Dr. Waxner suspected that Plaintiff suffered from obstructive sleep apnea and recommended Plaintiff be evaluated to rule out or confirm the condition. Plaintiff requested a day off from work to participate in a sleep study and was subsequently diagnosed with Sleep Apnea.

31. Shortly thereafter Plaintiff and Paul Turner, a fellow supervisor, were both summoned to a meeting with Division Manager Tom Cucce. Upon information and belief, Turner suffers from Diabetes. Cucce said to Plaintiff and Turner, in sum and substance, "*Your diseases are causing me a huge problem*" and explained that he did not have "*jobs for people like you.*" Cucce said that he had to weigh the facts to determine, "*do I feed my children...or feed your children.*" Cucce placed Plaintiff on involuntary disability leave until he received clearance to return to work without restrictions.

32. Cucce forced Plaintiff to take an unnecessary six month leave of absence, from December 2003 through May 2004. Plaintiff objected to the forced leave of absence. During this period, Plaintiff's physicians indicated he could return to work with certain reasonable accommodations.

33. When Plaintiff advised Defendant he could return to work, Cucce refused to allow

5

Plaintiff to return so long as he required any kind of accommodation.

34. In or around May 2004, Plaintiff's doctors authorized Plaintiff to return to work with restrictions on heavy and/or repetitive lifting and working excessive hours. Plaintiff provided documentation from his physicians to Defendant stating that he was authorized to return to work with certain restrictions.

35. Thereafter, Defendant's physician, Dr. Ciuffo, evaluated Plaintiff. Dr. Ciuffo concurred with the findings of Plaintiff's physician.

36. Nevertheless, Defendant failed to accommodate Plaintiff's requests for an accommodation. On Plaintiff's first day of work after his return from medical leave, Defendant required Plaintiff to deliver a full Delivery Driver's route, despite the fact that such activity was strenuous and exceeded Plaintiff's physical limitations.

37. On or around August 23, 2005, Plaintiff submitted a formal written request for accommodation of his disability.

38. Defendant failed to provide Plaintiff with the requested accommodations for at least four months thereafter.

39. In or about the Fall of 2005, Plaintiff's cardiologist, Dr. Sherrid, and Plaintiff's primary care physician, both, provided notification to UPS which advised Defendant the failure to accommodate Plaintiff had placed Plaintiff at considerable risk of sudden death.

40. UPS then sent Plaintiff to its physician for an evaluation. Dr. Ciuffo agreed with Plaintiff's physicians' assessments that Plaintiff required accommodation for his disability.

41. Defendant failed to accommodate Plaintiff from September, 2005 through January, 2006. The Defendant required Plaintiff to work in the package operations department in a

position that required lifting and excessive hours.

42. In January 2006, Defendant reassigned Plaintiff from Package Operations to the Safety Compliance Department.

43. In or about January 2007, Defendant removed Plaintiff's reasonable accommodation, and reassigned him to work on the "pre-load" in the Manhasset Center at the Uniondale facility. This position required Plaintiff to work fourteen (14) hour days, lift heavy boxes and perform repetitive lifting in violation of Plaintiff's medical restrictions.

44. In or about April 2007, while working at the pre-load, Plaintiff lost consciousness due to his disability and fell backwards from the elevated loading platform onto a concrete floor. When Plaintiff reported the incident to Defendant's Health & Safety Manager, Michael Ridolfi, Ridolfi responded, "We may not have a job for someone like you."

45. On July 10, 2007, Plaintiff submitted a second formal written request for accommodation of his disability.

46. About ten days later, Human Resources Division Manager, Kevin DiLibero threatened to demote Plaintiff from Supervisor to Specialist. Upon information and belief, this would have resulted in a $50,000 decrease in Plaintiff's salary.

47. On July 23, 2007, DiLibero informed Plaintiff that he was reassigned to the Safety Compliance Department in the Melville facility. This position required Plaintiff to work more than ten (10) hours per day in violation of Plaintiff's medical restrictions.

48. In December 2007, Ridolfi told Plaintiff, "the clock is ticking," and suggested that the Defendant would no longer accommodate Plaintiff's disability after the new year.

49. In January 2008, Plaintiff developed an infection at the site of his defibrillator and required surgery. He returned to work on or around January 22, 2008.

50. On or around January 4, 2008, Defendant unjustifiably suspended the ADA interactive process and never acted upon Plaintiff's 2007 request for an accommodation.

51. On or about January 23, 2008, Ridolfi told Plaintiff to "go home," until he could return without restriction as to the number of hours he could work each week.

52. Beginning January through June 2008, Defendant forced Plaintiff to take an involuntary short term disability leave for six (6) months, even though Plaintiff continued to work as a Package Inside Supervisor.

53. Defendant also denied Plaintiff's request for employee tuition reimbursement, purportedly because Plaintiff was not an "active" employee.

54. On May 30, 2008, Plaintiff retained counsel and notified Defendant of an imminent lawsuit based on Defendant's pattern of discrimination against Plaintiff.

55. On June 11, 2008, Defendant assigned Plaintiff to the UPS Uniondale Clerical Department.  This job required Plaintiff to work nine (9) hours per day in violation of Plaintiff's medical restrictions.

56. On August 25, 2008, Plaintiff was admitted to the Psychiatric Unit of the Northport Veterans Administration Medical Center due to his disability.  Plaintiff remained in the hospital for approximately one month.

57. On or about September 26, 2008 Plaintiff filed a Charge of Discrimination with the EEOC.

58. On October 16, 2008, UPS informed Plaintiff that he would not receive his salary for the time he was on medical leave.  Upon information and belief, Plaintiff was entitled to receive six month salary continuation for illness.

59. In November 2008, Defendant removed Plaintiff's reasonable accommodation and

transferred Plaintiff from the Safety Compliance Department to Package Operations in the Nassau Preload, the same job in which Plaintiff was injured and had lost consciousness in the previous year.    During this time period, Plaintiff experienced medically documented episodes of arrhythmia due to his HCM.

60. In January 2009, Plaintiff emailed several managers requesting an explanation for the denial of his tuition reimbursement and salary for the period he was on medical leave.

61. On January 26, 2009, DiLibero said to Plaintiff "*I don't have a job for someone like you.*"

62. On or after late January 2009, Dilbero gathered his staff in Defendant's conference room and summoned Welch at approximately 5:00 a.m. to interrogate him about his complaints regarding discrimination.

63. On or around late January 2009, Plaintiff was hospitalized again in the Northport Veterans Administration Psychiatric Unit due to the stress and hostility he faced at work. Plaintiff remained at the hospital until mid February 2009.

64. In mid February of 2009, Plaintiff was released from the hospital and cleared to return to work.  However, Defendant forced Plaintiff to take involuntary short term disability from January to March 2009.

65. In or around March 2009, Plaintiff returned to work as an On Car Supervisor.

66. Upon information and belief, since early May 2009 Defendant has subjected Plaintiff to excessive scrutiny in retaliation for Plaintiff's filing of an EEOC charge of discrimination against Defendant.

67. In or around June 22, 2009 through July 8, 2009, Defendant placed Plaintiff on another involuntary leave of absence.

68. In or around the Fall of 2009, Plaintiff returned to work as an On Car Supervisor. Plaintiff's job duties included the transport of heavy packages from Defendant's Garden City facility to on-the-road drivers. Since Defendant's own physician Dr. Bigman had denied Plaintiff clearance under the Federal Motor Carrier Safety Regulations (FMCSR) to operate commercial vehicles in 2006, Plaintiff was required to deliver said packages out of his own personal vehicle to expedite the delivery process.

69. Plaintiff worked as much as twelve hours per day and was required to lift, lower, carry, leverage, push, pull and manipulate equipment and/or packages weighing as much as seventy pounds (70 lbs) in violation of Plaintiff's medical restrictions.  Plaintiff also assisted in moving packages in excess of one hundred and fifty pounds (150 lbs).

70. Beginning late 2009 through 2010, Defendant failed to recognize Plaintiff's request for accommodations during "operational difficulties" to adhere to his medical restrictions in the following New York boroughs: Manhattan, Maspeth and Brooklyn.

71. On September 29, 2009, Defendant required Plaintiff to report to the Foster Avenue facility in Brooklyn to supervise operations.

72. Upon Plaintiff's arrival, Joe Reimo, Division Manager stated, "You are not here to supervise, you are here to work!"

73. For two days Plaintiff transported and delivered packages that had accumulated as a result of the Yom Kippur Holiday.  Plaintiff worked twelve hour shifts and repeatedly lifted packages that weighed in excess of forty (40 lbs) in violation of his medical restrictions.

74. In or around December 2009 Defendant reassigned Plaintiff to Package Operations in the Garden City facility.  Plaintiff was required to assist in the loading of about three

10

thousand (3000) packages per day from one trailer and five furniture vans. After the completion of the loading process, Defendant required Plaintiff to offload and distribute the packages to helpers. This position violated Plaintiff's medical restrictions insofar as the job required Plaintiff to work approximately twelve (12) hours each day (and in one instance seventeen (17) hours), lift heavy boxes and perform repetitive lifting.

75. On January 6, 2010, Plaintiff's cardiologist found that Plaintiff experienced over sixty (60) medically documented cardiac episodes since November 2009.

76. On or around March 2010 Plaintiff submitted a third formal written request for an eight (8) hour workday and restriction on the requirement to lift packages that weigh 20 lbs or more.

77. On April 23, 2010 Plaintiff attended a meeting with Human Resources District Workforce Planning Manager, Karen Francis and Irene Gordon, District Nurse regarding Plaintiff's ADA request.  At the meeting Francis referred to Plaintiff's medical condition as a "self-perceived medical illness."

78. On August 2010 Defendant reassigned Plaintiff to the Spring Street Facility in Manhattan to work as a Preload Assist in the Industrial Engineering Department.

79. Two months later, during the Rosh Hashanah Holiday, Defendant required Plaintiff to "assist" the sort at the Island City Division in Maspeth. Although it was Defendant's customary practice to provide two men to load/unload one trailer, Defendant provided Plaintiff two men (as opposed to six (6) men) to load a total of three trailers during the Rosh Hashanah Holiday.

80. Defendant's employee Kevin Fallon (Industrial engineering), instructed Plaintiff to "get in the truck."  Plaintiff was required to load two trailers between the hours of 3:00 a.m. to

10:00 a.m. everyday.

81. Moreover, each trailer contained approximately twelve hundred (1200) to two thousand (2000) packages or a total of six thousand (6,000) packages to sort each day. As a result, Plaintiff was forced to lift heavy packages in violation of his medical restrictions and request for an accommodation under the Americans with Disabilities Act.

82. Defendant has changed Plaintiff's work hours at least six (6) times, has failed to accommodate Plaintiff's ADA requests for an eight (8) hour workday and has failed to accommodate Plaintiff's request for job duties that do not require him to lift packages that weigh 20 lbs or more.

83. Defendant has continued to fail to accommodate Plaintiff's requests for a reasonable accommodation based on his disability.

### FIRST CLAIM FOR RELIEF
(Americans with Disabilities Act - Disability Discrimination)

84. Plaintiff repeats and realleges each and every allegation contained herein.

85. Defendant unlawfully discriminated against Plaintiff on the basis of his disability in violation of the ADA.

86. Defendant failed to make reasonable accommodations for Plaintiff based upon his record of impairment.

87. As a proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer substantial loss of past and future earnings, deferred compensation, bonuses and other employment benefits.

88. As a further and proximate result of Defendant's actions, Plaintiff suffered and continues to suffer severe and lasting embarrassment, humiliation, mental and physical anguish and other incidental and consequential damages and expenses

89. The conduct of the Defendant was outrageous and done in conscious disregard of Plaintiff's rights. Therefore, Plaintiff is entitled to equitable and injunctive relief, an award of compensatory damages, punitive damages, expenses and attorneys' fees in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
(Americans with Disabilities Act - Disability Harassment)

90. Plaintiff repeats and re-alleges each and every allegation contained herein.

91. Plaintiff is a qualified individual with a disability.

92. Plaintiff was subjected to unwelcome harassment on the basis of his disability in violation of the ADA.

93. The harassment of Plaintiff was so distracting as to interfere with Plaintiff's ability to work.

94. The harassment of Plaintiff made it more difficult for Plaintiff to perform his job.

95. The harassment was sufficiently severe or pervasive such that a reasonable employee would find the conditions of employment altered adversely.

96. Defendant knew or should have known of the harassment and failed to take prompt, remedial action.

97. As a proximate result of Defendants' harassing conduct, Plaintiff has suffered and

98. continues to suffer substantial loss of past and future earnings, bonuses, and other

99. employment benefits.

100. As a further proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses, all to Plaintiff's damage in an amount to be determined at trial.

13

101. Defendant conducted itself in conscious disregard of Plaintiff's rights.

## THIRD CLAIM FOR RELIEF
### (NYSHRL - Disability Discrimination)

102. Plaintiff repeats and realleges each and every allegation contained herein.

103. Defendant unlawfully discriminated against Plaintiff on the basis of his disability in violation of the NYSHRL.

104. Defendant failed to provide a reasonable accommodation based upon his record of

105. impairment.

106. As a proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer substantial loss of past and future earnings, deferred compensation, bonuses and other employment benefits.

107. As a further and proximate result of Defendant's actions, Plaintiff suffered and continues to suffer severe and lasting embarrassment, humiliation, mental and physical anguish and other incidental and consequential damages and expenses.

108. The conduct of Defendant was done in conscious disregard of Plaintiff's rights.

109. Therefore, Plaintiff is entitled to an award of compensatory damages in amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (NYCHRL - Disability Discrimination)

110. Plaintiff repeats and realleges each and every allegation contained herein.

111. Plaintiff has been discriminated against by Defendant on the basis of his disability in violation of the New York City Human Rights Law based on Defendant's failure to provide a reasonable accommodation of Plaintiff's disability or perceived disability all the while giving Plaintiff pretextual or untrue reasons for the failure to accommodate.

14

112. As a proximate result of Defendant's discrimination, Plaintiff has suffered and continues to suffer substantial loss of past and future earnings, deferred compensation, bonuses and other employment benefits.

113. As a further proximate result of Defendant's actions, Plaintiff suffered and continues to suffer severe and lasting embarrassment, humiliation, mental and physical anguish and other incidental and consequential damages and expenses.

114. The conduct of the Defendant was done in conscious disregard of Plaintiff's rights. Therefore, Plaintiff is entitled to relief, an award of compensatory damages, punitive damages and reasonable attorneys' fees in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
(NYSHRL - Retaliation)

115. Plaintiff repeats and realleges each and every allegation contained herein.

116. Plaintiff has been retaliated against by Defendant on the basis of his complaints of disability discrimination in violation of the NYSHRL.

117. As a proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer substantial loss of past and future earnings, bonuses, and other employment benefits.

118. As a further proximate result of Defendant's actions, Plaintiff has suffered and continued to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

119. The conduct of Defendant was done in conscious disregard of Plaintiff's rights.

120. Therefore, Plaintiff is entitled to equitable and injunctive relief, an award of punitive damages, compensatory damages, expenses and attorneys' fees from Defendant in an amount to be determined at trial.

