# Exhibit 76





RONALD E. AMOS, Plaintiff, -vs- QUEBECOR PRINTING, Defendant.

96-CV-0072E(F)

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

*1997 U.S. Dist. LEXIS 6688*

**April 28, 1997, Decided**
**April 29, 1997, OPINION FILED**

**NOTICE:**      [*1]  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:**   Quebecor's motion for a summary judgment of dismissal granted, Amos's application for appointment of counsel denied.

**COUNSEL:** RONALD E. AMOS, PLAINTIFF, Pro Se, Buffalo, NY.

ATTORNEYS FOR THE DEFENDANT: Sean P. Beiter, Esq. and Ginger D. Schroder, Esq., c/o Jaeckle, Fleischmann & Mugel, Buffalo, NY.

**JUDGES:** John T. ELFVIN, U.S.D.J.

**OPINION BY:** John T. ELFVIN

**OPINION**

   MEMORANDUM and ORDER

   Amos -- proceeding *pro se* -- alleges that his former employer ("Quebecor") discriminated against him on the basis of his race and disability -- *viz.*, drug and alcohol addiction -- in violation of Title VII of the Civil Rights Act of 1964 -- *42 U.S.C. § 2000e et seq.* ("Title VII") -- and of the Americans with Disabilities Act of 1990 -- *42 U.S.C. § 12101 et seq.* ("the ADA"). Jurisdiction is proper pursuant to *28 U.S.C. § 1331* and *42 U.S.C. §§ 2000e-5(f) & 12117(a)* and venue is proper pursuant to *28 U.S.C. § 1391(b)* and *42 U.S.C. §§ 2000e-5(f) & 12117(a)*. Presently before this Court is Quebecor's motion for a summary judgment predicated upon *Rule 56 of the Federal Rules of Civil Procedure* ("FRCvP") and an

application submitted by Amos pursuant to *28 U.S.C. § [*2]  1915(d)* requesting appointment of counsel. Quebecor's motion will be granted and, consequently, Amos's application will be denied.

   Unless otherwise noted, the following facts are drawn from the statement submitted by Quebecor as required by Rule 56 of the Local Rules of Civil Procedure for the United States District Court for the Western District of New York ("LRCvP"). [1] The plaintiff -- a black male -- began his employment with Quebecor in 1977; in 1984 he became a Class 22 Assistant and, inasmuch as he never sought advancement through the union bidding procedures provided in the successive collective bargaining agreements, he remained in such job classification until his discharge in May of 1995. [2] During Amos's approximately eleven years in such classification, Quebecor attempted to train him to perform assignments in several of the operations but, ultimately, he was able to qualify only for the position of Assistant on the "Mail Line" machine in the bindery, [3] a position he held from March 1990 to the date of his discharge. Throughout his employment with Quebecor, Amos was a member of the bindery bargaining unit and represented by Local 17-B of the Graphic Communications International [*3]  Union ("the union"). Although grievances were filed in 1987 and 1989 challenging certain disqualifications, the union determined not to pursue such after learning of Quebecor's reasons for its decisions -- *to wit*, the plaintiff's substandard job performance during the pertinent qualification periods. No grievances were filed by or on behalf of Amos between January 1990 and January 1995. Quebecor has an "absentee and tardiness policy" which applies to all employees in the bindery bargaining unit which provides that three unexcused absences in a three-month period constitutes a violation of the policy and

that an employee is subject to discharge if he has four such violations within a twelve-month period. Affidavit of Dennis J. Kerl, Quebecor Manager of Human Resources, sworn to September 6, 1996, P19, Exh E. Amos was aware of such attendance policy. Appendix I to Defendant Quebecor's Motion for Summary Judgment, Transcript of Examination Before Trial of Amos ("Amos Tr"), p. 83. On March 3, 1995, after Amos had accumulated four violations of such attendance policy, he was placed on suspension and a grievance was filed on his behalf. On March 8 Amos met with two union representatives [*4] -- K. Owen and M. Casey, president and vice-president of the union, respectively -- and two company officials during which time it was conceded that Amos was subject to termination but, inasmuch as the union sought consideration of his eighteen years with the company and of the fact that his attendance problems were related to his substance abuse, Quebecor agreed to settle the matter and to give Amos a final opportunity to retain his employment provided that he fully complied with the terms of a Last Chance Agreement ("the Agreement"). Kerl Afft, Exhs G & K. Under the Agreement Amos agreed, *inter alia*, to avail himself of Quebecor's employee assistance program ("EAP"), to follow all of the recommendations of his counselor and to improve his attendance immediately and bring such into compliance with the absentee and tardiness policy. The union, Quebecor and Amos agreed that he could be discharged if he violated the terms of the Agreement and that such a discharge would not be subject to review under the grievance and arbitration provision of the collective bargaining agreement. On March 9 Amos and the union representatives signed the Agreement. Despite entering a counseling program, [*5] Amos continued to use illegal drugs and he missed more than ten counseling appointments and tested positive for the presence of cocaine in his system on at least three occasions during the subsequent two months. Amos Tr, pp. 18-19, 37-38, 40; Kerl Afft, Exh I; Complaint, Exh (letter dated June 6, 1995 from Askia Alkebulan, Addictions Counselor at Horizon Human Services). On May 12, after it had reviewed a status report from the EAP administrator advising it of Amos's continued drug use and his general lack of compliance with the Agreement, Quebecor terminated him. Kerl Afft, Exhs H, I & J. On May 24, 1995 a grievance was filed on behalf of Amos to which Quebecor responded in writing on June 1; on June 27 a hearing, requested by the union, was held at which Amos had an opportunity to address his violations of the terms of the Agreement and after which the union determined not to pursue the grievance further. Kerl Afft, P27, Exh K. On August 29, 1995 Amos filed charges with the Equal Employment Opportunity Commission ("the EEOC") alleging that he had "unable to advance [at Quebecor] because of [his] race" and that he had been "discharged for hav-

ing a drug and alcohol addiction," [*6] he received a right-to-sue notice November 13,1995 and he commenced this action February 5, 1996. Complaint, PP10, 12 & 17, Exh (Charge of Discrimination filed with EEOC). Prior to filing charges with the EEOC in August 1995, Amos had never complained to Quebecor management or to a supervisory official or in any of the aforementioned grievances that he had been discriminated against on the basis of race.

1   Inasmuch as Amos failed to submit, as required by LRCvP 56, an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, the facts contained in Quebecor's statement are deemed admitted unless otherwise adequately controverted in the record. It is also noted that, inasmuch as Amos submitted neither a memorandum of law nor a supporting affidavit, he additionally failed to comply with LRCvP 7.1(e), which failure, in and of itself, could constitute adequate grounds for resolving Quebecor's motion against him. However, this Court is mindful that *pro se* litigants are held to less stringent standards than are litigants who are represented by counsel. *Ortiz v. Cornetta, 867 F.2d 146, 148 (2nd Cir. 1989)*.

[*7]

2   Inasmuch as Quebecor, in May 1993, purchased all the stock of Arcata Graphics Buffalo, Inc. ("Arcata")and thereby acquired the pertinent commercial printing operations from Arcata, technically the plaintiff began his employment in 1977 with Quebecor's predecessor. However, for present purposes, the predecessor-successor relationship has no bearing.

3   Employees on the Mail Line machine perform quality inspections and ensure that all publications have been properly split, trimmed, wrapped and labeled.

*FRCvP 56(c)* requires that a motion for summary judgment be denied unless the court determines, after reviewing all the evidence presented, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-254, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*, and *Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 585-588, 89 L. Ed. 2d 538, 106 S. Ct. 1348 S.* [*8] Ct. 1348 (1986). The party seeking a summary judgment must demonstrate the absence of a genuine issue respecting any material fact. *Celotex, at 325*. A genuine issue of fact requires such evidence that a reasonable jury could

1997 U.S. Dist. LEXIS 6688, *

thereupon return a verdict for the non-moving party and, when determining whether a genuine factual issue exists, the court must consider the substantive evidentiary burdens assigned to each party. *Anderson, at 248, 254*. All reasonable inferences must be drawn and all ambiguities must be resolved favorably to the non-moving party. *Gallo v. Prudential Residential Services, 22 F.3d 1219, 1223 (2nd Cir. 1994)*. Nevertheless, a summary judgment must be granted against a party in instances when such party fails to adequately establish an essential element on which it bears the burden of proof. *Celotex, at 322*. The non-moving party may not rest upon unsubstantiated allegations, conclusory assertions or mere denials of the adverse party's pleading, but must set forth and establish specific facts showing that there is a genuine issue of fact for trial. *FRCvP 56(e)*. A metaphysical or other whimsical doubt concerning a material fact does not establish [*9] a genuine issue necessitating a trial. *Matsushita Elec. Industrial Co.*, 586. The "mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson, at 252*. The court's task at this stage is not to decide factual issues but rather to determine whether there is any genuine issue of fact to be tried. *Gallo, at 1224*. Although granting such a motion would not be appropriate where it is established that the employer's intent is genuinely at issue, unsubstantiated allegations and conclusory assertions are not sufficient to withstand a properly supported motion for a summary judgment, especially "given the ease with which [employment discrimination] suits may be brought and the energy and expense required to defend such actions." *Meiri v. Dacon, 759 F.2d 989, 998 (2nd Cir.), cert. denied, 474 U.S. 829, 88 L. Ed. 2d 74, 106 S. Ct. 91 (1985)*.

Quebecor's first argument is that the failure-to-promote discrimination allegations in the EEOC charge - - *viz.*, that Amos had "been unable to advance [in the company] because of [his] race" -- are time-barred. A plaintiff must file his discrimination [*10] charges with the EEOC within 300 days of the alleged discriminatory act. *42 U.S.C. § 2000e-5(e); Butts v. City of New York Dept. of Housing, 990 F.2d 1397, 1401 (2nd Cir. 1993)*.[4] An employment discrimination claim is time barred to the extent that it relates to events which occurred more than 300 days prior to filing a charge with the EEOC. *Ibid.* In this case, inasmuch as the attempts by Amos to qualify for other jobs occurred more than five years prior to his filing of charges with the EEOC and he had notice of the allegedly racially motivated failure to promote him at the time such actions occurred and there is no evidence of any racially discriminatory policy or mechanism which would amount to a continuing violation, his race-discrimination claim is time-barred. *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712-713 (2nd Cir. 1996)*.

[4] Inasmuch as it appears from the record that the plaintiff concurrently filed charges with the state agency authorized to address charges of discriminatory employment practices -- *viz.*, New York's Division of Human Rights --, a requirement that must be met before the 180-day limitation is extended to 300 days, and Quebecor presumes the applicability of the longer 300-day time limitation and such assumption favors Amos, this Court accepts the 300-day period applies. *Ford v. Bernard Fineson Development Center, 81 F.3d 304, 307 & fn 6 (2nd Cir. 1996); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 & fn 1 (2nd Cir. 1996)*.

[*11] Courts evaluate discrimination claims predicated upon the ADA using the burden-shifting analysis developed to examine Title VII employment discrimination claims in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, and later refined in *Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)* ("*Burdine*"), and *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-511, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)* ("*Hicks*"). *Price v. S-B Power Tool, 75 F.3d 362, 364-65 (8th Cir.), cert. denied, 136 L. Ed. 2d 197, 117 S. Ct. 274, 1996 U.S. LEXIS 6096 (1996); Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 57-58 (4th Cir. 1995); Glidden v. County of Monroe, 950 F. Supp. 73, 75 (W.D.N.Y. 1997); Duprey v. Prudential Ins. Co. of America, 910 F. Supp. 879, 883 (N.D.N.Y. 1996)*. The analysis is neither rigid nor mechanized and the general requirements of proof must be flexibly tailored to the facts of each case. *Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978)*. [*12] The plaintiff must first establish a *prima facie* case of disability discrimination which requires him to make a modest showing (1) that he is a member of a protected class -- *to wit*, that he is "qualified individual with a disability" within the meaning of the ADA (*42 U.S.C. §§ 12102(2) & 12111(8)*) --, (2) that he was performing his duties in a satisfactory manner -- *i.e.*, meeting his employer's legitimate expectations -- but nevertheless suffered an adverse or detrimental employment decision made by his employer and (3) that the adverse employment decision was made under circumstances giving rise to a reasonable inference of discrimination. *42 U.S.C. § 12112(a); Ennis, at 58; Duprey, at 884*. If the plaintiff succeeds in establishing his *prima facie* case, "the burden of production" shifts to the employer to present clear, legitimate non-discriminatory rationale for its conduct. *Hicks, at 507; Glidden, at 75; Duprey, at 883*. If the employer adequately articulates such, any inference or presumptions of disability discrimination vanish and the plaintiff

retains the ultimate burden of proving that the proffered rationale is pretextual and that the employer [*13] was discriminatorily motivated. *Hicks, at 509-511*; *Glidden, at 75*. To demonstrate such pretext and defeat an employer's properly supported summary judgment motion in an employment discrimination action, a plaintiff must establish through direct, statistical or circumstantial evidence the existence of a genuine issue of material fact as to whether the employer's asserted rationale is false or unworthy of belief *and* whether it is more likely than not that improper animus towards the plaintiff's purported disability was the real reason for the discharge. *Hicks, at 515*; *Duprey, at 883*.

Quebecor contends that Amos has failed to establish his *prima facie* case. This Court agrees. First, Quebecor argues that Amos is not a member of a statutorily protected group. Although it does not contend that drug addiction or alcoholism is not a recognized disability -- *i.e.*, a physical or mental impairment substantially limiting an individual's major life activities [5] -- protected in proper circumstances under the ADA, Quebecor correctly points out that an individual is not a member of the protected class if he engages in the illegal use of drugs and the employer terminates [*14] him on the basis of such use. *42 U.S.C. § 12114(a)*; *Shafer v. Preston Memorial Hospital Corp., 107 F.3d 274, 276 (4th Cir. 1997)*. Inasmuch as it is not disputed that Amos admittedly engaged in the illegal use of drugs and continued to do so even after Quebecor afforded him a final opportunity to seek counseling and that he was terminated on the basis of, *inter alia*, his inability to abstain from his illegal use of controlled substances, Amos falls outside the protections of the ADA. *Id., at 278-281*. Furthermore, the termination of employment was based upon a breach by Amos of the terms and conditions of the Agreement -- *to wit*, his repeated failure to attend counseling sessions and his failure to abstain from ingesting illegal drugs -- and not on account of a disability. Second, Quebecor argues that Amos has failed to demonstrate that he was performing his job in a satisfactory manner. This Court agrees. It is undisputed that the plaintiff's dismal job-attendance failed to comply with the company's policy and there is no evidence that Quebecor's attendance requirements and subsequent demands embodied in the Agreement were made in bad faith. *Thornley v. Penton* [*15] *Publishing, Inc., 104 F.3d 26, 29 (2nd Cir. 1997)* (plaintiff has burden of showing that employer's criteria are not legitimate). Finally, this Court notes that there is no evidence that any other employee was treated more favorably and that, based upon the record, there is no evidence from which a reasonable inference could be drawn that Quebecor's adverse employment decision was discriminato-

rily motivated. Amos has failed to sustain his *de minimis* burden to establish a *prima facie* case that he was discriminated on the basis of a disability.

> 5   *See* EEOC regulations implementing the ADA -- *viz., 29 C.F.R. § 1630.2(h)* (The phrase "physical or mental impairment" includes any physiological, mental or psychological disorder or condition.); *cf.* Department of Justice Regulations effectuating part A of subchapter II of the ADA - *viz., 28 C.F.R. § 35.104(1)(ii)* ("The phrase physical or mental impairment includes *** drug addiction and alcoholism.")

Even assuming *arguendo* that a *prima* [*16] *facie* case had been established, Quebecor has substantially satisfied its burden of articulating and producing evidence of legitimate non-discriminatory reasons for its decision to terminate Amos -- his poor attendance record and his ongoing illegal use of controlled substances -- thereby vitiating any inference or presumption of discrimination.

In the final analysis, there is simply no evidence that Quebecor's rationale supporting its decision to terminate Amos was pretextual or that the decision was motivated by improper animus. It is undisputed that Amos repeatedly violated the company absentee and tardiness policy and that he missed numerous counseling sessions and continued using drugs and thereby grossly failed to comply with the terms and conditions of the Agreement and there is no evidence that any other employee was treated more favorably. Based upon the totality of the evidence, Amos has failed to produce sufficient evidence that would support a rational finding that the legitimate and non-discriminatory reasons put forth by Quebecor were false and that, more likely than not, disability discrimination was the real reason for his discharge.

Finally, the foregoing discussion [*17] renders moot Amos's application for appointment of counsel; consequently, such will be denied.

Accordingly, it is hereby ***ORDERED*** that Quebecor's motion for a summary judgment of dismissal is granted, that Amos's application for appointment of counsel is denied and that this case shall be closed.

DATED: Buffalo, N.Y.

April 28, 1997

John T. ELFVIN

U.S.D.J.

# Exhibit 77



**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, and RONALD S. WALDEN, Intervenor Plaintiff, -against- YELLOW FREIGHT SYS-TEM, INC., Defendant.**

**98 Civ. 2270 (THK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 16826; 14 Am. Disabilities Cas. (BNA) 1223*

**September 4, 2002, Decided
September 9, 2002, Filed**

**DISPOSITION:**    [*1]  Judgment entered.

**COUNSEL:** For Equal Employment Opportunity Commission, PLAINTIFF: Nora E Curtin, Equal Employment Opportunity Commission, New York, NY USA.

For Yellow Freight System Inc, DEFENDANT: John F Parker, Jeffrey I Pasek, Cozen and O'Connor, New York, NY USA.

For Yellow Freight System Inc, INTERVENOR-DEFENDANT: John F Parker, Cozen and O'Connor, New York, NY USA.

**JUDGES:** Theodore H. Katz, United States Magistrate Judge.

**OPINION BY:** Theodore H. Katz

**OPINION**

**OPINION AND ORDER**

**THEODORE H. KATZ, UNITED STATES MAGIS-TRATE JUDGE.**

Plaintiffs in this employment discrimination action, the Equal Employment Opportunity Commission ("EEOC") and Ronald S. Walden ("Walden," or "Plaintiff"), have brought claims against Defendant, Yellow Freight System, Inc. ("Yellow Freight," or "the Company"), under the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101, et seq.*, and the New York

Human Rights Law ("NYHRL"), *N.Y., Exec. Law § 290, et seq.* The parties consented to trial before me, pursuant to *28 U.S.C. § 636(c)*,  [*2]  and a four-day bench trial was conducted from January 28 to 31, 2002.