15

## DEMAND FOR JURY TRIAL

121. Plaintiff repeats and realleges each and every allegation contained herein.

122. Plaintiff hereby demands a trial by jury.

**WHEREFORE**, as a result of the unlawful conduct and actions of Defendant alleged herein, Plaintiff demands judgment:

a.   Declaring Defendant violated the aforementioned statutes;

b.   Issuing a permanent injunction enjoining Defendant, their agents, employees, officers, and successors in interest, and those acting in concert with Defendant from engaging in the illegal and unlawful customs, policies, and practices described herein and to provide Plaintiff with a reasonable accommodation;

c.   On the First Claim for Relief, Defendant pays Plaintiff compensatory and punitive damages, where applicable, in an amount to be determined at trial;

d.   On the Second Claim for Relief, Defendant pays Plaintiff compensatory damages, where applicable, in an amount to be determined at trial;

e.   On the Third and Fourth Claims for Relief, Defendant pays Plaintiff compensatory damages, where applicable, in an amount to be determined at **trial;**

f.   On the Fifth Claim for Relief, Defendant pays Plaintiff compensatory damages, where applicable, in an amount to be determined at trial;

g.   Plaintiff be made whole in the form of back pay and front pay, and afforded all benefits that would have been afforded Plaintiff but for Defendant's unlawful acts resulting in a failure to accommodate;

h.   An award of Plaintiff's cost of this suit, including reasonable attorney's fees;

i.   Defendant is ordered to pay Plaintiff pre- and post-judgment interest;

16

j.      Such other and further relief as the court deems just and proper.


Dated: Farmingdale, New York
      November 17, 2010

                                        **FRANK & ASSOCIATES, P.C.**
                                        *Attorneys for Plaintiff*

By:     _Rashmee Sinha_

                                          Rashmee Sinha (RS 6252)
                                          500 Bi-County Blvd., Suite 112N
                                          Farmingdale, New York 11735
                                          (631) 756-0400
                                          rsinha@laborlaws.com

17

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2010, I electronically filed the forgoing First Amended Complaint with the Clerk of the District Court using the CM/ ECF System.

I affirm that the foregoing statements are true, under penalty of perjury.

Dated: Farmingdale, New York
      November 17, 2010

Rashmee Sinha (RS 6252)

# Exhibit 69



**CHRISTINE VILLANTI, Plaintiff, -against- COLD SPRING HARBOR CENTRAL SCHOOL DISTRICT, ANDREA CLOUSER (sued in her Official and Individual Capacities), THOMAS P. DOLAN, (sued in his Official and Individual Capacities), JOSEPH MONESTARO (sued in his Official and Individual Capacities), JAY MATUK (sued in his Official and Individual Capacities), Defendants.**

**08-cv-434 (ADS)(MLO)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2010 U.S. Dist. LEXIS 85806; 23 Am. Disabilities Cas. (BNA) 906*

**August 20, 2010, Decided**

**COUNSEL:** **[*1]** For Plaintiff: Scott Michael Mishkin, Esq., Bruce E. Wingate, Esq., of Counsel, Scott Michael Mishkin, P.C., Islandia, New York.

For Defendants: Rondiene E. Novitz, Esq., Keith V. Tola, Esq., of Counsel, Cruser Mitchell & Novitz LLP, Melville, NY.

**JUDGES:** ARTHUR D. SPATT, United States District Judge.

**OPINION BY:** ARTHUR D. SPATT

**OPINION**

**MEMORANDUM OF DECISION AND ORDER**

   **SPATT, District Judge**.

   The plaintiff Christine Villanti, a junior high school science and health teacher, filed this suit against her employer and various school administrators, alleging violations of the Americans with Disabilities Act ("ADA") and related New York state laws. The defendants now move for summary judgment on all

claims. For the reasons that follow, the Court grants this motion in part and denies it in part.

**I. BACKGROUND**

   Plaintiff Christine Villanti is forty-four years old, and has taught science and health at the Cold Spring Harbor Junior/Senior High School (the "High School") since 2001. During the summer break in 2004, Villanti experienced a mild heart attack for which she was temporarily hospitalized. Villanti was ultimately diagnosed with an ongoing condition called "vasospastic angina," which the Court understands to mean that Villanti **[*2]** experiences chest pains that are related to contractions of the blood vessels in her heart. See Stedman's Medical Dictionary at 80, 1934 (27th ed. 2000). Villanti states that her chest pains worsen with stress, changes in the weather, and physical exertion, and that her condition has significantly affected her ability to do a number of things, including exercise, carry heavy weights, and do stressful activities.

   Villanti returned to teaching in the fall of 2004 without missing any work. She states that she informed school administrators about her heart attack shortly after it happened, and then requested certain accommodations. Although her requests changed to some extent over the

Case 2:09-cv-04400-ADS -WDW   Document 29-16   Filed 05/16/11   Page 22 of 66

Page 2
2010 U.S. Dist. LEXIS 85806, *2; 23 Am. Disabilities Cas. (BNA) 906

next three years, Villanti primarily asked that (1) she teach in only one classroom, (2) she should teach a limited number of classes each week, (3) she should not teach more than two *unique* classes, and (4) she not teach more than two or three consecutive class periods.

According to Villanti, her superiors granted most, if not all, of these accommodations for the 2004-05 school year, but then refused to accommodate any of her requests during the next two and a half years. In July 2006, the plaintiff filed [*3] a formal complaint with the Equal Opportunity Employment Counsel ("EEOC") concerning the denial of her requests. Villanti alleges that, in response to this complaint and her previous requests for accommodation, her superiors gave her an increasingly heavy workload; gave her negative reviews; increased their supervision of her; and stymied her professional development

On January 31, 2008, the plaintiff filed the present lawsuit, naming five defendants:

> o  The Cold Spring Harbor School District;

> o  Thomas Dolan, the principal at the High School until June 30, 2006;

> o  Jay Matuk, the principal at the High School after June 30, 2006;

> o  Andrea Clouser, the Chairperson for the Science Department at the High School; and

> o  Joseph Monestaro, an Assistant Principal at the High School until 2006, who was charged with preparing the teaching schedule for the school.

Against all of these defendants, the plaintiff asserts the following causes of action: (1) Under the ADA alleging discrimination and failure to accommodate, *42 U.S.C. §§ 12101 et seq.*, (2) Under the ADA sounding in retaliation for protected acts, and (3) violation of the New York State Human Rights Law, codified at *New York Executive Law §§ 290 et seq.*

The [*4] defendants now move for summary judgment with respect to the first two causes of action, and request that the Court decline to exercise pendant

jurisdiction over the third cause of action. The defendants move to dismiss the plaintiff's first cause of action on grounds, among other contentions, that the plaintiff has failed to demonstrate that she has a "disability" under the relevant federal definition. With respect to the plaintiff's retaliation claim, the defendants seek dismissal primarily on the ground that none of the acts that the plaintiff complains of were sufficiently adverse to her to be retaliatory under the law.

## II. DISCUSSION

### A. Summary Judgment Standard

It is well-settled that summary judgment under *Fed. R. Civ. P. 56(c)* is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. A fact is "material" within the meaning of *Fed. R. Civ. P. 56* when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. [*5] An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir.1995)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)* (per curiam), and *Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989))*.

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (quoting *Fed.R.Civ.P. 56(e)*). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita, 475 U.S. at 586*. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving [*6] party's case." *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994)* (citations omitted).

Case 2:09-cv-04400-ADS -WDW   Document 29-16   Filed 05/16/11   Page 23 of 66

Page 3
2010 U.S. Dist. LEXIS 85806, *6; 23 Am. Disabilities Cas. (BNA) 906

**B. As to the Plaintiff's Claim for Discrimination and Failure to Accommodate**

The plaintiff's first cause of action is for discrimination and failure to accommodate. In this cause of action, the plaintiff essentially asserts that the defendants treated her unfairly because of her medical condition, and also failed to reasonably accommodate her medical needs in the workplace. As a prerequisite to a claim under either of these theories, a plaintiff must demonstrate that she had a "disability" as defined under the ADA. *Conley v. United Parcel Serv., 88 F. Supp. 2d 16, 18 (E.D.N.Y. 2000)*. Because the issue of the plaintiff's alleged disability is dispositive in this case, the Court addresses only this factor with respect to the plaintiff's first cause of action.

An individual has a disability within the meaning of the ADA if she: "(A) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) [has] a record of such an impairment; or (C) [is] regarded as having such an impairment." *42 U.S.C. § 12102(2)*; *Colwell v. Suffolk County Police Dep't, 158 F.3d 635 (2d Cir. 1998)*; **[*7]** *Conley, 88 F. Supp. 2d at 18*. Here, the plaintiff advances in her complaint and opposition papers only the theory in that that she *had* a qualifying impairment. She does not assert that there was a *record* of her having such an impairment or that she was *regarded* as having a qualifying impairment. To the extent that the plaintiff appears to assert facts in her Rule 56.1 statement that go to a perception or record of impairment, the Court finds that the plaintiff has not raised triable issues of fact on these grounds.

**1. Applicability of the 2008 Amendments to the ADA**

On January 4, 2008, the United States Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), thereby modifying the standard by which courts assess whether a person has a disability under the ADA. Pub. L. 110-325. The ADAAA substantially broadened the definition of a "disability" under the law, and explicitly overturned the Supreme Court's holdings in *Sutton v. United Air Lines, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)* and *Toyota Motor Manufacturing v. Williams, 534 U.S. 184, 185, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)*, which had defined the statutory terms "substantially limits" and "major life activities" **[*8]** strictly. Although the ADAAA was passed on January 4, 2008, it did not take effect until January 1, 2009. Pub. L.

110-325, § 8.

The plaintiff now urges the Court to apply to this case the definition of "disability" as modified by the ADAAA, in spite of the fact that all of the relevant facts occurred prior to the effective date of the ADAAA. By contrast, the defendants assert that retroactive application of the ADAAA is inappropriate, and that the previous definition of "disability" is applicable.

While the Second Circuit has not yet addressed this issue in a published decision, it has held in multiple summary orders that the ADAAA does not apply retroactively. See, e.g., *Ragusa v. Malverne Union Free Sch. Dist., No. 08-cv-5367, 381 Fed. Appx. 85, 2010 U.S. App. LEXIS 12640, 2010 WL 2490966 at *1, n. 2 (2d Cir. June 21, 2010)*; *Rogers v. City of N.Y., 359 F. App'x 201, 203, n. 1 (2d Cir. 2009)*. Moreover, other federal district and circuit courts have held almost universally that the ADAAA does not apply retroactively. See *EEOC v. Agro Distrib., 555 F.3d 462, 2009 WL 95259, at *5 n. 8 (5th Cir. 2009)*; *Kiesewetter v. Caterpillar, Inc., 295 F. App'x 850, 851, (7th Cir. 2008)*; *Casseus v. Verizon N.Y., Inc., No. 08-cv-4119, 722 F. Supp. 2d 326, 2010 U.S. Dist. LEXIS 68910, 2010 WL 2736935 (E.D.N.Y. 2010)*; **[*9]** *White v. Sears, No. 07-CV-4286, 2009 U.S. Dist. LEXIS 35554, 2009 WL 1140434, at *4 (E.D.N.Y. Apr. 27, 2009)*; *Moran v. Premier Educ. Group, LP, 599 F. Supp. 2d 263, 271-72 (D.Conn. 2009)*. The Court finds these cases to be persuasive. The ADAAA contains no language indicating that it applies retroactively, and it would work an injustice on parties to be held liable for conduct that they would have reasonably believed at the time was in compliance with the law.

Nevertheless, the plaintiff urges that the Court apply the ADAAA retroactively based on the Sixth Circuit's unpublished decision in *Jenkins v. National Board of Medical Examiners, No. 08-5371, 2009 U.S. App. LEXIS 2660, 2009 WL 331638, at *1 (6th Cir. Feb. 11, 2009)*. However, the reasoning in *Jenkins* confirms, rather than impeaches, the Court's present holding. The plaintiff in *Jenkins* filed a claim in 2008, before the ADAAA took effect, asserting that his diagnosed reading disorder was a disability under the ADA. *Id.* Based on this alleged disability, the plaintiff sought extra time to take a national medical exam. Id. However, the plaintiff asserted no claims for monetary damages or other retrospective relief. *Id.* In deciding *Jenkins*, the Sixth Circuit implicitly acknowledged the potential **[*10]** injustice that would

2010 U.S. Dist. LEXIS 85806, *10; 23 Am. Disabilities Cas. (BNA) 906

come from awarding retrospective relief based on the amended definition of "disability", but held that "[b]ecause Jenkins seeks *prospective relief*, no injustice would result from applying the amended law." *Id.* (emphasis added).

In the Court's view, the Sixth Circuit's decision is entirely consistent with this Court's determination not to apply the ADAAA to claims for money damages such as the plaintiff's. The Court therefore applies the definition of "disability" from the ADA as interpreted prior to the enactment of the ADAAA.

**2. Application of the Disability Standard**

Courts in the Second Circuit follow a three-step process to determine whether a person has a disability under the ADA. As such, a court analyzes: "(1) whether the plaintiff suffered from a physical or mental impairment, (2) whether the life activity upon which the plaintiff relied constitutes a major life activity under the ADA, and (3) whether the plaintiff's impairment substantially limited the major life activity identified." *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 201 (2d Cir. 2004) (internal quotations, citations, and alterations omitted) (citing *Colwell, 158 F.3d at 641*). The Court will now apply **[*11]** these rules to this case.

*Did the Plaintiff Have a Physical or Mental Impairment*

The parties here agree that the plaintiff's heart-related chest pains are a physical impairment. Thus, the Court need not address this issue further.

*Did the Plaintiff's Impairment Limit a Major Life Activity*

In her complaint, the plaintiff states that her impairment limited the major life activity of working. In her opposition papers, she also contends that her condition affected her ability to "lift[], carry[], and exercise[e]." (Pl.'s Resp. at 8.) The Court therefore analyzes whether any of these four activities is a major life activity.

First, there is no doubt that working is a major life activity. The EEOC regulations interpreting the ADA, to which courts properly look for guidance, explicitly identify it as such. See *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005) (citing 29 C.F.R. § 1630.2(i)). Lifting and carrying are at least arguably major life activities, and the Court assumes without

deciding that these activities are major life activities. See *Colwell, 158 F.3d at 643.* Similarly, though there is some doubt as to whether exercise is a major life activity, see id.; *Johns-Davila v.* **[*12]** *City of New York, No. 99-cv-1885, 2000 U.S. Dist. LEXIS 17012, 2000 WL 1725418, *6 (S.D.N.Y. Nov. 20, 2000)* (collecting cases), the Court also assumes without deciding that it is a major life activity.

*Did the Plaintiff's Impairment Substantially Limit the Major Life Activities Identified*

The plaintiff provides two sources of evidence to describe the effects of her various conditions: three letters from her doctor, Richard H. Dyckman; and her own testimony. The Court addresses these sources in turn.