In addition to Plaintiff, the following witnesses testified at trial: (1) James Bair, Yellow Freight's distribution center manager during the period at issue in the litigation; (2) Mary Thomas, Yellow Freight's injury counselor; (3) Dr. Calvin Hargis, a chiropractor who performed an independent medical examination of Plaintiff; (4) John Novak, Yellow Freight's manager of labor relations during the relevant period; (5) John Sexton, the Company's line haul operations manager; (6) Dr. Ronald Scheinzeit, an orthopedic surgeon and Plaintiff's treating physician; (7) David Stewart, the pension fund manager for Local 707, Plaintiff's union; (8) Nicholas Picarello, who was president of Local 707 during the relevant time period but who now works for the Company, as labor relations manager; and (9) Peter Herbst, Yellow Freight's safety administrator for the Northeast region.

The following constitute the Court's findings of fact and conclusions of law.

**FINDINGS OF FACT**

Intervenor Plaintiff Ronald Walden began working for Defendant, Yellow Freight, a large trucking company, in 1978. (Transcript ("Tr.") at 29.) [*3] Walden, who had not finished high school, was hired as a Dock Worker at Yellow Freight's terminal in Newburgh, New York. (Id. at 30.) Within a short time, Walden passed the test to become a Road Driver, and alternated between road driving and working in the terminal yard as a hos-

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 8 of 35

Page 2

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

tler, or Yard Jockey. (Id. at 29-31.) After Walden had been working at the Newburgh facility for two or three years, he transferred to Maybrook, New York, where Yellow Freight had recently opened a new terminal. (Id. at 30.) Walden worked out of Maybrook for the rest of his career at Yellow Freight. (Id. at 30, 40.) Walden was a member of the Maybrook chapter, Local 707, of the International Brotherhood of Teamsters. (Id. at 33.)

The Maybrook facility is a "breakbulk" facility, so named because freight arrives there in bulk and gets broken down into smaller units, which in turn get shipped to destinations around the country. (Id. at 30.) The job of a Road Driver at Maybrook is to transport freight from Maybrook to other Company terminals. (Id. at 225-26, 274.) (City Drivers transport the freight from Company terminals directly to customers, and bring freight to the terminals from [*4] the customers. (Id.)) Road Drivers at Maybrook bid according to seniority on the type of driving assignments they prefer. (Id. at 517-18.) Pursuant to this process, a Road Driver may be assigned to routes on one of four "boards": the layover board, the long-turn board, the subsequent-turn board, and the extra board. (Id. at 516.) Layovers are long runs that require the driver to get a night's sleep before returning to Maybrook. (Id. at 514.) Long-turn runs are round trips that are accomplished in a single day, but that require up to ten hours of driving. (Id.) The subsequent-turn board contains shorter round trips, of which a driver may perform two or even three in a single day. (Id. at 514-15.) The extra board contains every type of run; drivers are assigned to the extra board either because they lack enough seniority to get a bid on one of the other three boards, or because they have enough seniority to get a bid but for whatever reason, such as for variety, choose not to. (Id.)

In January 1994, Walden was a Road Driver assigned to the long-turn board, and typically worked the New England long-turn run, which included, inter alia, round trips to Boston, [*5] to Manchester, New Hampshire, and to Portsmouth, New Hampshire. (Id. at 37, 260.) For each of these runs, the round trip could be completed in less than ten hours of driving time (i.e., time on the road exclusive of time spent taking breaks). (Id. at 260.)

On January 11, 1994, Walden was driving to Boston in a rig with two twenty-eight-foot trailers, with a total weight of 75,000 pounds and length of approximately sixty-five feet. (Id. at 38-39.) His tractor hit an irregular area of pavement near Waterbury, Connecticut, causing his pneumatic seat to collapse under him, which injured his back. (Id. at 38-39.) The injury caused Walden severe pain, but he nevertheless continued the run to Boston, stopping several times along the way. (Id. at 40.) When he arrived at Boston, he reported the injury to Yellow

Freight. (Id. at 40-41.) The Company asked if he wanted to see a doctor, but Walden said that he wanted to try to make it back to Maybrook. (Id.) After resting in Boston for an hour and fifteen minutes, Walden drove his rig back to Maybrook, again stopping several times along the way. (Id. at 40-41.) Because of the stops, the trip took one and a half [*6] to two hours longer than normal. (Id. at 41.)

Upon returning to Maybrook, Walden saw doctors at the Company's twenty-four-hour medical facility, who recommended that Walden see his own doctor. (Id. at 41-42.) The next day, Walden saw a chiropractor, Dr. Reuss, who examined Walden and took x-rays, finding compression fractures of two vertebrae, T8 and T9 (that is, the eighth and ninth thoracic vertebrae). (Id. at 42.) Dr. Reuss notified Yellow Freight that Walden could not return at that time to his position as a Road Driver. (Id.)

Within a week, Walden filed for workers' compensation, which he soon began receiving. (Id. at 42-43.) Yellow Freight is self-insured for workers' compensation; that is, Yellow Freight pays out-of-pocket for the workers' compensation benefits its injured workers receive. (Id. at 304.) Later in January 1994, Yellow Freight placed Walden on light duty through its Transitional Work Program. (Id. at 43-44; Plaintiff's Exhibit 1 ("P-1").) The program involves placing injured employees who are receiving workers' compensation in light-duty positions at Yellow Freight that they are capable of performing. (Tr. at 304-06.) Walden was assigned [*7] to an office position in the Operations Department, where he performed clerical duties. (Id. at 43-44, 307.) While in the program, Walden received both workers' compensation equal to two-thirds of his regular pay, and an hourly wage from Yellow Freight, for a total compensation of 85% of his regular pay. (Id. at 304-05, 341.)

On July 26, 1994, Walden saw an orthopedic surgeon, Dr. Ronald Scheinzeit, to whom he had been referred by Dr. Reuss. (Id. at 46, 50, 587.) Dr. Scheinzeit, upon examining Walden and taking x-rays, concluded that Walden had compression fractures of the eighth and ninth thoracic vertebrae, as well as some scoliosis and arthritis. (Id. at 590; P-56.) Dr. Scheinzeit found Walden's orthopedic condition normal in other respects, noting, inter alia, that he had a good range of motion of his shoulder, hips, and knees, and that his motor function, sensation, and reflexes were all good. (Tr. at 589-90; P-56.) Dr. Scheinzeit recommended that Walden continue light duty, and prescribed physical therapy and Feldene, a pain medication. (Tr. at 591; P-56.) Dr. Scheinzeit also recommended that Plaintiff try using a sacral cushion, a device designed to lessen [*8] the impact of stress on the back from sitting, but Walden told him that he had already tried a sacral cushion and that it had not helped. (Tr. at 591; P-56.)

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 9 of 35

Page 3

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

In subsequent visits in 1994 and 1995, Dr. Scheinzeit continued to believe that Plaintiff was suited for light duty, and that he was unsuited for his prior duties as a truck driver. (Tr. at 591-607; P-56.) Specifically, Dr. Scheinzeit concluded that Walden could not sit for long periods of time without pain; this conclusion was based on Walden's subjective complaints, his medical history (which included a prior back injury in 1993), his x-rays, and Dr. Scheinzeit's experience with similar injuries. (Tr. at 593, 605.) During this series of visits, Dr. Scheinzeit found that Plaintiff suffered from constant low-level pain, which was aggravated by sitting. (Id. at 656-57; P-56.) Dr. Scheinzeit continually noted tenderness in Plaintiff's mid-back region, and found that Plaintiff's complaints of pain were credible and consistent over time. (Tr. at 603, 605, 621-22; P-56.) Dr. Scheinzeit also found Plaintiff's complaints of pain to be consistent with his medical history and his x-rays. (Tr. at 605; P-56.) Although he noted at one [*9] point that physical therapy appeared to alleviate, at least temporarily, some of Plaintiff's pain, Dr. Scheinzeit continued to find Plaintiff disabled from his job as a truck driver. [1] (Tr. at 597, 599, 604; P-56.) Besides finding that Plaintiff had a limited ability to sit without pain, Dr. Scheinzeit also felt that Plaintiff would be unable to work as a Road Driver because of the stress that going over rough terrain would place on his back. (Tr. at 606.) Dr. Scheinzeit noted on January 2, 1995, that Walden had felt pain after trying to drive for forty-five minutes; on that date, and on February 27, 1995, Dr. Scheinzeit agreed with Walden's assessment, as expressed in a disability insurance form, that he could not sit for more than forty-five minutes at time. (Id. at 239-45, 634-35, 638-39; Defendant's Exhibit 31 ("D-31"); D-32.)

1   Dr. Scheinzeit noted that Plaintiff discontinued the Feldene because it had caused him diarrhea. (P-56.)

On August 3, 1994, at the direction of the Company, Walden saw Dr. Calvin [*10] Hargis, an orthopedic chiropractor, for an independent medical examination ("IME"). (Tr. at 50-51, 308-10.) Yellow Freight sent Walden to a chiropractor, and not a medical doctor, because it was not aware that Walden had recently ceased treatment with Dr. Reuss, a chiropractor, and started seeing Dr. Scheinzeit. (Id. at 308-10.) Under New York workers' compensation law, an IME must be conducted by the same type of doctor as the worker's treating physician. (Id.)

Dr. Hargis took Walden's medical history, conducted a physical examination, and observed x-rays taken by Dr. Reuss in 1993 (following the earlier back injury) and in January 1994 (following the most recent accident). (Id. at 378-81, 388-89, 396-98.) While taking Walden's medical history, which lasted a half hour, Dr. Hargis observed that Walden sat without any noticeable discomfort or shifting. (Id. at 378-81.) Dr. Hargis noted that Walden reported an inability to sit for more than thirty to forty-five minutes without pain. (D-11 at 1.)

Dr. Hargis also conducted numerous clinical tests designed to assess Walden's range of motion and flexibility, all of which resulted in negative findings. (Tr. at 397-406.) [*11] During the tests, which involved a variety of bending, stretching, and flexing exercises that placed pressure on Walden's back, Dr. Hargis observed that Walden never expressed any pain, either verbally or through facial expressions or body language. (Id.) Dr. Hargis did, however, observe that Plaintiff had "mild tenderness to deep palpation" in his thoracic region. (D-11 at 3.) Nevertheless, based on the otherwise negative results of his physical examination, Dr. Hargis concluded that Walden had a "superb" range of motion and good muscle flexibility; that he had no mechanical defects or problems that one would expect to cause pain or impairment; and that, in sum, Walden's responses were entirely within the limits of a normal, healthy individual. (Tr. at 405-06, 434; D-11 at 3.)

Finally, Dr. Hargis examined Walden's 1993 and 1994 x-rays. Finding no change between the two, Dr. Hargis concluded that the January 1994 incident had not caused the compression fractures of the T8 and T9 vertebrae. (Tr. at 394-96.) Dr. Hargis believed that the fractures predated 1993, since they showed signs of healing even in the 1993 x-ray. (Id. at 407, 424.) Dr. Hargis testified that healed compression [*12] fractures were likely to be asymptomatic. (Id. at 415-16.) Dr. Hargis further noted that in both x-rays, Walden's spinal discs, which can cause pain if eroded or thinning, were healthy and intact. (Id. at 392-93.) Dr. Hargis thus found that the pain Walden complained of was inconsistent with the condition of his spine, as revealed in the x-rays. (Id. at 424.)

Dr. Hargis did note that the x-rays showed a degenerative disease throughout the thoracic spine, and he also found that Plaintiff had lumbar and thoracic scoliosis, as well as a "somewhat prominent kyphosis," or tilting, of the thoracic spine. (D-11 at 2 - 3; see also Tr. at 391-92.) Dr. Hargis concluded that Plaintiff had "residual inflammation of the thoracic spine which is chronic in nature and is secondary to long standing scoliotic and degenerative changes." (D-11 at 3; see also Tr. at 407.) In other words, Dr. Hargis did not believe that the tenderness he observed in Plaintiff's thoracic spine had resulted from the 1994 accident. Dr. Hargis concluded that Walden was not disabled, that he required no further medical or chiropractic treatment (although Dr. Hargis did recommend an exercise program), and [*13] that he could return without restrictions to his job as a Road Driver. (Tr. at 407-09.) Dr. Hargis reported his conclusion to Wal-

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 10 of 35

Page 4

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

den, who appeared to Dr. Hargis to take it well, and in fact asked Dr. Hargis if he could send him back to work. [2] (Id. at 408.) However, because Dr. Hargis was an IME, and not Walden's treating physician, he did not have the authority to do so. (Id. at 409.) [3]

> 2   On the other hand, the notes of Mary Thomas, Yellow Freight's injury counselor, record that on the following day, Walden came to the terminal and was extremely angry about Hargis's findings. (P-64.)
> 3   The discrepancy between Dr. Hargis's medical opinion and that of Dr. Scheinzeit, and the Court's factual findings and credibility determinations on this issue, are discussed in connection with the Court's legal conclusions concerning Walden's disability, infra.

Dr. Hargis reported his findings to Mary Thomas, Yellow Freight's "injury counselor," in a letter dated August 3, 1994. (Id. at 409; D-11.) The [*14] next day, Yellow Freight advised Walden that in light of Dr. Hargis's report, Walden could no longer participate in the Transitional Work Program. (Tr. at 51-52, 308-09.) Walden was told that if he could not return to work as a Road Driver without restrictions, he could no longer work at all. (Id. at 64-66, 281.) Walden began to protest, but was told to leave the property. (Id. at 51-52.) Yellow Freight immediately stopped paying Walden, and, by September, had his workers' compensation benefits suspended pending review of his case by the Workers Compensation Board. (Id. at 53, 267.)

Employees at the Maybrook terminal in a particular work classification, such as "road work" or "dock work," could bid only on jobs within that classification. (Id. at 277-78.) Once a year, however, pursuant to a 1993 agreement between the Company and Local 707 ("Cross Bid Agreement"), workers could "cross-bid" to a different classification for the following year. (Id. at 278; P-20.) For example, someone in road work, which included the position of Road Driver, could cross-bid, if he had enough seniority and was otherwise qualified, to a position in dock work, which included the job [*15] of Yard Jockey. (Tr. at 278, 280-81.) At all relevant times, the annual cross-bids took place in the month of May.

Under the Cross-Bid Agreement, individuals returning from workers' compensation leave or other long-term illness, as well as from non-medical leave, could also bid for positions in a different classification without waiting for the annual cross-bid. (Id. at 32, 279-80; P-20.) Upon returning from leave, an individual could immediately bid for work in a different classification, and, assuming he had enough seniority, could begin such work without returning to his former classification. (Tr. at 178-79.) (If the employee returned to work, and did any work -- even

a single day's -- in his former classification, he would have to wait until the annual cross-bid in May to change classifications. (Id. at 71.)) Such an individual had the right under--the Cross Bid Agreement to "bump" someone with less seniority. (Id. at 281-82.)

During this period, Yellow Freight had a policy requiring that any employee returning to work after an injury or extended illness had to return to his previous job classification without medical restrictions. (Id. at 66, 281, 284-85, 326-27, 681-82; [*16] P-(15-19); P-66; D-6.) Pursuant to this policy, an employee seeking to return to work after a medical or other absence could not do so unless he obtained a note from his doctor saying he was fully released to do his former job "without restrictions." (Tr. at 66, 281, 284-85, 681-82.) Only with such a release would the individual be permitted to return to his former job, or to exercise his right to cross-bid under the Cross Bid Agreement. (Id.) For example, if a Road Driver who had been injured for several months wished to return to work as a Yard Jockey, he could do so if and only if his doctor released him for work "without restrictions" as a Road Driver. (Id. at 178, 284-85.) With such a release, the individual would not have to work a single day as a Road Driver before beginning as a Yard Jockey. Without such a release, the individual could not work at all, in any position. (D-6.) The rule thus barred someone from returning to work if he was not medically able to perform his old job, even if he was capable of performing a different job.

This policy was not in the Cross Bid Agreement or the more general Collective Bargaining Agreement (D-1), but had been in place for a number [*17] of years before the time period in question, and Yellow Freight had enforced it on numerous occasions. (Tr. at 280-81, 682; P-66.) In addition to Walden, the record contains two other examples of Road Drivers who returned from disability leave with a note releasing them to the Yard Jockey position but not the Road Driver position. (Tr. at 326-27; D-5.) Like Walden, these individuals were not permitted to return to work. Unlike Walden, these individuals subsequently secured a medical release for the Road Driver position "without restrictions," whereupon they were allowed to return to work and to immediately exercise their right to cross-bid into the yard. (Tr. at 326-27.)

Plaintiff was no longer working in any capacity at Yellow Freight following the Company's receipt of Dr. Hargis's report. Dr. Hargis's findings notwithstanding, Walden and Dr. Scheinzeit continued to believe that Walden would be incapable of returning to work as a Road Driver because of the pain he experienced from extended sitting. (Id. at 59, 593, 597-99, 600, 602; P-56.) Walden believed, however, that he would be able to do the job of a Yard Jockey. (Tr. at 55-56.) Yard Jockeys

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 11 of 35

Page 5

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

maneuver tractors and trailers [*18] around the May-brook facility, getting them in position to be loaded and unloaded. (Id. at 31, 35, 55, D-22.) Yard Jockeys can be assigned to one of two positions: working "against the house" or in the "check lane." (Tr. at 31, 55-56.) Yard Jockeys working in the check lane are primarily responsible for driving the tractor-trailers short distances in the yard so that the Jockeys working against the house can take them to be unloaded and loaded. (Id. at 31, 33-34.) Working against the house involves driving and operating a machine called an Ottawa, which is similar to a tractor but has hydraulic lifting capability. (Id. at 31, 34, 168-69.) The Ottawa is used to position the trailers next to the "house," that is, the terminal where they are unloaded. (Id. at 34-35.) An Ottawa contains a stiff rear suspension that, in connection with the somewhat rough blacktop area in the yard, produces a moderately bumpy ride. (Id. at 35.) However, the Ottawa is driven around the yard at speeds of less than ten miles per hour. (Id.)

One cannot be a Yard Jockey unless he is qualified as a Road Driver, since, on occasion, Yard Jockeys are required to relieve Road Drivers who are [*19] stuck on the road. (Id. at 32, 208.) This happened infrequently, however, and Walden testified credibly that a Yard Jockey could refuse such an assignment without repercussions. (Id. at 713-14.)