The three letters from Dr. Dyckman, dated June 20, 2006, May 24, 2007, and June 17, 2008, are not extensive. The first letter, addressed generically "To Whom It May Concern," states that Villanti developed "vasospastic angina" after a "myocardial infarction" in 2004, and that she has had "mild flare-ups" since then. (Letter from Dr. Richard Dyckman to Whom it May Concern ("Dyckman Letter I"), dated June 20, 2006.) The only conclusion that the letter states is that Villanti requires "accommodations . . . in her work environment to minimize external stress." (Id.) The nature of these proposed accommodations is not discussed.

The second letter, dated almost a year later, May 24, 2007, and addressed to defendant Andrea Clouser, **[*13]** an administrator at the High School, identifies Villanti's diagnosis as "recurrent stress-induced vasospastic angina with documented myocardial injury," and states that her condition:

> *requires that she be assigned to one classroom (to obviate the need for her to switch rooms multiple times each day)*, and that her classroom needs to be fully "set-up" for her assigned course work so that she will not have to transport textbooks and supplies to her room on a daily basis.

(Letter from Dr. Richard Dyckman to Andrea Clouser, dated June 20, 2006 ("Dyckman Letter II") (emphasis in original).)

The third letter is dated one year after the second

letter, June 17, 2008, and is addressed to the Deputy Superintendent of Cold Spring Harbor School District, Dr. Judith A. Wilansky. In that letter, Dr. Dyckman states that while Villanti's "cardiac function has . . . largely normalized [since her heart attack in 2004], she continues to have episodes of stress-induced vasospastic angina." (Letter from Dr. Richard Dyckman to Judith Wilansky, dated June 17, 2008 ("Dyckman Letter III").) Dr. Dykman then states that:

> [Villanti's] condition appears to be exacerbated by stress in her work environment. Toward that [*14] end, I would very strongly recommend, if possible, that her classroom assignments be made with a view toward minimizing her need to switch rooms multiple times a day, and that if she needs to work in several different classrooms, that they be fully 'set up' so that she does not have to transport textbooks or supplies between rooms on a daily basis.

(Id.) Dr. Dykman concludes that "[i]f such reasonable accommodations are made, I anticipate that she will be able to carry a full academic load." (Id.)

Villanti also provides her own deposition testimony describing the limitations that her condition imposes on her. In general, Villanti states that when she experiences "stress", "change[s] in the room temperature", or when she is "exerting [herself] physically", she has intermittent chest pains, with "sometimes . . . a little numbness in my left arm," and "occasionally" shortness of breath. (Villanti Dep., dated May 19, 2009 ("Villanti Dep. II") at 134:17-18, 135:4, 11-12.) Villanti affirms that because of this, she doesn't carry her son "often," or ever carry "filled laundry baskets." (Id. at 154:19, 145:18-19.)

Villanti further states that, as a result of her condition, she does "less cardiovascular [*15] exercise than [she] would like to." (Id. at 119:9-10). Whereas before her heart attack she was a member of a gym, her exercise now amounts only to lifting ten pound weights twice a week, taking very short walks twice a week, and exercising on an elliptical machine--a low-impact substitute for a treadmill--twice a month.

As for her work, Villanti maintains that she experiences chest pains if she teaches more than "three [or] four consecutive [forty-minute class] periods in a row without a break." (Id. at 135:19-21.) Likewise, she experiences pain as a result of the stress of teaching "a different subject for three consecutive periods." (Id. at 136:10-11.) In addition, Villanti testified that she gets chest pains from moving items like "textbooks, . . . laboratory manuals, [and]. . . lab materials" between classrooms. (Villanti Dep., dated September 27, 2006 ("Villanti Dep. I") at 8:22-23.)

The EEOC has promulgated regulations for courts to consider when determining whether a person is substantially limited in a particular major life activity. Under these regulations, "substantially limits" means:

> (i) Unable to perform a major life activity that the average person in the general population [*16] can perform; or

> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*29 C.F.R. § 1630.2(j)(1).* Further, the regulations provide that, when determining whether a person is substantially limited in a major life activity, courts should consider:

> (i) The nature and severity of the impairment;

> (ii) The duration or expected duration of the impairment; and

> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

*29 C.F.R. § 1630.2(j)(2).* In determining whether a person is substantially limited in the major life activity of working, the EEOC has provided that:

> The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

Case 2:09-cv-04400-ADS -WDW   Document 29-16   Filed 05/16/11   Page 26 of 66

Page 6
2010 U.S. Dist. LEXIS 85806, *16; 23 Am. Disabilities Cas. (BNA) 906

The inability to perform a single, particular job does not constitute a substantial limitation in the major **[*17]** life activity of working.

*29 C.F.R. § 1630.2(h)(3)(i).*

Generally, to survive summary judgment on the issue of whether a plaintiff's condition substantially limits a major life activity, a plaintiff must not only (1) describe how those life activities are limited, but must also (2) support this description with competent medical evidence. See *Heilwil v. Mount Sinai Hospital, 32 F.3d 718, 722-23 (2d Cir. 1994)* (requiring medical evidence to show substantial limitation under the Rehabilitation Act's parallel statutory requirements); *Levy v. Hustedt Chevrolet, No. 05-cv-4832, 2008 U.S. Dist. LEXIS 101701, 2008 WL 5273927 at *5 (E.D.N.Y. Dec. 17, 2008)* (requiring medical evidence to sustain a claim under the ADA); *Sussle v. Sirina Prot. Sys. Corp., 269 F. Supp. 2d 285, 301-02 (S.D.N.Y. 2003)* (same, collecting cases).

Here, the plaintiff's medical evidence is insufficient to support her claim that she is substantially limited in working, lifting, carrying, or exercising. First, the letters do not describe the plaintiff's condition in detail, nor do they explain in detail the basis for the accommodations requested in the letters. All three of Dr. Dyckman's letters state that the plaintiff has "vasospastic angina," but none **[*18]** explains the severity or result of this condition. Similarly, while some of the letters request specific accommodations, the only apparent basis for these accommodations is that the plaintiff should not be exposed to "stress." (Dyckman Letter I ("accommodations need to be made in [Villanti's] work environment to minimize external stress"); Dyckman Letter II (describing the plaintiff's condition as "stress-induced"); Dyckman Letter III ("[Villanti's] condition appears to be exacerbated by stress").)

Likewise, Dr. Dyckman's descriptions of the accommodations Villanti requires at her work are either vague or contradictory. The June 2006 letter provides no description of the accommodations Villanti needs, except to say that Villanti should have her "external stress" minimized. (Dyckman Letter I.) Dr. Dyckman provides a much clearer and more emphatic mandate in his May 2007 letter: Villanti's condition "*requires that she be assigned to one classroom . . . .*" (Dyckman Letter II

(emphasis in original).) However, Dr. Dyckman does not explain clearly why this is necessary, and in his following letter he retreats from this position, stating that he "very strongly recommend[s], if possible" that **[*19]** Villanti be scheduled so as to "minimize her need to switch rooms multiple times a day." (Dyckman Letter III.) This third letter then requests that Villanti not be required to move books or supplies between rooms, but also expressly admits of the possibility that Villanti might "work in *several* different classrooms." (Id. (emphasis added).) Finally, Dr. Dyckman concludes that, "if such reasonable accommodations are made, I anticipate that [Villanti] will be able to carry a *full academic load*." (Id. (emphasis added).)

Considering this medical evidence in light of the direction provided by the EEOC regulations interpreting the ADA, the Court finds that it is insufficient to show that the plaintiff is substantially limited in her ability to work, lift, carry, or exercise. First, with respect to lifting, carrying, and exercising, Dr. Dykman's letters provide virtually no information. While Dr. Dyckman's latter two letters request that Villanti not "transport" books and supplies between classrooms, he makes no explicit mention of her ability to lift or carry items or to do other forms of exercise. With respect to working, Dr. Dyckman's letters at most suggest that Villanti cannot work as **[*20]** a teacher if she must repeatedly move classrooms and transport materials. This does not support the conclusion that Villanti is restricted from performing either "a class of jobs or a broad range of jobs in various classes," *29 C.F.R. § 1630.2(h)(3)(i)*, as required to show a substantial limitation of the ability to work.

Even if medical evidence were not required to avoid summary judgment on this issue, the plaintiff's own description of her limitations is insufficient to establish that she is significantly restricted in any major life activity. First, the plaintiff's testimony demonstrates her capacity to carry out the major life activities she identifies. The plaintiff states that, on a limited basis, she lifts weights, takes short walks, and exercises on an elliptical machine. She also states that she sometimes carries her son or light objects. Her ability to do this precludes her from being found to be substantially limited in lifting, carrying, or exercising. See *id. at 640, 644* (holding that an inability to lift heavy objects and an inability to do some exercise are not substantial limitations of major life activities); *Piascyk v. City of New Haven, 64 F. Supp. 2d 19, 29-30 (D.Conn. 1999)*

Case 2:09-cv-04400-ADS -WDW   Document 29-16   Filed 05/16/11   Page 27 of 66

Page 7

2010 U.S. Dist. LEXIS 85806, *21; 23 Am. Disabilities Cas. (BNA) 906

[**\*21**] (holding that an inability to lift heavy objects was not a substantial limitation of a major life activity, and collecting cases).

As for the plaintiff's testimony with regard to her limitations on her ability to work, the Court has already noted that applicable EEOC regulations explicitly provide that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *29 C.F.R. § 1630.2(h)(3)(i)*. Here, even if the plaintiff had testified that she is unable to perform her current job--a conclusion about which the Court has some doubt--she has not offered any testimony indicating that she could not perform another comparable job in her field. See *Colwell, 158 F.3d at 645* (granting defendant employer judgment as a matter of law on disability issue, and holding that "[w]ithout specific evidence about 'the kinds of jobs from which [an] impaired individual is disqualified,' the jury could not perform the careful analysis that is necessary to determine that [the plaintiff] was substantially limited in his ability to work," citing *Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir.1994)*). To the extent that the plaintiff [**\*22**] asserts that she cannot perform jobs that are stressful, this category is insufficient to satisfy the requirements of the ADA. See *id. at 645* (holding that there was no substantial limitation of the ability to work when plaintiff presented evidence that his doctor instructed him to "avoid stress").

Therefore, the Court finds that the plaintiff cannot meet her burden of showing that she has a disability as defined under the ADA. As such, the plaintiff cannot sustain a claim either for discrimination or failure to accommodate, and the Court grants the defendants' motion for summary judgment dismissing the plaintiff's claim for discrimination and failure to accommodate.

## C. As to the Plaintiff's Retaliation Claim

The plaintiff separately asserts a claim against the defendants for retaliating against her for complaining about the defendants' alleged discrimination and failure to accommodate. To assert this claim under the ADA, the plaintiff need not show that she was disabled under the meaning of the ADA. Rather, she must only "possess[] a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia v. Town of Manlius 313 F.3d 713, 719 (2d Cir. 2002)* [**\*23**] (quoting *Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999)*). Here, the

defendants do not challenge the plaintiff's good faith belief, and the Court's finding that the plaintiff was not disabled under the provisions of the statute does not preclude the plaintiff from advancing a retaliation claim.

To analyze a claim for retaliation, the Court employs the familiar McDonnell-Douglas burden shifting test, as modified for the retaliation context. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 54 (2d Cir. 2002)*. Thus, in the first step of the process, the plaintiff must show that she "[1] was engaged in protected activity, [2] that the defendant was aware of this activity, [3] that the defendant took adverse action against the plaintiff, and [4] a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Id.* (internal quotations, citations, and alterations omitted). If the plaintiff thus succeeds in establishing a prima facie case of discrimination, the defendants must then produce a non-discriminatory reason for the complained-of [**\*24**] conduct. *Id.* Upon the production of this reason, the plaintiff then must meet her ultimate burden of showing that the defendants' acts were retaliatory. *Id.*

### 1. The Prima Facie Case

The parties here agree that the plaintiff has satisfied the first two prongs of the prima facie case required by the McDonnell-Douglas test. The plaintiff made numerous requests for accommodations and filed a formal complaint with EEOC with regard to the denial of these requests. Making these requests and filing this complaint was protected activity, satisfying the first prong of the prima facie case. See *Treglia, 313 F.3d at 720*; *Weixel v. Board of Education of the City of New York, 287 F.3d 138, 149 (2d Cir. 2002)* (citing *Muller v. Costello, 187 F.2d 298, 301 (2d Cir. 1999)*). The parties also agree that the defendants were aware of this activity, thus satisfying the second prong. However, the parties vigorously contest whether the plaintiff has satisfied the third prong of the prima face case, which requires that the plaintiff show that the defendants took adverse action against her.

In the retaliation context, an "adverse action" is an action that "well might have dissuaded a reasonable worker from making or [**\*25**] supporting a charge of discrimination." *Alam v. HSBC Bank USA, N.A., No. 07-cv-3540, 2009 U.S. Dist. LEXIS 89303, 2009 WL 3096293 at \*12 (S.D.N.Y. Sept. 28, 2009)* (quoting

Case 2:09-cv-04400-ADS -WDW  Document 29-16  Filed 05/16/11  Page 28 of 66

Page 8

2010 U.S. Dist. LEXIS 85806, *25; 23 Am. Disabilities Cas. (BNA) 906

*Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006))*. Here, the plaintiff has asserted that the defendants took numerous retaliatory actions against her, most of which the Court views as unsupported or insubstantial. However, the Court is satisfied that there are genuine issues of fact with respect to at least one alleged retaliatory act: whether the defendants unfairly increased the burden of the plaintiff's teaching schedule between the 2005-2006 and the 2006-2007 school years. As such, summary judgment with respect to the plaintiff's retaliation claim is not appropriate.

The parties agree that during the 2005-2006 school year, Villanti taught only two different classes, and taught in just one classroom. Then, for the 2006-2007 school year, Villanti was additionally scheduled to teach three different subjects rather than two, and to teach in two different classrooms rather than one. The plaintiff further asserts that she was scheduled to teach more periods in a row in 2006-2007 compared **[*26]** to the previous year, though the defendants dispute this.

These scheduling changes are not dramatic, and, in fact, the plaintiff's contract provided that she was obligated to take on the additional burdens assigned to her. Nevertheless, the United States Supreme Court has stated that changing an employee's working conditions may be a retaliatory action even when the employee is contractually obligated to perform under the increased burden. See *Burlington-Northern, 548 U.S. at 69* (citing *Washington v. Illinois Dept. of Revenue, 420 F.3d 658, 662 (7th Cir. 2005))*. In *Burlington-Northern*, and more explicitly in the Seventh Circuit cases that stem from *Washington*, courts have held that a change in working conditions within an employee's ordinary obligations can be retaliatory when it takes advantage of a "unique vulnerability" that the employee faces. *Thomas v. Potter, 202 Fed. App'x 118, 119 (7th Cir. 2006)* (citing *Washington, 420 F.3d at 662-63*); see also *Ragusa, 2010 U.S. App. LEXIS 12640, 2010 WL 2490966 at *3* (holding that the "added challenged" of an increased teaching schedule could be a retaliatory action).