As mentioned, Walden, who had occasionally worked as a Yard Jockey over the years, believed he could handle the job. (Id. at 30-31, 721.) Although both the check lane and the against the house positions require some driving, this is broken up by myriad other duties that require getting out of the vehicles. (Id. at 31, 34, 55, 721.) Walden believed that he would be able to move around and stretch his back regularly, and that the Yard Jockey position would therefore not cause the same symptoms as would the Road Driver. (Id. at 55-56, 721.) In addition, Yard Jockeys work forty hours per week, unlike Road Drivers, who work up to sixty hours in a seven-day period. (Id. at 62.) Finally, the Yard Jockey position does not involve the safety risks that self-evidently inhere, as both Dr. Scheinzeit and Walden noted, in driving a large tractor-trailer on the highway while in constant pain. (Id. at 59, 256, 652-55.)

On September 23, 1994, Walden submitted a note to the Company [*20] from Dr. Scheinzeit stating that he could not return to work as a Road Driver, but that he would be able to perform the duties of a Yard Jockey with no restrictions. (Id. at 56; P-21.) Walden had explained the functions of a Yard Jockey to Dr. Scheinzeit, who felt that Walden's condition would not prevent him from being able to do the job. (Tr. at 55-56, 595, 625-29.) Had he been allowed to bid for it, Walden would have had sufficient seniority to get a job as a Yard Jockey at Maybrook. (Id. at 56-57.)

The Company rejected the note from Dr. Scheinzeit, citing its no-restrictions policy. (Id. at 64-66, 281.) It was explained to Walden that in order to return to work, he had to get a release saying he could perform the duties of a Road Driver without restrictions. (Id. at 66.) Because Walden's note only released him to the position of Yard Jockey, he could not return to work as a Yard Jockey or in any other capacity. James Bair, the distribution center manager, told Walden, "Ron, just get a note saying you can come back to work without restrictions and then cross-bid into the yard." (Id. at 66.)

Walden testified at trial that he did in fact ask Dr. Scheinzeit for [*21] a note releasing him to work as a Road Driver without restrictions, and that Dr. Scheinzeit refused to provide him with such a note. (Id. at 179-80.) Walden stated that Dr. Scheinzeit told him he would not release him to the Road Driver position because he believed Walden was incapable of performing the job, and did not want to expose himself to liability for releasing Walden in the event he returned to the job and further injured his back. (Id.) Dr. Scheinzeit, however, testified that Walden never requested to be released to the Road Driver position without restrictions. (Id. at 642-43.) Defendant makes much of the contradiction between Dr. Scheinzeit's and Walden's recollections in this regard, claiming it indicates Walden's lack of credibility. (Defendant's Post-Trial Brief ("Def. Post-Tr. Br.") at 12-13.) However, it is equally plausible that Dr. Scheinzeit simply did not remember Plaintiff's request for the note, which was made more than seven years before trial, and that Dr. Scheinzeit did not see fit to record Plaintiff's request -- which in essence was a request for him to lie -- in his notes. In any event, whether or not Walden asked for the release is not a material [*22] fact in this case. Much more significant is Dr. Scheinzeit's testimony that if he had been asked for a note releasing Walden to the Road Driver position without restrictions, he would not have given it to him. (Tr. at 643-44, 645, 647-48, 649.)

On October 13, 1994, Jim Bair, who was in charge of day-to-day operations at Maybrook, sent Walden a letter stating that "you will be removed from the Seniority List for 'unauthorized failure to report for work for seven (7) consecutive days when work is available." (Id. at 68, 287-88; P-14.) Walden believed that this letter meant he was being fired. (Tr. at 68.) Bair testified at trial that this letter was a standard letter the Company called a "come home little Sheba" letter, by which the Company was informing Walden not that he had already been terminated, but that if he did not return for seven days, then he would be fired. (Id. at 287, 295-96.) The Court finds this explanation implausible, despite the letter's use of the future tense in stating "you will be removed . . . ." The letter does not say, "You will be removed unless you return within seven days"; rather, it

Case 2:09-cv-04400-ADS -WDW    Document 29-18    Filed 05/16/11    Page 12 of 35

Page 6

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

effectively presents the removal as a fait accompli [*23]. Moreover, at his deposition, Bair himself stated, "[The letter] notifies the person that they have been removed from the seniority list." (Id. at 298.)

Dr. Scheinzeit wrote Yellow Freight a second note on October 20, 1994, again stating that Walden was released to the position of Yard Jockey without restrictions. (Id. at 70; P-22) Walden delivered this note to Mary Thomas, but never received any response from the Company. (Tr. at 70.) Walden never returned to work at Yellow Freight. (Id. at 267.) [4]

> 4    Nevertheless, as of January 1995 Walden remained on, or, more likely, had been returned to, the seniority roster. (Id. at 70.)

Under the Collective Bargaining Agreement, when an employee's treating physician and the IME disagree as to the employee's work capacity, the individual may be sent to a third, "tie-breaker" doctor. (Id. at 275-77; D-1, article 61.) The conclusions of the third doctor are binding. (Tr. at 91-93, 299; D-1, article 61.) In Plaintiff's case, the parties agreed upon [*24] Dr. Jeffrey Passick, an orthopedic surgeon. (Tr. at 275-77.) Dr. Passick examined Walden and issued a report dated March 17, 1995. (Id. at 84-87, 312; P-25.) Dr. Passick wrote that Walden "has, by history, suffered a compression fracture of T8 and T9 which is presumably due to the [January 1994] incident. He does have a history of a previous back injury but states he was asymptomatic at the time of this injury." (P-25 at 2.) Dr. Passick also wrote that Plaintiff complained of pain in his back that became severe when he sat for extended periods, and that Plaintiff needed to stretch after 45 minutes of sitting, which "relieves the pain to some degree." (Id.) As for Walden's work limitations, Dr. Passick wrote:

> At the present time, his symptoms preclude his ability to perform his duties as a driver as stated in the accompanying documentation. He is unable to sit for prolonged periods of time and this would make driving distances very difficult. I feel that he would be able to perform other duties that would not require prolonged sitting, and the patient has stated a desire to attempt this.
>
> To that end, I would recommend that this patient be considered for employment [*25] as a yard jockey and not as a driver. I feel this case should be settled. He cannot return to his previous occupation." [5]

(Id.)

> 5    Dr. Passick did not testify at trial. Defendant therefore objected to the admission of Dr. Passick's report on the grounds of hearsay. (Tr. at 87-88.) Plaintiff then agreed to offer the report solely for the nonhearsay purpose of its effect on the parties, and the Court admitted the report for this purpose. (Id.) Nevertheless, in its post-trial submissions, Defendant cites to Dr. Passick's report (or rather, those portions of Dr. Passick's report that are purportedly favorable to Defendant) to support Defendant's argument that Plaintiff is not disabled. (Def. Post-Tr. Br. at 7-9.) The Court will adhere to its ruling at trial, and will not consider Dr. Passick's report for the truth of the medical findings contained therein.

As Yellow Freight's injury counselor, Mary Thomas was responsible for keeping Yellow Freight's workers' compensation expenses as low as possible. [*26] (Tr. at 302, 339.) After receiving Dr. Passick's report, Thomas wrote to Dr. Passick, asking him to reconsider his opinion and requesting his opinion on whether Walden would be able to perform the job of Road Driver with an accommodation. (Id. at 315.) Although Thomas signed the letter, the impetus for writing it, as well as most of its contents, came from Yellow Freight's corporate legal department in Kansas City. (Id. at 314, 348.) The letter stated:

> It is important to note that as a Road Driver, Mr. Walden would drive long distances from one location to another. However, he can stop his unit as he sees fit to get out of it in order to stretch, walk around, and/or basically refresh himself. We, in fact, encourage such action to [sic] all of our Road Drivers.
>
> In an effort to get Mr. Walden back into our work force as a Road Driver, we are looking for a way to accommodate him so he can perform the job function he left when injured. To this end, in your letter you have suggested that he would be able to perform duties that would not require prolonged sitting. By permitting Mr. Walden to stop on a recurring basis while acting as a Road Driver would therefore [*27] apparently be an effective accommodation. [sic] Moreover, since the Road Driver duties are not as strenuous as those of a Yard Jockey, we would request your opinion as to whether this would be a permissible accommodation? [sic]

(P-26.) In the letter, Thomas also enclosed a description of the duties of a Yard Jockey. (Tr. at 313-14; P-26.)

Plaintiff was copied on the letter. (Tr. at 89.) In response, Walden wrote his own letter to Dr. Passick, in which he reiterated his belief that he could perform the functions of a Yard Jockey and that he could not perform the work of a Road Driver. (Id. at 101; P-27.) As for Thomas's proposed accommodation, Walden stated that it would be difficult and dangerous to continually pull off the road while hauling two large trailers. (P-27.) Walden added that it would also be dangerous for him to drive his truck while distracted with back pain. Walden further stated that making repeated stops would greatly increase his travel time, and he enclosed an excerpt from the transcript of his December 1994 workers' compensation hearing. At the hearing, David Yanchowsky, Maybrook's general operations manager (Tr. at 319), testified that it [*28] would be problematic if a Road Driver were constantly late. (P-27; D-18.)

On April 4, 2002, Dr. Passick wrote a short letter to Thomas stating his adherence to his initial position that Walden was disabled from being a Road Driver. (P-28.) Dr. Passick stated that Thomas's recommendation that Walden get out of the truck and stretch from time to time was "highly unrealistic." (Id.) Dr. Passick also wrote, "I continue to contend that Mr. Walden would be able to be a hostler, as his main disability is his inability to sit for long periods without pain." (Id.)

Despite Dr. Passick's conclusion, Yellow Freight adhered to its position that Walden could not return to work and bid for the Yard Jockey position, because he did not have a release stating that he could return to the Road Driver position without restrictions. (Tr. at 83.) Neither Mary Thomas, nor anyone else at Yellow Freight, ever discussed with Walden the "accommodation" proposal made to Dr. Passick. (Id. at 89-90.) Similarly, Walden never approached Mary Thomas to discuss the proposal in her March 30 letter, a copy of which was sent to Walden, as well as to a union representative and to the Company's labor relations [*29] manager. (Id. at 191; P-26.) In short, the only communication between the parties regarding the proposed accommodation was via the copy of the March 30 letter to Dr. Passick that was sent to Plaintiff.

In September 1994, following Yellow Freight's refusal of Dr. Scheinzeit's note releasing Walden to the Yard Jockey position, Walden filed a grievance with a committee established by the union's Collective Bargaining Agreement with the Company. (Tr. at 67.) In October 1995, the grievance was referred to a different grievance committee, also established by the CBA. (Id. at 452-53.) Local 707 filed a brief on Walden's behalf with this committee, arguing (1) that the no-restrictions policy contravened the Collective Bargaining Agreement, and (2) that the Company violated the Collective Bargaining Agreement by failing to adhere to the decision of the third-party doctor, Dr. Passick. (Id. at 454, 686; P-40.) The brief also stated the union's belief that the no-restrictions policy violated the ADA. (P-40 at 2.) The Company opposed the grievance on both substantive and procedural grounds, arguing that (1) "sound business practice necessitated" adherence to its "long-standing" no-restrictions [*30] policy, since without such a policy 500 people at Maybrook alone would fake an injury and cross-bid to a lower-paying position in order to receive the workers' compensation benefits mandated by state law; (2) the grievance should have been filed with a different committee; and (3) an identical case involving the no-restrictions policy had already been ruled on in the Company's favor. (Tr. at 455-61; D-34.) The Company did not address the lawfulness of the policy under the ADA, nor did it ever mention that it had offered Walden a reasonable accommodation. (Tr. at 83; D-34.) On January 4, 1996, the committee, which consisted of an equal number of union and employer representatives, dismissed the grievance on procedural grounds, albeit without specifying the basis for its decision. (Tr. at 458-60; D-8.)

Yellow Freight amended its written no-restrictions policy in 1998 to allow for individuals to return to their former jobs with reasonable accommodations. (Tr. at 284-86, 290; D-27.) Yellow Freight contends that its March 30, 1995 letter to Dr. Passick constituted an offer to waive the policy as to Walden by permitting him to return as a Road Driver with an accommodation. (Tr. at 290, [*31] 320; Def. Post-Tr. Br. at 35.) However, as mentioned, no one at Yellow Freight ever said to Walden that the Company would accommodate his disability. Nor did anyone ever state that the Company would waive its no-restrictions policy as to him. (Tr. at 289-90, 363, 492, 718-19.) The Court's findings and conclusions concerning the significance of the March 30 letter are discussed more fully in the Conclusions of Law section, infra.

Walden never returned to work at Yellow Freight. Since 1995, he has held a succession of jobs in New York and Florida. In 1995 and 1996, Walden worked for two different companies doing maintenance and repair on swimming pools. (Id. at 137-38.) In 1996, Walden worked as a taxi driver in Beekman, New York, a small town near Plaintiff's home in Wappingers Falls. (Id. at 138-39.) Although this job entailed driving, it involved only short runs to and from the train station, none of which lasted longer than fifteen minutes or so. (Id. at 139.) At some point, Dr. Scheinzeit indicated that the taxi driving position might be "too much" for Walden.

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 14 of 35

Page 8

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

(Id. at 603; P-56.) Plaintiff left the job after five months. (Tr. at 149.)

In 1997, Walden worked [*32] as a delivery person for an automobile body parts company. (Id. at 139.) Walden drove a van and delivered car parts to body shops. (Id.) In July 1997, Walden moved to Florida, and began work at a similar job delivering small auto parts. (Id. at 139-40.) In 1998, Walden held a job stocking soft-cover books at several K-Marts in Sarasota, Florida. (Id. at 151-52.) Walden's next job, which he held until 2000, was as a starter/ranger at a golf course. (Id. at 141-42.) His primary responsibilities in this job were to ensure that golfers started their rounds on time, and to drive a golf cart around the course to check for problems. At some point while he was in Florida, Walden worked for one day as a dump truck operator for an earth-moving company. (Id. at 142-43.) Although he managed to work a full day, Walden did not return to the job because the rough terrain, and the lack of opportunities to get out of the truck to stretch, caused him back pain. (Id.)

In mid-2000, Walden moved back to New York State. (Id. at 154.) Walden began working at the same body parts company he had worked for in 1997, doing similar delivery work as well as sales. (Id. at 155-56.) [*33] In March 2001, Walden came down with pneumonia, as a result of which he lost a significant amount of his breathing capacity. (Id. at 144.) Walden could no longer perform any work and began receiving Social Security disability benefits. (Id. at 120, 144.) The pneumonia and its after-effects do not stem from Walden's injuries at Yellow Freight. (Id. at 144.)

In November 1994, Walden filed a complaint of disability discrimination with the New York State Division of Human Rights, which was dual-filed with the EEOC. (Id. at 77; P-32.) In March 1996, the NYDHR found probable cause to believe discrimination had occurred, whereupon the EEOC took jurisdiction and, for its part, found reasonable cause. (P-33, P-35.) The EEOC filed this action on March 30, 1998. Walden filed his Intervenor's Complaint on September 24, 1998.

## CONCLUSIONS OF LAW

### I. Americans with Disabilities Act

The ADA prohibits a covered employer from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, [*34] and other terms, conditions and privileges of employment." *42 U.S.C. § 12112(a).* In order to make out a prima facie case of discrimination based on an employer's failure to accommodate, a plaintiff must show "(1) that he is an individual who has a disability

within the meaning of the statute, (2) that an employer covered by the statute had notice of his disability, (3) that with reasonable accommodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations." *Stone v. City of Mt. Vernon, 118 F.3d 92, 96-97 (2d Cir. 1997)* (citation omitted); accord *Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 216 (2d Cir. 2001).* An employer can defeat the claim if it shows "(a) that making a reasonable accommodation would cause it hardship, and (b) that the hardship will be undue. The burden of proof on these two issues is on the employer." *Stone, 118 F.3d at 97.*

### A. Disability

Under the above standard, a plaintiff must first show that he suffers from a disability within the meaning of the ADA. The Act defines "disability" [*35] as follows:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such impairment;
>
> (C) being regarded as having such an impairment.

*42 U.S.C. § 12102(2).* Walden claims that his back condition qualifies as a disability under subsection (A) of this definition. In *Bragdon v. Abbott, 524 U.S. 624, 631, 118 S. Ct. 2196, 2202, 141 L. Ed. 2d 540 (1998),* the Supreme Court established a three-prong test for determining whether an alleged disability comes within the meaning of subsection (A). First, the plaintiff must show that he suffers from a physical or mental impairment. Second, the plaintiff must show that such impairment affects a major life activity. Third, the plaintiff must show that the physical or mental impairment substantially limits that activity. See id. "'In order to be eligible to prevail upon a further showing of discrimination, a plaintiff must satisfy each of the three prongs.'" *Usala v. Consolidated Edison Co., 141 F. Supp. 2d 373, 380-81 (S.D.N.Y. 2001)* (quoting *Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 641 (2d Cir. 1998)).* [*36]

The EEOC, the agency responsible for enforcing the ADA, has issued regulations defining each of the prongs of subsection (A). Although not binding, the EEOC's interpretations of the statute are entitled to great deference. See *Bartlett v. New York State Bd. of Law Exam'rs, 226 F.3d 69, 79 (2d Cir. 2000); Muller v. Costello, 187 F.3d 298, 312 & n.5 (2d Cir. 1999); Usala, 141 F. Supp. 2d at 381.*

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 15 of 35

Page 9

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

### (1) Impairment

The EEOC regulations define "impairment" as "any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." *29 C.F.R. § 1630.2(h)(1)*. Defendant concedes that Plaintiff's compressed vertebrae constitute an impairment under the ADA. (Defendant's Pre-Trial Brief Regarding Legal Issues ("Def. Pre-Tr. Br.") at 3; Def. Post-Tr. Br. at 2.)

### (2) Major Life Activities

The EEOC regulations define "major life activities" as "functions [*37] such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *29 C.F.R. § 1630.2(i)(1)*. The list, though "illustrative, not exhaustive," *Bragdon, 524 U.S. at 639, 118 S. Ct. at 2196*, makes apparent that "major life activities" are "those activities that are of central importance to daily life." *Toyota Motor Mfg. v. Williams, 534 U.S. 184, 197, 122 S. Ct. 681, 691, 151 L. Ed. 2d 615 (2002)*; see also *Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 151 (2d Cir. 1998)* ("The term 'major life activity,' by its ordinary and natural meaning, directs us to distinguish between life activities of greater and lesser significance."). In addition to the activities mentioned in the regulations, the Second Circuit has also recognized "sitting, standing, lifting, [and] reaching" as major life activities. *Colwell, 158 F.3d at 642* (citing *Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 870 (2d Cir. 1998)* )); see also 29 C.F.R. Pt. 1630, App. 1630.2(i) (EEOC interpretative guidelines, referring to these activities [*38] as major life activities).