Here, while the Court has found as a matter of law that Villanti was not disabled under the terms of **[*27]** the statute, Villanti nevertheless expressed to the defendants that she experienced pain when put under additional stress and when called on to physically exert herself. In the Court's view, there is at least an issue of

fact as to whether this is a "unique vulnerability" that the defendants took advantage of when preparing the plaintiff's teaching schedule. Similarly, the Court finds that the additions to the plaintiff's obligations between 2005-2006 and 2006-2007 are sufficient to raise genuine issues of fact as to whether they were burdensome enough so as to discourage a reasonable person in the plaintiff's condition from pursuing a discrimination complaint.

As for the fourth prong of the prima facie case, causation, the Court is satisfied that the temporal proximity between the plaintiff's protected activity and the alleged retaliatory acts raises a genuine issue of fact as to the causal connection between the protected activity and the alleged retaliation. There is credible evidence that the plaintiff requested certain accommodations in May 2006, and received her class schedule on the last day of school in June 2006. Under Second Circuit law, this is sufficient to raise an issue **[*28]** of fact as to whether the defendants changed the plaintiff's teaching schedule in retaliation for her protected activity. See *Gorman-Bakos v. Cornell Coop. Ext'n of Schenectady Cty., 252 F.3d 545, 554-55 (2d Cir. 2001)* (collecting cases).

## 2. The Non-Discriminatory Reason for the Allegedly Retaliatory Conduct

In the second step of the burden-shifting test, the defendants must state a non-discriminatory reason for the alleged retaliatory conduct. Here, the defendants essentially assert that the plaintiff's teaching schedule was prepared pursuant to the school's ordinary practices, and any increase in her teaching burden was incidental to the needs of the school. This response satisfies the defendants' burden of production.

## 3. The Plaintiff's Ultimate Burden of Proof

Once the first two steps of the burden-shifting test have been satisfied, "the McDonnell Douglas framework disappears," *Reg'l Econ. Cmty. Action Program v. City of Middletown, 294 F.3d 35, 49 (2d Cir. 2002)* (internal citations and aleterations omitted), and "[t]he plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason [for the allegedly retaliatory conduct] is a pretext." *Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006)*. **[*29]** The plaintiff may do this by presenting additional evidence, or by relying on the evidence that supported the plaintiff's prima facie case. *Sista, 445 F.3d at 173* (quoting *Heyman*

Case 2:09-cv-04400-ADS -WDW   Document 29-16   Filed 05/16/11   Page 29 of 66

Page 9

2010 U.S. Dist. LEXIS 85806, *29; 23 Am. Disabilities Cas. (BNA) 906

*v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999))*.

Here, the Court is satisfied that the evidence that supported the plaintiff's prima facie case also raises genuine issues of fact as to whether the defendants' explanation for the plaintiff's change in schedule was pretextual. To be sure, the defendants offer voluminous evidence explaining the non-discriminatory reasons for the schedule that the defendants prepared. If this testimony is credited by a jury, it may preclude the plaintiff's retaliation claim. However, at the present procedural stage, the Court takes all evidence in the best light for the plaintiff. In doing so, the Court finds that the plaintiff has produced sufficient evidence to allow her to proceed to trial on her retaliation claim. Therefore, except as described directly below, the Court denies the defendants' motion for summary judgment with respect to the plaintiff's retaliation claim under the ADA.

**4. Claims Against Individual [*30] Defendants**

The plaintiff asserts her ADA retaliation claim against four natural persons. The Second Circuit has recently held that the ADA does not provide for individual liability for retaliation, *Spiegel v. Schulmann, 604 F.3d 72, 79-80 (2d Cir. 2010)*, and therefore the plaintiff's claim for retaliation asserted against these individual defendants must be dismissed. To the extent that the plaintiff asserts a retaliation claim against the individual defendants in their official capacities, this claims is duplicative of the plaintiff's retaliation claim against the Cold Spring Harbor School District, and also is dismissed. See, e.g., *Tsotesi v. Bd. of Educ., 258 F. Supp. 2d 336, 338 n. 10 (S.D.N.Y. 2003)*.

**D. As to the Plaintiff's State Law Claims**

The defendants request that the Court decline to exercise its supplementary jurisdiction over the plaintiff's state law claims pursuant to New York's Human Rights Law, on grounds that the plaintiff can sustain no valid federal claims. As the Court finds that the plaintiff has established genuine issues of material fact with respect to

her retaliation claim under the ADA, the defendants' request is without basis. Therefore, the Court continues [*31] to exercise its supplementary jurisdiction over the plaintiff's state law claims, and the defendants' motion in this regard is denied.

**III. CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the defendants' motion for summary judgment with respect to the plaintiff's discrimination and failure to accommodate claim under the ADA is granted, and this claim is dismissed as to all defendants; and it is further

**ORDERED** that the defendants' motion for summary judgment with respect to the plaintiff's retaliation claim under the ADA against Thomas Dolan, Jay Matuk, Andrea Clouser, and Joseph Monestaro is granted, and this claim is dismissed; and it is further

**ORDERED** that the defendants' motion for summary judgment with respect to the plaintiff's retaliation claim under the ADA against Cold Spring Harbor School District is denied; and it is further

**ORDERED** that the defendants' motion for the Court to decline to exercise supplemental jurisdiction over the plaintiff's state law claims is denied; and it is further

**ORDERED** that the parties are directed to appear before the Court for a pretrial conference on Monday, September 13, 2010 at 9:00 a.m.

**SO ORDERED.**

Dated: Central Islip, New York
August  [*32] 20, 2010

*/s/ Arthur D. Spatt*

ARTHUR D. SPATT

United States District Judge

# Exhibit 70



JASON TAYLOR, Plaintiff, -v- LENOX HILL HOSPITAL, Defendant.

00 Civ. 3773 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2003 U.S. Dist. LEXIS 5429; 14 Am. Disabilities Cas. (BNA) 753*

April 2, 2003, Decided
April 3, 2003, Filed

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted as to all federal claims. Plaintiff's remaining state claims dismissed.

**COUNSEL:** Robert S. Nayberg, Law Offices of Martin H. Scher, Carle Place, NY, for Plaintiff Jason Taylor.

Joel E. Cohen, McDermott, Will & Emery, New York, NY (Jason K. Brown, on the brief), for Defendant Lenox Hill Hospital.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

*OPINION AND ORDER*

GERARD E. LYNCH, District Judge:

Plaintiff Jason Taylor ("plaintiff" or "Taylor") brings this suit against his former employer, Lenox Hill Hospital ("defendant" or "the Hospital"), alleging violations of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101 et seq. (2000)*, the New York State Human Rights Law ("NYSHRL"), *New York Executive Law § 290 et seq.,* and the New York City Human Rights Law ("NYCHRL"), Administrative Code of the City of New York, *§ 8-101 et seq.* He asserts that the Hospital failed to accommodate his disability, discriminated against him on the basis of his sex and disability, and retaliated against him after [*2] he asserted his rights under the ADA. The Hospital now moves for summary judgment

on all of the claims. The motion will be granted with respect to all federal claims.

*BACKGROUND*

Plaintiff is a registered nurse who was employed as a Staff Nurse in defendant's Cardiac Care Unit ("CCU") from 1995 through 1998. (Compl. P 7.) He was responsible for caring for critically ill cardiac patients, which among other duties involved turning the patients over in bed, helping them to walk, and lifting them. (Taylor Dep. at 33-36; Bodee-Isidore Aff. P 5.) On January 18, 1998, Taylor was injured when a patient grabbed on to his left shoulder in the process of sitting up in bed. (Compl. P 12.) He promptly visited Dr. Richard Rho, who diagnosed him with a cervical spine injury and provided the Hospital with a note indicating that he should not lift more than forty pounds. (Brown Aff. Ex. I.) On January 20, the Hospital placed plaintiff on a medical leave of absence, and in February, he submitted a Medical Certification Form for Medical and Family Leave ("FMLA form"), on which Dr. Rho indicated that he could lift no more than thirty pounds. (*Id.* Ex. J.) Because lifting and otherwise supporting [*3] ill patients is a large part of a Staff Nurse's daily activities (Kilfeather Dep. at 93-94), Dr. Rho was of the opinion that plaintiff could not work as a nurse. (Rho Dep. at 20.)

In early 1998, plaintiff filed a claim for, and received, workers' compensation benefits. (Brown Aff. Ex. M.) The Hospital's workers' compensation carrier, Lovell Safety Management, continued to pay plaintiff throughout the year, although it did reduce his payments around March 1998. (Bodee-Isidore Dep. at 52-53.) In October, Lovell requested that the Hospital approve surveillance of Taylor in order to determine whether he was truly

Case 2:09-cv-04400-ADS -WDW   Document 29-16   Filed 05/16/11   Page 32 of 66

Page 2

2003 U.S. Dist. LEXIS 5429, *; 14 Am. Disabilities Cas. (BNA) 753

entitled to the benefits he was receiving, and the Hospital approved video surveillance on October 6. (Nayberg Affirm. Ex. A-2.) Lovell apparently suspected that Taylor might be working elsewhere during his leave from the Hospital, because its physicians had determined that Taylor was only mildly disabled, and he had not complained when his benefits were reduced in March. (Id.) Nothing in the record indicates the results of the surveillance.

In May, Taylor submitted a second FMLA form, and the Hospital extended his medical leave through June. (Brown Aff. Ex. K.) At that [*4] time, Lourdes Blanco, the Hospital's Benefits Coordinator, wrote to Taylor to inform him that, upon his return to work on June 20, he would be expected to submit a Fitness For Duty form, in which his physician was to indicate the conditions under which Taylor would be able to work. Blanco enclosed the form in the letter. (Id. Ex. L.) The Hospital's procedure was to require an employee returning from a medical leave of absence to submit the Fitness For Duty form, listing any restrictions that she might have. (Bodee-Isidore Aff. P 6.) Once the form was submitted, one of the Hospital's physicians would examine the employee to determine whether she would be able to perform her job with or without an accommodation. In the event that the Fitness For Duty form indicated that the employee's condition would require a transfer to a different job, the Hospital would use the form to determine what positions she might be able to fill. (Id. PP 7-10.) Taylor never submitted the Fitness For Duty form, however, allegedly because Mary Ann Bodee-Isidore, the Director of Employee and Labor Relations, had told him that he could not return to work so long as there were any restrictions on his ability [*5] to lift. (Taylor Dep. at 61; 178-79.) He did not return to work in June (Pl. Mem. at 2), although there is no record of his FMLA leave having been further extended. Nonetheless, the Hospital apparently considered Taylor to be on continued medical leave until his eventual resignation. (Nayberg Affirm. Ex. A-28.)

The next communications between Taylor and the Hospital took place in September and October, when Taylor had a series of conversations with Bodee-Isidore and Marge Kilfeather, the Assistant Director of Nursing for Labor Relations. In these conversations, Taylor repeatedly asked whether he could return to his nursing position even though he was unable to lift more than forty pounds. (Pl. Mem. at 19; Kilfeather Dep. at 43-47; Bodee-Isidore Dep. at 35-42.) Both women advised him that since lifting was an intrinsic part of a Staff Nurse's duties, he should talk to the Hospital's Human Resources Department about available non-nursing positions. (Kilfeather Dep. at 43-47.) Taylor never did so. (Taylor Dep. at 123-24.) He alleges that, during one of these conversations, Bodee-Isidore told him that he would not be allowed to return to work until he was "100% fit," and that being unable [*6] to lift rendered him incapable of performing CPR, a requirement for all nurses. (Taylor Aff. P 4.)

In early October, plaintiff contacted the EEOC, and informed Blanco that he had been "in touch" with the agency.[1] (Id. P 5.) On November 14, he wrote to Bodee-Isidore, stating that the Hospital had not allowed him to return to work because an independent consulting physician, who had examined him for workers' compensation purposes, had deemed him "25% disabled." (Brown Aff. Ex. N.) Taylor asserted that, even with his lifting requirement, he was able to "perform the essential functions of [his] job ... according to the responsibilities outlined in the job description ... for a Registered Nurse" (id.), since the Hospital's Staff Nurse job description did not specifically state that lifting of any sort was part of a nurse's duties (id. Ex. R). He requested that he be allowed to "return to work with a reasonable accommodation according to the guidelines of the Americans With Disabilities Act." (Id. Ex. N.) Specifically, he asked for "an administrative accommodation to be transferred to a Registered Nurse position ... that does not involve lifting of more than 40 pounds. [*7] " (Id.)

> 1   It is not clear whether plaintiff filed a charge with the EEOC at this time; the agency did contact the Hospital regarding a charge until October 1999. (Nayberg Aff. Ex. A-15.)

Bodee-Isidore did not reply until November 30, at which point she sent Taylor a letter indicating that the Staff Nurse job description on which he had relied had recently been revised. (Id. Ex. O.) Since the new job description required that all Staff Nurses be able to lift at least fifty pounds (id. Ex. S), Bodee-Isidore stated that "it is an essential function of the RN position to be able to lift over 50 pounds. Employers are not required to provide an accommodation that would, in essence, relieve them of an essential function of the job." (Id. Ex. O.) She also noted that Taylor's own physician, Dr. Rho, had not yet "cleared" him to return to work (presumably because Taylor had not submitted the Fitness For Duty form in which his doctor would have indicated whether or not he thought that Taylor was healthy [*8] enough to return to work), and that the "impartial consultant physician exams rendered you as mild, partial disability ... [and] has not recommended a return to work date." (Id.)

The new job description to which Bodee-Isidore referred had become effective on November 11. Unlike the previous description, it lists several physical demands of the position, along with their relative frequency, stating that nurses must be able to lift "more than 50 lbs." at least once an hour. (Id. Ex. S.) According to the Hospital, the new description was the product of its two-year proc-

Case 2:09-cv-04400-ADS -WDW   Document 29-16   Filed 05/16/11   Page 33 of 66

Page 3

2003 U.S. Dist. LEXIS 5429, *; 14 Am. Disabilities Cas. (BNA) 753

ess of reevaluating all of its job descriptions, in light of the standards and recommendations of the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). (Kilfeather Dep. at 72-76.) The stated purpose of the modification was to implement objective benchmarks that would measure clinical competency, since the JCAHO had recommended that job descriptions should contain more quantitative requirements. (*Id.* at 72-73.) Since the JCAHO was to examine the Hospital in December 1998, the Hospital completed its job descriptions in November so that the JCAHO could analyze them when it arrived. ( [ *9] *Id.* at 73.)

There does not appear to have been further discussion between Taylor and Bodee-Isidore regarding his request for an accommodation. In January 1999, the Hospital wrote to Taylor to request that he fill out another FMLA leave form. By a letter dated February 19, 1999, Taylor resigned from his position, citing "the continued refusal of Lenox Hill Hospital to provide, suggest, discuss, or even consider a reasonable work accommodation." (Brown Aff. Ex. Q.) This suit followed.