Plaintiff asserts that his back injury affects his ability to perform the major life activities of sitting and working. Because each of these has been identified as a major life activity by both the EEOC and the Second Circuit, see *29 C.F.R. § 1630.2(i)(1)* (working); 29 C.F.R. Pt. 1630, App. 1630.2(i) (sitting); *Bartlett, 226 F.3d at 80* (working); *Colwell, 158 F.3d at 642* (sitting and working), Walden has satisfied the second prong of the Bragdon analysis.

### (3) Substantially Limits

To constitute a disability, an impairment must not merely affect a major life activity, it must "substantially limit" that activity. See *Toyota, 122 S. Ct. at 692; Ryan, 135 F.3d at 870*. Determining whether or not it does so requires an individualized, fact-specific inquiry. See *Toyota, 122 S. Ct. at 692; Colwell, 158 F.3d at 643; Ryan, 135 F.3d at 870*.

The EEOC regulations implementing the ADA define "substantially limits" as follows:

> (i) Unable to perform a major life activity that the average person in the general [*39] population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*29 C.F.R. § 1630.2(j)(1)*. The regulations further provide that the following factors should be considered in determining whether an individual is substantially limited in a major life activity:

> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

*29 C.F.R. § 1630.2(j)(2)*; see also *Ryan, 135 F.3d at 871-72* (applying factors).

Accordingly, this Court must conduct an individualized assessment of Walden's limitations with respect to sitting in light of the above guidelines and the facts adduced at trial.

Consistent with the need for a fact-specific inquiry into the nature of each particular plaintiff's [*40] impairment, the cases addressing the major life activity of sitting do not yield a single benchmark against which to test all sitting limitations. Nevertheless, courts have generally found that the inability to sit for periods of an hour or less may constitute a substantial limitation on the ability to sit, while the ability to sit for periods longer than an hour does not. Compare *Hayes v. UPS, 17 Fed. Appx. 317, 2001 WL 1006162*, at *4 (6th Cir. 2001) (unpublished opinion) (inability to sit for more than twenty to twenty-five minutes raised issue of fact as to whether plaintiff was substantially limited in the major life activity of sitting); *Konewko v. Village of Westchester, 2000*

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 16 of 35

Page 10

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

*U.S. Dist. LEXIS 11500*, No. 99 C. 7277, 2000 WL 1038125, at *5 (N. D. Ill. July 25, 2000) (jury could find that permanent back injury that limited ability to sit for more than one hour, and made staying in one position very painful, substantially limited major life activity of sitting); *United States v. City and County of Denver, 49 F. Supp. 2d 1233, 1245 (D. Colo. 1999)* (jury could find that inability to sit for more than thirty minutes substantially limited [*41] ability to sit); and *Meling v. St. Francis Coll., 3 F. Supp. 2d 267, 273-74 (E.D.N.Y. 1998)*(uncontradicted evidence at trial that plaintiff could not sit for more than ten to fifteen minutes required conclusion that plaintiff was substantially limited in the major life activity of sitting), with *Coker v. Tampa Port Auth., 962 F. Supp. 1462, 1468 (M. D. Fla. 1998)* (back condition limiting ability to sit for more than one hour did not substantially limit major life activity of sitting where plaintiff produced no evidence that condition was permanent or long-term); *Horth v. Gen. Dynamics Land Sys., Inc., 960 F. Supp. 873, 878 (M. D. Pa. 1997)*(inability to sit for more than two hours at a time without difficulty did not constitute substantial limitation on ability to sit); *Kirkendall v. United Parcel Serv., Inc., 964 F. Supp. 106, 111 (W.D.N.Y. 1997)* (inability to sit for more than three hours at a time did not substantially limit ability to sit); and *Schneider v. Continental Cas. Co., 1996 U.S. Dist. LEXIS 19631* at *21, No. 95 C 1820 (N. D. Ill. Jan. 7, 1997) (temporary physical impairment that permitted [*42] plaintiff to sit up to an hour and a half did not substantially limit any major life activities). Courts have rejected claims where plaintiffs have merely alleged an inability to sit for "prolonged" or "extended" periods. See, e.g., *Colwell, 158 F.3d at 644* (plaintiff's description of his impairments, including his inability to sit for "too long" or for a "prolonged" time, was "marked . . . by hedging and a studied vagueness" and therefore insufficient to meet his burden of showing a substantial limitation); *Wernick v. Fed. Reserve Bank, 1995 U.S. Dist. LEXIS 14835*, No. 93 Civ. 2606 (KTD), 1995 WL 598973, at *2 (S.D.N.Y. Oct. 10, 1995) (plaintiff's allegation that her impairment prevented her from "prolonged sitting without sufficient opportunity to be ambulatory" was insufficient to show substantial limitation), aff'd, *91 F.3d 379 (2d Cir. 1996)*.

Defendant cites two cases in which a court purportedly found that the inability to sit for periods shorter than an hour did not substantially limit the major life activity of sitting. The Court reads these cases differently, and finds that they do not support Defendant's position. In *Helfter v. United Parcel Serv., Inc., 115 F.3d 613, 616 (8th Cir. 1997)*, [*43] the plaintiff submitted an affidavit in opposition to defendant's motion for summary judgment in which she stated that she could not "sit[] for a fixed position for longer than 30 minutes." The Eighth Circuit affirmed the district court's discounting of this

affidavit, as well as of plaintiff's "no more expansive" deposition testimony, due to its conclusory nature. Id. The court stated that "such statements, standing alone, are insufficient to withstand a properly-supported motion for summary judgment." Id. Thus, the court ruled solely on the basis of the quality of the plaintiff's evidence, and expressed no opinion concerning whether a substantiated, permanent thirty-minute sitting limitation would constitute a disability under the ADA.

Defendant's reliance on *De Marco v. Pals Express, Inc., 1997 U.S. Dist. LEXIS 15309*, No. 96 C 6817, 1997 WL 619829 (N. D. Ill. Sept. 30, 1997), is equally misplaced. In De Marco, although the plaintiff alleged that his impairment required him to avoid sitting for longer than thirty to forty-five minutes, see *1997 U.S. Dist. LEXIS 15309*, [WL] at *5, the plaintiff's only claim of disability was with respect to the major life activity of working, see *1997 U.S. Dist. LEXIS 15309*, [WL] at *6. It is well-established [*44] that a claim of disability based on the major life activity of working requires a showing distinct from, and broader than, that required for any other life activity. See, e.g., *Muller, 187 F.3d at 312-13* (noting that the regulations define "substantially limits" differently, and set forth different factors to consider, when the major life activity is working)(citing *29 C.F.R. § 1630.2(j)(3)(i)-(ii)*). Thus, as in Helfter, the De Marco court made no finding as to whether a thirty to forty-five minute sitting limitation substantially limited the major life activity of sitting.

Defendant also argues that Plaintiff's claim must fail because he has not presented any expert testimony concerning the sitting capabilities of the average person in the general population. As noted, the EEOC regulations require a plaintiff to show that he is "significantly restricted" in a particular life activity "as compared to . . . the average person in the general population." *29 C.F.R. § 1630.2(j)(1)(ii)*. Defendant argues this showing is "impossible" without comparative evidence in the form of expert testimony that addresses the [*45] capability of the average person. (Def. Pre-Tr. Br. at 7-9; Def. Post-Tr. Br. at 17.) The Court disagrees. On its face, the quoted language of the regulations does not mandate that the comparison must be made using a specific type of evidence; nor do the interpretative guidelines to the regulations dictate any such requirement. See 29 C.F.R. Pt. 1630, App. 1630.2(j) ("For example, an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking. It should be noted that the term 'average person' is not intended to imply a precise mathematical 'average.'"). Further, there is no support for such a requirement in the caselaw of this Circuit. This Court disagrees with Defendant that Colwell stands for the proposition that such evidence is necessary. The

Colwell plaintiffs' claims foundered on the weakness of the medical evidence of their disability; the opinion contains no discussion, and establishes no requirement, of an evidentiary showing regarding the abilities of the average person. See colwell, *158 F.3d at 643-45*. In addition, Defendant does not cite to, and this [*46] Court is not aware of, any court in this district imposing such a requirement.

In fact, the cases cited by Defendant do not even stand for the proposition that comparative evidence, in the form of expert testimony or otherwise, is always required. For example, in *Lusk v. Ryder Integrated Logistics, 238 F.3d 1237, 1240-41 (10th Cir. 2001)*, the court specifically noted that comparative evidence was not always required; construing an earlier Tenth Circuit case explicitly holding that such evidence was not required, the court stated that "comparative evidence is not required as a matter of law to withstand a motion for summary judgment where the impairment appears substantially limiting on its face." *Id. at 1240* (citing *Lowe v. Angelo's Italian Foods, Inc., 87 F.3d 1170, 1174 (10th Cir. 1996))*. Nor do the other cases cited by Defendant impose a categorical requirement regarding the type of evidence a plaintiff must introduce. The one case that did explicitly hold that a plaintiff must always present specific evidence regarding the abilities of the average person in the population, *Maynard v. Pneumatic Prods. Corp., 233 F.3d 1344, 1349 (11th Cir. 2000)*, [*47] was subsequently vacated (albeit on unrelated grounds). See *Maynard v. Pneumatic Prods. Corp, 256 F.3d 1259, 1261 (11th Cir. 2001)*(per curiam). In any event, this Court respectfully disagrees with the Maynard court's conclusion that a trier of fact cannot determine on his own, without the aid of "expert testimony and/or statistical evidence," *233 F.3d at 1350 n.13*, whether someone who cannot walk more than forty or fifty yards is substantially limited in his ability to walk as compared to the average person.

Of course, this Court does not disagree that under the regulations, a plaintiff must demonstrate that his condition renders him significantly restricted in comparison to the average person in the general population. Indeed, the Court does not disagree that specific evidence of the average person's abilities     such as in the form of expert medical testimony or statistical evidence -- may often be "helpful to the trier of fact." *Lowe, 87 F.3d at 1174*. Nevertheless, the Court disagrees that the finder of fact must always be presented with such evidence before it can consider whether a limitation is substantial. In this [*48] regard, the Court finds the reasoning of the Sixth Circuit in Hayes persuasive:

The plaintiff in this case has submitted evidence indicating that his injury rendered him unable to sit for longer than 20 or 25 minutes. He need not provide information concerning the average person's ability to sit. Common sense and life experiences will permit finders of fact to determine whether someone who cannot sit for more than this period of time is significantly restricted as compared to the average person.

*Hayes, 17 Fed. Appx. 317, 2001 WL 1006162*, at *321; see also *Witt v. Northwest Aluminum Co., 177 F. Supp. 2d 1127, 1131 (D. Or. 2001)*("In appropriate cases factfinders may draw on their own experience to determine whether particular impairments constitute 'substantial limitations' of major life activities . . . . Factfinders do not need expert testimony to understand a person confined to a wheelchair is substantially limited in the major life activity of walking. Factfinders similarly are competent to weigh the evidence about other walking limitations to determine whether those limitations are so substantial that they constitute a disability."); cf. *Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1207 (8th Cir. 1997)* [*49] ("The plaintiff must proffer evidence from which a reasonable inference can be drawn that such activity is substantially or materially limited."). Accordingly, the Court declines Defendant's invitation to impose on Plaintiff a rigid evidentiary requirement not specifically imposed by the regulations or the Second Circuit.

As for the discrepancy between the findings of Dr. Hargis and those of Dr. Scheinzeit, the Court ultimately gives more weight to the opinion of Dr. Scheinzeit. In addition to being a medical doctor, not merely a chiropractor, Dr. Scheinzeit was Plaintiff's treating physician, not a consultative examiner chosen by the Company. Moreover, Dr. Scheinzeit saw Plaintiff on a regular basis in 1994 and 1995, rather than simply once, and his diagnosis remained consistent throughout this period. Additionally, the Court is unpersuaded that the multiple tests performed by Dr. Hargis are actually inconsistent with an inability to sit for extended periods. For example, Dr. Hargis's observation that Plaintiff stood up from sitting without apparent pain does not suggest to the Court that Plaintiff did not experience pain while sitting. Likewise, the fact that Plaintiff had a good [*50] range of motion in his back and legs, and good flexibility, does not necessarily translate into the ability to sit continually without pain. Indeed, Dr. Scheinzeit also found that Plaintiff had a good range of motion of his shoulder, hips, and knees, and that his reflexes and motor function were all good. (P-56.)

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 18 of 35

Page 12

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

Moreover, the Court does not place great significance on Dr. Hargis's observation that Plaintiff's post-accident x-rays showed no apparent change from x-rays taken the year before. Dr. Scheinzeit credibly explained that even if Plaintiff's compression fractures were not caused by the January 1994 accident, such a traumatic incident could make a pre-existing condition disabling. (Tr. at 608-09.) Dr. Hargis himself noted in his report that "if [Plaintiff's] history is accurate, there may be a causal relationship to the accident of January 11, 1994." (D-11 at 3.) Dr. Hargis also testified at trial that the jolting motion of driving in a tractor-trailer could exacerbate a pre-existing condition. (Tr. at 429.)

Finally, the Court finds Plaintiff's own testimony regarding his symptoms credible. Defendant argues otherwise, pointing to various supposed inconsistencies between Walden's [*51] complaints and his conduct. (Def. Post-Tr. Br. at 11.) None of the facts Defendant cites, however, convince this Court that Walden was not telling the truth about, his back pain during the period at issue in this litigation, and at trial. For instance, Defendant notes that following the collapse of his seat on January 11, 1994, Walden was able to continue his trip to Boston, and subsequently to return all the way to back to Maybrook. What Defendant omits from this supposedly revealing fact, however, is that Walden was in substantial pain while he completed the trip, and that it took him one and a half to two hours longer than normal. (Tr. at 40.) In any event, it is reasonable to infer that the full effects of Walden's injury may not have been felt in the hours immediately following the initial trauma. Defendant also makes much of the fact that Walden sat continuously in a chair for an hour and fifteen minutes at a 1996 conference with the New York State Division of Human Rights, and that he sat for two one-hour periods, separated by only a short break, during his 1999 deposition. (Def. Post-Tr. Br. at 11.) However, as Defendant acknowledges (id. at 4-5), Walden was only able to [*52] "sit" continually for these periods by sliding forward in the seat and kneeling on one or both knees. (Tr. at 237.) In the Court's view, this is hardly "sitting" in the everyday sense of that term, or in the manner that would be required to drive a large truck. In any case, such squirming and kneeling, whatever they are, do not demonstrate that Walden's condition caused him no difficulty in sitting.

Walden also testified credibly that his inability to sit affects the way he conducts a variety of everyday activities. (*Id. at 72-76.*) At the movies, for instance, Walden stands in the rear of the theater. (*Id. at 74.*) Similarly, Walden must watch television either lying down or standing up. (Id.) When a passenger in a car, he reclines his seat so that he is practically lying down. (*Id. at 72.*) He himself only drives for short trips of a half hour or less. (Id.) Although he held a variety of jobs after his employment at Yellow Freight that involved some amount of driving, none involved long-range, continual driving; in all of his jobs, Walden was able to stop frequently and stretch his back. Indeed, the one job that involved continual sitting all day, driving a dump [*53] truck, put so much strain on Walden's back that he had to quit after a single day.

The foregoing persuades the Court that Walden was substantially limited in his ability to sit. The evidence showed that Walden could sit for, at most, forty-five minutes at a time without experiencing pain that required him to stand up and stretch. Even when he did get up and move around, the pain in his back would only diminish, and not recede entirely. (Id. at 60-61, 656-67.) Moreover, the pain from sitting would progressively increase the more he tried to sit; that is, although stretching after a period of time would reduce the pain, when Walden tried to sit again the pain would recur with greater frequency and intensity. (Id.) Stretching after forty-five minutes or so did not reset Walden's sitting-related pain to zero; only a full night's sleep did so. (Id. at 61.) Dr. Scheinzeit confirmed that such cumulative pain is consistent with Plaintiff's condition. (*Id. at 605-06, 656-57.*) Thus, even the forty-five-minute sitting limitation, which itself falls within the range of times that courts have found to constitute substantial limitations, progressively became more difficult to sustain [*54] as the day went on. Finally, the evidence at trial demonstrated that Plaintiff's condition was permanent. See *Konewko, 2000 U.S. Dist. LEXIS 11500, 2000 WL 1038125*, at *5 ("Konewko's injury is unlike the 'temporary, non-chronic' impairments that are not disabilities under the ADA.").

Application of the factors contained in the EEOC regulations provides further support for the Court's conclusion that Plaintiff was substantially impaired. The first factor, the nature and severity of Plaintiff's impairment, weighs in favor of finding a substantial limitation. Plaintiff's back condition dramatically shortened the period in which he could sit, and caused him significant and increasing amounts of pain when he did sit for extended periods. The Court is unpersuaded by Defendant's argument that Plaintiff's "twisting in his seat; sliding forward; leaning back; stretching while seated; [and] standing to stretch" constitute "corrective measures" that reduce the severity of Plaintiff's impairment. (Def. Post-Tr. Br. at 17.) Even assuming, arguendo, that such squirming and kneeling constitute "sitting," such self-accommodation reduced Plaintiff's pain only moderately and temporarily. Nothing in the record [*55] supports Defendant's contention that these activities ameliorated Plaintiff's impairment to the point where it was less than substantial. Compare *Sutton v. United Air Lines, Inc., 527 U.S. 471, 488-89, 119 S. Ct. 2139, 2149, 144 L. Ed. 2d 450 (1999)*

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 19 of 35

Page 13
2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

(plaintiffs with severe myopia were not substantially limited in any life activity where their vision was 20/20 with eyeglasses); *Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521, 119 S. Ct. 2133, 2137, 144 L. Ed. 2d 484 (1999)* (plaintiff with high blood pressure was not substantially limited in any major life activity where medicine allowed him to function normally). The two district court cases cited by Defendant are thus distinguishable on their facts, inasmuch as both cases involved self-accommodation measures that did in fact improve the plaintiffs' conditions. See Bailey v. Charlotte-Mecklenburg Bd. of Educ., No. 3:98 CV565, 2001 WL 1019736, at *8 (W.D.N.C. Apr. 3, 2001)("Plaintiff's impairment was managed with conservative measures that, when employed, were effective."); *Lanci v. Arthur Andersen, LLP, 2000 U.S. Dist. LEXIS 3954*, No. 96 CIV. 4009 (WK), 2000 WL 329226, at *4 (S.D.N.Y. Mar. 29, 2000)(plaintiff's [*56] ability to "function very well" with self-accommodation weighed against finding him disabled).