*DISCUSSION*

Taylor asserts twelve claims for relief, resting on five theories of discrimination. First, he alleges that the Hospital violated the Americans with Disabilities Act, the New York State Human Rights Law, and the New York City Human Rights Law, by failing to provide reasonable accommodation for his disability. Second, he alleges that the Hospital discriminated against him because it regarded him as disabled, in violation of all three statutes. Third, plaintiff asserts that the Hospital discriminated against him on the basis of his disability within the meaning of the ADA by employing a standard or test that tends to screen out people with disabilities. Fourth, he asserts that the Hospital [*10] retaliated against him after he contacted the EEOC, in violation of the ADA, NYSHRL, and NYCHRL. Finally, Taylor claims that the Hospital discriminated against him on the basis of his sex, in violation of the NYSHRL and NYCHRL, because it accommodated pregnant nurses' lifting restrictions.

Defendant moves for summary judgment on all of plaintiff's claims, asserting that Taylor is not disabled within the meaning of the ADA, and that plaintiff's failure to follow the Hospital's procedures for returning from medical leave provides a legitimate reason for the Hospital's actions, and forecloses all of the remaining disability claims. (Def. Mem. at 5.) The Hospital also argues that Taylor's sex discrimination claim must fail because he was not similarly situated to female nurses who were given lifting accommodations during their pregnancies. (*Id.* at 23-25.) Plaintiff opposes the motion, arguing that the Hospital discouraged him from submitting the re-

quired form, and that factual issues prevent the dismissal of all of his claims. (Pl. Mem. at 6.)

I. *Summary Judgment Standard*

Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and [*11] admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *FED. R. CIV. P. 56(b).* The party opposing summary judgment "may not rest upon mere allegations or denials," rather it must "set forth specific facts showing that there is a genuine issue for trial." *Id. 56(e).* The non-moving party cannot defeat summary judgment by "offering purely conclusory allegations of discrimination," *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985),* or by offering evidence in opposition that is merely speculative. *See Dister v. Continental Group, Inc., 859 F.2d 1108, 1116-1117 (2d Cir. 1988).* Accordingly, to defeat summary judgment, she must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984).*

Summary judgment should be granted sparingly in employment discrimination cases, as "intent and state of mind are at issue," raising the possibility that "careful scrutiny of the factual allegations may reveal circumstantial evidence to support the [*12] required inference of discrimination." *Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).* In addition, credibility is a particularly important issue in discrimination cases, and "doubts about the credibility of an affidavit or deposition are generally left to the factfinder." *Brock v. Wright, 315 F.3d 158, 161 (2d Cir. 2003).* Thus, summary judgment should be granted only if there is no evidence in the record that could reasonably support a jury verdict for the non-moving party. *Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000).*

II. *Plaintiff's Claims Under the ADA*

Plaintiff brings four claims for disability discrimination under the ADA. Three out of the four theories of disability discrimination -- failure to accommodate, discrimination because of his disability, and the use of standards that screen out disabled people -- require that plaintiff have a disability within the meaning of the ADA in order to invoke its protections. *See Stone v. City of Mount Vernon, 118 F.3d 92, 96-97 (2d Cir. 1997)* (stating prima facie case for failure to accommodate claim); *Reeves v. Johnson Controls, 140 F.3d 144, 149-50 (2d Cir. 1998)* [*13] (stating prima facie case for disability discrimination claim); *O'Neal v. City of New Albany, 293 F.3d 998, 1010 (7th Cir. 2002)* (holding that plaintiff could not state a claim for use of a discriminatory em-

ployment policy under *42 U.S.C. § 12112(b)(6)* without having a disability within the meaning of the ADA). Because plaintiff has not presented evidence from which a rational juror could conclude that he has a disability within the meaning of the ADA, these three claims must be dismissed.

A. *Disability Under the ADA*

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," or "being regarded as having such an impairment." *42 U.S.C. § 12102(2) (2000).* For an impairment to be substantially limiting, it must significantly restrict the manner in which an individual can perform a major life activity, in comparison with the average member of the general population. *Reeves, 140 F.3d at 150* (citing *29 C.F.R. § 1630.2(j)(1)(ii)*). Plaintiff argues that he had a disability because his [*14] injury substantially limited him with respect to lifting and working (Pl. Mem. at 12-15), both of which constitute major life activities under the ADA, or in the alternative, that the Hospital regarded him as so limited. *Colwell v. Suffolk Cty. Police Dep't, 158 F.3d 635, 642-43 (2d Cir. 1998).*

Plaintiff's lifting restriction clearly does not constitute a disability under the ADA, because the inability to lift over forty pounds is not a substantial limitation. Since the average person in the general population may not be able to lift forty pounds or more, Taylor's lifting ability is not substantially restricted in relation to that of most people. See, e.g., Strassberg v. Hilton Hotels Corp., 1997 U.S. Dist. LEXIS 12916, No. 95 Civ. 6235, 1997 WL 531314 (S.D.N.Y. Aug. 28, 1997), *aff'd, 173 F.3d 846 (2d Cir. 1999).* With respect to the activity of working, in order to be substantially limited in the ability to work, an individual must be unable to perform a broad class of jobs, not simply a single job or type of job. *Colwell, 158 F.3d at 643 (2d Cir. 1998).* Since many jobs do not require lifting over forty pounds, Taylor is not substantially limited [*15] in his ability to work.

Plaintiff next argues that he has a disability because the Hospital regarded him as disabled with respect to lifting or working. EEOC regulations define being regarded as having a disability as, in relevant part, having "a physical or mental impairment that does not substantially limit a major life activity but is treated by [an employer] as constituting such limitation." *29 C.F.R. § 1630.2(l).* Since employers are often aware of an employee's physical restrictions, plaintiff may not rest on conclusory allegations that the Hospital considered him disabled or unqualified for the position at issue because of his limitation, but must present evidence that tends to show that defendant perceived him as substantially limited in a major life activity. *Reeves, 140 F.3d at 153-54.*

Plaintiff has not proffered any evidence that the Hospital regarded him as substantially limited in his ability to work. It is undisputed that the Hospital knew of plaintiff's forty-pound lifting limit, and that it considered him unable to fulfill the duties of a Staff Nurse because of it. (Brown Aff. Ex. O.) There is no evidence, however, that [*16] the Hospital considered Taylor substantially limited in relation to the average person; in fact, the evidence suggests that the Hospital considered the lifting restriction only mildly limiting. In her letter to plaintiff, Bodee-Isidore stated that plaintiff had a "mild, partial disability" *(id.),* and the Hospital approved surveillance of the plaintiff precisely because his disability was mild enough that he was suspected of working elsewhere (Nayberg Affirm. Ex. A-2).

Since being disabled with respect to working requires that an individual be unable to perform a broad range of jobs, the Hospital would have had to consider Taylor unable to work at most jobs, rather than simply disqualified from working as a Staff Nurse. *Beason v. United Technologies Corp., 213 F. Supp. 2d 103, 111-12 (S.D.N.Y. 2002).* While there is evidence that Bodee-Isidore and Kilfeather told plaintiff that he would be unable to work as a nurse as long as he was unable to do heavy lifting (Taylor Dep. at 56; Kilfeather Dep. at 44), both suggested to plaintiff that he investigate vacant non-nursing positions. (Bodee-Isidore Dep. at 36; Kilfeather Dep. at 46.) Thus, while the Hospital may have [*17] viewed plaintiff as unfit for any job that required heavy lifting, it clearly did not regard him as incapable of performing most jobs. *Beason, 213 F. Supp. 2d at 112-15* (surveying cases and concluding that to be regarded as disabled, employee must be viewed as unable to perform a range of jobs that vary widely in the degree of exertion required).

Because plaintiff does not have a disability within the meaning of the ADA, his claims under the ADA of failure to accommodate, discrimination because of his disability, and use of a discriminatory standard, must be dismissed.

B. *Retaliatory Job Action*

Plaintiff's remaining ADA claim is based on the theory that the Hospital's implementation and enforcement of the fifty-pound lifting requirement constituted retaliation for his requests for an accommodation and his contact with the EEOC. (See, e.g., Compl. P 78.) The fact that plaintiff was not actually disabled within the meaning of the ADA does not affect his retaliation claim, since the statute requires only that he have contacted the EEOC with the good-faith belief that the Hospital's conduct was unlawful under the ADA. *Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002);* [*18] *Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155,*

Case 2:09-cv-04400-ADS -WDW   Document 29-16   Filed 05/16/11   Page 35 of 66

Page 5

2003 U.S. Dist. LEXIS 5429, *; 14 Am. Disabilities Cas. (BNA) 753

*159 (2d Cir. 1999).* Here, the evidence would permit a factfinder to conclude that plaintiff subjectively believed both that he was disabled under the ADA (Brown Aff. Ex. N), and that the Hospital was wrongfully refusing to accommodate his disability (Taylor Aff. P 5). The Hospital has not argued that Taylor contacted the EEOC in bad faith, or that his belief that he was disabled under the ADA was in any way unreasonable.

Claims of retaliation under the ADA are analyzed under the burden-shifting framework used for Title VII retaliation claims. *Treglia, 313 F.3d at 719.* To establish a prima facie case, plaintiff must proffer evidence tending to show that "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* Once the plaintiff establishes a prima facie case of retaliatory action, the burden shifts to the employer to put forth a legitimate, nondiscriminatory reason for the employment [*19] action at issue. If the defendant carries its burden, any inference of discrimination drops out, and the plaintiff must establish that the legitimate reason is pretextual. Evidence casting doubt on the employer's proffered justification "may -- or may not -- be sufficient" to establish pretext. *Fisher v. Vassar College, 114 F.3d 1332, 1333 (2d Cir. 1997)* (en banc). Thus, when the employer has proffered an explanation and the plaintiff has attempted to refute it, the Court's responsibility is to "examine the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally [retaliated] against the plaintiff.'" *Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000)* (citing *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).*

Plaintiff has presented sufficient evidence to establish a prima facie case of retaliation. He contacted the EEOC in October 1998, for advice concerning the Hospital's position that he could not return to work until he was completely recovered. (Taylor Aff. P 5.) Shortly thereafter, [*20] plaintiff told Lourdes Blanco, the Hospital's Benefits Coordinator, that he had been in touch with the EEOC, which constitutes a protected activity, and that he was requesting a reasonable accommodation under the ADA. *(Id.)* She allegedly stated that she would tell her supervisor that Taylor had talked to the EEOC. *(Id.)* There is no evidence in the record as to whether Blanco ever relayed the conversation to anyone else in the Hospital. Blanco's knowledge is sufficient to satisfy the knowledge requirement of the prima facie case, however, as all that is necessary is that the Hospital, as a corporate entity, know of plaintiff's protected activity. *Gordon v.*

*New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000).*

With respect to the third element of the prima facie case, the Hospital argues that the implementation and enforcement of the lifting requirement did not constitute an adverse employment action (Def. Mem. at 21-22), but the enforcement of the requirement led directly to the Hospital's refusal to consider plaintiff's two suggested accommodations. In his discussions with the Hospital during the fall of 1998, plaintiff suggested two possible accommodations: [*21] reinstatement in his CCU Staff Nurse position, with the understanding that he would not have to lift over forty pounds (Taylor Aff. P 12), or transfer to another position that would allegedly require less lifting (Brown Aff. Ex. N). The Hospital refused both of these accommodations, as indicated by Bodee-Isidore's November 30 letter to Taylor, [2] specifically because Taylor had admitted that he would be incapable of fulfilling the fifty-pound lifting requirement. This refusal constitutes an adverse action with respect to the terms and conditions of plaintiff's employment, since it prevented plaintiff from returning to work. *See Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).*

---

2   The context surrounding Taylor's correspondence with Bodee-Isidore indicates that her letter refused both suggested accommodations, even though it did not explicitly mention the IV Nurse position. While Taylor's written request for an accommodation asked for "transfer to a Registered Nurse position ... that does not involve lifting of more than 40 pounds" (Brown Aff. Ex. N), and the IV Nurse position was technically not a nursing position, he had discussed both a transfer to the IV Nurse position (Bodee-Isidore Dep. at 41) and returning to his original position (Taylor Aff. P 4) with Bodee-Isidore. With respect to the IV Nurse position, plaintiff talked to Ruth Ravenell, the IV Team supervisor, and was told that per diem vacancies existed. (Taylor Aff. P 7; Kilfeather Dep. at 40-41.) Taylor states that when he next inquired about the position, after he had requested a lifting accommodation in November, Ravenell told him that "there was a problem about ... taking the position at this time," and Kilfeather stated that he should wait for a letter from the Hospital -- referring to the Bodee-Isidore letter that denied his request to return to work with a lifting accommodation. (Taylor Aff. P 8.) Thus, it is possible to infer that this letter was meant to deny plaintiff's request for a transfer to the IV Team as well as his request for a lifting accommodation in the CCU position.

Case 2:09-cv-04400-ADS -WDW   Document 29-16   Filed 05/16/11   Page 36 of 66

Page 6

2003 U.S. Dist. LEXIS 5429, *; 14 Am. Disabilities Cas. (BNA) 753

[*22]  Finally, a jury could infer a causal connection between the protected activity and the adverse action based on the close temporal proximity of the two events. *Treglia, 313 F.3d at 720-21* (holding that temporal proximity alone could establish the requisite causal connection for purposes of the prima facie case). Since Taylor complained to the EEOC in October and the Hospital put the lifting requirement into effect, and enforced it against him, in November, the temporal proximity would permit a jury to infer a causal connection between his EEOC contact and the failure to accommodate him.

The Hospital has proffered legitimate nondiscriminatory reasons for its creation and enforcement of the lifting requirement. The Hospital offers testimony that it developed the requirement to comply with JCAHO recommendations (Bodee-Isidore Dep. at 100-01; Kilfeather Dep. at 73-74), and enforced it against Taylor because the Hospital considered the new requirement to be an essential function of all Staff Nurse positions. The Hospital contends that exempting Taylor from the requirement would have been an unreasonable burden, because the lifting requirement embodies an essential function [*23] of all nursing positions, and that therefore Bodee-Isidore enforced the requirement against him in the belief that doing so would not violate any disability statutes. (Def. Mem. at 15-16; Brown Aff. Ex. O.) Taylor argues that these reasons are pretextual because the Hospital selectively enforced the requirement against him, and because the fact that the Hospital set the requirement ten pounds over plaintiff's lifting capability indicates that it may have developed the requirement itself in retaliation against him. (Compl. P 78; Pl. Mem. at 24.)

Plaintiff's most persuasive evidence to this effect is that the Hospital does not appear to have enforced the new requirement in a broad-based way. The Hospital did not test other current or prospective employees for their ability to lift fifty pounds (Bodee-Isidore Dep. at 115; Hurley Aff. P 3), and at least one CCU Nurse was not even aware of the new requirement (Hurley Aff. P 3). This could suggest to a reasonable juror that the Hospital was selectively enforcing the requirement against Taylor, casting doubt on the legitimacy its use of the requirement to avoid accommodating him. On the other hand, there is no evidence that the Hospital [*24]  would not have acted similarly had another nurse, like Taylor, affirmatively informed it that she could not fulfill the lifting requirement. The formal, quantitative standard was new, weakening any inference from the absence of other cases enforcing it. At the same time, the vaguer requirement that nurses be able to engage in heavy lifting indisputably was an attribute of the job long before the adoption of the specific standard; indeed, Taylor's inability to perform that function was the reason he sought and was granted leave from his job in the first place. This fact

significantly undercuts any inference that the lifting requirement was not genuine.