The second EEOC factor, the duration of the impairment, also weighs in favor of finding Plaintiff disabled. "Duration" in this context "refers to the length of time an impairment persists." *Ryan, 135 F.3d at 872* (quoting 29 C.F.R. Pt. 1630, App. 1630.2(j)). The medical evidence indicates that Plaintiff's back condition is permanent, and that his symptoms have persisted unabated to this day. Plaintiff testified that he has continually experienced pain from sitting since his 1994 injury. Cf. id. (finding this factor weighed against substantial limitation where affliction was permanent, but-asymptomatic for long periods). Dr. Scheinzeit's recent examination confirms that Plaintiff's condition has changed little since his previous examinations, and that his prognosis was "guarded." (Tr. at 604-05; P-56.) This factor thus weighs strongly in favor of finding a substantial limitation.

The final factor, the expected long-term impact from the impairment, also weighs in favor of finding a substantial limitation. "The term 'impact' refers to the residual effects of an impairment. [*57] " *Ryan, 135 F.3d at 871* (quoting 29 C.F.R. Pt. 1630, App. 1630.2(j)). As explained, Plaintiff's back condition is permanent, and permanently symptomatic. Accordingly, its long-term impact is significant.

The EEOC factors thus all point to the conclusion that Walden is substantially limited in his ability to sit. The application of these factors, in tandem with the standards developed in the caselaw, convinces the Court that Plaintiff is substantially limited in the major life activity of sitting. [6]

      6  In light of this conclusion, the Court need not address whether Plaintiff's impairment substan-

tially limits him in the major life activity of working. See 29 C.F.R. Pt. 1630, App. 1630.2(j) ("If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working."); *Bartlett v. New York State Bd. of Law Exam'rs, 156 F.3d 321, 329 (2d Cir. 1998)*, vacated on other grounds, *527 U.S. 1031, 119 S. Ct. 2388 (1999)*.

**[*58]  B. Reasonable Accommodation**

Having established that he is disabled within the meaning of the ADA, Plaintiff must also show that Yellow Freight failed to reasonably accommodate his disability, of which it was indisputably aware. Under the ADA, an employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." *42 U.S.C. § 12112(b)(5)(A)*; see also *Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 98 (2d Cir. 1999)*. An individual is "otherwise qualified" if he can, with or without reasonable accommodation, . . . perform the essential functions of the employment position that [he] holds or desires." *42 U.S.C. § 12111(8)*; see also *Lovejoy-Wilson, 263 F.3d at 218*; *Norville, 196 F.3d at 98-99*.

A plaintiff claiming that an employer failed to offer a reasonable accommodation bears the burden of establishing "that an accommodation exists that permits her to perform [*59] the job's essential functions." *Jackan v. New York State Dep't of Labor, 205 F.3d 562, 566 (2d Cir.)*, cert. denied, *531 U.S. 931, 121 S. Ct. 314, 148 L. Ed. 2d 251 (2000)* (citing *Borkowski v. Valley Ctl. Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995))*. [7] Reasonable accommodations include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position." *42 U.S.C. § 12111(9)(B)*; see also *Lovejoy-Wilson, 263 F.3d at 217*; *Jackan, 205 F.3d at 565-66*. Thus, by the plain language of the Act, an employer may be required to transfer a disabled individual who cannot perform his current job to a different position whose essential functions he can perform. See *Jackan, 205 F.3d at 565* (citing *Stone, 118 F.3d at 100-01*); [8] see also *Cravens v. Blue Cross & Blue Shield, 214 F.3d 1011, 1018 (8th Cir. 2000)*("The definition of 'qualified individual with a disability' includes a disabled employee who cannot do his or her current job, but who desires and can perform, with or without reasonable accommodation, the [*60] essential functions of a vacant job within the company to which he or she could be reassigned. Such a view of the reassignment duty is well-supported among the circuits.")(collecting cases). It is the plaintiff's burden

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 20 of 35

Page 14

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

to show that "a suitable vacancy existed at the time he sought transfer." *Jackan, 205 F.3d at 567.*

7   The EEOC regulations further explain that a reasonable accommodation may entail, inter alia,

> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

> (iii) Modifications that enable an ... employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

*29 C.F.R. § 1630.2(o)(1)(ii)-(iii),* quoted in, *Stone, 118 F.3d at 99.*

8   The pre-Jackan district court cases cited by Defendant for the proposition that an employer has no general duty to transfer to another position a disabled employee unable to perform his current position -- absent a showing of a contractual right to such a reassignment -- are clearly no longer good law, if indeed they ever were. See, e.g., *Parisi v. Coca-Cola Bottling Co., 995 F. Supp. 298, 303 (E.D.N.Y. 1998),* aff'd, *172 F.3d 38 (1999); Katz v. Metro. Life Ins. Co., 1998 U.S. Dist. LEXIS 2749,* No. 95 Civ. 10075 (RPP), 1998 WL 132945, at *5 (S.D.N.Y. Mar. 20, 1998). These cases expressly rely on *Bates v. Long Island R.R., 997 F.2d 1028, 1035 (2d Cir. 1993),* a case decided under the Rehabilitation Act of 1973, *29 U.S.C. §§ 701-797(b),* which at the time did not provide for reassignment to a vacant position as a reasonable accommodation. See *Connolly v. Bidermann Indus. U.S.A., Inc., 56 F. Supp. 2d 360, 366-67 & n.4 (S.D.N.Y. 1999)*(finding Bates "of little persuasive value when considering the reassignment issue under the ADA" and declining to follow the Parisi court's reliance on Bates); *D'Amato v. Long Island R.R. Co., 2001 U.S. Dist. LEXIS 6768,* No. 99 Civ. 1797(NRB), 2001 WL 563569, at *6 & n.7 (S.D.N.Y. May 24, 2001) (noting that Jackan explicitly resolved the reassignment issue and finding Bates "inapplicable" to the ADA).

[*61]   In this case, Walden has shown that a suitable position existed for him at the time he sought reassignment from the Road Driver position. Road Drivers regularly cross-bid for Yard Jockey positions; indeed, it was their contractual right to do so, either at the annual cross-bid or upon returning from leave. Moreover, it is undisputed that had Walden been able to exercise this right, he would have had enough seniority to secure a position as a Yard Jockey. [9] Indeed, Yellow Freight has never taken the position that allowing Walden to transfer to the yard would have posed an undue hardship.

> 9   Thus, this case does not involve the issue presented in *U.S. Airways, Inc. v. Barnett, 152 L. Ed. 2d 589, 535 U.S. 391, 122 S. Ct. 1516, 1525 (2002),* in which the Supreme Court held that a requested transfer that would conflict with a bona fide seniority system is ordinarily not a reasonable accommodation.

The undisputed evidence further demonstrates that Walden would have been capable of performing [*62] the essential functions of the Yard Jockey position. Walden was well familiar with the job's responsibilities, having previously worked in the position on more than one occasion. Although the job entailed some sitting, it would have permitted Walden to frequently dismount from the Ottawa and stretch and move around the yard. Further, both Walden and Dr. Scheinzeit testified that Walden's physical condition would not have prevented him from performing the work. As mentioned, after Walden explained the position to Dr. Scheinzeit in September 1994, Dr. Scheinzeit gave him a full medical release to return to the position. Dr. Passick received descriptions of the job's duties from both Mary Thomas and Walden, and also reported that Walden was fully capable of performing the position.

Although not contending he was physically incapable of being a Yard Jockey, [10] Yellow Freight contends that Walden was contractually barred from seeking the position under the Cross Bid Agreement. As mentioned, Yellow Freight had a written policy that prohibited any employee from cross-bidding to a job in a different classification without first obtaining a full medical release to perform his former job. [*63] Although the Cross Bid Agreement contains no mention of the need for such a release, Yellow Freight contends that its no-restrictions policy constituted a valid, enforceable interpretation of the Cross Bid Agreement. Yellow Freight points to the denial of Walden's grievance challenging the no-restrictions policy, as well as the denial of the similar grievance of another employee, as conclusive evidence that Walden had no right under the Cross Bid Agreement to return to work as a Yard Jockey. Thus, Yellow Freight argues, its "without restrictions" policy -- which the

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 21 of 35

Page 15

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

Company more or less concedes was unlawful (Def. Pre-Tr. Br. at 1 n.1; Def. Post-Tr. Br. at 47 n.27.) -- "actually had no impact whatsoever on Walden." (Def. Post-Tr. Br. at 47 n.27.) Rather, the reason Walden could not cross bid was because he had no right to do so under the Cross Bid Agreement. From this proposition, it allegedly follows that Walden was not a "qualified individual" for the Yard Jockey position, because one of its "essential functions" was that an employee seeking to cross-bid into the position, must, by virtue of the Cross Bid Agreement, be released into his former position.

> 10  In its correspondence with Dr. Passick and in this litigation, Yellow Freight emphasized the strenuousness of the Yard Jockey position. Nevertheless, Yellow Freight does not take the position that Walden was physically incapable of performing the job's essential duties; such a position would appear to be inconsistent with its fundamental claim that Walden suffers no disability whatsoever. In any event, as mentioned, the Court finds that Walden would have been capable of doing the job of a Yard Jockey had he been given the opportunity.

[*64] This argument is specious. Whether the no-restrictions policy derived from the Company's own practice, or from its "interpretation" of the Cross Bid Agreement, it strains reason to claim, as Yellow Freight does, that this "arguably unlawful" policy "actually had no impact whatsoever on Walden." It clearly did; because of this policy, Walden was not permitted to return to work and to cross-bid to the Yard Jockey position. More fundamentally, the source of the no-restrictions policy has no bearing at all on its lawfulness under the ADA, which gives rise to rights independent of, and which may ordinarily not be trumped by, whatever contractual agreements exist between the union and the Company. See 42 U.S.C. § 12112(b)(2)("discrimination" includes "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to" discrimination); see also 29 C.F.R. § 1630.6.

That the policy was unlawful is clear. Courts have consistently found that policies prohibiting injured employees from returning to work unless they can do so "without [*65] restrictions" violate the ADA. As the Ninth Circuit has explained,

> [a] "100% healed" or "fully healed" policy discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified indi-

vidual is "100% healed" from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation.

*McGregor v. Nat'l R.R. Passenger Corp., 187 F.3d 1113, 1116 (9th Cir. 1999)*(collecting cases); see also *Henderson v. Ardco, Inc., 247 F.3d 645, 653 (6th Cir. 2001)*("All courts that have examined the question . . . agree that a 100% rule is impermissible as to a disabled person.")(emphasis removed); *Hutchinson v. United Parcel Serv., Inc., 883 F. Supp. 379, 397 (N. D. Iowa 1995)*("Such a policy would on its face 'discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment.'")(citing *42 U.S.C. § 12112(a)*); [*66] cf. *Meling, 3 F. Supp. 2d at 274-75* ("From the moment Meling was injured, St. Francis insisted that it would permit Meling to resume working only when she could return to 'full duties and full responsibilities,' without any 'limitations.' That position, which St. Francis faithfully maintained throughout its communications with Meling, simply defies the ADA, which requires employers to make reasonable accommodations for disabled employees.").

Thus, even if the Court were to adopt the Company's position that the no-restrictions policy was somehow part of the Cross Bid Agreement, the unlawful policy would still not form a legitimate basis for refusing to permit Walden to cross-bid. [11] The Court thus rejects the Company's assertion that Walden was not "qualified" to work as a Yard Jockey. Cf. *Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 678 (7th Cir. 1998)*("Nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers.")(emphasis added). Thus, this case is clearly distinguishable from *Ragusa v. TIAA-CREF, Inc., 1998 U.S. Dist. LEXIS 12697,* No. 96 Civ. 3127 (JSM), 1998 WL 483461 [*67] (S.D.N.Y. Aug. 17, 1998), cited by Defendant. In that case, the reason the Plaintiff was not "qualified" for reassignment to a different position was because of a legitimate, nondiscriminatory policy. See *1998 U.S. Dist. LEXIS 12697 at *7.* Plaintiff was on "final warning" for deficient performance having nothing to do with her disability, and the company's regularly enforced policy forbid transfers of employees to different positions when they were on final warning in their current one. See id. This neutral policy self-evidently bears no relation to Yellow Freight's no-restrictions policy, which on its face affects only disabled individuals. Accordingly, Walden's failure to comply with the Com-

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 22 of 35

Page 16

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

pany's discriminatory policy did not render him unqualified for the Yard Jockey position. (Likewise, compliance with this policy may not be deemed an "essential function" of the position.) Because Walden has shown that he was otherwise qualified for the position, he has sustained his burden of showing that a reasonable accommodation existed that would have allowed him to return to work.

> 11   Put another way, even if reassignment to the Yard Jockey position is not viewed as a contractual right Walden already enjoyed under the Cross Bid Agreement -- a matter the parties dispute -- the Company still had an obligation to consider reassigning Walden to the position as an accommodation of his disability. Defendant has not claimed that the Cross Bid Agreement required the no-restrictions policy -- that is, that the Agreement prohibited the transfer sought by Walden. Nor is there any support in the record for such a claim.

[*68] Yellow Freight also claims that it was not obligated to transfer Walden since it offered him an equally effective accommodation. Yellow Freight asserts that Mary Thomas's March 30 letter to Dr. Passick constituted an offer of reasonable accommodation, which Walden was not entitled to refuse (or rather, which he was not entitled to refuse and subsequently claim a denial of accommodation under the ADA). Although the Court agrees with Yellow Freight that under the ADA an employee has no right to any particular accommodation, but merely to a reasonable accommodation, the Court agrees with Plaintiff that no reasonable accommodation was ever offered to Walden.

"Where a comparable position is vacant and the disabled employee is qualified for the position, an employer's refusal to reassign the employee to that position -- absent some other offer of reasonable accommodation -- constitutes a violation of the ADA." *Norville, 196 F.3d at 99* (emphasis added). As this indicates, an employer may avoid liability even where a plaintiff has requested transfer to a suitable vacancy by showing that it made "some other offer of reasonable accommodation." [12] In other words, an employer [*69] need not accept an employee's requested accommodation, even if "reasonable," if the employer offers a reasonable accommodation of its own. See *Schmidt v. Methodist Hosp., 89 F.3d 342, 344 (7th Cir. 1996)*; *Hankins v. The Gap, Inc., 84 F.3d 797, 802 (6th Cir. 1996)*; *Katz, 1998 U.S. Dist. LEXIS 2749, 1998 WL 132945, at *5*; *Kemer v. Johnson, 900 F. Supp. 677, 686 (S.D.N.Y. 1995)*; see also *29 C.F.R. § 1630.9(d)*("If a [qualified individual] rejects a reasonable accommodation . . . that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection,

perform the essential functions of the position, the individual will not be considered a qualified individual with a disability."). Although the employee's preference among equally reasonable accommodations "should be given primary consideration," the employer retains "ultimate discretion to choose between effective accommodations." 29 C.F.R. Pt. 1630, App. 1630.9.

> 12   Of course, the employer may also avoid liability by proving that reassignment would have created an undue hardship. See *Norville, 196 F.3d at 89*; *Jackan, 205 F.3d at 566*. As noted, Yellow Freight has not claimed that reassigning Walden to the Yard Jockey position would have created an undue hardship.

[*70]   The proposed accommodation expressed in the March 30 letter, that Walden simply pull his truck off the road and stretch every so often, was not reasonable for several reasons. First, the proposed accommodation would not have been effective, since it would have allowed Walden to do the job, if at all, only with substantial pain. An accommodation that aggravates the symptoms of a disability, rather than mitigates their effect on the employee's ability to perform, is no accommodation at all. See *Vande Zande v. Wisc. Dep't of Admin., 44 F.3d 538, 546 (7th Cir. 1996)* (accommodation must allow employee to work in "reasonable comfort"); see also *Marshall v. Fed. Express Corp., 327 U.S. App. D.C. 302, 130 F.3d 1095, 1099 (D.C. Cir. 1997)*(assuming without deciding that ADA prohibits "working conditions that inflict pain or hardship on a disabled employee"). Walden had a severe back impairment that caused him significant pain when he sat for forty-five minutes. This pain did not go away when he stood up and stretched, but simply receded temporarily, only to return with greater force, and in less time, when he resumed sitting. Walden's testimony in this regard, [*71] which the Court finds credible, was confirmed by Dr. Scheinzeit as consistent with his diagnosis. Dr. Scheinzeit also stated that the bumpiness of the highway would further exacerbate Walden's condition. Finally, Dr. Scheinzeit shared Walden's belief, which comports with common sense, that it is simply unsafe to drive a large tractor-trailer on the highway when your attention is constantly focused on the pain in your back, much less on the frequent need to find suitable places to pull off the road. Thus, the primary job-related difficulty associated with Walden's condition -- back pain caused by sitting and aggravated by bumping -- was not effectively addressed by Yellow Freight's proposed accommodation. This alone makes it unreasonable.

The accommodation was also unreasonable as a practical matter, because Walden did not have a doctor's release allowing him to return to his job. Dr. Passick,

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 23 of 35

Page 17

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

whose decision was binding on the Company and Walden, specifically rejected the proposed accommodation. Dr. Scheinzeit testified that he, too, would not have authorized Walden to return to work as a Road Driver with the accommodation. Thus, the only way for Walden to return to work would have [*72] been to seek out a doctor willing to release him to work with the accommodation after two doctors, including a neutral third-party doctor, had stated the accommodation was not advised. The Court does not believe that Walden was under an obligation to engage in such "doctor-shopping."