At any rate, even if plaintiff's evidence of selective enforcement casts doubt on the veracity of the Hospital's justification, it does not raise an inference of retaliatory intent. Because "proof that the employer's explanations were false would not necessarily constitute affirmative evidence that the real reason was prohibited discrimination," in order to successfully rebut the employer's evidence of legitimate reasons, a plaintiff alleging discriminatory retaliation must present evidence from which a factfinder could conclude that [*25]  the adverse employment action was in fact motivated by retaliatory intent. *Collette v. St. Luke's Roosevelt Hospital,* 2002 U.S. Dist. LEXIS 18164, No. 99 Civ. 4864 (GEL), 2002 WL 31159103, at *3 (S.D.N.Y. Sept. 26, 2002) (discussing *James v. New York Racing Assoc., 233 F.3d 149, 154 (2d Cir. 2000),* and its requirement that plaintiff produce evidence of discrimination in addition to the evidence sufficient to satisfy the minimal prima facie case); *see also Morris v. City of New York, 153 F. Supp. 2d 494, 500-01 (S.D.N.Y. 2001)* (noting that evidence of falsity of employer's justification is not enough to withstand summary judgment, absent evidence of discrimination). Here, plaintiff has proffered no evidence that suggests that the Hospital's enforcement of the requirement against him is in any way related to the fact that he had recently contacted the EEOC.

Taylor also suggests that the requirement itself was developed and added to the Staff Nurse job description in retaliation against him. (Compl. P 78.) This claim is speculative at best; while plaintiff states that he suspects that the Hospital "purposely changed the job description to include a weight lifting [*26]  requirement that was ten pounds ... over my doctor's recommendation" (Taylor Dep. at 160), he does not proffer any evidence to support this theory. The Hospital has presented testimony that the job description was changed to comply with JCAHO recommendations (Bodee-Isidore Dep. at 100-01; Kilfeather Dep. at 73-74), [3] and although plaintiff points out that defendant has not produced the JCAHO recommendations themselves (Pl. Mem. at 3), he has not suggested a reason to doubt the Hospital's explanation and its employees' sworn testimony. In addition, he does not contest the Hospital's assertions that the lifting requirement on its face applies to 800 Staff Nurses (Def. Mem. at 23), was created as part of a process that took roughly a year, starting before plaintiff was injured (Kilfeather Dep. at 74), and is only one of many physical and other requirements that were quantified for the first time in the new job description (Brown Aff. Ex. S). [4] Thus, there is simply no evidence in the record from which a jury could infer that the Hospital created the requirement with the

Case 2:09-cv-04400-ADS-WDW   Document 29-16   Filed 05/16/11   Page 37 of 66

Page 7

2003 U.S. Dist. LEXIS 5429, *; 14 Am. Disabilities Cas. (BNA) 753

intent of enforcing it against Taylor to retaliate for his contact with the EEOC.

> 3   It is not clear who was responsible for the new job description and the fifty-pound lifting requirement, as both Bodee-Isidore and Kilfeather stated that they had not been involved in the project, and did not know who had. (Bodee-Isidore Dep. at 101-03; Kilfeather Dep. at 73-74.) There is no evidence that anyone who was involved in the drafting process had any animus against Taylor, or any awareness of his EEOC complaint.

[*27]

> 4   Plaintiff does suggest that, before the lifting requirement was added to the job description, Bodee-Isidore had cited a number of reasons that he could not return to work, including his not being physically able to perform CPR, and the fact that the IV Nurse position was per diem and did not carry benefits. (Pl. Mem. at 25.) These alleged statements in themselves, while perhaps probative of the Hospital's state of mind with respect to Taylor's returning to work, and therefore relevant to his failure to accommodate and discrimination claims, do not support any inference that the Hospital created and enforced the lifting requirement in order to retaliate against Taylor.

Taylor's remaining argument as to pretext is essentially that the Hospital exhibited reluctance -- an "adverse disposition" -- to allow Taylor to return to work, suggesting that the fifty-pound lifting requirement was simply an excuse to keep Taylor from returning. (Pl. Mem. at 25.) Plaintiff argues that the Hospital betrayed this reluctance when it authorized surveillance of him at the beginning of October 1998, even though [*28] Taylor's conversations with Kilfeather and Bodee-Isidore should have alerted the Hospital that Taylor was truly disabled and eager to come back to work. (Id.) The evidence in the record establishes, however, that the surveillance was authorized at the request of the Hospital's workers' compensation carrier, and that the purpose of the investigation was to verify that plaintiff was not working elsewhere while continuing to accept workers' compensation from the Hospital's carrier. (Nayberg Affirm. Ex. A-2.) Although the Hospital authorized surveillance relatively infrequently (Bodee-Isidore Dep. at 54), it had used it in the past, in similar situations. (Id.) In addition, there is no evidence suggesting that plaintiff was harmed by the surveillance, that the Hospital took any adverse actions because of it, conducted it to harass plaintiff, or that it played a role in the Hospital's alleged refusal to transfer him. No rational juror could conclude that the surveillance, even assuming that it took place after the Hospital knew of plaintiff's EEOC contact, suggests that the Hospital intended to retaliate against Taylor.

Taylor has failed to show that the Hospital's proffered nondiscriminatory [*29] reasons were pretexts for retaliating against him. First, his prima facie case is weak. The causal connection between Taylor's activity and the adverse action relies entirely on the temporal proximity of the two events, rather than on any suspicious circumstances or comments made by Hospital officials. Second, Taylor has not presented any evidence tending to show that Bodee-Isidore or any other Hospital decision-makers intended to retaliate against him. It is not even clear that any decision-makers, other than Blanco, had knowledge of his discussions with the EEOC, or that the employees responsible for developing the new job description even knew who he was. The various facts Taylor cites in support of his failure to accommodate and discrimination claims do not suggest that the Hospital took any actions because of Taylor's conversations with the EEOC. Thus, summary judgment must be granted with respect to Taylor's ADA retaliation claim. See Collette, 2002 U.S. Dist. LEXIS 18164, 2002 WL 31159103, [WL] at *10 (stating that where plaintiff has established "minimally adequate" prima facie case and proffered weak evidence of pretext, no inference of retaliatory intent was raised).

III. *Plaintiff's* [*30] *State Claims*

Taylor also brings several state and municipal claims for disability discrimination, based on the same theories as his ADA claims, and for sex discrimination. Having dismissed all of the claims over which this Court has original jurisdiction, however, it is unnecessary to reach the merits of the state claims. The statute governing federal supplemental jurisdiction, 28 U.S.C. § 1367, provides courts with discretionary authority to dismiss remaining state claims when all federal claims have been dismissed prior to trial. 28 U.S.C. § 1367(c)(3) (2000). Indeed, the Second Circuit has held that "in general, where the federal claims are dismissed before trial, the state claims should be dismissed as well," *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) (internal citations omitted), since "the appropriate analytic framework to be applied to discrimination claims ... as defined by New York state and municipal law is a question best left to the courts of the State of New York." *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001).

CONCLUSION

For the reasons set forth above, [*31] defendant's motion for summary judgment is granted as to all claims under the ADA. Plaintiff's remaining state claims are dismissed pursuant to 28 U.S.C. § 1367(c)(3).

SO ORDERED.

2003 U.S. Dist. LEXIS 5429, *; 14 Am. Disabilities Cas. (BNA) 753

Dated: April 2, 2003                                    United States District Judge

GERARD E. LYNCH

# Exhibit 71



ANGEL R. GARCIA, Plaintiff, - against - DEPARTMENT OF CORRECTIONAL SERVICES, NEW YORK STATE, Defendants.

05 Civ. 5138 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2006 U.S. Dist. LEXIS 89061*

December 5, 2006, Decided
December 7, 2006, Filed

**PRIOR HISTORY:** *Garcia v. New York State, 2005 U.S. Dist. LEXIS 22991 (S.D.N.Y., Oct. 5, 2005)*

**COUNSEL:** **[*1]** For Plaintiff: Edward A. Schneider, Esq., New York, New York.

For Defendants: Jeb Harben, Assistant Attorney General, Office of the Attorney General, New York, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I. INTRODUCTION**

Angel R. Garcia brings this action against the Department of Correctional Services ("DOCS") and the State of New York (collectively, the defendants). [1] Garcia alleges that defendants discriminated against him in violation of Title VII of the Civil Rights Act of 1964 [2] ("Title VII") and the Americans with Disabilities Act [3] ("ADA"). Garcia seeks monetary damages and equitable relief in the form of an oral and written apology and work schedule accommodations. [4] Defendants now move to dismiss the case pursuant to *Federal Rule of Civil Procedure 56.* For the following reasons, defendants' motion is granted.

1   In a prior Opinion, this Court dismissed Garcia's claims against Glenn S. Goord, Commissioner of DOCS, pursuant to *Federal Rule of Civil Procedure 12(b)(6). See Garcia v. New York State, No. 05 Civ. 5138, 2005 U.S. Dist. LEXIS 22991, 2005 WL 2581926, at *1 (S.D.N.Y. Oct. 11, 2005).*

**[*2]**

2   *See 42 U.S.C. § 2000e et seq.*
3   *See id. § 12101 et seq.*
4   *See* Complaint ("Compl."), Ex. A to the Declaration of Jeb Harben [counsel for defendants] in Support of Defendants' Motion for Summary Judgment ("Harben Decl."), at 4.

**II. BACKGROUND** [5]

5   Unless otherwise indicated, the following facts are either undisputed or evaluated in the light most favorable to the plaintiff.

In early 2004, Garcia was employed as a registered nurse by DOCS and assigned to the Fulton Correctional Facility in the Bronx. [6] On January 7, 2004, Garcia alleges that a colleague, Sergeant Alicia Perez, referred to him as a "Puerto Rican rat." [7] Garcia reported this incident to Acting Deputy Superintendent, Cynthia Morton. [8] Morton investigated Garcia's allegations at the facility level and found that the claim could not be substantiated. [9] Morton forwarded the results of **[*3]** the internal investigation to DOCS' Office of Diversity Management ("OMD"). [10]

2006 U.S. Dist. LEXIS 89061, *

6  *See* Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem.") at 1.

7  4/25/06 Deposition of Angel Garcia ("Garcia Dep."), Ex. G to Harben Decl., at 143. *See also* Def. Mem. at 3. Although not raised in his Complaint, Garcia claimed for the first time at his deposition that there was a second incident in which Sgt. Perez called him a "Puerto Rican rat." Garcia Dep. at 144. However, Garcia did not report this incident to DOCS. As a result, DOCS was not in a position to investigate this allegation. Further, Garcia claimed that the second incident occurred in the presence of Sergeant Raymond Adams and Lieutenant Long. However, Adams testified at his deposition that he had no recollection of any such incident. *See* 5/31/06 Deposition of Raymond Adams ("Adams Dep."), Ex. R to Harben Decl.

8  *See* Defendants' *Rule* 56.1 Statement ("Def. 56.1") P 5. *See also* Plaintiff's Affirmation in Opposition ("Pl. Opp.") P 5; 1/18/06 Deposition of Cynthia Morton, Ex. F to Harben Decl., at 60.

[*4]

9  *See* Def. 56.1 PP 7-8. Morton took written statements from Garcia, Sgt. Perez, Sgt. Robert Taylor, Sgt. Cylton Collymore, and Lt. George Enny. *See id.* 1/22/04 Memorandum from Cynthia Morton to Charlie Harvey ("Morton Mem."), Ex. H to Harben Decl.

10  *See* Def. 56.1 P 10.

During its investigation, OMD conducted interviews with numerous witnesses. [11] None of the witnesses interviewed corroborated Garcia's account of the incident. [12] However, in his deposition testimony, Sergeant Robert Taylor stated that Sergeant Perez had once referred to Garcia as "a rat." [13] Based on the witnesses' statements, OMD found that Garcia's claim of racial and ethnic harassment could not be substantiated. [14]

11  *See id.* P 11. Interviews were conducted of the same witnesses from whom Morton received written statements during the internal investigation. *See id.*

12  *See id.* P 9. *See also* 2/10/06 Deposition of Alicia Perez, Ex. C to Harben Decl.; 1/17/06 Deposition of Robert Taylor ("Taylor Dep."), Ex. D to Harben Decl.; and 1/17/06 Deposition of Clyton Collymore, Ex. E to Harben Decl.

[*5]

13  Taylor Dep. at 36. *See also* Pl. Opp. P 9; Def. Mem. at 4.

14  *See* Def. 56.1 P 13. *See also* 5/5/04 Letter from Charlie Harvey to Garcia, Ex. M to Harben Decl.; 3/3/04 Memorandum from Mary Savage to Harvey, Ex. J to Harben Decl.

In a March 2004 letter to Acting Deputy Superintendent Laurel Jones, Garcia requested a change in work schedule for an unspecified medical condition. [15] Later, Garcia clarified that he was suffering from sleep apnea. [16] By letter dated March 25, 2004, Garcia's request for a change in work schedule was denied because it did "not meet the needs of the facility." [17] Garcia filed a Charge with the Equal Employment Opportunity Commission ("EEOC") sometime in March 2004. [18] On March 4, 2005, the EEOC issued Garcia a right-to-sue letter for violations under Title I and Title V of the ADA. [19]

15  3/25/04 Letter from Garcia to Laurel Jones, Ex. A to Harben Decl. Garcia sought to have his Tuesday to Friday work schedule changed from 9:00 a.m. to 5:00 p.m. to 11:00 a.m. to 7:00 p.m. *See id.*

[*6]

16  *See* Def. Mem. at 7. Sleep apnea is "a disorder which causes a person to cease breathing for longer than ten seconds while asleep; it can be caused by a brain wave abnormality or irregularities in a person's airway musculature." *Brown v. Triboro Coach Co., 153 F. Supp. 2d 172, 175 n.1 (E.D.N.Y. 2001).* During his deposition, Sgt. Adams stated that he also suffers from sleep apnea. However, he stated that the condition does not affect his work schedule, which includes working double shifts, starting work as early as 5:00 a.m. and ending after 10:00 p.m. *See* Adams Dep. at 13-15.

17  3/25/04 Letter from Jones to Garcia, Ex. A to Harben Decl.

18  *See* EEOC Intake Questionnaire, Ex. K to Harben Decl.

19  *See* 4/4/05 Letter from EEOC to Garcia, Ex. A to Harben Decl. Title V of the ADA provides a cause of action for retaliatory discrimination or interference, coercion, or intimidation. Having considered the pleadings in the light most favorable to the plaintiff, Garcia has not claimed violations under Title V of the ADA. Instead, Garcia is claiming solely a failure to make reasonable accommodations for his alleged disability. Therefore, for purposes of this Opinion, the Court addresses Garcia's ADA claim under Title I only.