Nor does the Court find that Walden had an obligation to get Dr. Scheinzeit or Dr. Passick to lie for him, and to sign a release against his medical judgment. The Court accepts the Company's contention that had Walden procured such a note, he could have immediately cross-bid to the Yard Jockey position without having to work as a Road Driver. As explained, under the Cross Bid Agreement, Walden, as an employee returning from sick leave, could have exercised his right to cross-bid; further, it is undisputed that Walden had sufficient seniority to gain a position in the yard. That said, the Court finds untenable Yellow Freight's position, expressed to Walden at the time and to the Court in its submissions in this lawsuit, that Walden should simply have gotten Dr. Scheinzeit or another doctor to submit a false release for him. Without belaboring the point, the Court will merely point out that the ADA does [*73] not require a disabled employee to deny that he is disabled, or to have his doctor lie about his disability, in order to be allowed to work. [13]

> 13   The Company's insistence that Walden first procure a note releasing him "without restrictions" to his former position comes down to an unwillingness to pay Walden the workers' compensation benefits that were his due. Had Walden returned to work "without restrictions," he would, obviously, no longer have qualified for workers' compensation benefits. Thus, if he had returned to work as a Yard Jockey, a lower-paying position than a Road Driver, he would have made a Yard Jockey's salary, and no more. By contrast, had he been permitted to work in a Yard Jockey position with a note saying he was disabled from his former job as a Road Driver, he would have been entitled to the Yard Jockey's wages plus workers' compensation benefits equal to two-thirds of the difference between the Yard Jockey salary and his former Road Driver earnings. Yellow Freight, who was self-insured for workers' compensation, would have been responsible for paying these benefits. Thus, Yellow Freight had a strong incentive to have Walden return to work "100% healed." The Company freely acknowledges that it felt that workers' compensation payments at the Maybrook facility had consistently been too high, and that one of the primary duties of Mary Thomas, its injury counselor, was to keep workers' compensation payments as low as possible. Indeed, at Plaintiff's grievance hearing, the Company representative testified that the rationale for the no-restrictions policy was that without it, 500 people at Maybrook alone would fake an injury, cross-bid from their former Road Driver job to the lower-paying Yard Jockey position, file for workers' compensation based on the reduced wages, and receive an award of two-thirds of the salary differential. (Tr. at 458; D-34.)

> Yellow Freight's concern that every Road Driver would fake an injury to take advantage of a rule that permitted them to cross-bid to the yard while maintaining workers' compensation -- besides providing an insight into the esteem in which the Company holds its workers -- ignores the obvious fact that not every Road Driver would have two fractured vertebrae and two surgeons concluding, after examination, that he was disabled from work as a Road Driver. More fundamentally, under New York law, a disabled employee who returns to work in a lower-paying position because he cannot perform his former position is entitled to benefit payments to compensate for some of the differential in earnings. (Id. at 1 (citing *N.Y. Workers' Comp. Law § 15(5)*.) Contrary to Yellow Freight's claim that Walden was trying "to take advantage of the workers' compensation system," (Def. Pre-Tr. Br. at 1), an employee who receives such benefits is simply collecting his legal due.

[*74] Finally, the March 30 proposal was not a reasonable accommodation for the fundamental reason that it was not an "offer" that was ever made to Plaintiff. Simply put, the March 30 letter from Mary Thomas to Dr. Passick, a copy of which was sent to Plaintiff as well as to a representative of the Company and of Local 707, does not constitute an offer of accommodation to Plaintiff. Defendant's argument that the letter "self-evidently" constitutes such an offer runs afoul of common sense and ordinary experience. (Def. Post-Tr. Br. at 26.) The letter is not addressed to Walden, and is quite clearly a request of Dr. Passick to give his medical opinion on whether Plaintiff could return to work as a Road Driver if he were allowed to get out and stretch periodically. On its face, the letter contains no direct address to Walden, no mention of an offer to him, no invitation for him to respond, and no suggestion that Plaintiff contact Yellow Freight to discuss the proposal. Indeed, Yellow Freight never dis-

cussed the March 30 "offer" with Walden at any time before or after it was sent to Dr. Passick. Thus, the Court finds fully justified Plaintiff's belief, expressed in his April 3 letter [*75] to Dr. Passick, that the letter was not a good faith offer of accommodation. Walden wrote, "I believe Yellow Freight merely wants a doctor to say I can come back as a road driver simply so they can close my [workers'] compensation case and that is all they are concerned with at this time." (D-17 at 2.)

Plaintiff's doubts about Yellow Freight's good faith, and his belief that no bona fide accommodation was being offered, are further warranted by the context in which the letter was sent. Yellow Freight's utter refusal to engage in a meaningful dialogue with Walden concerning his disability, as well as its proposal to Dr. Passick, constitutes evidence of bad faith. See *Beck v. Univ. of Wisc. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996)*("A party that fails to communicate, by way of initiation or response, may . . . be acting in bad faith.") "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan, 205 F.3d at 566* (citing *Beck, 75 F.3d at 1135* and *29 C.F.R. § 1630.2(o)(3)*). Courts have consistently [*76] found that an employer's participation in this process is mandatory, and that it is triggered by a disabled employee's request for a reasonable accommodation. See, e.g., *Jacques v. DiMarzio, Inc., 200 F. Supp. 2d 151, 169 (E.D.N.Y. 2002)*(citing *Barnett v. U.S. Airways, Inc., 228 F.3d 1105, 1112 (9th Cir. 2000)*(collecting cases), rev'd on other grounds, *152 L. Ed. 2d 589, 535 U.S. 391, 122 S. Ct. 1516 (2002)*); *Felix v. New York City Transit Auth., 154 F. Supp. 2d 640, 657 (S.D.N.Y. 2001)*; see also *Taylor v. Principal Fin. Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996)* ("It is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one.").

Once the interactive process has been initiated by the employee's request for accommodation, the regulations contemplate that the employer, "using a problem solving approach," 29 C.F.R. Pt. 1630, App. 1630.9, will do the following:

> (1) Analyze the particular job involved and determine its purpose and essential functions;
>
> (2) Consult with the individual [*77] with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;

> (3) In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and
>
> (4) Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer.

Id.; see also *Lovejoy-Wilson, 263 F.3d at 219* (citing *Taylor v. Phoenixville Sch. Dist., 174 F.3d 142, 162 (3d Cir. 1999)*)(noting that process involves "meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered [the] employee's request, and offering and discussing available alternatives when the request is too burdensome").

Yellow Freight has provided no evidence that it took any such steps. To the [*78] contrary, at no time before or after the March 30 "offer" did Yellow Freight ever meet with or otherwise communicate with Walden about the letter itself or about an accommodation generally. Rather, Yellow Freight's conduct toward Walden in the months prior to the March 30 letter consisted of expelling him from the transitional work program; having his workers' compensation cut off; asking him to get a doctor to sign a false release for him; writing to tell him he had been removed from the seniority roster; and contesting his grievance. As for the latter, Yellow Freight's position that its "processing" of Walden's grievances constitutes evidence of good faith engagement in an "interactive process" is simply absurd (Def. Post-Tr. Br. at 42); Yellow Freight was contractually obligated to respond to Plaintiff's grievance. Furthermore, during the grievance process, Yellow Freight never even contended that it had offered or would offer Walden a reasonable accommodation; rather, it defended its policy solely on the grounds of "sound business practice." (D-34.) This adversarial, rigid adherence to its policy is "the antithesis of participation in the interactive process." See *Lovejoy, 263 F.3d at 208*; [*79] see also 29 C.F.R. Pt. 1630, App. 1630.9 ("The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified employee with a disability.").

Yellow Freight argues that whether or not it engaged in an interactive process is of no moment, since it offered Walden a reasonable accommodation. Yellow Freight cites *Rehling v. City of Chicago, 207 F.3d 1009, 1015-16 (7th Cir. 2000),* for the proposition that an employer's failure to engage in an interactive process is irrelevant where the employer in fact offers an accommodation. The Court has no quarrel with this statement of the law. Indeed, although the vast majority of circuits that have addressed the issue have found the interactive process to be mandatory, see *Barnett, 228 F.3d at 1112* (collecting cases), no case that this Court is aware of has found the interactive process to be an independent source of liability irrespective of whether a reasonable accommodation was actually offered (or, conversely, irrespective of whether one was actually possible). Rather, the failure to engage in an interactive process is relevant [*80] only where it leads to the more fundamental failure to provide an accommodation. See *Kvorjak v. Maine, 259 F.3d 48, 52 (1st Cir. 2001)* (noting that "courts have construed the regulation as imposing various levels of obligation," but stating that at a minimum, liability depends on a showing that had the interactive process occurred, an acceptable accommodation could have been reached).

Such is the case here. Plaintiff is not asking the Court to hold, and the Court is not holding, that Defendant's failure to participate in the interactive process subjects it to liability. Rather, as explained below, the Court considers this failure simply as an indication of why the March 30 "offer" falls short of constituting an offer of reasonable accommodation. As the Tenth Circuit has stated, "The obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee. The interactive process is typically an essential component of the process by which a reasonable accommodation can be determined." *Smith v. Midland Brake, Inc., 180 F.3d 1154, 1172 (10th Cir. 1999).*

Much [*81] energy was expended at trial, and in the parties' submissions, arguing over whether or not the proposed accommodation was "realistic." Apart from the medical aspect of this dispute, [14] the parties vigorously contest what would have been the implications of the accommodation on Walden's job performance. Specifically, both parties acknowledge that frequent stopping on the road would significantly increase the time it took Walden to do his runs, but they dispute whether or not this would have had an impact on his ability to perform the essential functions of a Road Driver. For his part, Plaintiff claims that Yellow Freight would not have tolerated a Road Driver who took substantially longer than other drivers to complete his runs. Plaintiff asserts that timely delivery of freight is obviously an essential function of a truck driver, and points to the job description of a Road Driver at Yellow Freight, which includes, under "Essential Duties," "performs the work required in a timely manner and maintain[s] adequate production in order to meet service schedules." (D-21 at 3.) Plaintiff also points out, among other things, that at his workers' compensation hearing, the general operations [*82] manager of the Maybrook terminal testified that "there would be some serious questions asked" if an employee took six hours to complete a four-hour run, and that, if an employee had to stop every half hour to take a break, he "would say right away that then maybe he is not capable of doing the job." (D-18 at 19-20.)

14   To be clear, this discussion involves solely whether an accommodation was feasible from an operational (i.e., non- medical) standpoint. As indicated, the Court finds that the accommodation was not reasonable from a medical standpoint, and thus, was not a reasonable accommodation under the ADA. Ordinarily, the Court's discussion would end there. However, the parties have extensively debated the viability of the accommodation as an operational matter, the Court offers its views on the subject.

Defendant argues that the company representative who made these statements was not sufficiently knowledgeable to do so, and that the statements do not actually mean what they say, namely, that a Road Driver [*83] who took substantially longer than other drivers to complete his runs would likely not be considered suited for the job. The Court finds these arguments unpersuasive, and also finds unconvincing Defendant's attempts to downplay the significance of "performing the work required in a timely manner" to the job of Road Driver. Nevertheless, the Court agrees with Defendant that, as to Walden, Plaintiff's assertion that, had he accepted the "accommodation," he would have been terminated for excessive lateness, is speculative and somewhat illogical. As Defendant notes, Plaintiff is essentially claiming that Defendant's proposed accommodation was unreasonable because it would have imposed an undue hardship on Defendant by forcing it to tolerate a consistently late driver. The Court agrees that it was Yellow Freight's prerogative to determine whether to take on that burden regardless of whether Plaintiff found it excessive. Thus, had Yellow Freight actually made an accommodation offer, and had Plaintiff been medically able (and medically authorized) to return to work with the accommodation, Plaintiff would not have been justified in rejecting it solely on the grounds that it would have [*84] imposed a hardship on Defendant.

Nevertheless, Plaintiff's concerns in this regard are not irrelevant. On the contrary, they go to the heart of this case, which is Defendant's wholesale refusal to en-

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 26 of 35

Page 20

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

gage in an interactive process, and its resultant failure to offer Plaintiff a reasonable accommodation. The obviously increased amount of time it would have taken Walden to deliver freight under the accommodation was a valid ground for his belief that he simply could not perform an essential function of the job. Indeed, Yellow Freight's own experiment -- conducted the week before trial -- in which it had an employee drive a car on Walden's normal run from Maybrook to Boston, pulling off the road every twenty minutes or so for a simulated stretch break, took longer than five hours. (Tr. at-706; D-36.) [15] Taking this amount of time one way, Walden could not have completed the round trip in a single day -- the slated period of time for a long-turn run -- because it would have required more than the federally permitted maximum of ten hours on the road. Once the ten-hour limit was reached, a driver had to stop his rig regardless of where he was, and could no longer drive for the day. (Tr. [*85] at 258-59.) In its post-trial submissions, Yellow Freight suggests that this problem could have been solved by Walden's bidding for a spot on the subsequent-turn board, which contained shorter runs. (Def. Post-Tr. Br. at 14; Def. Fact PP 201-11; D-20.) While superficially plausible, Defendant's suggestion still does not adequately address the fact that the subsequent-turn board, by definition, required drivers to make more than one run in a single day. Thus, Walden would likely still have faced the same difficulties arising from the ten-hour limit.

> 15   Moreover, many of the "stops," which were meant to simulate breaks during which Walden could stretch his back and refresh himself, lasted no more than one or two minutes. (D-(36-39).) For this reason, as well as the fact that the driver was in a car and not a tractor-trailer -- which would clearly be more difficult to maneuver and slower to stop and start (Tr. at 708) -- the Court finds the probative value of this experiment extremely limited. Likewise, the Court finds highly dubious, and indeed dangerous, the Company's suggestion that Walden could simply have pulled onto the emergency shoulder of the highway for his required breaks. (Defendant's Proposed Findings of Fact ("Def. Fact") at 42 (citing Tr. at 222-26).) The Company's own safety administrator testified that such stopping might be illegal absent a true emergency, and that in the last ten years or so, there have been at least two accidents involving Company trucks being hit by oncoming cars while parked on the shoulder. (Tr. at 705.) The Company's take on this -- to turn the statistic around and proclaim that there have been "no more than two or three" such accidents -- is not reassuring. (Def. Fact at 42-43.)

[*86] More fundamentally, as to the suggestion that Walden bid for the subsequent-turn board; the repeated assertions of Yellow Freight's managers that the Company would adjust its expectations regarding the length of time for particular deliveries; the identification of numerous places along his route where he could pull over; and the suggestion that Walden simply make regular stops onto the emergency shoulder of the road -- none of these ideas, whatever their sincerity and feasibility, were ever discussed with Walden. Nowhere in Mary Thomas's March 30 "offer" does she discuss the effect of the accommodation on the time it would take Plaintiff to make his runs. (This makes sense, of course, given the Court's finding that the March 30 letter was not an offer to Walden, but was simply a request for a medical opinion.) Nor did Thomas, or anyone else at Yellow Freight, ever discuss with Plaintiff how exactly the Company would accommodate the fact that Plaintiff's required running times would consistently exceed the normal times allowed, and would consistently run up against the federal maximum driving time of ten hours per day. These nontrivial, not-easily-solved details are precisely the [*87] type of arrangements that should have been the subject of the "problem solving process" envisioned by the ADA. 29 C.F.R. Pt. 1630, App. 1630.9. Yellow Freight's failure to participate in this process explains why the bare-bones "accommodation" contained in the March 30 letter, which raises more questions than it answers, was inadequate. The March 30 letter discusses only Plaintiff's physical need to stretch, leaving unaddressed the substantial "job restructuring," 42 U.S.C. 12111(9), described above, that the constant stopping of his truck would necessarily entail. In short, the letter contains no mention of any of the additional accommodations that Defendant now argues could have been easily provided. A disability discrimination trial is not an appropriate moment for an employer to offer a reasonable accommodation. [16] For this reason, in addition to those previously discussed, the March 30 letter cannot be considered an offer of reasonable accommodation that Walden was bound to accept.

> 16   Cf. Phoenixville, 184 F.3d at 316 n.6 ("The interactive process can be thought of as a less formal, less costly form of mediation," and is even more effective at "preserving confidentiality, allowing the employee to stay on the job, and avoiding monetary damages for an employer's initially hostile responses to requests for accommodations.").

[*88] Accordingly, the Court concludes that Yellow Freight failed to reasonably accommodate Walden's disability. Walden is therefore entitled to judgment in his favor on this claim.

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 27 of 35

Page 21

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

## II. New York Human Rights Law

Plaintiff also claims that the Company violated New York's Human Rights Law. Defendant argues that this claim fails because (1) Walden is not disabled within the meaning of the NYHRL, and (2) whether or not Walden is disabled, the Company did not refuse to allow Walden to return to work "because of" his disability.

Under the NYHRL, an employer may not terminate, or otherwise subject a disabled employee to an adverse employment action, "because of" the employee's disability. See *N.Y. Exec. Law § 296(1)*; *McEniry v. Landi, 84 N.Y.2d 554, 558, 620 N.Y.S.2d 328, 330, 644 N.E.2d 1019 (1994)*. A plaintiff raising a disability discrimination claim under the NYHRL must prove that he suffers from a "disability" within the meaning of the law. See *McEniry, 84 N.Y.2d at 558-59, 620 N.Y.S.2d at 330*; *Dantonio v. Kalaida Health, 288 A.D.2d 866, 866, 732 N.Y.S.2d 322, 323* (4th Dep't 2001). At the time of Plaintiff's termination [*89] in 1995, the NYHRL defined "disability" as "a physical, mental or medical impairment resulting from anatomical, physiological or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques . . . provided, however, that . . . the term [disability] shall be limited to disabilities which do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held." *N.Y. Exec. Law § 292(21).* [17]

> 17   In 1997, the last portion of this provision was amended, creating a new obligation on the part of the employer to provide reasonable accommodations to an employee with a disability. The last portion of the definition now reads, "The term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved . . . ." *N.Y. Exec. Law § 292(21)*(emphasis added).

[*90]  It is clear that Plaintiff's back condition meets the first half of this definition, which does not even require a showing that the claimant is substantially limited in a major life activity. See *Reeves, 140 F.3d at 154-55*; *New York State Div. of Human Rights v. Xerox Corp., 491 N.Y.S.2d 106, 109, 65 N.Y.2d 213, 218-19, 480 N.E.2d 695 (1985)*. Indeed, Defendant does not contest this point. (Def. Pre-Tr. Br. at 33.)