[*7]  On April 16, 2004, Garcia was suspended from work for reasons unrelated to this litigation. [20] For the three weeks prior to his suspension, Garcia continued to work from 9:00 a.m. to 5:00 p.m. [21] While on suspension, OMD notified Garcia that he must provide medical documentation with his request for work schedule ac-

Case 2:09-cv-04400-ADS -WDW    Document 29-16    Filed 05/16/11    Page 42 of 66

Page 3
2006 U.S. Dist. LEXIS 89061, *

commodations. [22] In May 2004, [23] Garcia supplemented his request with a May 4, 2004 letter from Dr. Paul Maravel. [24] The letter stated that Garcia was requesting a change in work hours "due to his severe sleep apnea -- and his inability to get a sufficient amount of sleep." [25] Dr. Maravel later stated that he "wrote the note as a courtesy to Mr. Garcia, who was my patient. The note is not a statement that in my medical opinion, Mr. Garcia[] . . . was unable to perform his job functions without the change. To date, I have not offered any such opinion or medical advice to Mr. Garcia." [26]

20   See 4/16/04 Notice of Discipline to Garcia, Ex. L to Harben Decl.
21   See Def. 56.1 P 18.
22   See 5/5/04 Letter from Harvey to Garcia, Ex. M to Harben Decl.

[*8]

23   Defendants claim that Garcia submitted a form requesting reasonable accommodations on May 24, 2004. However, Garcia claims the form was signed on May 13, 2004 and received May 18, 2004. For purposes of this Opinion, the dates provided by Garcia are presumed true.
24   See 5/4/04 Letter from Paul W. Maravel, M.D. to Garcia ("Maravel Letter"), Ex. M to Harben Decl.
25   Id.
26   Declaration of Paul Maravel, M.D., Ex. N to Harben Decl., P 5.

In August 2004, following his suspension, Garcia returned to work under a new schedule approved by Superintendent William Connolly. [27] The new schedule allowed Garcia to begin work at 10:00 a.m. several days of the week. [28] On January 14, 2005, Garcia was suspended pending termination for reasons unrelated to this litigation. [29] In a decision dated September 22, 2005, Garcia's termination was upheld by a labor arbitrator. [30]

27   See 8/10/04 Memorandum from Connolly to Garcia, Ex. O to Harben Decl. See also 2/22/06 Deposition of Connolly, Ex. S to Harben Decl.

[*9]

28   See Def. 56.1 P 24.
29   See id. P 26.
30   See id. P 27. See also Opinion and Award of Arbitrator, Ex. P to Harben Decl.

Garcia commenced this action on May 31, 2005, alleging Title VII and ADA violations. Specifically, Garcia claims that the reference to him as a "Puerto Rican rat" violated his rights pursuant to Title VII and caused him "great embarrassment, humiliation, sleep disturbances, pain and suffering." [31] Further, Garcia claims that the use of this racial epithet created a hostile work environment.

Garcia also claims that the failure to accommodate his sleep apnea by modifying his work schedule violated the ADA. [32]

31   Compl. at 5.
32   See id.

## III. LEGAL STANDARD

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment [*10] as a matter of law." [33] "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'" [34] A fact is material when "it 'might affect the outcome of the suit under the governing law.'" [35] The movant has the burden of demonstrating that no genuine issue of material fact exists. [36]

33   Fed. R. Civ. P. 56(c).
34   Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).
35   Id. (quoting Anderson, 477 U.S. at 248).
36   See, e.g., Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)).

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it must do more than show that there is a "'metaphysical doubt as to the material [*11] facts,'" [37] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'" [38] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. [39]

37   Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).
38   Jeffreys, 426 F.3d at 554 (quoting Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 428 (2d Cir. 2002)).
39   See, e.g., Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 201 (2d Cir. 2004).

## IV. APPLICABLE LAW

### A. Title VII of the Civil Rights Act

Title VII makes it unlawful for an employer,

to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, [*12] conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as any employee, because of such individual's race, color, religion, sex, or national origin. [40]

In order to prevail on a claim of hostile work environment under Title VII, a plaintiff must show that a reasonable person would find that "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [41] A plaintiff must also show that he "subjectively perceive[d] that environment to be abusive." [42] Further, a plaintiff "must also demonstrate that [he] was subjected to the hostility because of [his] membership in a protected class." [43]

40   *42 U.S.C. § 2000e-2(a)(1).*
41   *Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003)* (quotation marks and citation omitted). *See also Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004).*
[*13]
42   *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).*
43   *Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 318 (2d Cir. 1999).*

In deciding whether plaintiff's work environment was sufficiently hostile under Title VII to withstand a motion for summary judgment, a court must consider the totality of the circumstances, [44] including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [45] "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'" [46] However, a single episode may be sufficient if it is severe enough to establish a hostile work environment. [47]

44   *See Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004). See also Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).*
[*14]
45   *Harris, 510 U.S. at 23.*
46   *Hill v. Rayboy-Brauestein, No. 02 Civ. 3770, 467 F. Supp. 2d 336, 2006 U.S. Dist. LEXIS 82759, 2006 WL 3298383, at *14 (S.D.N.Y. Nov. 9, 2006)* (quoting *Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)). See also Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992)* ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").
47   *See Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004). See also Mormol v. Costco Wholesale Corp., 364 F.3d 54, 59 (2d Cir. 2004)* (stating that it is "well-settled in this Circuit that even a single act can meet the threshold of [hostile work environment] if, by itself, it can and does work a transformation of the plaintiff's workplace") (quotation marks and citation omitted)).

### B. American with Disabilities Act

The ADA provides that

no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual [*15] in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. [48]

The ADA requires employers to make reasonable accommodations "'to the known physical or mental limitation of an otherwise qualified individual with a disability.'" [49] Further, the ADA defines a disability to include a physical or mental impairment that substantially limits one or more major life activities of the individual, a record of such an impairment, or being regarded as having such an impairment. [50]

48   *42 U.S.C. § 12112(a).*
49   *Board of Trustees v. Garrett, 531 U.S. 356, 361, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001)* (quoting *42 U.S.C. § 12112(b)(5)(A)).*
50   *See 42 U.S.C. § 12111(8).*

### C. Eleventh Amendment

Even if a plaintiff is able to make out a prima facie case under Title VII or the ADA, "[i]t is well-settled **[*16]** that the *Eleventh Amendment* bars claims for damages against nonconsenting states and against entities . . . that are considered arms of the state." [51] "The *Eleventh Amendment* prevents civil suits against a state and its agencies unless the state has unequivocally consented or Congress has abrogated the state's immunity pursuant to its powers under the *Fourteenth Amendment*." [52]

> 51   *Jackson v. City Univ. of N.Y., No. 05 Civ. 8712, 2006 U.S. Dist. LEXIS 43221, 2006 WL 1751247, at *2 (S.D.N.Y. June 23, 2006).* The *Eleventh Amendment* states that the "judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." *U.S. Const. amend. XI.*
> 52   *Rolle v. New York State Liquor Auth., No. 05 Civ. 3536, 2006 U.S. Dist. LEXIS 55821, 2006 WL 2254807, at *3 (S.D.N.Y. Aug. 7, 2006). See also Board of Trustees, 531 U.S. at 365-75* (holding that Title I of the ADA did not abrogate *Eleventh Amendment* immunity).

**[*17] V. DISCUSSION**

**A. There Is No Genuine Issue of Material Fact Under Title VII**

Garcia claims that his rights were violated under Title VII when a colleague called him a "Puerto Rican rat." While a reasonable jury could find that Garcia is a member of a protected class [53] and that he subjectively perceived the environment to be abusive, [54] Garcia's hostile work environment claim fails because he has not raised a triable issue of fact as to whether the harassment was objectively severe or pervasive.

> 53   *See Avillan v. Potter, No. 04 Civ. 9019, 2006 U.S. Dist. LEXIS 80062, 2006 WL 3103309, at *10 (S.D.N.Y. Nov. 1, 2006)* ("Plaintiff, as a Hispanic man born in Puerto Rico, belongs to a protected class . . . .").
> 54   *See* Garcia Dep. at 160.

Specifically, Garcia has alleged only one or two incidents in which a racial epithet was used to refer to him. At his deposition, Garcia stated that he did not claim that Sergeant Perez called him a Puerto Rican rat at any time other than those two occasions. [55] **[*18]** At worst, the alleged acts are unfortunate, irresponsible, and offensive. But they do not rise to the level of a Title VII violation.

Therefore, defendants' motion to dismiss Garcia's hostile work environment claim is granted.

> 55   *See id.* at 149.

**B. There Is No Genuine Issue of Material Fact Under the ADA**

Garcia has alleged ADA violations by New York State and the New York State Department of Correctional Services for failing to make reasonable accommodations to Garcia's work schedule. Because the *Eleventh Amendment* bars claims against a nonconsenting state and its agencies, Garcia's failure to accommodate claim is dismissed. [56]

> 56   Agencies of the state, such as DOCS, are entitled to assert the state's *Eleventh Amendment* immunity where, for all intents and purposes, the agency is the alter ego of the state and the state is the real party in interest. *See Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)* ("[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the *Eleventh Amendment.*") (citing *Florida Dep't of Health v. Florida Nursing Home Ass'n, 450 U.S. 147, 101 S. Ct. 1032, 67 L. Ed. 2d 132 (1981) (per curiam); Alabama v. Pugh, 438 U.S. 781, 98 S. Ct. 3057, 57 L. Ed. 2d 1114 (1978) (per curiam)*).

**[*19]** Alternatively, Garcia has not raised a triable issue of fact as to whether his sleep apnea meets the requirements of an ADA disability. Specifically, Garcia has not demonstrated that his condition substantially limited any major life activity. The EEOC has defined major life activities to include "performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." [57] Garcia has not shown that he could not function at work, had serious difficulty performing tasks, or was otherwise seriously impaired by his sleep apnea. Instead, Garcia has offered nothing more than a mere grievance against defendants for failing to change his work schedule. Garcia's own doctor stated that he submitted a note in support of Garcia's request for a change in work hours only because "Garcia asked me to submit a note on his behalf" and not because the doctor believed it was medically necessary. [58]

> 57   *Heyman v. Queens Village Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 73 (2d Cir. 1999)* (quotation marks and citation omitted).
> 58   Maravel Letter at 1.

2006 U.S. Dist. LEXIS 89061, *

**[\*20]** Further, upon receipt of Garcia's formal request for reasonable accommodations and Dr. Maravel's accompanying letter, DOCS allowed Garcia to begin work at 10:00 a.m. instead of 9:00 a.m. [59] This new schedule was in effect from August 2004 to January 2005. [60] At no point did Garcia object to this new schedule on the basis of sleep apnea. For all of these reasons, defendants' motion to dismiss Garcia's failure to accommodate claim is granted.

59  *See* Def. 56.1 P 24.
60  *See id.* PP 24, 26. *See also* Def. Mem. at 8-9.

**C. Plaintiff's Claims for Equitable Relief Are Moot**

Because Garcia is no longer employed by DOCS, his request for equitable relief in the form of a change in work hours is moot. Further, because Garcia's claims are dismissed, there is no basis for this Court to order DOCS to apologize to Garcia.

**VI. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this **[\*21]** motion [No. 48 on the docket] and this case.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

December 5, 2006

# Exhibit 72



2 of 100 DOCUMENTS

**ANGELO BURGOS, Plaintiff, v. CITY OF ROCHESTER, Defendant.**

**99-CV-6480**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 22454*

**March 31, 2003, Decided**

**DISPOSITION:** [*1] Defendant's motion for summary judgment on federal claims granted. Plaintiff's remaining state law claims dismissed without prejudice.

**COUNSEL:** For Angelo Burgos, PLAINTIFF: Donna Marianetti, Webster, NY USA.

For City of Rochester, DEFENDANT: Michele Digaetano, Rochester, NY USA.

**JUDGES:** JONATHAN W. FELDMAN, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JONATHAN W. FELDMAN

**OPINION**

**DECISION AND ORDER**

**Procedural Background**

In accordance with the provisions of *28 U.S.C. § 636(c)*, the parties have consented to the jurisdiction of this Court for all dispositive matters, including trial. (Docket # 11). Before the Court is defendant City of Rochester's motion for summary judgment. (Docket # 14).

**Relevant Facts**

Plaintiff Angelo Burgos (hereinafter "Burgos") began his employment with the defendant City of Rochester (hereinafter "the City") in 1989. At all times relevant to this action, plaintiff's job with the City was a Water Maintenance Worker/Construction Worker. (The job duties of a Water Maintenance Worker/Construction Worker are attached as Exhibit "A" to Docket # 14). While the exact chronology of events is less than clear from the record, sometime before

**[*2]** 1997, plaintiff injured his back while working. Although he was disabled from work for a period of time, the record is clear that plaintiff did eventually return to work.

On January 26, 1998, plaintiff "further injured his back in the performance of his duties by lifting a fire hydrant head." See Complaint at paragraph 17. This injury was severe enough for plaintiff to be placed on full disability by the City. Plaintiff apparently applied for and received Workers Compensation benefits.

On September 15, 1998, the City received a report from plaintiff's treating internist, Dr. Bernard Sussman, opining that plaintiff was able to return to work with certain limitations. According to Dr. Sussman's report, plaintiff could return to a "light duty assignment" involving "no lifting in excess of 25 pounds" and "no repetitive bending or stooping." Dr. Sussman's report also recommended that plaintiff be "able to change positions as frequently as needed." According to Sussman's report, "these restrictions are permanent." See Exhibit "B" annexed to Docket # 14. Thereafter, the City apparently received another medical report, this one from plaintiff's treating neurologist, Dr. James T.

[*3] Maxwell. Although Dr. Maxwell found plaintiff to complain of constant pain, plaintiff advised he was able to drive a car, shop and "go about" the simple activities of daily living. Dr. Maxwell's report opined that plaintiff could return to work full time, "8 hours a day, 5 days a week" doing things like paper work, answering the phone, scheduling, driving, reading water meters, going up and down stairs [and] light machining." Dr. Maxwell's report stated that plaintiff should not engage in "heavy lifting, pushing, pulling for the present time." See Exhibit "A' annexed to Docket 21.

Plaintiff did not apply for reinstatement to his former position with the City, but instead requested reassignment to an alternative position for which he was qualified and which would have accommodated his medical restrictions. See Docket # 19 at paragraph 13. After reviewing the available medical reports and information, the City determined that plaintiff could not perform the duties associated with his old job and there were not any permanent light duty positions available for plaintiff. After the expiration of a one year leave of absence pursuant to *section 71 of New York's Civil Service*, plaintiff's

[*4] employment with the City was terminated. Plaintiff thereafter commenced the instant lawsuit alleging that his termination constituted disability discrimination in violation of the *American with Disabilities Act* (hereinafter "ADA"). The City now moves for summary judgment on the ground that plaintiff has failed to establish that he is disabled within the meaning of the ADA.

## Discussion

**A. Summary Judgment Standard:** A district court properly may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. A court must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party. *Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996)*. Although the Second Circuit has cautioned against granting summary judgment

[*5] in discrimination cases where an employer's intent is at issue, *Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994)*, the Court has also deemed summary judgement an appropriate measure to resolve ADA cases where the record is clear that plaintiff did not meet the threshold burden of proving that he or she had a disability. *Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 154 (2d Cir. 1998)*.