Rather, Defendant asserts that Walden's disability "prevented [him] from performing in a reasonable manner the activities" of the Road Driver position. Thus, Defendant argues, Plaintiff was not entitled to the protection of the NYHRL. The gaping hole in this argument is

that Plaintiff's disability did not prevent him from performing the duties of a Yard Jockey. The plain language of the statute forbids discrimination against an individual whose disabilities do not prevent him from performing the functions "involved in the job or occupation sought or held." *N.Y. Exec. Law § 292(21)* (emphasis added). Here, Plaintiff sought the position of a Yard Jockey, and it is undisputed that he could have performed the activities of that position [*91] in a reasonable manner despite his disability.

Defendant further claims that Plaintiff has not shown that he suffered an adverse employment action "because of" his disability. Rather, Defendant argues, the reason Plaintiff could not cross-bid to the Yard Jockey position was because of Yellow Freight's interpretation of the Cross Bid Agreement (i.e., that individuals must return to their former job "without restrictions" before cross-bidding). This argument also fails for the simple reason that Defendant may not cite its own facially discriminatory policy as a grounds for refusing to permit Plaintiff to work in the position he sought. It is irrelevant whether Defendant's rejection of Plaintiff's attempt to cross-bid stemmed from Yellow Freight's "interpretation" of the Cross Bid Agreement or directly from the written no-restrictions policy itself. In either case, Plaintiff's disability was the sole reason he was not allowed to bid for the Yard Jockey position. Defendant's explanation that Plaintiff was treated no differently from any other similarly situated employee with a disability seeking to exercise a cross-bid -- for example, George Greis and Hays McArdle -- only supports the [*92] Court's conclusion that Defendant's policy discriminated against Walden and other individuals with disabilities. The obvious fallacy in Defendant's argument is that the relevant "similarly situated" group of employees is not other individuals with disabilities, but individuals without disabilities. It is clear that nondisabled employees returning to work were treated differently than Walden; those individuals were permitted to cross-bid, and Walden was not. (Tr. at 279-80.) Indeed, as Defendant itself points out, once Greis and McArdle secured doctors' notes stating they could return to their former jobs without any medical restrictions, they were allowed to cross-bid. It is thus inescapable that Defendant discriminated against Plaintiff "because of" his disability.

This analysis of Plaintiff's NYHRL claim does not depend on Plaintiff's assertion that he had a "contractual right" under the Cross Bid Agreement to bid for the Yard Jockey position. (Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. Post-Tr. Br.") at 40-41, 47.) Whether or not the Cross Bid Agreement required the Company to allow Plaintiff to bid for the position, it certainly did not prohibit the [*93] Company from permitting such a cross-bid. At most, the grievance commit-

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 28 of 35

Page 22

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

tee decisions allegedly upholding Defendant's interpretation of the Cross Bid Agreement demonstrate that the no-restrictions policy did not violate the Collective Bargaining Agreement or any other contract between the union and the Company; there is no evidence of any decision construing the Collective Bargaining Agreement, Cross Bid Agreement, or any other agreement as requiring the no-restrictions policy. [18]

> 18  Nor is there any claim by Defendant, or evidence, that allowing Walden to cross-bid would have violated the rights of other employees. Indeed, the union represented Walden in his grievance.

Moreover, the committee did not even deny Walden's grievance on the merits, but rather dismissed it on unexplained procedural grounds. As for the Greis grievance, the committee simply denied his claim that the policy violated the Collective Bargaining Agreement. (D-7.) Its one-sentence decision clearly does not support the proposition that the [*94] Company was forbidden from allowing a cross-bid in Greis's case (much less Walden's). Moreover, in opposing Walden's grievance, Yellow Freight did not even argue that the Cross Bid Agreement (or the Collective Bargaining Agreement) required a full medical release; rather, Yellow Freight argued that its "long-standing policy" was necessitated by "sound business practice." (D-34.) [19]

> 19  Further, the plain language of the Cross Bid Agreement contains not even a suggestion that the right to cross-bid upon returning from leave depends on the employee's obtaining a full medical release for his former position. The relevant provision states merely, "Employees returning from [workers'] compensation, long term illness or leave of absence, who did not have an opportunity to Cross Bid will be allowed to Cross Bid upon return from work." (P-20 at P 8.) This unambiguous language undermines Yellow Freight's contention that its policy constituted a good-faith "interpretation" of the Cross Bid Agreement, rather than a unilaterally imposed policy. Extrinsic evidence further discredits this contention. First, the policy existed in written form at least as early as 1986, whereas the Cross Bid Agreement which it is allegedly an interpretation, did not come into being until 1993. Second, Yellow Freight's own labor relations manager, Nicolas Picarello, testified that the policy was unilaterally imposed by Yellow Freight, and that neither the Collective Bargaining Agreement nor the Cross Bid Agreement provided for such a policy. (Tr. at 682-83; P-66.) Yellow Freight's distribution center manager, Jim Bair, also testi-

fied that the policy was not part of the Cross Bid Agreement, but was simply "understood." (Tr. at 281.) Finally, when Yellow Freight sought in 1995 to make its no-restrictions policy an explicit part of the Cross Bid Agreement, the union opposed such a provision. (P-36; *P-66 P 7.*)

[*95]  In sum, the only rationale ever provided for refusing to allow Walden to cross-bid for the Yard Jockey position -- the activities of which he undisputedly could perform -- was that his disability prevented him from doing another job, that of a Road Driver. Yellow Freight offers no reason for its treatment of Walden other than its facially discriminatory policy forbidding cross-bids for individuals with such disabilities. These plain facts compel the conclusion that Yellow Freight discriminated against Walden "because of" his disability in violation of New York's Human Rights Law.

## RELIEF

### I. Backpay

The purpose of awarding damages in an employment discrimination case is to make the victim whole for injuries suffered because of the discrimination. See *Albemarle Paper Co. v. Moody, 422 U.S. 405, 418-19, 95 S. Ct. 2362, 2372, 45 L. Ed. 2d 280 (1975); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir. 1998).*

A court may award a victim of discrimination backpay for any salary, raises, and fringe benefits lost as a result of a defendant's discriminatory conduct. See *Albemarle Paper, 422 U.S. at 417-21, 95 S. Ct. at 2371-74*; [*96] *Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 144-45 (2d Cir. 1993); Carrero v. New York City Housing Auth., 890 F.2d 569, 580 (2d Cir. 1989)* ("An award of back pay is the rule, not the exception."). The backpay period is usually measured from the date of termination until the date of judgment. See *EEOC v. Joint Apprenticeship Comm. of the Joint Bd. of Elec. Ind., 164 F.3d 89, 100 (2d Cir. 1998); Saulpaugh, 4 F.3d at 144-45.* However, the period may end earlier where the plaintiff's disability would have prevented him from working. See *Gilbert v. Hotline Delivery, 2001 U.S. Dist. LEXIS 9876*, No. 00 Civ. 160 (MBM) (RLE), 2001 WL 799576, at *2 (S.D.N.Y. July 10, 2001)(Report & Recommendation).

The parties agree that as of March 31, 2001, Walden was permanently disabled from working in any capacity due to lung problems. Thus, his entitlement to backpay ends on that date. Plaintiff assumes that the period for which Walden deserves backpay began immediately following his injury on January 11, 1994, when Walden began working in the Company's transitional work program at a reduced pay rate. The Court disagrees. Plaintiff is entitled [*97] to a backpay award that compensates

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

the decreased earnings he suffered as a result of Defendant's discrimination, not those resulting simply from Plaintiff's injury. Accordingly, the Court will award backpay starting on September 23, 1994, the date Yellow Freight refused to allow Walden to return to work despite Dr. Scheinzeit's release, and thus refused to accommodate Walden's disability. [20]

> 20   For NYHRL purposes, this date is also appropriate, as it is the date the Company refused to permit Walden to cross-bid "because of" Walden's disability.

Plaintiff uses the Road Driver's salary as the base amount of backpay owed, from which Plaintiff sets off mitigation income and the like. Clearly, this is incorrect, since Plaintiff's own contention is that he could not have worked as a Road Driver after 1994. The appropriate base figure should be what Plaintiff would have earned had he been permitted to work as a Yard Jockey. This figure should include, of course, the supplemental amount of two-thirds of the difference [*98] between the Yard Jockey salary and the Road Driver salary, since Plaintiff would have been entitled to this amount under New York workers' compensation law.

Plaintiff's average salary as a Road Driver in the two years prior to his accident was $ 44,781. The Court will therefore begin its calculations using this figure as the amount Plaintiff would have earned as a Road Driver in 1994 had he not been injured. In the Collective Bargaining Agreement is a pay schedule for Road Drivers in Local 707 for the annual period starting in April 1994 through the annual period starting in April 1997. (D-1, App. A.) This schedule reflects an approximate annual increase in pay of 2%. Although the record contains no similar evidence of the pay scale for the three years beginning in April 1998, the Court finds it reasonable to infer that Road Drivers would have had comparable annual increases during this period. Accordingly, the Court will calculate Walden's hypothetical earnings as a Road Driver based on the $ 44,781 annual salary for 1994, with subsequent annual increases of 2%.

The Collective Bargaining Agreement also contains the wage rates for Local 707 Yard Jockeys for each of the four years [**99] beginning April 1994. (D-1, App. A.) The Court will use these rates in determining what Walden would have earned as a Yard Jockey during this period, before the workers' compensation add-on. (The reason the Court did not use the scheduled rates for the Road Driver salary is that Walden's actual previous earnings as a Road Driver, which include significant overtime, are available. Since Walden never worked as a Yard Jockey, and since the record shows that Yard Jockeys seldom received overtime pay, the scheduled Yard Jockey rates are appropriate.) The schedule also reflects an approximately 2% annual increase in pay for Yard Jockeys. Accordingly, the Court will assume that this pattern continued for the three subsequent years.

Once the annual salaries for a Yard Jockey and a Road Driver are calculated, the Court can determine what Walden actually would have earned had he been permitted to cross-bid to the yard. As mentioned, this amount is equal to the Yard Jockey salary plus two-thirds of the difference between this amount and what Walden would have earned as a Road Driver. The following table illustrates each of these three figures:

| Year | Road Driver | Yard Jockey | Actual Lost Pay |
|---|---|---|---|
| 9/23/94 - 4/1/95 (27 weeks) | [21]$ 23,252 | [22]$ 18,349 | [23]$ 21,618 |
| 4/1/95 - 3/31/96 | $ 45,677 | $ 35,963 | $ 42,439 |
| 4/1/96 - 3/31/97 | $ 46,590 | $ 36,691 | $ 43,290 |
| 4/1/97 - 3/31/98 | $ 47,522 | $ 37,523 | $ 44,189 |
| 4/1/98 - 3/31/99 | $ 48,472 | $ 38,273 | $ 45,072 |

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

| Year | Road Driver | Yard Jockey | Actual Lost Pay |
|---|---|---|---|
| 4/1/99 - 3/31/00 | $ 49,442 | $ 39,039 | $ 45,974 |
| 4/1/00 - 3/31/01 | $ 50,431 | $ 39,820 | $ 46,894 |
| | | TOTAL: | $ 289,476 |

[*100]

21   This figure is based on an annual salary of $ 44,781 salary, prorated to reflect earnings for 27 weeks.

22   The lost Yard Jockey earnings during this period are calculated by multiplying by 27 the $ 679.60 weekly salary that appears in the schedule in the Collective Bargaining Agreement for the year beginning in April 1994. The annual Yard Jockey salaries for years beginning in April 1995, April 1996, and April 1997 are derived by multiplying the weekly rates for these respective years by 52. As mentioned, the annual salaries for the years beginning April 1998 and thereafter are equal to the 1997 salary plus a 2% increase each year.

23   As indicated, actual is lost pay is equal to the Yard Jockey salary plus two-thirds of the difference between the Yard Jockey and Road Driver salaries.

Thus, the base amount of backpay owed to Walden -- that is, the amount before any setoffs and other adjustments -- is $ 289,476. As the Court indicated in its pretrial ruling, the Court will reduce this amount by [*101] the workers' compensation payments that the Company made to Walden. See *EEOC v. Yellow Freight Sys., Inc., 2001 U.S. Dist. LEXIS 20240*, No. 98 Civ. 2270, 2001 WL 1568322, at **1-2 (S.D.N.Y. Dec. 6, 2001). As explained in the earlier opinion, these payments are not "collateral source" payments, for which a defendant is not normally entitled to a reduction in a plaintiff's backpay award. This is because the Company is self-insured for workers' compensation, and thus the source of the payments is not actually "collateral." See id. at *1.

Just as Plaintiff is not entitled to backpay before September 23, 1994, Defendant is not entitled to set off workers' compensation payments made before this period. Defendant is not entitled to a setoff for a period for which Plaintiff is not receiving backpay. [24] Accordingly, Defendant is entitled to recoup the workers' compensation benefits paid to Plaintiff after September 23, 1994.

As indicated on Plaintiff's exhibit 62, Defendant paid Plaintiff $ 309.62 per week in worker's compensation through December 12, 1997, at which time it paid him a lump sum of $ 78,500 as a final settlement of his workers' compensation case. However, because of a New York [*102] State agency determination that Walden's prior back condition had contributed to his disability following the January 11, 1994 injury, Yellow Freight was legally entitled to, and received, a partial reimbursement from the State for a portion of the payments it made to Walden after the first 104 weeks of his disability. This reimbursement was equal to 70% of the total amount paid after the first 104 weeks; under the law, Yellow Freight received no reimbursement for the first 104 weeks. (Tr. at 330-37.)

24   Indeed, had the company allowed Walden to return to work as a Yard Jockey, Plaintiff would have been entitled to receive worker's compensation benefits in addition to his salary, and would have been under no obligation to reimburse Defendant for them.

From the time of Walden's accident to the time it settled his case, Yellow Freight paid $ 144,136 total in workers' compensation benefits. (P-62.) Plaintiff's exhibit 62, which contains a record of all payments made by Defendant, shows that the amount paid in the [*103] first 104 weeks is $ 34,674. [25] Thus, Defendant paid $ 109,462 after the first 104 weeks (i.e., $ 144,136 -- $ 34,674). Defendant would thus have been reimbursed for 70% of this amount, or $ 76,623. Defendant is therefore not entitled to set off this amount against Plaintiff's backpay, leaving $ 32,839 (i.e., $ 109,462 - $ 76,623) that Defendant is entitled to set off from its backpay award to Plaintiff.

25   This figure is equal to the estimated sum of each payment made from January 12, 1994, through January 12, 1996, the 104-week marker. Because it is only possible from the exhibit to calculate the exact sum of benefits paid through February 2, 1996 -- three weeks after January 12

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

-- the Court has subtracted three weeks' worth of payments from the total amount paid through February 2, 1996.

Defendant is also entitled to a full reduction for the worker's compensation payments it made after September 23, 1994 (the date when the backpay award commences), but before the 104-week mark. This is because, as mentioned, [*104] Defendant did not receive any reimbursement from the State for these payments. The schedule indicates that Plaintiff received $ 21,797 in payments between September 21, 1994, and February 2, 1996; this sum must be reduced by the three weeks' worth of payments made after January 12, 1996. The total comes to $ 21,178. Defendant is therefore entitled to reduce Plaintiff's backpay award by this amount plus the $ 32,839 in unreimbursed payments made after January 12, 1996. Following Defendant, the Court will reduce the total amount of the setoff by the attorneys, fees Plaintiff paid in connection with the lump sum settlement of his worker's compensation benefits; this amount is $ 7,850. (Def. Fact P 275.) The total figure setoff thus comes to $ 46,167. [26]

> 26   Yellow Freight asserts in its Proposed Findings of Fact that total unreimbursed worker's compensation expenditures come to $ 49,999. (Def. Fact P 275.) This figure is based in part on using $ 86,287 as the amount of reimbursement Defendant received after 104 weeks. (Id.) However, because there is no evidence in the record of the actual reimbursement received, and because Defendant's figure does not appear to be substantiated by the data on Plaintiff's workers' compensation settlement form (P-62), the Court will rely on its own calculations. Plaintiff's calculations are also erroneous, primarily because they do not include in the total permissible setoff any worker's compensation payments made during the first 104 weeks. (Pl. Br. at 25-26.)

[*105] When Plaintiff's backpay is reduced by this figure, the total backpay award comes to $ 243,309 (i.e., $ 289,476 - $ 46,167). This amount must be reduced in turn by the amount Plaintiff received in income from other employment and from unemployment insurance during the period from September 23, 1994, to March 31, 2001. The total amount of wages earned is $ 76,221; the total amount of unemployment benefits is $ 10,221. [27] (P-58.) Together, these amounts total $ 86,442. Once the backpay owed is reduced by this figure, the total backpay award comes to $ 156,867.

> 27   Plaintiff himself includes an offset for unemployment insurance benefits in his damages cal-

culations (Pl. Br. at 27), and thus the Court too will reduce his award by this amount.

## II. Lost Pension Benefits

Plaintiff also claims that he is entitled to the lost pension benefits he suffered as a result of being forced to retire in 1994 instead of 2001. Plaintiff asserts that he is entitled to the difference between the pension benefits he [*106] actually receives, and those he would have received had he continued to work for Yellow Freight until March 31, 2001, the date he became completely disabled. Defendant contends that it is only liable for the contributions it would have made during those years to Plaintiff's pension fund, which is administered by Plaintiff's union. Defendant further argues that there is no evidence in the record as to what Plaintiff's pension benefits would have been had he continued to work until 2001.

Compensation for lost pension benefits is an essential component of the relief to which victims of discrimination are entitled. See  *Sharkey v. Lasmo (AUL Ltd.), 214 F.3d 371, 374 (2d Cir. 2000)*("If Sharkey was denied compensation for lost pension benefits, he was not made whole, and thus did not receive the proper measure of relief under the anti-discrimination laws."). Relief for lost pension benefits may take one of two forms, legal or equitable. See id. (citing *Banks v. Travelers Cos., 180 F.3d 358, 365 (2d Cir. 1999)*). Legal relief, in the form of money damages paid directly to the plaintiff, compensates the plaintiff for the value of the pension benefits that [*107] were lost. See id. This type of relief is properly awarded by the finder of fact. See id. Equitable relief, which is the province of the court, entails the restoration of lost service and salary credits to the plaintiff's pension plan. See id. (citing *Banks, 180 F.3d at 365*, and *Geller v. Markham, 635 F.2d 1027, 1036 (2d Cir. 1980)*). "Unlike damage awards, 'which are payable to the plaintiff, pension benefits are paid into pension annuity funds. They merely replace the benefits that would have accrued during the [period] of employment wrongfully denied to [the plaintiff].'" *Banks, 180 F.3d at 365* (quoting *Geller, 635 F.2d at 1065*).