**B. Is Plaintiff Disabled Within the Meaning of the ADA?** The ADA prohibits an employer from discriminating against a qualified individual with a disability in the terms, conditions and privileges of employment. *42 U.S.C. § 12101 et seq*. To prove a prima facie case of discrimination, a plaintiff must demonstrate, *inter alia,* that he has a disability within the meaning of the ADA. *Heyman v. Queens Vill. Comm. for Mental Health, 198 F.3d 68, 72 (2d Cir. 1999)*.

Whether a person has a disability under the ADA is an individualized inquiry. *Sutton v. United Air Lines, Inc., 527 U.S. 471, 483, 144 L. Ed. 2d 450, 119 S. Ct. 2139 (1999)*. An individual is considered to have

2003 U.S. Dist. LEXIS 22454, *6

[*6] a "disability" under the ADA if he or she has: "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such impairment; or (3) being regarded as having such an impairment." *42 U.S.C. § 12102(2)(A)-(C)*; *Williams v. Salvation Army, 108 F. Supp.2d 303, 313 (S.D.N.Y. 2000)*. If an individual meets any one of these three criteria, he or she is considered to be an individual with a disability for purposes of coverage under the ADA. *Glidden v. County of Monroe, 950 F. Supp. 73, 76 (W.D.N.Y. 1997)*. In response to the City's summary judgement motion, plaintiff argues that

he meets the first and third variation of the ADA's definition of disability. See Plaintiff's Memorandum of Law (Docket # 18).

1. Substantial Limitation of Major Life Activity: The Supreme Court recently set forth a three step analysis for determining whether a plaintiff has a disability under the first subsection of the ADA's definition of disability. The plaintiff must (1) have a mental or physical impairment that (2) substantially limits (3) a major life activity. *Bragdon v. Abbott, 524 U.S. 624, 631, 141 L. Ed. 2d 540, 118 S. Ct. 2196 (1998)*.

[*7] For purposes of this motion, the Court assumes that Burgos' back condition qualifies as a physical impairment. Hence, the crucial inquiry hinges on whether the impairment (1) significantly restricts (2) Burgos' major life activities. It is here that plaintiff proof falls far short of what is required to defeat defendant's motion for summary judgment.

Regulations implementing the ADA have defined "major life activities" to encompass "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *29 C.F.R. § 1630.2(i)*. This list is illustrative and not exhaustive. *Bragdon, 524 U.S. at 625*. Indeed, the Second Circuit has identified other major life activities to include sitting, standing, lifting and reaching. *Ryan v. Grae & Rybicki P.C., 135 F.3d 867, 870 (2d Cir. 1998)*. Plaintiff's complaint does not identify the major life activity or activities which his back impairment substantially limits. Indeed, the only identification of such activities is contained in plaintiff's affidavit submitted in opposition to the City's summary judgment motion. See Docket

2003 U.S. Dist. LEXIS 22454, *8

**[*8]**  # 20. At paragraph 5 of that affidavit, plaintiff avers:

> As a result of my condition I cannot preform any functions in my daily life which require bending, lifting or twisting. I cannot stand or sit for extended periods of time without a break. I cannot lift weight in excess of 20 pounds.

Assuming this lone and conclusory allegation is sufficient to identify the major life activity which is being impaired, Burgos has failed to provide any admissible evidence to substantiate his assertion that his ability to perform these is substantially limited. It must be remembered that not every physical impairment qualifies as an ADA disability because not every physical impairment substantially limits a major life activity. "Although almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled. Thus, in assessing whether a plaintiff has a disability, courts have been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities." *Ryan v. Grae & Rybicki, 135 F.3d at 870* (emphasis in original). See

[*9] *Parisi v. Coca-Cola Bottling Co., 995 F. Supp. 298, 302 (E.D.N.Y. 1998)* (plaintiff must allege a specific factual basis to support a finding of a substantial limitation of a major life activity and may not rely upon conclusory allegations of such a limitation), aff'd, *172 F.3d 38 (2d Cir. 1999)*.

Plaintiff has failed to meet his burden of coming forward with admissible evidence of a substantial limitation of any major life activity. Critical to this failure is the lack of any admissible medical evidence to support a finding of substantial limitation. Plaintiff has not submitted an affidavit or sworn testimony from a medical professional documenting his impairment or any substantial physical limitations. The only medical evidence plaintiff has submitted or referred to are doctors' letters which are clearly inadmissible hearsay and may not properly be considered. See *Douglas v. Victor Capital Group, 21 F. Supp.2d 379, 391 (S.D.N.Y. 1998)*(Summary judgment granted in ADA case where the only medical evidence plaintiff relied upon were inadmissible hearsay doctor letters). Plaintiff's affidavit describing his medical limitations and restrictions,

**[*10]** without admissible supporting documentation, "simply is not sufficient to establish his prima facie case under the ADA." *Id. at 384*. See *McCleary v. National Cold Storage, Inc, 67 F. Supp.2d 1288, 1296-97, n.3 (D. Kan. 1999)* (discussing effect of ADA plaintiff's failure to submit admissible medical evidence regarding limitations of major life activities).

Even were this Court to consider the doctors' letters, plaintiff has nonetheless failed to proffer evidence sufficient to permit a jury to conclude that any of his major life activities were "substantially limited." In determining whether plaintiff's impairments are substantial, the court should consider the nature and severity of the impairment as compared with the average person's ability to perform the identified activities. *29 C.F.R. § 1630.2(j)(2)*. The letters from Drs. Sussman and Maxwell note that plaintiff's back condition does not prevent him from lifting up to 25 pounds, driving a car, going up and down stairs, performing light machine work or even working a 40 hour work week. In the context of back conditions, this "medical evidence" does not support a finding

[*11] of a substantial limitation. See *Colwell v. Suffolk County Police Department, 158 F.3d 635, 644-46 (2d Cir. 1998)* (police officers' back injuries which limited the ability to lift heavy objects did not substantially limit the major life activity of working so as to render the officers disabled under the ADA), cert. denied, *526 U.S. 1018, 143 L. Ed. 2d 350, 119 S. Ct. 1253 (1999)*; *Helfter v. United Parcel Service, Inc., 115 F.3d 613, 617-18 (8th Cir. 1997)* (evidence that impairment that limited lifting weights over ten pounds did not demonstrate triable issue regarding substantial limitation on a major activity); *Snow v. Ridgeview Medical Center, 128 F.3d 1201, 1207 (8th Cir. 1997)* (general lifting restriction of 25 pounds not a disability under the *ADA); Rosa v. Brink's Inc., 103 F. Supp.2d 287, 291 (S.D.N.Y. 2000)* ("Recurrent back pains and problems are endemic to a substantial part of the adult population of the United States, and it would require something considerably more severe and specific than anything plaintiff has evidenced here for such a problem to qualify as 'substantial' in terms of the ADA"); *Baker v. County of Monroe, 47 F. Supp.2d 371, 379 (W.D.N.Y. 1999)*

**[*12]** (back injury limiting plaintiff from lifting more than 40 pounds did not establish disability within meaning of *ADA*); *Kirkendall v. United Parcel Serv., Inc., 964 F. Supp. 106, 111 (W.D.N.Y. 1997)* (plaintiff's primary limitations, which consisted of an inability to lift items in excess of 30 pounds, to sit for periods longer than three hours at a time and to engage in certain leisure activities, did not demonstrate that he was substantially limited in any major life activity, including the ability to work).

Plaintiff has also failed to demonstrate that he was disabled because he was substantially limited in the major life activity of work. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *29 C.F.R. § 1630.2(j)(3)(i)*. See *Vaughnes v. United Parcel Serv., Inc., 2000 U.S. Dist. LEXIS 11474, 2000 WL 1145400 at *7 (S.D.N.Y. August 14, 2000)* ("Thus, the inability to perform a narrow range of jobs does not constitute a substantial limitation in the major life activity of working.") (citations omitted). See generally What Constitutes Substantial Limitation on Major Life Activity

[*13] of Working for Purposes of Americans with Disabilities Act (*42 U.S.C.A. §§ 12101-12213*), *141 A.L.R. Fed. 603 (1997)*.

Even accepting Burgos' assertions regarding his work limitations as being true, his ability to work is not "significantly restricted" as is most plainly evidenced by the large class of jobs of which he is capable of performing and is actively seeking. [1] See *Dupre v. Charter Behavioral Health Systems, 242 F.3d 610, 615 (5th Cir. 2001)* (fact that plaintiff's back condition precluded her from jobs involving prolonged standing or sitting, heavy lifting or prolonged walking insufficient to demonstrate substantial limitation in life activity of working); *Glozman v. Retail, Wholesale & Chain Store Food Employees Union, 204 F. Supp. 2d 615, 2002 WL 727020 at *6 (S.D.N.Y. April 24, 2002)* (plaintiff not substantially limited from working where he presented a number of other positions in which he could work without significant accommodation); *Zarzycki v. United Technologies Corp., 30 F. Supp.2d 283, 292-93 (D. Conn. 1998)* (plaintiff's subsequent work experience in class of jobs available is relevant to the issue

[*14] of whether he was actually disabled); *Parisi v. Coca-Cola Bottling Co., 995 F. Supp. at 299* (plaintiff's knee injury which precluded him from employment as route deliveryman did not substantially limit his ability to work in a wide range of employment options, in fact, plaintiff "sought reassignment to other positions in the defendant's employ which his injury would not prevent him from performing.").

1  Ironically, the letters from plaintiff's doctors, which specifically identify a broad range of jobs which plaintiff could perform refute his

contention that he is disabled under the ADA. Plaintiff's treating neurologist wrote that he thinks Burgos "can and should go back to work full time, 8 hours a day, 5 days a week. Such things as paper work, answering the phone, scheduling, driving, reading water maters, going up and down stairs, light machining all would be possible for him to do." See Exhibit A, Docket # 21..

2. Regarded as Having a Disability: Plaintiff makes the alternative argument

[*15] that even if he is not disabled under the first definitional standard set forth in the ADA, the City regarded him as such and accordingly, he is disabled under the ADA. To state a claim under the "regarded as" prong of the ADA, the plaintiff must "allege that the employer believed, however erroneously, that the plaintiff suffered from an 'impairment' that, if it truly existed, would be covered under the statute and that the employer discriminated against the plaintiff on that basis." *Francis v. City of Meriden, 129 F.3d 281, 285 (2d Cir. 1997)*. In addition, the employee must demonstrate that the employer viewed him or her as precluded from

more than one job in order to support an allegation that the employer "regarded" the employee as disabled. Whitlock v. Mac-Gray, Inc., 2002 U.S. Dist. LEXIS 20878, 2002 WL 31432688 at *3 (D. Mass. October 30, 2002).

The evidence that plaintiff relies on in support of his claim that the City "regarded" his as disabled is a March 2, 1998 memo in his personnel file which states that he was "100% disabled" and refers to his "12-15 comp cases." (Exhibit "E" to Marinetti Affidavit, Docket # 21). However, this document does not warrant a finding that

[*16] the City perceived Burgos to be disabled. In the first place, the statement in the memo about Burgos being "100% disabled" was not a statement by the City that it considered plaintiff disabled. Rather, the memo refers to the opinion of plaintiff's treating physician. Second, the bare fact that the City was aware of Burgos' limitations or believed him to be unqualified for his previous position does not equate to a finding that defendant regarded him to be disabled. See *Reeves v. Johnson Controls World Servs., 140 F.3d 144, 153 (2d Cir. 1998)* ("The mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action. Plaintiff must show that defendants perceived his impairment as substantially limiting the exercise of a major life activity") (citations omitted); *Beason v. United Techs. Corp., 213 F. Supp. 2d 103, 2002 WL 519459 at *11 (D. Conn. March 15, 2002)* (while employer may have perception that employee is unable to perform work involving heavy lifting, "he has not presented sufficient evidence that he was

[*17] regarded as unable to perform technical or mechanical work that may have also been within his abilities or qualifications, but that did not require a high physical demand"); Covelli v. National Fuel Gas Distribution Corp., 2001 U.S. Dist. LEXIS 23932, 2001 WL 1823584 at *6 (W.D.N.Y. December 6, 2001) ("Simply because a plaintiff is viewed by his employer as being unable to work in a specific job does not mean that the employer regards that employee as being substantially limited in the major life activity of working as is required for the stating of a claim under the ADA"), aff'd, *49 Fed. Appx. 356 (2d Cir. 2002)*.

Moreover, Burgos has failed to established that the City perceived him to be precluded from performing a "broad range of jobs." *Colwell, 158 F.3d at 647*. Indeed, the same memo plaintiff relies on in support of his contentions states: "It is also important that we proceed quickly and not wait like we did and allow him to be on light duty for one and <1/2> years." (See Exhibit "E", Marinetti Affidavit). The logical conclusion to be drawn from this statement is that defendant believed that plaintiff would be qualified to handle a light duty position, and

[*18] thus, not substantially limited in a broad range of jobs.

In sum, Burgos has offered no evidence which would support a finding that the City "regarded" him as having a disability. This determination is fatal to plaintiff's claims and consequently, defendant's motion for summary judgment on the ADA claims is **granted**. [2]

> 2   Because the Court concludes that plaintiff does not have a disability under the ADA (or was regarded as such) as a matter of law, it need not consider whether plaintiff could perform the essential functions of his position with our

without reasonable accommodation or whether defendant has offered a legitimate non-discriminatory reason for Burgos' termination.

***New York State Human Rights Law:*** Plaintiff has also brought a claim against defendant arising under the *New York State Human Rights Law*. Plaintiff argues, and defendant concedes, that the burden of proving a qualifying disability is easier under the *New York State Human Rights Law* than under the ADA. See *Reeves, 140 F.3d at 155-56.*

[*19]

However, having dismissed plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law state law claim pursuant to *28 U.S.C. § 1367(c)(3)*. The Second Circuit has held that in the usual case in which all federal-law claims are eliminated before trial, the Court should decline to exercise jurisdiction over the remaining state law claims. *Travelers Ins. Co. v. Keeling, 996 F.2d 1485, 1490 (2d Cir. 1993)* (citations omitted). See also *Martz v. Incorporated Vill. of Valley Stream, 22 F.3d 26, 32 (2d Cir. 1994)* ("having dismissed all of [plaintiff's] federal claims, the district court was correct in also dismissing her pendent state law claims).

Because the remaining cause of action involves an interpretation of solely state law, it is best left to be decided by a state court. See *Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001)* (having dismissed plaintiff's ADA claims, Court declines to exercise supplemental jurisdiction over New York state law discrimination claims). See also *United Mine Workers v. Gibbs, 383 U.S. 715, 726 n.15, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)*

[*20] ("federal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in state court litigation") (citations omitted).

**Conclusion**

For all of the foregoing reasons, defendant's motion for summary judgment on the federal claims is **granted.** Plaintiff's remaining state law claims are **dismissed**

without prejudice.

**SO ORDERED.**

JONATHAN W. FELDMAN

UNITED STATES MAGISTRATE JUDGE

Dated: March 31, 2003