Here, Plaintiff seeks the legal remedy of an award of money damages to compensate for lost benefits. The Court agrees, in principle, that Plaintiff is entitled to such an award. Defendant's contention that it may only be liable to Plaintiff for the amount of contributions Defendant would have made to the pension fund, as opposed to the actual amount of benefits Plaintiff would have received, is obviously incorrect. Plaintiff must be made whole by Defendant for the losses [*108] he suffered as a result of Defendant's discrimination; clearly, the reduction in his pension benefits was directly caused by Defendant's conduct. It is irrelevant what Defendant's con-

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 32 of 35

Page 26

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

tribution would have been had it not discriminated against Plaintiff.

Thus, the Court agrees with Plaintiff's claim of entitlement to an award of lost benefits -- but only in principle. It is simply impossible for this Court to make such an award with any accuracy based on the scanty evidence presented at trial. Although Plaintiff introduced a chart indicating the monthly benefits to which a member of Local 707 would be entitled based on how many years he had served and how old he was at retirement (P-60), Plaintiff himself asserts that his benefits cannot be fully determined from this chart. Rather, as a representative of the Local 707 pension fund testified, an individual's pension benefits are partially determined by the number of service credits he has accrued with other unions with whom Local 707 has a reciprocity agreement. (Tr. at 663-66.) An individual who, like Plaintiff, had worked for such unions would receive a pension based on the total number of service credits from all unions; his benefit [*109] from Local 707 would be a prorated amount of the total benefit. Defendant correctly points out that there is no evidence in the record of the number of total service credits Plaintiff had accrued with other unions, or even whether those unions have a reciprocity agreement with Local 707. Because the record contains no competent evidence as to these critical components of Plaintiff's pension benefits, any award of such benefits would be both unjustified and speculative.

Nevertheless, it is clear that Plaintiff will not be made whole, and Defendant will unjustly enjoy a substantial windfall, if no compensation is made for Plaintiff's lost pension benefits. Accordingly, this Court will exercise its equitable discretion to order Defendant to make the contributions to the Local 707 pension fund that it would have made had Plaintiff worked full-time as a Yard Jockey during the period in question. As indicated above, this period runs from September 23, 1994, to March 31, 2001. [28] Presumably, the union will adjust Plaintiff's monthly pension benefits accordingly. (Obviously, the Court cannot order the union to do so, since it is not a party to this lawsuit.)

28   Yellow Freight's required contributions are found in the Collective Bargaining Agreement. (D-1 at 231.)

### [*110] III. Prejudgment interest

"It is ordinarily an abuse of discretion not to include prejudgment interest in a back pay award." *Saulpaugh, 4 F.3d at 145*; see also *Greenway, 143 F.3d at 55-56*; *Robinson v. Instructional Sys., Inc., 80 F. Supp. 2d 203, 207 (S.D.N.Y. 2000)*. Although the rate of prejudgment interest lies within the court's discretion, see *Greenway, 143 F.3d at 56*, one standard commonly employed is the

interest rate for short-term United States Treasury bills, the standard used for post-judgment interest in *28 U.S.C. § 1961(a)*. See *Robinson, 80 F. Supp. 2d at 208*; *McIntosh v. Irving Trust Co., 873 F. Supp. 872, 884 (S.D.N.Y. 1995)*; *Walia v. Vivek Purmasir & Assocs., Inc., 160 F. Supp. 2d 380, 388-89 (E.D.N.Y. 2000)* (citing cases). Because the purpose of backpay is to make the plaintiff whole, interest generally should be compounded. See *Saulpaugh, 4 F.3d at 145*; *McIntosh, 873 F. Supp. at 884*.

In calculating the amount of prejudgment interest Plaintiff is owed, this Court will adopt the [*111] three-step process that other courts in this Circuit have used. See, e.g., *Robinson, 80 F. Supp. 2d at 208* (following *McIntosh, 873 F. Supp. at 884*); *Luciano v. Olsten, 912 F. Supp. 663, 677 (E.D.N.Y. 1996)*, aff'd, *110 F.3d 210 (1997)*. First, the total backpay award of $ 156,867 is to be divided pro rata over the backpay period, that is, from the last quarter (i.e., October-December) of 1994 through the first quarter (i.e., January-March) of 2001. See *Robinson, 80 F. Supp. 2d at 208*; *Luciano, 912 F. Supp. at 677*. Specifically, for the 27-week period between September 23, 1994 and April 1, 1995, the backpay award is $ 12,493.71. For the remaining six one-year periods of backpay, the total backpay award of $ 144,373.29 ($ 156,867 minus $ 12,493.71) will be divided equally, yielding an annual backpay award of $ 24,062.22.

Second, the average annual Treasury bill rate of interest, referred to at *28 U.S.C. § 1961*, for the years 1995 through 2000, will be applied to the backpay award for each of the seven periods described above. See id. [29] The interest [*112]  will be compounded annually for the entire backpay period, beginning on September 23, 1994 and ending on March 31, 2001. See id. Plaintiff should also receive interest for the period between the end of the backpay period, March 31, 2001, and the entry of judgment -- approximately seventeen months. This amount will be calculated based on the average annual Treasury bill rate of interest for the period of March 2001 through August 2002, will also be compounded annually, and will apply to the subtotal arrived at after adding the compounded interest for the backpay period to the backpay principal. The resulting amount of interest will then be added to the backpay subtotal, to yield Plaintiff's total backpay award, with interest.

29   The most recent rates, i.e., those not appearing in *28 U.S.C. § 1961*, can be found at www.federalreserve.gov.

### IV. Compensatory Damages

Under the ADA, a victim of illegal discrimination has the right to compensatory damages for personal [*113] injury, pain, suffering, or mental anguish. See *42*

Case 2:09-cv-04400-ADS -WDW    Document 29-18    Filed 05/16/11    Page 33 of 35

Page 27

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

*U.S.C. § 1981a(a)(1)*; *Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 848, 121 S. Ct. 1946, 1949, 150 L. Ed. 2d 62 (2001)*; *Landgraf v. USI Film Prods., 511 U.S. 244, 253, 114 S. Ct. 1483, 1491, 128 L. Ed. 2d 229 (1994)*. The appropriate amount of compensatory damages turns on the unique facts of each case, and should take into consideration such factors as "the duration, severity, consequences and physical manifestations of the mental anguish, as well as any treatment that plaintiff underwent as a result of her anguish." *Walia, 160 F. Supp. 2d at 390* (citations and internal quotations omitted); see also *Carrero, 890 F.2d at 581*. Although a plaintiff need not submit corroborating evidence to establish compensable emotional distress damages, he must present evidence of concrete emotional problems. See *Annis v. County of Westchester, 136 F.3d 239, 244 (2d Cir. 1998)*; *Uddin v. New York City, 2001 U.S. Dist. LEXIS 12207*, No. 99 Civ. 5843 (GEL), 2001 WL 1512588, at **5-6 (S.D.N.Y. Nov. 28, 2001); *Ortiz-Del Valle v. Nat'l Basketball Ass'n, 42 F. Supp. 2d 334, 341 (S.D.N.Y. 1999)* [*114] (finding as a matter of law that jury award of compensatory damages was unjustified where plaintiff's only evidence of emotional distress damages was her testimony that she felt ignored and that her dreams and goals were crushed).

Here, there is insufficient evidence upon which to award any compensatory damages for emotional distress. The evidence of the "mental anguish" suffered by Plaintiff consists entirely of his testimony that he "felt very bad" when he was not permitted to return to work, because he "liked working for Yellow," and that he was "hurt" because "I thought that in the years I worked there, I proved my worth . . . . It just showed me that with companies like this, you're just a number. That's all you are. And I thought I was more than just a number." (Tr. at 145.)

Other than these realizations, and Plaintiff's hurt feelings, Plaintiff offered no evidence, concrete or otherwise, of any emotional problems he suffered as a result of Defendant's conduct. Although the Court does not question the genuineness of Plaintiff's feelings, it is hard-pressed to see how they amount to "mental anguish" or "emotional distress." Moreover, there is no evidence whatsoever of the "duration, [*115] severity, consequences and physical manifestations" of these feelings, *Walia, 160 F. Supp. 2d at 390*, much less of any treatment Plaintiff sought to address them. [30]

30 Plaintiff also asserts that he lost his house following his termination because he was unable to afford his mortgage payments and property taxes. However, there is insufficient evidence in the record directly tying the allegedly necessary sale of the house in 1997 to Plaintiff's 1994 termination from Yellow Freight. Moreover, any claim of a directs causal connection between the two events is undermined by Plaintiff's own statement that he received a "good price" for the house. (Tr. at 141.)

For similar reasons, the Court finds Plaintiff is not entitled to compensatory damages under New York law. Under the NYHRL, "mental injury may be proved by the complainant's own testimony, corroborated by reference to the circumstances of the alleged misconduct." *Bick v. City of New York, 1998 U.S. Dist. LEXIS 5543*, No. 95 Civ. 8781 (MHD), 1998 WL 190283, [*116] at *23 (S.D.N.Y. Apr. 21, 1998) (quoting *New York City Transit Auth. v. New York State Div. of Human Rights, 78 N.Y.2d 207, 216, 573 N.Y.S.2d 49, 54, 577 N.E.2d 40 (1991)*). Although a plaintiff "'need not produce the quantum and quality of evidence to prove compensatory damages' as [he] would under strict common-law principles," id. (citing Batavia *Lodge No. 196, Loyal Order of Moose v. New York State Div. of Human Rights, 35 N.Y.2d 143, 147, 359 N.Y.S.2d 25, 25, 316 N.E.2d 318 (1974)*), "the record must contain proof that the complainant in fact suffered mental anguish or humiliation," McIntosh, 887 F. Supp. at 666 (citing *Cullen v. Nassau County Civil Serv. Comm'n, 53 N.Y.2d 492, 497, 442 N.Y.S.2d 470, 473, 425 N.E.2d 858 (1981)*). Compensatory damages for emotional distress may not be presumed simply because a plaintiff suffered discrimination; rather, they must be proved. See McIntosh, 887 F. Supp. at 666 ("If the Court were to accept the evidence introduced at trial as sufficient to support the jury's award for compensatory damages, it would, in effect, be establishing a per se rule that once [*117] a defendant is found liable for unlawful retaliation, the plaintiff is entitled to damages for mental anguish. However, such a rule has been rejected.")(citing Cullen and collecting additional cases).

Because of the dearth of evidence regarding mental injury, the Court, as the trier of fact, finds that Plaintiff has not met his burden of showing that he "in fact suffered mental anguish or humiliation." *Cullen, 53 N.Y.2d at 497, 442 N.Y.S.2d at 473*.

## V. Punitive Damages

Finally, a plaintiff in an ADA action may recover punitive damages where he demonstrates that the defendant "engaged in a discriminatory practice . . . with malice or with reckless indifference to [her] federally protected rights." *42 U.S.C. § 1981a(b)(1)*; see also *Weissman v. Dawn Joy Fashions, 214 F.3d 224, 235 (2d Cir. 2000)*; *Connolly v. Bidermann Indus. U.S.A., Inc., 56 F. Supp. 2d at 369*; *Meling, 3 F. Supp. 2d at 274*. [31] "Although egregious misconduct is evidence of the requisite mental state," it is not required under the statute.

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 34 of 35

Page 28

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

*Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 384 (2d Cir. 2001) [*118] (quoting *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 535-36, 119 S. Ct. 2118, 2124, 144 L. Ed. 2d 494 (1999)). Rather, malice or reckless indifference may be established where there is "evidence that the employer discriminated in the face of a perceived risk that its actions would violate federal law." *Id.* at 384 (quoting *Kolstad,* 527 U.S. at 536, 119 S. Ct. at 2125). The actor's state of mind is the determinative factor in awarding punitive damages. See id.

> 31  Punitive damages are unavailable under the NYHRL. See *Weissman,* 214 F.3d at 235 (citing *Thoreson v. Penthouse Int'l, Ltd.,* 80 N.Y.2d 490, 496, 591 N.Y.S.2d 978, 979, 606 N.E.2d 1369 (1992)).

Under these standards, the Court finds that Defendant is liable for punitive damages. The record makes clear that Defendant acted with callous disregard toward Plaintiff's federally protected rights. There can be no doubt that Defendant, a large and sophisticated national corporation, [*119] had knowledge of its obligations under the ADA. Indeed, the Collective Bargaining Agreement in place as of April 1, 1994 -- well before Defendant refused to permit Plaintiff to return to work -- explicitly states that "the Union and the Employer agree to abide by the provisions of the Americans with Disabilities Act." (D-1 at 60.) Further, Defendant was specifically alerted to the possibility that its no-restrictions policy violated federal law by Plaintiff's filing of a complaint with the EEOC and the New York State Division of Human Rights in November 1994. Finally, the supposed offer of accommodation contained in the March 30 letter, woefully inadequate though it was, clearly suggests knowledge on the part of Yellow Freight of its obligation under the ADA to provide a reasonable accommodation. Indeed, the letter, though signed by Mary Thomas, was largely written by members of the legal department at Yellow Freight's corporate headquarters. It is thus apparent to the Court that Defendant "perceived [a] risk" that its conduct toward Walden violated the ADA.

Defendant claims that Plaintiff is barred from recovering punitive damages by *42 U.S.C. § 1981a(a)(3)*, which precludes punitive damage awards against defendants who make good faith offers of reasonable accommodation. However, in light of the Court's findings that the March 30 letter was neither made in good faith nor even an "offer," this provision is unavailable to Defendant. As explained above, the letter, which was not even addressed to Walden and never discussed with him, smacks of bad faith. The bad faith of this "offer" becomes further apparent when seen in the context of Yellow Freight's consistent stonewalling of Walden, as evidenced by its (1) rejecting Walden's doctor's note, and requested accommodation, on the sole grounds that it conflicted with Yellow Freight's discriminatory policy, (2) having Walden's workers' compensation benefits cut off, (3) removing Walden from the seniority list (or at the very least, threatening to, despite the impossibility of Walden's returning to work under Yellow Freight's no-restrictions policy), (4) suggesting that Walden simply have his doctor lie for him, and (5) opposing Walden's grievance concerning the no-restrictions policy. In the Court's view, the foregoing demonstrates that Yellow Freight's March 30 "offer" was simply a charade, [*120] and not an actual effort at complying with the law.

The record contains no evidence that the Company, in rejecting Walden's proposed accommodation and refusing to offer him an alternative, ever relied on a good faith belief that its no-restrictions policy complied with the ADA. Indeed, in opposing Walden's grievance, during which he specifically contended that the no-restrictions policy violated the ADA, the Company did not even defend the lawfulness of its policy. Rather, the Company argued that the policy -- which it now concedes is unlawful -- was necessitated by "sound business practice." (D-34.) As explained above, the Company defended the policy on the grounds that paying workers' compensation benefits to Walden, and to the "substantial number" of other Road Drivers "rushing" to cross-bid to the Yard Jockey position, would be financially onerous. (Id.) Aside from the fact that there was no evidence of disabled Yellow Freight workers "rushing" to cross-bid for Yard Jockey positions, the Company's interest in reducing the worker's compensation benefits to which its workers were entitled as a matter of law provides no justification for flouting federal anti-discrimination law.

[*121] Yellow Freight's indifference to accommodating Plaintiff is further illustrated by its failure to propose any additional accommodation, or to reconsider its initial position regarding transferring Plaintiff, even after the third-party doctor rejected the March 30 accommodation. As explained, this lack of communication with Plaintiff before and after the March 30 letter constitutes a wholesale failure to engage in the interactive process contemplated by the ADA. This failure provides additional evidence of Yellow Freight's reckless disregard of Plaintiff's rights under the ADA. See *Connolly,* 56 F. Supp. 2d at 369 (refusal to engage in interactive process with employee, plus failure to inform her of a suitable vacancy after she requested transfer, permits award of punitive damage).

In light of the foregoing, the Court finds that Plaintiff is entitled to recover $ 50,000 in punitive damages. Although Defendant is a large corporation with substantial assets (P-27), the Court finds that this amount is sufficiently large to punish Defendant for its unlawful be-

Case 2:09-cv-04400-ADS -WDW   Document 29-18   Filed 05/16/11   Page 35 of 35

Page 29

2002 U.S. Dist. LEXIS 16826, *; 14 Am. Disabilities Cas. (BNA) 1223

havior and to deter other employers from similar mis-conduct. See, e.g., *Luciano v. Olsten Corp., 110 F.3d 210, 221 (2d Cir. 1997).* **[\*122]**

## VI. Injunctive Relief

The EEOC also seeks equitable relief, primarily in the form of an injunction mandating Yellow Freight to eliminate its unlawful no-restrictions policy and to otherwise comply with the ADA. However, as Plaintiffs themselves admit in their Proposed Findings of Fact, Yellow Freight changed its policy in 1998 to allow for reasonable accommodations. (Pl. Post-Tr. Br. at 10-11; see also D-27.) Moreover, there is no evidence in the record that Yellow Freight has not adhered to this policy, or is otherwise engaging in unlawful practices under the ADA. Accordingly, the Court will not issue an injunction specifically barring the no-restrictions policy at issue in this litigation, or more generally requiring Yellow Freight to comply with the ADA. For similar reasons, and because the events in issue in this action occurred over eight years ago, the Court also finds the other injunctive relief requested by Plaintiff unnecessary.

## CONCLUSION

For the reasons set forth above, the Court finds that Defendant unlawfully discriminated against Plaintiff Ronald S. Walden on account of his disability, in violation of both the Americans with Disabilities Act, **[\*123]**

*42 U.S.C. § 12112*, and New York Human Rights Law, *N.Y. Exec. Law § 296.*

Accordingly, it is hereby ORDERED:

(1) The Clerk of the Court shall enter Judgment in favor of Plaintiffs, the Equal Employment Opportunity Commission and Ronald Walden, and against Defendant, Yellow Freight System, Inc.;

(2) The Judgment shall include an award to Walden of $ 156,867 in backpay, along with prejudgment interest, to be calculated by the Clerk of the Court according to the formula set forth above, at 84-86; and an award to Walden of $ 50,000 in punitive damages;

(3) Within forty-five days of the entry of judgment, Defendant shall make the contributions to Plaintiff's pension fund that it would have made had Plaintiff worked as a Yard Jockey from September 23, 1994, through March 30, 2001.

So ordered.

Theodore H. Katz

United States Magistrate Judge

Dated: September 4, 2002

New York, New York