# Exhibit 78



**WILBUR ALLMOND, Plaintiff, v. AKAL SECURITY, INC. and ALBERTO GON-
ZALES, Attorney General of the United States, Defendants.**

Civil Action No. 4:05-cv-96(HL)

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
GEORGIA, COLUMBUS DIVISION

*2007 U.S. Dist. LEXIS 72713; 19 Am. Disabilities Cas. (BNA) 1346*

September 28, 2007, Decided
September 28, 2007, Filed

**SUBSEQUENT HISTORY:** Affirmed by *Allmond v.
Akal Security Inc., 2009 U.S. App. LEXIS 3287 (11th Cir.
Ga., Feb. 20, 2009)*

**PRIOR HISTORY:** *Allmond v. Akal Sec., Inc., 2007
U.S. Dist. LEXIS 23374 (M.D. Ga., Mar. 29, 2007)*

**COUNSEL:** [*1] For Wilbur Allmond, also known as
Gene Allmond, Plaintiff: Janet Elizabeth Hill, LEAD
ATTORNEY, Hill & Associates, P.C., Athens, GA; John
W. Griffin, Jr., LEAD ATTORNEY, Victoria, TX;
Katherine L. Butler, LEAD ATTORNEY, Houston, TX;
James L. Wiggins, Eastman, GA.

For Akal Security, Inc., Defendant: Jamie E. Kitces,
LEAD ATTORNEY, Littler Mendelson, PC, Atlanta,
GA; Kurt Peterson, LEAD ATTORNEY, Atlanta, GA.

For Alberto Gonzales, Attorney General of the United
States, Defendant: Jack B. Hood, LEAD ATTORNEY,
Macon, GA; Kurt Peterson, Atlanta, GA.

For AARP, Amicus: Daniel B. Kohrman, LEAD AT-
TORNEY, Washington, DC.

**JUDGES:** HUGH LAWSON, JUDGE.

**OPINION BY:** HUGH LAWSON

**OPINION**

**ORDER**

This matter is before the Court on the Motion for
Summary Judgment (Doc. 74) of Defendants Akal Secu-
rity, Inc. and Alberto Gonzales, Attorney General of the
United States, in his official capacity, and the Motion for
Partial Summary Judgment (Doc. 80) of Plaintiff Wilbur
Allmond. The Court heard oral argument on the Motions
on December 19, 2006. After consideration of the plead-
ings, depositions, answers to interrogatories, admissions,
and affidavits, and the arguments of the parties, and as
more fully set forth below, the Court grants the Motion
[*2] of Defendants and denies the Motion of Plaintiff.

**I. FINDINGS**

From April 1, 2003, until February 3, 2004, Wilbur
Allmond was employed as a Court Security Officer
("CSO") by Akal Security, Inc. ("Akal"). Akal is a con-
tractor to the United States Marshal's Service ("USMS"),
and provides CSOs for the federal courthouses within the
Eleventh Circuit. At the time of the events giving rise to
this suit, Allmond was a CSO at the federal courthouse in
Columbus, Georgia.

At the time he went to work for Akal, Allmond was
55 years-old. Before working at Akal, Allmond had
worked as a law enforcement officer, accumulating 36
years of law enforcement experience. Allmond was not
aware of having any hearing problems during his time as
a law enforcement officer and did not wear hearing aids
at the time he applied to work at Akal. (Allmond Dep. at
15, Doc. 128.)

As a new applicant at Akal, Allmond was required
to take a medical examination, which included a hearing
test. Since January of 2001, the USMS has required that
its CSOs meet the hearing requirements of the physical
exam without the use of hearing aids. (Pl.'s Resp. Defs.'
Statement Material Facts P 41, Doc. 97.) However, the

Case 2:09-cv-04400-ADS -WDW   Document 29-19   Filed 05/16/11   Page 3 of 43

Page 2

2007 U.S. Dist. LEXIS 72713, *; 19 Am. Disabilities Cas. (BNA) 1346

USMS allows its CSOs **[*3]** to use hearing aids on the job. (Id. P 42.) CSOs who wear hearing aids and who pass the hearing test unaided must have their aided tests reviewed to ensure that the CSOs' hearing aids are functioning. (Id. P 43.)

At the time that Allmond took his physical exam, the initial threshold requirements were as follows [1]:

Initially all CSOs are tested UNAIDED using a pure tone, air conduction audiogram (audiometer) for measurement, testing each ear separately. . . .

(i) In the frequency range from 500-2000 hertz (Hz), the pure tone audiometric deficit must not exceed 30 decibels (dB) in either ear, without the use of hearing aids.

(ii) At 3000 Hz, the pure tone audiometric deficit must not exceed 40 dB in either ear, without the use of hearing aids.

(iii) At 4000 Hz, the pure tone audiometric deficit must not exceed 50 dB in either ear, without the use of hearing aids.

(Pl.'s Summ. J. Evid. Doc. 101-4 at 1.) If the unaided pure tone audiogram is failed and the applicant does not wear a hearing aid, the applicant must undergo unaided functional hearing assessments. (Id. at 2.) The requirements for the functional hearing tests are as follows:

(i) Unaided hearing loss between the two ears must not differ **[*4]** by 25 dB or more at three of the four speech frequencies, i.e., 500, 1000, 2000, and 3000 Hz. (Measures the ability to localize sound.)

(ii) Unaided Speech Reception Threshold must be 30 dB or better in at least one ear. (Measures the ability to hear sounds that alert to danger.)

(iii) Unaided Speech Recognition in quiet must be 90% or above in each ear.

(iv) Unaided Speech Recognition in a noise sound field must be 50% or above.

(Id. at 2-3.) Under the standards in place, an applicant could have moderate hearing loss and still work as a CSO as long as he or she met the hearing standards unaided. (Pl.'s Summ. J. Evid., Doc. 101-9 at 39.) An applicant who could not meet the hearing standards without

the use of hearing aids would not be allowed to work. (Id. at 39-41.)

1    Under the heading "Current Government Qualification Standard for Hearing" (Pl.'s Summ. J. Evid., Doc. 101-1, Ex. C.), Allmond has offered a document labeled as "modification M032." (Id.) Defendants' witness, Marc A. Farmer, states in his Declaration, "On December 18, 2002, the USMS issued contract modification No. M032, which spelled out in great detail the hearing standards and protocols that had been utilized since the **[*5]** beginning of the revised medical program." (Defs.' Evid. Materials, Doc. 78-2 P 14.) The Court will assume, therefore, that Modification M032 states the standard in place at the time Allmond took his physical exam.

Allmond completed the medical examination, including the hearing test, on February 1, 2003. Immediately following the examination, Allmond was told by the examining physician that he did not do well on the hearing portion of the test. (Allmond Dep. at 16.) That was the first time Allmond became aware that he had a hearing problem. (Allmond Dep. at 15, 63-64.) In completing the hearing portion of the examination, the examining physician noted, "The examinee does not wear a hearing aid." (Pl.'s Summ. J. Evid., Doc. 104-7 at 12.) In the Examination Summary, the physician noted the following under the heading "Significant Findings": "Patient's hearing exam seems to be suboptimal according to written guidelines provided in this pamphlet." (Pl.'s Summ. J. Evid., Doc. 104-8 at 4.)

Allmond's medical examination was reviewed by the Judicial Security Division on February 25, 2003. Following that review, Allmond's status was given as "medical **[*6]** determination deferred pending further documentation." (Defs.' Materials Supp. Mot. Summ. J., Doc. 78-23 at 9.) Allmond was advised that his pure tone audiogram did not meet the required standards. He was further advised to see an ear, nose and throat physician for additional testing. (Id.)

Allmond provided supplemental medical information on March 26, 2003. (Id. at 11.) The supplemental medical information was reviewed by the Judicial Security Division on April 25, 2003. (Id.) Based on the review of the supplemental medical information, Allmond's status remained "medical determination deferred pending further documentation." (Id.) The reviewing physician, Louis Chelton, determined that Allmond's unaided speech recognition in quiet did not meet the required standard. (Id.) Dr. Chelton requested that additional information be provided by an audiologist. (Id.) During the time that Allmond's medical status with re-

gard to his hearing was under review Allmond was allowed to begin working for Akal.

The additional hearing information requested by Dr. Chelton was provided on May 8, 2003. (Id. at 12.) Dr. Chelton reviewed the medical information on June 17, 2003, and determined that Allmond was [*7] not medically qualified to perform the essential functions of the job. Specifically, Dr. Chelton concluded,

> The following medical condition(s) poses a significant risk to the health and safety of yourself and/or others in the performance of essential job functions.
>
> According to the results of the tests provided by you from your audiologist, you have a severe conversational hearing loss. The tests confirm your decreased ability to distinguish speech in the absence of background noise (speech discrimination in quiet of 84% right and 68% left). Your impairment in performing this essential law enforcement function poses a significant threat to the health and safety of yourself, other law enforcement officers, and the public.

(Id.)

Although Dr. Chelton determined on June 17, 2003, that Allmond was not medically qualified to perform the essential functions of the job, no immediate action was taken by Akal and Allmond continued to work as a CSO at the Columbus courthouse until February 3, 2004. It is undisputed that during the period that Allmond worked at the courthouse he did his job very well and never had any problems related to his hearing or otherwise. Allmond never owned or wore hearing [*8] aids during his employment with Akal. He obtained hearing aids for the first time in 2005. (Allmond Dep. at 22-23, 64.) At that time he obtained hearing aids for both ears. (Allmond Dep. at 82.)

On December 19, 2003, Allmond underwent his annual fitness for duty physical examination. The physical examination included a hearing test. The audiologist who conducted the December 19, 2003, exam noted that "[a]udiometric testing revealed similar test results as found on 3/20/2003." (Pl.'s Summ. J. Evid., Doc. 104-9 at 1.) As to the audiometric testing, the audiologist further noted:

> borderline normal hearing in the right ear, dropping to a mild sensorineural hearing loss at 2000 Hz and further dropping

to a severe to profound sensorineural hearing loss in the high frequencies. Left ear test results indicate normal hearing, dropping to a mild sensorineural hearing loss at 500 and 1000 Hz and further dropping to a severe sensorineural hearing loss in the high frequencies. Excellent word recognition scores when words were presented at amplified levels.

(Id. at 1-2.) Allmond considered the December 19, 2003, test results to be good, (Allmond Aff., Doc. 104-17 P 4), but also conceded that he has [*9] a limited understanding of the tests and forms that were used. (Allmond Dep. at 19-20.)

In a letter dated February 2, 2004, Akal was advised by the United States Marshals Service that Allmond did not meet the contract medical requirements for a CSO. (Pl.'s Summ. J. Evid., Doc. 104-9 at 4.) The contracting officer who wrote the letter, Maxine Robinson, informed Akal that Almond was to be removed immediately from his position under the CSO contract. (Id.) In a letter dated February 3, 2004, Akal advised Allmond of the communication from the Marshals Service and further advised him that he was "medically disqualified" from the CSO position and, therefore, terminated from employment effective immediately. (Id. at 3.)

After Allmond received notice of his termination, he contacted a human resources officer for Akal and asked her to explain the basis of the decision to terminate his employment. (Allmond Dep. at 57.) He claims that she told him that he was being terminated on the basis of his initial hearing test. (Allmond Dep. at 57.) He then asked if he could use hearing aids. (Allmond Dep. at 57.) According to Allmond, he was told, "Hearing aids don't count." (Allmond Dep. at 57-58.)

Believing [*10] that the decision to terminate him was unlawful, Allmond sued Akal and the United States Marshals Service. Allmond contends that the Government's requirement that he pass a hearing test without a hearing aid is a screening test that screens out the disabled. (Compl. P 14). It is Allmond's contention that Defendants' actions against him served to violate the Americans with Disabilities Act, *42 U.S.C.A. § 12112(b)(6)*, and the Rehabilitation Act of 1973, *29 U.S.C.A. §§ 701 to 796l.* (Compl. P 20.) [2]

> 2 Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases. *See 29 U.S.C. § 794(d) and Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000).* Therefore, the Court will hereinafter refer to Allmond's claims as having been brought under

Case 2:09-cv-04400-ADS -WDW   Document 29-19   Filed 05/16/11   Page 5 of 43

Page 4

2007 U.S. Dist. LEXIS 72713, *; 19 Am. Disabilities Cas. (BNA) 1346

the ADA, but the discussion applies equally to the Rehabilitation Act claims.

After engaging in discovery, the parties filed the Motions that are the subject of this Order. In their Motion for Summary Judgment, Defendants argue they are entitled to judgment as a matter of law as to all issues raised by the Complaint. In his Motion for Partial Summary Judgment, Allmond seeks judgment as a matter of law on three grounds: [*11] 1) that he has a disability in that he was regarded as having a substantial hearing impairment; 2) the Government's limitations on the use of hearing aids for testing purposes violate the law; and 3) Akal is liable for the Government's violations of disability law. The court will address the parties' contentions below.

## II. CONCLUSIONS OF LAW

Congress enacted the Americans with Disabilities Act in order to, among other things, "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *42 U.S.C.A. § 12101(b)(1) (West 2005)*. In enacting the ADA, Congress expressed its intent to address discrimination based on stereotypical notions about disabilities. Id. *§ 12101(a)(7)*. Toward that end, Congress defined "disability" under the ADA to include not only those individuals with physical or mental impairments, but also those individuals regarded as having such impairments. Id. *§ 12102(2)*.

In its efforts to address disability discrimination, Congress extended the ADA to employers, enacting the following general rule:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability [*12] of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

Id. *§ 12112(a)*. Thus, an individual who seeks to make a claim under the ADA that he was discriminated against under the "general rule," that is to say in the "terms, conditions, and privileges of employment" (the classic disparate treatment case), must show that he was a qualified individual with a disability and that his employer intentionally discriminated against him because of the disability. See, e.g., Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000) ("In order to establish a prima facie case of discrimination under the ADA, [a plaintiff] must demon-

strate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability.").

If an ADA plaintiff proceeding under the general rule can satisfy a prima facie case of discrimination, then the burden-shifting analysis of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, comes into play. See Carlson v. Liberty Mut. Ins. Co., No. 06-15417, 237 Fed. Appx. 446, 2007 U.S. App. LEXIS 13551, 2007 WL 1632267, *1 (11th Cir. June 7, 2007) [*13] (unpublished op.) (holding that burden-shifting analysis of McDonnell Douglas Corp. applies in ADA cases). Under this standard, the burden would shift to the defendant employer to offer a legitimate, nondiscriminatory reason for its employment decision. If it does so, the burden shifts back to the plaintiff to show that the proffered reason for the employer's decision was pretextual.

The general rule, however, is only that, a general rule. In defining employment discrimination under the ADA, Congress extended it to cover situations that do not fall within the traditional disparate treatment framework, including the following:

> using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

*42 U.S.C.A. § 12112(b)(6) (West 2005)*. Numerous federal appellate circuit courts have declined to apply the McDonnell Douglas analysis to claims brought pursuant to *§ 12112(b)(6)*. In Davidson v. America Online, Inc., 337 F.3d 1179 (10th Cir. 2003), [*14] the court explained that the burden-shifting framework "may be unnecessary and inappropriate" if the "employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability." *Id. at 1189*. The court further explained:

> Instead, an employer will defend its decision on the ground that plaintiff is not otherwise qualified for the position, with or without reasonable accommodation. The *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent has been admitted and the plaintiff has direct evidence of

Case 2:09-cv-04400-ADS -WDW   Document 29-19   Filed 05/16/11   Page 6 of 43

Page 5

2007 U.S. Dist. LEXIS 72713, *; 19 Am. Disabilities Cas. (BNA) 1346

discrimination on the basis of his disability. If the plaintiff in such a case is in fact statutorily disabled, the determinative issue in the case will not be the employer's intent, but whether the employee is 'otherwise qualified,' with or without reasonable accommodation, to perform the job, a factual dispute that is resolved through traditional methods of proof.

*Id.* (citing *Monette v. Elect. Data Sys. Corp., 90 F.3d 1173, 1182 (6th Cir. 1996)*). In Davidson, the court held that because the employer relied on the employee's disability when it took an adverse action **[*15]** against him, the McDonnell Douglas framework was inapplicable. Id. Instead, the court considered only whether the employee was a qualified individual, as defined by the ADA. Id.

The parties have briefed the motions in terms of both the traditional McDonnell Douglas framework and the disparate impact theory. Therefore, this Court must first determine what framework to apply in analyzing Allmond's claims. The starting point for the Court's analysis is Plaintiff's complaint, which is remarkably simple: He alleges that he brings his complaint pursuant to the ADA and the Rehabilitation Act (Compl. P 5); that he worked as a CSO but was terminated because he was told he was not medically qualified for the job (Compl. P 12); that he was qualified for the job (Compl. P 13); that Akal and the Government unlawfully dismissed him on the basis of screening criteria that screens out the disabled (Compl. P 14); that with the assistance of hearing aids he meets the standards set by the USMS (Compl. P 15); and that in prohibiting him from using hearing aids, Defendants have violated the Rehabilitation Act and that portion of the ADA that prohibits employers from using qualification standards that screen **[*16]** out the disabled, *42 U.S.C. § 12112(b)(6)* (Compl. P 20).

Review of the complaint thus reveals that Allmond is alleging that Akal and the Government unlawfully discriminated against him by employing a screening criteria that screens out the disabled in violation of *42 U.S.C.A. § 12112(b)(6) (West 2005)*. Claims brought pursuant to *§ 12112(b)(6)* are treated as disparate impact claims. *See Davidson, 337 F.3d at 1189* (describing claims brought under *§ 12112(b)(6)* as claims brought under a disparate impact theory); *Erickson v. Bd. of Governors, 207 F.3d 945, 949 (7th Cir. 2000)* (explaining that *§ 12112(b)(6)* defines criteria with disparate impacts as discrimination); *Boersig v. Union Elec. Co., 219 F.3d 816, 822 (8th Cir. 2000)* (discussing *§ 12112(b)(6)* claim as "invoking a disparate impact theory of ADA liability"); *Gonzales v. City of New Braunfels, Tx., 176 F.3d 834, 839 (5th Cir. 1999)* (noting that the disparate impact

theory of discrimination "has been adopted entirely by the ADA" and citing to *§§ 12112(b)(3) & (6)*); *Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1196 (7th Cir. 1997)* (noting that disparate impact approach to proving discrimination is applicable to cases under the **[*17]** ADA and citing to *§ 12112(b)(6)) and Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1179 n.5 (6th Cir. 1996)* (describing *§ 12112(b)(6)* cases as "analytically similar to Title VII disparate impact claims").

Under a disparate impact challenge to an employer's action, the plaintiff in an ADA case need not prove that the employer intended to discriminate. *Erickson, 207 F.3d at 950*. Instead, the ADA places the burden on the employer to show that its practice is "job-related for the position in question and is consistent with business necessity." *42 U.S.C.A. § 12112(b)(6) (West 2005)*; *Erickson, 207 F.3d at 950*. The United States Court of Appeals for the Fifth Circuit has explained that a plaintiff makes out an ADA claim of disparate impact discrimination by (1) identifying the challenged employment practice or policy, and pinpointing the employer's use of it; (2) demonstrating an adverse impact on himself or a group that falls within the protections of the ADA; and (3) demonstrating a causal relationship between the challenged practice and the disparate impact. *Gonzales, 176 F.3d at 839 n.26*. The Sixth Circuit has explained that in disparate impact cases, the employer bears the burden of **[*18]** proving that a particular job requirement is necessary, while the disabled individual always bears the burden of proving that he is "otherwise qualified" for the position in question. *Monette, 90 F.3d at 1184*.

Although the parties have addressed some of the issues within the McDonnell Douglas framework, the Court is of the opinion that this case should be analyzed under the disparate impact framework. Accordingly, the Court will consider whether Allmond belongs to the class of persons protected by the ADA, i.e., whether is an individual with a disability who is otherwise qualified for the position in question. If he is, Defendants must show that the hearing standard at issue here is a business necessity.

## A. Individual with a Disability

The Act defines the term "disability" with respect to an individual as follows: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *42 U.S.C.A. § 12102(2) (West 2005)*. Given the foregoing definition, an individual who seeks to state a claim under the ADA "must have an actual disability (*subsection (A)* **[*19]** [of *42 U.S.C.A. § 12102(2)*]), have a record of a disability (*subsection (B)*), or be regarded as having one (*subsection (C)*)." *Sutton v. United Airlines,*

Case 2:09-cv-04400-ADS -WDW   Document 29-19   Filed 05/16/11   Page 7 of 43

Page 6

2007 U.S. Dist. LEXIS 72713, *; 19 Am. Disabilities Cas. (BNA) 1346

*Inc., 527 U.S. 471, 478, 119 S. Ct. 2139, 2144, 144 L. Ed. 2d 450 (1999).*

In this case, no argument is made that Allmond has a record of a physical or mental impairment that substantially limits one or more of the major life activities. Furthermore, Allmond does not argue that he has a physical or mental impairment that substantially limits one or more of the major life activities. [3] Rather, Allmond contends he has a disability as defined by the Act because Defendants regarded him as having a physical impairment that substantially limits a major life activity. The Supreme Court of the United States has explained that there are two ways in which an individual may be regarded as substantially limited in a major life activity: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton, 527 U.S. at 489, 119 S. Ct. at 2139.* The Court **[*20]** further explained: "In both cases, it is necessary that a covered entity entertain misperceptions about the individual--it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.*

3  To the contrary, Allmond's argument is that he does not have a disability. He maintains that while he was working with Akal, he had no limitations on his ability to function as a CSO, and he continues to maintain that he is able to function without limitations in the major life activities. (Allmond Dep. at 61-64.) Moreover, Allmond's argument throughout this litigation has been that "with the assistance of hearing aids . . . he meets the hearing standards set by the U.S. Marshal's Service" (Compl. P 15), thereby suggesting that the use of corrective measures would eliminate any limitations he might have on his hearing. When corrective measures will allow an individual whose impairment might constitute a disability to function identically to individuals without a similar impairment, then that person is not disabled within the meaning of the ADA. *See Sutton v. United Airlines, Inc., 527 U.S. 471, 488-89, 119 S. Ct. 2139, 2149, 144 L. Ed. 2d 450 (1999)* **[*21]** (holding that "disability under the Act is to be determined with reference to corrective measures," and petitioners whose visual limitations could be corrected with corrective lenses could not state a claim that they were substantially limited in any major life activity).

Here, Allmond contends Defendants regarded him as being substantially limited in the major life activities of hearing and working. The Court will address each of these contentions.

## 1. The Major Life Activity of Hearing

In support of his contention that Defendants regarded him as substantially limited in the major life activity of hearing, Allmond points to Dr. Chelton's determination, in his review dated June 17, 2003, that Allmond had "a severe conversational hearing loss." Allmond also relies on Defendants' interrogatory responses, in which Defendants stated the following:

Based upon Mr. Allmond's medical records and hearing test results, [the Federal Occupational Health Law Enforcement Medical Program] made the medical determination that Mr. Allmond's hearing deficiency rendered him unable to perform adequately, or presented too great a risk of him not being able to perform adequately, the following essential job functions **[*22]** of the CSO position.

(Pl.'s Summ. J. Evid., Doc. 101-19.) The interrogatory response then identified the essential job functions listed below:

to comprehend speech during face-to-face conversations;

to comprehend speech during telephone conversations;

to comprehend speech during radio transmissions;

to distinguish higher frequency tones such as fire alarms and smoke detectors;

to comprehend speech and distinguish sounds in loud and/or reverberant environments such as courthouse lobbies or in emergency situations; and

to comprehend speech when he did not have eye contact with the speaker.

(Id.) Allmond contends that by taking the position that Allmond's known hearing limitations--identified by Defendants as a severe conversational hearing loss--rendered him unable to perform the foregoing essential job functions, Defendants regarded him as being substantially limited in the activity of hearing.

Case 2:09-cv-04400-ADS -WDW    Document 29-19    Filed 05/16/11    Page 8 of 43

Page 7

2007 U.S. Dist. LEXIS 72713, *; 19 Am. Disabilities Cas. (BNA) 1346

Defendants take the position that there is no evidence that they viewed Allmond as substantially limited in his ability to hear. They contend that the determination by Chelton that Allmond had a "severe conversational hearing loss" is not "equivalent to a perception that [Allmond] could not hear" but, [*23] instead, was a determination that Allmond failed to meet the requirement that he be able to hear 90% of the spoken words out of each ear when tested in quiet. (Def.'s Am. Mem. Supp. Mot. Summ. J., Doc. 79 at 21.) In support of their position, they have provided, among other things, the declaration of Louis Chelton, in which he states that when he used the phrase "severe conversational hearing loss," he did not intend to indicate that Allmond was impaired in his ability to hear generally. (Chelton Decl. P 6, Doc. 78-23.)

In the Court's view, issues of fact remain for determination by a jury as to whether Defendants regarded Allmond as substantially limited in the major life activity of hearing. Defendants' intent in declaring Allmond to have a "severe conversational hearing loss" is a matter for a jury to decide. Therefore, insofar as Plaintiff's Motion for Summary Judgment requires a determination that Defendants regarded him as substantially limited in the major life activity of hearing, that Motion is denied.

## 2. The Major Life Activity of Working

In addition to contending that Defendants regarded him as substantially limited in the major life activity of hearing, in a footnote (Pl.'s [*24] Mot. Partial Summ. J., Doc. 80-1 at 6 n.4), Allmond contends he is entitled to judgment as a matter of law on the issue of whether Defendants regarded him as substantially limited in the major life activity of working. Allmond contends that the limitations perceived by Defendants on Allmond's hearing ability, particularly his inability to comprehend speech during face-to-face conversations, would preclude him from working in all law enforcement jobs. Defendants have moved for summary judgment on this issue, as well, contending they are entitled to judgment as a matter of law on the issue of whether they viewed him as substantially limited in his ability to work.

The Supreme Court has never issued an opinion in which it has concluded that working is a major life activity under the ADA. However, decisions of the Eleventh Circuit treat working as a major life activity. *See, e.g., Mullins v. Crowell, 228 F.3d 1305, 1313 (11th Cir. 2000)* (noting that precedent treating working as a major life activity is still valid after Sutton and holding that district court erred by interpreting the Rehabilitation Act to the contrary). Therefore, this Court will likewise treat working as a major life [*25] activity for purposes of the ADA and Rehabilitation Act claims at issue here.

In order to prevail under the theory that he was regarded by Defendants as being substantially limited in the major life activity of working, Allmond must show that as a result of the perceived disability he was "'significantly restricted in the ability to perform either a *class of jobs or a broad range of jobs* in various classes as compared to the average person having comparable training, skills and abilities.'" *Rossbach v. City of Miami, 371 F.3d 1354, 1359 (11th Cir. 2004)* (quoting *29 C.F.R. § 1630.2(j)(3)(i)*). In Rossbach, the court further emphasized the following:

> The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. Thus, an impairment must preclude--or at least be perceived to preclude--an individual from more than one type, even if the job foreclosed is the individual's job of choice.

*Id. at 1359* (citing *Sutton, 527 U.S. at 492, 119 S. Ct. at 2151*). In Rossbach, the court held that the job of "police officer" is "too narrow a range of jobs to constitute a 'class of jobs' as that term is defined in the EEOC regulations." [*26] *Id. at 1361.* The court upheld the district court's determination that the plaintiff police officer in Rossbach failed to demonstrate that his physical impairments substantially limited a major life activity.

Unlike the plaintiff in *Rossbach*, here Allmond argues that Defendants perceived his physical impairments as precluding him from working in the field of law enforcement, not just in the CSO position. He contends that this result is demonstrated by the testimony of Defendants' witnesses in which they concede that, in general, law enforcement officials need to be able to satisfy the essential job functions that they determined Allmond was unable to perform as a CSO. Some of the evidence on which Allmond relies for this contention is set out below:

(1) The deposition of Dr. Richard Miller, taken in a different case against the same Defendants, from which the following exchange was excerpted:

> Q Now, do you, as the doctor, the occupational medicine doctor who is the head of the Law Enforcement Medical Program for the United States government, does comprehend speech mean something other than -- other -- other than understanding speech to you?
>
> A. No.

Case 2:09-cv-04400-ADS -WDW   Document 29-19   Filed 05/16/11   Page 9 of 43

Page 8

2007 U.S. Dist. LEXIS 72713, *; 19 Am. Disabilities Cas. (BNA) 1346

Q. Okay. And going down that list, using [*27] the words you used as a general proposition, you agree that for weapons-carrying law enforcement people, they need to understand speech on the telephone, too, don't they?

A. Yes.

Q. And they need to be able to understand speech during radio transmissions, don't they?

A. Yes.

Q. And they need to be able to understand speech when their vision is blocked from seeing the person talking?

A. Yes.

Q. Okay. And hear sounds that require investigation?

A. Yes.

Q. That's common to law enforcement, isn't it?

A. In general it is common.

(Pl.'s Summ. J. Evid., Ex. U, Doc. 104-2 at 2.)

2) The deposition of Thomas Galgon, the United States Marshal's Service's Chief Inspector of Judicial Protective Services, taken on November 18, 2005, from which the following exchange was excerpted:

Q. Would you anticipate as a security professional that the vast majority of people in law enforcement work would need to be qualified to comprehend speech during radio transmissions?

THE WITNESS: Again it would depend on whether their responsibilities included carrying a radio and being able to do that.

Q. Isn't it your understanding that most law enforcement officers do carry radios?

THE WITNESS: Yes, I would agree that most police [*28] officers carry radios.

Q. So if someone is not able to comprehend speech during radio transmissions, they would not be well suited for law enforcement work; is that a fair statement?

THE WITNESS: I think that they would not be able to perform in a job that required them to carry a radio and comprehend radio transmissions.

(Pl.'s Summ. J. Evid., Ex. FF, Doc. 104-15 at 2.)

3) The deposition of Doctor Louis Chelton, taken in this case on October 27, 2005, from which the following exchange was excerpted:

Q. (By Mr. Griffin) Right. Am I right in saying it's important that we -- that law enforcement people be able to discriminate or understand speech even in a noisy background sometimes?

A. Correct.

(Pl.'s Summ. J. Evid., Ex. JJ, Doc. 104-19 at 1.)

4) The Declaration of Dr. Carl Hansen, a vocational rehabilitation counselor, who asserted the following on July 27, 2006:

My professional opinion is that if Mr. Almond's hearing impairment existed as perceived by the U.S.M.S. (i.e. caused him to have "severe conversational hearing loss" which in turn kept him from being able to understand face to face conversations and have telephone conversations), that he would be precluded from virtually all jobs in [*29] the class of jobs of law enforcement. This is because virtually every law enforcement job requires the ability to understand face to face conversations and telephone conversations. Thus if Mr. All[]mond's hearing was as poor as the U.S.M.S. perceived it, he would not be able to work in the class of jobs of law enforcement.

(Pl.'s Summ. J. Evid., Ex. KK, Doc. 104-20 at 2.)

Defendants take the position that the evidence establishes that the Government perceived Allmond only as unable to hear at a level sufficient to satisfy the CSO hearing standard and that the Government did not necessarily view Allmond as limited in performing a class of law enforcement jobs. (Defs.' Reply Pl.'s Resp. Def.'s Mot. Summ. J., Doc. 107-1 at 5.) Defendants assert that

Case 2:09-cv-04400-ADS -WDW   Document 29-19   Filed 05/16/11   Page 10 of 43

Page 9

2007 U.S. Dist. LEXIS 72713, *; 19 Am. Disabilities Cas. (BNA) 1346

in order for Allmond to prevail as to this issue, he must come forward with evidence that the hearing standards employed by the Government for its CSOs are the same hearing standards employed by other law enforcement agencies. (Defs.' Reply Pl.'s Resp. Def.'s Mot. Summ. J. at 6.) The Court disagrees.

In the Court's view there is sufficient evidence in the record from which a jury could conclude that Defendants perceived Allmond's physical [*30] impairments as precluding him from working in the field of law enforcement. It is not necessary, as Defendants suggest that Plaintiffs put forth evidence that other law enforcement agencies utilized the same standards as those employed by the Government with respect to Allmond. It is enough that there is evidence in the record to show that the Government perceived Allmond as having a severe hearing loss; that the impairment prevented him from performing essential functions of the job, including comprehending speech during face-to-face conversations and during telephone conversations and radio transmissions; and that these same functions were essential to working in the field of law enforcement. Therefore, Defendants' Motion for Summary Judgment is denied as to this issue. To the extent that Allmond also seeks summary judgment as to that issue, fact issues preclude summary judgment, and Plaintiff's Motion is thus denied on the issue of whether Defendants regarded Allmond as substantially limited in the major life activity of working.

**B. Otherwise Qualified.**

Because this Court has concluded that fact issues exist with respect to whether Allmond had a disability as that term is defined [*31] under the ADA, the Court must next consider whether Allmond can show that he was otherwise qualified for the position. A qualified individual

> means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position."

*29 C.F.R. § 1630.2(m) (2006).* "Determining whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis." *Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1258 (11th Cir. 2001).* In deciding whether a particular job duty is an essential function, consideration is to be given to the employer's judgment. Id. Evidence of whether a particu-

lar function is essential can also include the consequences of not requiring the individual to perform the function. *29 C.F.R. §1630.2(n)(3)(iv) (2006).*

Although the regulations define a qualified individual as one who can perform the essential functions of the position, there is considerable debate among the circuits with respect to whether a disparate impact plaintiff [*32] must also show that he was qualified to perform the essential function challenged under *42 U.S.C.A. § 12112(b)(6).* At least two circuits have concluded that a plaintiff challenging a qualification standard under *§ 12112(b)(6)* need not also show that he was a "qualified individual" under the general rule of *§ 12112(a),* which provides, in part, that no covered entity shall discriminate against a qualified individual with a disability. *See Bates v. UPS, 465 F.3d 1069, 1081 (9th Cir. 2006), rehearing en banc granted,* (discussing burdens under the ADA and holding that a plaintiff challenging a standard under *§ 12112(b)(6)* does not bear the burden of proving that he is qualified as to the essential job function the standard addresses) *and Monette, 90 F.3d at 1184* (holding that in a claim brought pursuant to *§ 12112(b)(6),* plaintiff bears the burden of showing he is disabled and qualified to perform the essential functions of the job, absent the challenged job requirement). *But see Davidson, 337 F.3d at 1188-89* (noting *§ 12112(b)(6)* as a distinct type of ADA discrimination, but stating, "No matter what type of discrimination is alleged, however, a plaintiff must establish first that he was [*33] a 'qualified individual with a disability.'").

This Court adopts the reasoning of the Ninth and Sixth Circuits and finds that in order to bring a challenge under *§ 12112(b)(6),* Allmond does not bear the burden of proving that he is qualified as to the job function addressed by the allegedly illegal qualification standard. Consistent with the Sixth and Ninth Circuits, this Court will only require Allmond to show that he is disabled and qualified to perform the essential functions of the job, absent the challenged job requirement--in this case the ability to pass the required hearing test without the use of hearing aids. Under this standard, Allmond has shown that he is otherwise qualified.

Defendants do not take issue with Allmond's ability to perform the essential functions of the job--except insofar as those essential functions stem from his inability to pass the hearing test unaided. In other words, except as to the hearing standard challenged by Allmond as unlawful under *§ 12112(b)(6),* Defendants do not dispute that Allmond was qualified for the job. This Court has already determined that, for purposes of this disparate impact claim, Allmond need not prove that he was qualified as [*34] to that function. Therefore, Allmond has shown that he is a otherwise qualified for the position.

2007 U.S. Dist. LEXIS 72713, *; 19 Am. Disabilities Cas. (BNA) 1346

## C. Business Necessity Defense

Because Allmond has shown that he is a qualified individual and the Court has determined that fact issues exist with respect to whether he had a disability, the Court must next consider whether Defendants can meet their burden of proving that the particular standard, employment test, or other selection criteria is "job-related for the position in question and is consistent with business necessity." *42 U.S.C.A. § 12112(b)(6) (West 2005)*. These terms are not easily defined or applied in the ADA context. Therefore, this Court will follow the lead of the United States District Court for the District of Kansas and apply the business necessity principles used in Title VII disparate impact cases. *Riechmann v. Cutler-Hammer, Inc., 183 F. Supp. 2d 1292, 1296 (D. Kan. 2001)* (analyzing federal regulations and determining that regulations require consideration of analogous Title VII cases in Rehabilitation Act cases in which employer uses tests or other selection criteria to screen out handicapped persons).

In *Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971)*, [*35] the Supreme Court held that the business necessity defense in Title VII cases "placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question." *Id. at 432, 91 S. Ct. at 854*. With regard to employment tests, the Court also stated that with Title VII, Congress has commanded "that any tests used must measure the person for the job and not the person in the abstract." *Id. at 436, 91 S. Ct. at 856*.

In 1984, the Eleventh Circuit had the occasion to discuss the business necessity defense at length. In *Walker v. Jefferson County Home, 726 F.2d 1554, 1558 (11th Cir. 1984)*, the court offered the following discussion of the standard and the relevant caselaw:

> In determining whether the employer has met its burden, the court looks at the amount of skill required for the position and the economic and human risks involved. "When a job requires a small amount of skill and training and the consequences of hiring an unqualified applicant are insignificant, the courts should examine closely any pre-employment standard or criteria which discriminate against minorities. In such a case, the employer should have a heavy burden to demonstrate [*36] to the court's satisfaction that his employment criteria are job-related." *Spurlock v. United Air Lines, Inc., 475 F.2d 216, 219 (10th Cir.1972)*. See *EEOC v. International Union of Op-*

*erating Engineers, 553 F.2d 251 (2d Cir.1977)* (union admission requirements of city operator's license, ability to operate more than one piece of equipment, and 200 days' experience were not job related); *Fisher v. Procter & Gamble Mfg. Co., 613 F.2d 527, 541-42 n. 27 (5th Cir.1980), cert. denied, 449 U.S. 1115, 101 S. Ct. 929, 66 L. Ed. 2d 845 (1981)* (injunction against 20-year experience requirement for promotion from nonmanagement to management positions upheld in view of racial impact); *Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157 (5th Cir.1978), cert. denied, 439 U.S. 1115, 99 S. Ct. 1020, 59 L. Ed. 2d 74 (1979)* (experience prerequisite for eligibility for apprenticeship program and on-the-job training found to perpetuate effects of past discrimination; district court ordered to consider whether experience prerequisite should be shortened). *Compare Spurlock v. United Air Lines, Inc., 475 F.2d 216 (10th Cir.1972)* (job of airline flight officer requires high degree of skill, and [*37] economic and human risks are great); *Hodgson v. Greyhound Lines, Inc., 499 F.2d 859 (7th Cir.1974), cert. denied, 419 U.S. 1122, 95 S. Ct. 805, 42 L. Ed. 2d 822 (1975)* (requirement that applicants for bus-driving position be younger than 35 years of age upheld on safety grounds).

*Id. at 1558-59*. Applying the factors discussed in *Griggs* and *Walker*, the Court finds that Defendants have shown that hearing requirements challenged by Allmond were job-related for the CSO position and consistent with business necessity.

The evidence unequivocally shows that Defendants undertook a study of the CSO position, that they engaged a physician experienced in law enforcement to lead the study, and that based on his recommendations, the standard at issue here was put in place. While the results of that study served to limit the employment of certain persons whose hearing fell below the designated standard, it did not foreclose entirely on the employment of those persons with hearing aids. Specifically, those persons whose hearing enabled them to meet the minimum threshold unaided were allowed to work with hearing aids, if they also satisfied those tests designed to ensure that the hearing aids were functioning [*38] properly.

Case 2:09-cv-04400-ADS -WDW   Document 29-19   Filed 05/16/11   Page 12 of 43

Page 11

2007 U.S. Dist. LEXIS 72713, *; 19 Am. Disabilities Cas. (BNA) 1346

Allmond heavily criticizes Defendants for setting standards based on events that may never occur, such as confrontations that might result in hearing aids being dislodged, but the human risks that are present with the CSO position not only permit such "what if" thinking, they demand it. It is the job of the CSO to be prepared for any occurrence. Likewise, it is the job of the Marshals Service to ensure that its CSOs are capable of meeting any occurrence, whether or not foreseeable. As to Allmond's suggestions to the contrary, the Court finds the reasoning of the United States District Court for the Southern District of Indiana in *Leverett v. City of Indianapolis, 51 F. Supp. 2d 949 (S.D. Ind. 1999)*, to be persuasive.

In Leverett, the plaintiff challenged the City of Indianapolis's requirement that firefighters be capable of a minimum level of hearing in both ears. The City maintained that the plaintiff's inability to localize sound would present a safety risk; the plaintiff challenged the medical basis for the City's conclusions. In finding for the City, the district court had this to say:

> The City's hearing test was not created arbitrarily, but rather was based upon the well **[*39]** supported medical opinion that the ability to hear in both ears relates directly to one's ability to localize sound and thus to perform the essential functions of a firefighter. . . .
>
> . . . .
>
> Plaintiff argues that such an opinion is not universally held in the medical community . . . and that some applicants with unilateral hearing may be able to localize sounds sufficiently well to perform their jobs. This may well be true, but the law does not require the City to put the lives of [plaintiff], his fellow firefighters, and the citizens they serve at risk by taking the chance that he can localize sound . . . .The lack of a precise or universally perfect fit between a job requirement and actual safe and effective performance is not fatal to a claim of job-relatedness, particularly when the public health and safety are at stake.

*Id. at 958.*

The Tenth Circuit has also noted that courts may consider risks to public health and safety when considering whether a particular standard is justified by business necessity. As the court noted in *Spurlock v. United Air-*

*lines, Inc., 475 F.2d 216, 219 (10th Cir. 1972)*, when determining whether defendants' hiring requirements for an airline flight officer **[*40]** were a business necessity, "when . . . the human risks involved in hiring an unqualified applicant are great, the employer bears a correspondingly lighter burden to show that his employment criteria are job-related." *Id. at 219*. With respect to the importance of the airline flight officer position, the court added, "The public interest clearly lies in having the most highly qualified persons available to pilot airliners. The courts, therefore, should proceed with great caution before requiring an employer to lower his pre-employment standards for such a job." Id. The same analysis applies to the CSO position.

In the employment discrimination setting, courts have been loathe to impose their judgment concerning personnel matters on defendant employers. As far back as 1991, the Eleventh Circuit adopted the view of the Seventh Circuit, noting in a Title VII case, "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'" *Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)* (quoting *Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)*). Other circuits have applied the same rationale to ADA cases. *See, e.g.,* **[*41]** *Henderson v. Ford Motor Co., 403 F.3d 1026, 1034 (8th Cir. 2005)*.

As the Seventh Circuit noted in Erickson, the ADA only condemns irrational distinctions based on disabilities. *Erickson, 207 F.3d at 949*. Where, as here, a defendant relies on objectively reasonable medical evidence to conclude that a distinction based on a disability is necessary to protect the health and safety of the public, then an adverse action taken against an employee based on that distinction is not unlawful. In sum, Defendants have shown that the action challenged by Allmond is consistent with business necessity. As a result they are entitled to summary judgment as to his ADA claim brought pursuant to *§ 12112(b)(6). See, e.g., Lee v. Dep't of Children & Family Servs., 135 Fed. Appx. 202, 2005 WL 139508, *2 (11th Cir. 2005)* (unpublished op.) (assuming prima facie showing by plaintiff in Title VII case, but granting summary judgment based on defendant's showing of business necessity).

### III. CONCLUSION

In view of the foregoing, therefore, the Court finds that Defendants have demonstrated as a matter of law that the hearing standards challenged by Allmond were job-related and consistent with business necessity. **[*42]** As a result, Defendants have presented a successful defense to Plaintiff's employment discrimination claim and, therefore, Defendants' Motion for Summary Judgment is

Case 2:09-cv-04400-ADS -WDW   Document 29-19   Filed 05/16/11   Page 13 of 43

Page 12

2007 U.S. Dist. LEXIS 72713, *; 19 Am. Disabilities Cas. (BNA) 1346

granted; Plaintiff's Motion for Summary Judgment is denied.

**SO ORDERED,** this the 28th day of September, 2007.

*s/* **HUGH LAWSON, JUDGE**

# Exhibit 79



KATHY H PLOURDE, Plaintiff, -against- JOHN W. SNOW, Secretary of Treasury, Internal Revenue Service, Defendants.

02-cv-5532 (SJF) (ARL)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

*2006 U.S. Dist. LEXIS 96040*

June 14, 2006, Decided

**SUBSEQUENT HISTORY:** Affirmed by *Plourde v. Paulson, 2007 U.S. App. LEXIS 13405 (2d Cir., June 6, 2007)*

**COUNSEL:** [*1] For Kathy H. Plourde, Plaintiff: Scott M. Mishkin, LEAD ATTORNEY, Scott Michael Mishkin, P.C., Islandia, NY.

For Paul H. O'Neill, Secretary of Treasury, Internal Revenue Service, Defendant: Catherine Mary Mirabile, LEAD ATTORNEY, United States Attorneys Office, Brooklyn, NY.

**JUDGES:** Sandra J. Feuerstein, United States District Judge.

**OPINION BY:** Sandra J. Feuerstein

**OPINION**

**OPINION + ORDER**

FEUERSTEIN, J.

I. Introduction

Plaintiff Kathy Plourde ("Plaintiff" or "Plourde") commenced this action against defendants John W. Snow, Secretary of Treasury [1] and the Internal Revenue Service (collectively, "Defendant"), alleging violations of the Rehabilitation Act of 1973, *29 U.S.C. 701 et seq.* (the "Rehabilitation Act"), Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* ("Title VII") and intentional infliction of emotional distress. Defendant moves for summary judgment on all counts pursuant to

*Fed. R. Civ. P. 56*. For the reasons set forth below, Defendant's motion for summary judgment is granted.

1  The named defendant in this action was originally Paul H. O'Neill, sued in his official capacity as Secretary of the Treasury of the United States of America. Pursuant to *Fed. R. Civ. P. 25(d)*, Mr. O'Neill's successor, John Snow, is automatically substituted as the Defendant in this action. See *Fed. R. Civ. P. 25(d)*. Furthermore, although the President nominated Henry M. Paulson on May 30, 2006 to replace Mr. Snow, Mr. Paulson has yet to be confirmed by the Senate. Cf. *McLaughlin v. Biasucci, 688 F. Supp. 965, 966 n. 1 (S.D.N.Y. 1988)*.

[*2]  II. Background

A. Employment History

Plaintiff has been employed by the Department of Treasury, Internal Revenue Service ("IRS") since 1973. (Joint Pretrial Order P 1; Def/Pl. 56.1 Stmt. PP 1-2). [2] In either 1989 or 1991, [3] Plaintiff became a Supervisory Tax Examiner Assistant, GS-11 level, ("Section Chief"), in the Error Correction and Reject Program ("ERRP") of the Document Perfection Branch at the Brookhaven Service Center. (Joint Pretrial Order P 3; Def. 56.1 Stmt. P 3; Pl. 56.1 Stmt. P 3). The position of Section Chief was a "full-time, second-level supervisory position." (Def/Pl. 56.1 Stmt. P 39). Although the size of the staff fluctuated depending upon the season, (Def/Pl. 56.1 Stmt. P 24), each Section Chief generally supervised five (5) managers who, in turn, supervised approximately one hundred and fifty (150) employees. (Def/Pl. 56.1 Stmt. PP 25, 41). The Section Chief was responsible for "planning,

directing, and controlling the activities of positions in subordinate organizations." (Def/Pl. 56.1 Stmt. P 42).

2    Those paragraphs in the parties' Rule 56.1 Statements agreeing that a fact is undisputed are jointly referred to as 'Def/Pl. 56.1 Stmt. P.'

[*3]

3    The Joint Pretrial Order submitted by the parties strpulates that Plaintiff became a Section Chief in 1991. (Joint Pretrial Order P 3). Plaintiff disputes this date in her Rule 56.1 Statement, however, and claims that she became a Section Chief in 1989. (Pl. 56.1 Stmt. P 3). The specific date on which Plaintiff became Section Chief is irrelevant to the instant motion.

Plaintiff's department, ERRP, was responsible for resolving errors in both individual and business tax returns. (Def/Pl. 56.1 Stmt. P 27). In the event an error could not be resolved internally, ERRP was responsible "for corresponding with the taxpayer, ... perfecting the tax return, and ... inputting the perfected tax return into the IRS processing system." (Def/Pl. 56.1 Stmt. P 28). At times, the Brookhaven Service Center handled fifty-thousand (50,000) to eighty-thousand (80,000) errors per day. (Def/Pl. 56.1 Stmt. P 51). These errors needed to be reconciled within two (2) days in order to comply with statutory requirements for the timely disbursement of tax refunds. (Id. P 50). This required "the [*4] ERRP Section Chief ... to closely monitor and control the workflow ..., constantly monitor and reallocate resources to meet the changing needs of the program." (Id. PP 53-54). In the event "a computer system issue arose, the ERRP Section Chief was required to undertake immediate efforts to resolve the system issue." (Id. P 55).

B. The April 11, 1997 In jury

On April 11, 1997, Plaintiff injured her back while at work. (Joint Pretrial Order P 4; Am. Cmplt. P 8). She spent approximately the next eighteen (18) months on paid disability leave. (Def/Pl 56.1 Stmt. PP 63, 65). Plaintiff's supervisors called her numerous times to inquire as to her anticipated return date, which she claimed she could not provide. (Def/Pl 56.1 Stmt. P 66). [4] Mark Bernstein, the Branch Chief for Document Perfection, met with Edward Safrey, the Submission Processing Assistant Division Chief, (id. PP 35-36), "to discuss provisions the Branch should make to put a temporary replacement in plaintiff's Section Chief position." (Id. P 68). Bernstein and Safrey agreed that "the Document Perfection Branch would rotate several managers through the Section Chief position [*5] and then double-encumber the Section Chief position (i.e. paying two employees at full-time salaries to perform the duties of the position) by temporarily assigning Carol Losee to the full-time Section Chief position." (Id. P 69). During her assignment as Section Chief, Losee was paid at a GS-11 level. (Id. P 72).

4    Plaintiff's Rule 56.1 Statement purports to deny the allegation that her supervisors called her. However, her specific objection actually concedes that they did call her, but claims that "there was no need to contact plaintiff" because Defendant had her "most recent reports from her treating physician ...." (Pl. 56.1 Stmt. P 66). Therefore, while the need for these calls is possibly in dispute, their existence is not.

Plaintiff returned to work on November 16, 1998 on a part-time basis. (Id. P 73). Although the Section Chief position was "still a full-time position and the duties and responsibilities were the same as before plaintiff went out on disability leave," [*6] (id. P 74), Plaintiff was permitted to work four (4) hours per day, five (5) days per week. (Id. P 73). However, although Plaintiff retained the grade and title of Section Chief, it is undisputed that she "did not assume the duties and responsibilities of the Section Chief position .... Rather, Losee continued to perform the duties of the full-time Section Chief position and plaintiff was given administrative assignments that could be accomplished during her part-time schedule." (Id. PP 75-76). Under this arrangement, the first-level managers reported to Losee, and Plaintiff "did not oversee any work related to the daily activities of employees in the Document Perfection Branch." (Id. PP 77-78). Plaintiff claims that she neither requested nor required this arrangement, but was "not permitted to assume the duties and responsibilities of her Section Chief position." (Pl. 56.1 Stmt. P 75).

Shortly after Plaintiff returned to work, Bonnie Fuentes became Branch Chief. [5] (Def/Pl. 56.1 Stmt. PP 37-38). According to Defendant, Fuentes conferred with Division Chief Michael Spiotta, among others, and "determined that the essential duties of the Section [*7] Chief could not be performed in a four - hour day." (Def. 56.1 Stmt. P 79). Fuentes determined that "the ability to make decisions, to make adjustments when those decisions turned out not to sufficiently address the requirements of the program, and to be held accountable for such decisions required that the Section Chief position be held by one individual working a full-time schedule, providing important continuity." (Def/Pl. 56.1 Stmt. P 81). Fuentes therefore decided that "Losee would continue in the Section Chief position until the agency knew more about plaintiff's medical condition; specifically how many hours she could work." (Id. P 83). In reaching this conclusion, it is undisputed that Fuentes considered.

(1) that the Section Chief position was a vital position to the Document Perfection Branch with numerous duties; (2) that most incumbents could not perform the essential functions of the job in an eight-hour workday; (3) that plaintiff had been out for more than a year and during that time internal procedures had changed; (4) that the Section Chief supervised two shifts of employees; (5) that there was a tremendous amount of work to be completed each day; [*8] (6) that the ERRP section was dependent on the computer system; and (7) that the Section Chief had both experienced and inexperienced managers reporting to her.

(Pl/Def. 56.1 Stmt. P 80).

5   Lucy Hoffman served as Acting Branch Chief during the brief period between Bernstein and Fuentes. (Def/Pl. 56.1 Stmt. P 37).

Although Plaintiff argues that her extensive experience and the experience of her "first line" supervisors made her "different than most other Section Chiefs," (id.), she concedes that "prior to her injury in April 1997, she did not have a lot of down time while she was working the full-time position as Section Chief." (Def/Pl. 56.1 Stmt. P 62).

B.  Plaintiff's Request for Accommodation and Her Transfer

In September 1999, at the request of the Office of Worker's Compensation ("OWCP"), Plaintiff was examined by Dr. Robert Moriarty, a Board Certified Orthopedic Surgeon. (Id. P 85). Dr. Moriarty indicated in a September 9, 1999 report that Plaintiff was capable of working [*9]  six (6) hours per day, and that, in three (3) months time, she should be capable of returning to a full eight (8) hour work day. (Id. P 86).

On November 2, 1999, Plaintiff "fell over the steps that were directly next to the area outside the training room by the cafeteria." (Am. Cmplt. P 53; Def/Pl. 56.1 Stmt. P 87). She completed an injury report on November 3, 1999. (Pl. 56.1 Stmt. PP 274-75). On November 12, 1999, Defendant "offered to keep plaintiff in the Section Chief position, while increasing her work schedule to six hours per day for an additional three month period, after which plaintiff would be returned to full-time status." (Joint Pretrial Order P 18). According to Plaintiff, "when Fuentes handed plaintiff the November 12, 1999, job offer, she asked plaintiff what she wanted her to do with the November 3, 1999 injury report form."

(Pl. 56.1 Stmt P 289). Plaintiff claims that she was "surprised that it was not sent in yet because it was supposed to have been sent in two (2) days after it was filled out." (Id. P 290). Plaintiff claims that the failure to timely submit her injury report was a form of intentional discrimination. (Id. P [*10]  292).

On November 24, 1999, Plaintiff's treating physician, Dr. John Acampa, issued a report stating that Plaintiff could not work in excess of four hours per day. (Id. P 96). Although Defendant claims this assessment was a result of the November 2, 1999 injury, Plaintiff claims Dr. Acampa had "never approved a work schedule of more than four hours per day . . . ." (Pl. 56.1 Stmt. P 96). On November 26, 1999, Plaintiff responded in writing to Defendant's November 12, 1999 offer, and "insisted that she could not work more than four hours a day and requesting that she be kept on her four hour per day schedule." (Joint Pretrial. Order P 19).

On December 9, 1999, OWCP "accepted plaintiff's workers' compensation claim stemming from the November 2, 1999 injury as a compensable injury." (Def/Pl. 56.1 Stmt. P 89). On January 6, 2000, Defendant denied Plaintiff's request to remain in the Section Chief position on a part-time basis. (Id. PP 101-02). The denial letter explained.

the medical statement submitted by Dr. Acampa regarding your present condition, however, is not sufficient to enable us to continue you in your present work status. Dr. Acampa's statement [*11]  did not address the limitations your condition requires in relation to the duties of your Section Chief position. Nor did his medical statement provide a prognosis for your present condition; rather, it merely advised that he would re-evaluate your work duty status on a forty-five day basis. You have been unable to perform the duties of your Section Chief position since your injury on April 11, 1997. While the Agency is willing to continue to make a reasonable effort to keep you employed in a manner consistent with your capabilities and with the business needs and mission of the Agency, we cannot continue to double-encumber your Section Chief position indefinitely. We must know that you will return to full-time status and resume the duties of your Section Chief position within a reasonable time. Otherwise, we must consider permanently reassigning you to a position that does not require a full-time employee. Unfortunately,

2006 U.S. Dist. LEXIS 96040, *

the position about which you inquired (Management and Program Analyst, V.A. 06-81-0078C) is not one that can be performed by a part-time employee.

(Id. P 102) (quoting Mirabile Decl., Ex. T). The letter requested that Plaintiff provide, within fourteen [*12] (14) days, "additional information regarding her medical condition, including a statement from plaintiff's physician stating an approximate date on which she would be able to return full-time or a statement that she would have to work part-time indefinitely." (Def/Pl. 56.1 Stmt. P 103). Defendant also stated its intention "to permanently reassign plaintiff to another position," (id. P 104), if this information was not provided within fourteen (14) days. (Id.).

Plaintiff responded on January 15, 2000, characterizing Defendant's request as "improper" and stating that she remained unable to work a full day. (Pl. 56.1 Stmt. P 105). Plaintiff also stated that all medical documentation relevant to her limited work schedule had been provided to Defendant. (Id.). She did not provide a statement from a physician as requested.

Defendant claims that it "searched for vacant positions at plaintiff's level but was unable to locate any that plaintiff could perform within her restricted four-hour work schedule." (Def. 56.1 Stmt. P 107). However, according to Plaintiff, "Defendant did not search for vacant positions at Plaintiff's level; rather their very limited search was [*13] for any position that could be performed in a four-hour workday. Carmen Belford's March 17, 2000 e-mail does not state that the employee for whom the search was being conducted was plaintiff. Moreover, the e-mail does not indicate that the employee was an experienced Section Chief, GS-11. Furthermore, Ms. Belford's e-mail provided its recipients with less than one week to respond." (Pl. 56.1 Stmt. P 107). In March 2000, Plaintiff's request for disability leave based on her November 2, 1999 injury was approved. (Def/Pl. 56.1 Stmt. P 90).

On April 12, 2000, Fuentes "informed plaintiff that the IRS could no longer continue to retain her in the Section Chief position because it required the IRS to pay the salaries of two full-time employees for the Section Chief position. Fuentes listed four lower - graded positions to which plaintiff could be reassigned which could accommodate plaintiff's need for a part-time schedule." (Joint Pretrial Order PP 20-21) (paragraph break omitted). Plaintiff rejected all four of these positions. (Id. P 24). On May 23, 2000, Fuentes sent a letter to Plaintiff offering her an opportunity to reconsider her rejection of the positions, stating [*14] that management "would wait

until after June 16, 2000 to propose removal" in order to allow Plaintiff additional time to reconsider. (Id. P 25).

On June 15, 2000, Plaintiff sent a letter to Defendant stating her desire to return full-time, but requesting an extension of the four-hour workday for an additional one hundred and twenty (120) days. (Id. P 26). Plaintiff advised that she did not wish to resign, retire on disability or accept a position at a lower grade, and that, despite her request, she was "uncertain as to whether 120 days would be sufficient." (Id.) On June 27, 2000, Dr. Acampa issued a report indicating that Plaintiff "was limited to four hours of work per day and that he was unable to make a prognosis as to when she could resume full-time work." (Id. P 27).

On July 13, 2000, the IRS proposed to remove Plaintiff from employment because her part-time schedule required it to double-encumber her position. (Id. P 28). Upon an internal appeal, Director James Gaither modified the decision on January 16, 2001, directing that Plaintiff be downgraded to a GS-9 position rather than terminated. (Id. PP 29-30). This position was created [*15] for Plaintiff, because "GS-9 analysts worked in groups, thereby providing backup for plaintiff who could only work four hours per day." (Def/Pl. 56.1 Stmt. P 112). Plaintiff was reassigned to the GS-9 position on January 29, 2001 (Joint Pretrial Order P 31). [6]

  6 Prior to Plaintiff's reassignment, she applied competitively for several full-time GS-11 and higher positions, for which she was not selected. (Def/Pl. 56.1 Stmt. P 136; see also Am. Cmplt. PP 41-43). She claims that she was not selected because of her disability or in retaliation for her complaints. (Pl. 56.1 Stmt. P 145; Am. Cmplt. PP 42-43, 48-49). In support of this allegation, she claims that, inter alia, she was asked about her disability at an interview, and that her uncorrected evaluation, discussed infra, referred to her disability. (Am. Cmplt. PP 42-43, 48). Defendant claims that Plaintiff failed to officially apply for a number of those positions, that one position was never funded or filled and that Plaintiff was not selected for the remaining positions because she was not as qualified as the individuals selected. (Def. 56.1 Stmt. PP 152-58). Plaintiff concedes that after she was rejected for one GS-11/12 position, she was offered but declined "the opportunity to work part-time in the selecting official's area in order to gain more recent experience." (Def/Pl. 56.1 Stmt. P 147-48).

[*16]  C. Hostile Work Environment and Disability-Related Claims

2006 U.S. Dist. LEXIS 96040, *

Plaintiff claims that she was subjected to discriminatory treatment and a hostile work environment upon returning to work in November 1998.

It is undisputed that Plaintiff was "not given her old office and desk to sit in . . . ." (Def/Pl. 56.1 Stmt. P 193). Losee occupied Plaintiff's former office space, and Plaintiff was seated "out on the floor in a factory layout style." (Id. P 194). However, it is also undisputed that Plaintiff never requested her former office, and did not "raise any issue regarding her seating location . . ." and never filed an EEO complaint on this basis, (id. PP 197-98), although she appears to claim now that the arrangement was discriminatory.

Plaintiff also claims that she was "discriminated against in work place assignments, including being given unrealistic time frames for the completion of projects and increased supervision, . . . that she was deliberately kept out of touch with the daily activities and tasks of the ERRP section and that she was excluded from management meetings because of her alleged disability." (Id. PP 199-200). She also alleges that she was [*17] subjected to increased supervision, and otherwise treated differently than "similarly situated employees." (Am. Cmplt. P 38). Plaintiff does not specify which employees she considered similarly situated. to answer such a question." (Id. P 207; see also id. P 206). Plaintiff claims that this question was improper.

Finally, Plaintiff alleges that a 1997 performance appraisal, which rated Plaintiff as "fully successful" rather than her prior year's ranking of "exceeds fully successful," (id. P 212), "made reference to her disability, and . . . was expressly based on her disability." (Pl. 56.1 Stmt. P 212). Plaintiff informally contacted an EEO counselor in the fall of 1997 and it was agreed that the evaluation would be changed. (Def/Pl. 56.1 Stmt. PP 212, 214). However, for reasons that Defendant attributes to administrative error and Plaintiff to discrimination, the change was not made to her file until March 2000. (Id. PP 214-217). Plaintiff claims that the "incorrect evaluation was in plaintiff's official personnel file and it may have been referenced by reviewing officials in regard to plaintiff's application for transfer or promotion." [*18] (Pl. 56.1 Stmt. P 217). Plaintiff also claims that "non-disabled employees received higher ratings on their performance appraisal than disabled employees." (Def/Pl. 56.1 Stmt. P 223). However, other than her 1997 performance appraisal, Plaintiff concedes that "the ratings she received did not affect the terms and conditions of her employment." (Id. P 224).

D. Sexual Harassment

Plaintiff alleges that she was sexually harassed on October 19, 2000 by outside contractors working at the Brookhaven facility. (Am. Cmplt. PP 102-03; Def/Pl. 56.1 Stmt. P 225). According to Plaintiff, the contractors "made constant derogatory remarks regarding the female anatomy, which made Plaintiff uncomfortable." (Am. Cmplt. P 103). Plaintiff claims that she reported this harassment to Safrey on October 20, 2000, who advised her to move her seat. (Id. PP 104, 106). Plaintiff alleges that Safrey's response was "in retaliation for Plaintiff's protected activity of complaining of sexual harassment, and for Plaintiff's prior EEO activity." (Id. P 107). Plaintiff "also reported the incident with the painters and Safrey's allegedly sexist remark to her supervisor." (Def/Pl. [*19] 56.1 Stmt. P 239). Plaintiff further alleges that Defendant failed to investigate her complaint, and Safrey "increased his supervision of Plaintiff and began to heavily criticize Plaintiff's work." (Am. Cmplt. P 112). The parties agree that (1) Safrey never made any other allegedly sexually harassing statements to Plaintiff, (Def/Pl. 56.1 Stmt. P 242), (2) Plaintiff was never subjected to any other allegedly sexual harassment at Brookhaven, (id. P 241), (3) "upon learning about the incident, Safrey personally met with the on-site building representative, who assured Safrey that the painters were no longer on the premises," (id. P 245), (4) the painters were removed from the office no later than October 20, 2000, (id. P 243), (5) Safrey "informed the on-site building representative that conduct like that of the painting contractors would not be tolerated in the workplace," (id. P 246), (6) Safrey "reported the plaintiff contractor incident to the Security Office and requested that it ensure that all vendors in the future would be apprised of the IRS'' policy prohibiting sexual harassment," (id. P 247), and (7) following the incident, "Fuentes [*20] held a meeting with all branch managers to remind them of their duties regarding the prevention of sexual harassment." (Id. P 248).

III. Analysis

A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. A fact is material if it "might affect the outcome of the suit under the governing law." *Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).* An issue of fact is genuine only if a jury could reasonably find in favor of the nonmoving party based on that fact. Id. The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that

must be resolved at trial. *Anderson, 477 U.S. at 256-57.* [*21] The trial court is required to construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. *Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).*

The Second Circuit has recognized that direct evidence of discriminatory intent is rare, and often must be inferred from circumstantial evidence found in the pleadings. *Holtz, 258 F.3d at 69.* Thus, while summary judgment may be appropriate in such cases, it should be done with an extra measure of caution. Id. (citing *McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997)*); see also *Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001)* ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

B. Disability Claims

1. Applicable Standards

Plaintiff alleges that Defendant failed to provide her with a reasonable accommodation as required by the Rehabilitation Act of 1973. Claims under the Rehabilitation Act are subject to the burden-shifting analysis first established by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* [*22] See *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown ("RECAP"), 294 F.3d 35, 48-49 (2d Cir. 2002).* In order to establish a *prima facie* case, Plaintiff must show "that (1) she is an individual with a disability within the meaning of the Act, (2) she is otherwise qualified to perform the job in question, (3) she was excluded from her job solely because of her disability, and (4) her employer received federal funding." *Borkowski v. Valley Central School Dist., 63 F.3d 131, 135 (2d Cir. 1995)*; see also *Stone v. City of Mt. Vernon, 118 F.3d 92, 96-97 (2d Cir. 1997).* An individual is "otherwise qualified for a job if she is able to perform the essential functions of that job, either with or without a reasonable accommodation." *Borkowski, 63 F.3d at 135* (citing *School Bd. v. Arline, 480 U.S. 273, 287 n.17, 107 S. Ct. 1123, 94 L. Ed. 2d 307 (1987)).* Upon such a showing, an employer can nevertheless "defeat the claim if it shows (a) that making a reasonable accommodation would cause it hardship, and (b) that the hardship would be undue. The burden of proof on these two issues is on the employer." *Stone, 118 F.3d at 97.* [*23]

2. Essential Functions

Defendant asserts that Plaintiff's part-time schedule precluded her from performing the essential functions of the Section Chief position. Essential functions are defined as "the 'fundamental' job duties of the employment position the individual with a disability holds or desires .

. . and does not include the 'marginal' functions of the position." *Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 8 (2d Cir. 1999)* (quoting *29 C.F.R. § 1630.2(n)(1)*). In determining whether a function is essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *42 U.S.C. § 12111(8)*; see also *Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003).* ("In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position. [*24] ") (internal quotations and citations omitted). Other evidence of whether a particular function is essential includes, inter alia, the amount of time spent on the job performing the function and the consequences of not requiring the individual to perform the function. *29 C.F.R. 1630.2(n)(3)*; *Mitchell, 190 F.3d at 8 n. 3.*

The duties and responsibilities of the ERRP Section Chief are:

1. Directs, coordinates, or oversees work using supervisors, leaders, team chiefs, group coordinators or comparable personnel.

2. Assigns work to subordinates based on priorities, selective consideration of the difficulty and requirements of assignments, and the capabilities of employees.

3. Evaluates subordinate supervisors and serves as the reviewing official on evaluations of nonsupervisory employees rated by subordinate supervisors.

4. Exercises significant responsibilities in dealing with officials of other units or organizations, or in advising management official of higher rank.

5. Interviews candidates for positions in the unit; recommends appointment, promotion, or reassignment to such positions.

6. Hears and resolves group grievances or [*25] serious employee complaints.

7. Effects minor disciplinary measures,

such as warnings or rep-rimands, recommending other action in more serious cases.

8. Identifies developmental and training needs of employees, providing or arranging for needed development and training.

9. Assures responsible equity among subordinate organizations of performance standards and rating techniques developed by subordinates.

10. Makes decisions on work problems presented by subordinates.

11. Makes or approves selections for subordinate supervisory positions.

12. Recommends selections for subordinate supervisory positions.

13. Recommends awards or bonuses for nonsupervisory personnel and changes in position classification, subject to approval by higher level officials, supervisors, or others.

14. Finds and implements ways to eliminate or reduce significant bottlenecks and barriers to production, promote team building, or improve business practices.

(Def/Pl 56.1 Stmt. P 45).

Plaintiff alleges that she is capable of performing the essential functions on a part-time basis of the Section Chief position because she "was an extremely experienced and diligent Section Chief and she had [*26] even more experienced managers working underneath her." (Pl. Mem. in Opp. at 7; see also Pl. 56.1 Stmt. P 61; Am. Cmplt. P 64) ("Plaintiff worked 150 per cent sic within her four (4) hour work day."). Defendant argues that Plaintiff's inability to work full-time necessarily prevents her from being able to perform the essential functions of the position.

As described above, the ERRP Section Chief was responsible for supervising a large team of individuals. (Def/Pl. 56.1 Stmt. P 41). The work performed by ERRP was time-sensitive, (id. P 50), and the Section Chief was required to "closely monitor and control the workflow ... and constantly monitor and reallocate resources to meet the changing needs of the program." (Id. PP 53-54). Furthermore, the Section Chief was required to respond to and resolve resource management issues quickly and "undertake immediate efforts" to correct problems with the computer system. (Id. P 55).

In *Mason v. Avaya Comm., Inc., 357 F.3d 1114 (10th Cir. 2004)*, the Tenth Circuit held that the plaintiff could not perform the essential functions of her position if she was in the office on a part-time basis. [*27] The plaintiff in Mason, a service coordinator at a communications company, was responsible for, inter alia, "scheduling service appointments for technicians working in the field, ... monitoring the current days' queue of repair tickets and assigning them through the computer system to a technician in the field . . . ." *Id. at 1117*. The Court, noting its deference for the employer's judgment, found that "physical attendance in the workplace is ... an essential function of most jobs," *id. at 1119*, and plaintiff's "self-serving testimony" regarding her ability to perform the essential functions of the job insufficient to overcome the evidence to the contrary. *Mason, 357 F.3d at 1122*.

The ERRP Section Chief position in this case and the service coordinator position in Mason are similar in that both positions (1) require team supervision and constant interaction with co-workers, and (2) place time-sensitive demands on employees. As in *Mason,* Plaintiff offers only self-serving testimony regarding her capabilities and the requirements of the position in support of her claim. See also *Mulloy v. Acushnet Co., 03-11077, 2005 U.S. Dist. LEXIS 12778, at *20 (D. Mass. Jun. 20, 2005)* [*28] (holding that an electrical engineer responsible for overseeing a manufacturing plant is required to work on-site in order to perform the essential functions of his position because "his duties required him to have access to the machines . . . and those operating them to assess their functioning . . . . The job description also involves training and support of personnel.") (internal citation and quotations omitted).

3. Reasonable Accommodation and Undue Hardship

The Rehabilitation Act requires a covered employer to provide reasonable accommodation to disabled employees who are otherwise qualified to perform the essential functions of a job. *Borkowski, 63 F.3d at 138-39*. The employee bears the burden of demonstrating "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id. at 138*. "The defendant must then show that the accommodation is not reasonable, or that it imposes an undue hardship, which in practice amount to the same thing." *Stone, 118 F.3d at 98* (quoting *Borkowski, 63 F.3d at 138*) (internal quotations and ellipses omitted). [*29] To demonstrate that a proposed accommodation is unreasonable or imposes an undue hardship, the employer must undertake a "common-sense balancing of the costs

and benefits" of the proposed accommodation . . . ." *Borkowski, 63 F.3d at 140.* Accommodations that an employer might consider include, for example," job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions." *34 C.F.R. § 104.12(b)(2)*; *45 C.F.R. § 8412(b)(2)*. Factors to be considered in determining what constitutes an 'undue hardship' include, inter alia, "the type of the recipient's operation, including the composition and structure of the recipient's workforce; and . . . the nature and cost of the accommodation needed." *34 C.F.R. § 104.12(c)(2)-(3)*; *45 C.F.R. § 84.12(c)(2)-(3)*.

Plaintiff's proposed accommodation is a four-hour work day. While the regulations suggest consideration of, inter alia, "part-time or modified work schedules," *34 C.F.R. § 104.12(b)(2)*, an "employee's [*30] request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Mason, 357 F.3d at 1122*; *Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 120 (2d Cir. 2004)* ("A scheduling accommodation is not reasonable if it, in essence, requires an employer to eliminate an essential function of a job."); *Borkowski, 63 F.3d at 140* ("An employer is not required to accommodate an individual with a disability by eliminating essential functions from the job."). An eight-hour workday is an essential function of the ERRP Section Chief position. While Plaintiff claims she is capable of performing the responsibilities of the Section Chief position in a four-hour workday, this claim is belied by the responsibilities of the position and the fact that Defendant double-encumbered the position while Plaintiff was temporarily working part-time, requiring it to "pay two employees at full-time salaries to perform the duties of the position . . . ." (Def/Pl. 56.1 Stmt. P 69). [7]

[7]

Plaintiff suggests that it was unnecessary to double-encumber the Section Chief position, and that Defendant never gave her an opportunity to demonstrate that she could perform the position while working part-time. However, this Court's "role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments." *Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001)* (internal citations omitted). Plaintiff's claim regarding Defendant's decision to double-encumber her position refutes Defendant's business judgment, to which this Court defers.

[*31] Although Plaintiff claims that Defendant has allowed other individuals to work part-time, she has of-

fered no evidence that any Section Chiefs or others similarly situated were permitted to work part-time indefinitely, negating any claim of disparate treatment.

Moreover, Plaintiff's claim is supported only by her self-serving testimony regarding her alleged efficiency and diligence. (Am. Cmplt. P 64) ("Plaintiff worked 150 per cent sic within her four (4) hour work day."). Based upon the failure of proof and the deference owed to the employer's business judgment as to the essential functions of the Section Chief position, *Rodal, 369 F.3d at 120*, Plaintiff has failed to meet her burden. Furthermore, Defendant has demonstrated that Plaintiff's proposed accommodation is unreasonable and would impose an undue hardship on Defendant.

### 4. Retaliation

Plaintiff alleges that her placement in a GS-9 position was in retaliation for her request for accommodation and her "formal and informal complaints of discrimination to defendant's Equal Employment Opportunity." (Am. Cmplt. PP 17, 13). As an initial matter, "a plaintiff may prevail on a claim for retaliation even [*32] when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)* (internal citations, quotations and brackets omitted). Thus, the fact that Plaintiff's claims regarding Defendant's underlying conduct lack merit does not necessarily render Plaintiff's retaliation claim meritless as well.

"Claims for retaliation are analyzed under the same burden-shifting framework established for Title VII cases." Id. [8] In order to establish a *prima facie* case of retaliation, Plaintiff, "must show that: (1) she engaged in an activity protected by the Rehabilitation Act; (2) the employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* If a plaintiff is able to establish a *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. [*33] If a defendant meets this burden, the plaintiff must point to evidence that would permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Id. at 721* (internal citation and quotations omitted).

[8] Plaintiff asserts retaliation claims under both the Rehabilitation Act and Title VII for the same allegedly improper conduct. (Am. Cmplt. PP 129-140). It is clear that disability discrimination is not actionable under Title VII, *Harrison v. N.Y.*

*City Hous. Auth., 0l Civ. 3664, 2001 U.S. Dist. LEXIS 21551, *4 (S.D.N.Y., Dec. 26, 2001)*, and any such claim is therefore dismissed. In any event, the same analysis applies under both Title VII and the Rehabilitation Act.

Defendant contends that it transferred. Plaintiff to the GS-9 position because it could not afford to double-encumber the ERRP Section Chief indefinitely. [9] Plaintiff argues that this explanation is pretextual because previous Section Chiefs "have been permitted [*34] to perform the essential functions of their job in less than eight (8) hours per day . . . and moreover, plaintiff is very experienced and was willing to work different hours, if necessary, in order to complete her job duties." (Pl. Mem. in Opp. at 15). However, Plaintiff has failed to identify any Section Chief who was permitted to work part-time on an indefinite or year-round basis and, Plaintiff's claim that she was willing to "work different hours . . . to complete her job duties" does not obviate the necessity of doubly-encumbering the position. Plaintiff has therefore failed to demonstrate that Defendant's legitimate, non-discriminatory reason for her transfer was pretextual. [10]

9   Defendant assumes, without conceding, that Plaintiff has established a *prima facie* case. Because Plaintiff is unable to demonstrate Defendant's legitimate, non-discriminatory reason is pretextual, it will be assumed, without deciding, that Plaintiff has established a *prima facie* case.

10   In fact, Defendant appears to have repeatedly tried to accommodate Plaintiff both before and after her complaints, specifically creating the GS-9 position for Plaintiff, (Def/Pl. 56.1 Stmt P 112), offering her the opportunity to work part-time in a higher level management position, (id. PP 147-48), and providing her with an opportunity to reconsider her rejection of the lower-grade positions. (Joint Pretrial Order P 25).

[*35]   Plaintiff also asserts that she was not selected for several positions at a higher grade because of her disability and in retaliation for her complaints. (Am. Cmplt. PP 83-84). According to Plaintiff, she applied for approximately fifteen (15) available positions in which she was capable of the corresponding essential functions . . . but defendant denied her each position despite her being, upon information and belief more qualified than each individual selected for each position." (Id.). However, Defendant has shown that Plaintiff did not formally apply for several of the disputed jobs, (Def/Pl. Stmt. PP 149-154), that one of the positions for which Plaintiff did apply was never funded and consequently not filled by anyone, (id. PP 156-158), and that Plaintiff was not selected for other positions because she was not the best

qualified individual for the positions. (Def. 56.1 Stmt. PP 136-146). While Plaintiff disputes the claim that she was less qualified than the individuals eventually selected, she has failed to offer any evidence in support of this contention other than her own self-serving evaluation of her qualifications. [11]

11   Indeed, Defendant's contention that Plaintiff lacked the necessary qualifications is further supported by Shelley Goldenberg's proposal that Plaintiff work part-time in her department "in order to gain more experience." (Def/Pl. 56.1 Stmt. P 147).

[*36]   Plaintiff also claims that her October 1997 evaluation rating was lowered as a result of her disability. (Am. Cmplt. PP 29, 30). However, Defendant corrected the evaluation after Plaintiff lodged a complaint with the EEO, (Def/Pl. 56.1 Stmt. PP 214, 219), and has offered the legitimate, non-discriminatory reason (administrative error) for the delay in effecting the change. Plaintiff has failed to establish that this explanation is pretextual. *Shannon, 332 F.3d at 99* ("Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact.") (internal citations, quotations and ellipses omitted). Plaintiff's claim that the reference to her disability in her evaluation precluded her from obtaining GS-11 or higher positions is without merit. Defendant has offered legitimate, non-discriminatory explanations for Plaintiff's failure to be chosen for the positions which she sought and Plaintiff has failed to demonstrate that such explanations are pretextual. Plaintiff also concedes that she did not file any formal complaint of discrimination relating to this evaluation. (Def/Pl. 56.1 Stmt. P 213). Finally, Plaintiff has also [*37] failed to establish any causal connection between any of her alleged protected activity and the adverse employment actions.

5. Hostile Work Environment

A plaintiff asserting a hostile work environment claim must demonstrate that (1) "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004)* (internal quotations and citations omitted), and (2) there exists "a specific basis for imputing the conduct creating the hostile work environment to the employer." Id. [12] In order to survive summary judgment, Plaintiff must satisfy both the objective and subjective elements, namely "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id. at 150* (internal quotations and citations omitted). Defendant has moved for summary judgment on the ground

that Plaintiff has failed to identify sufficiently severe or pervasive harassment. (Def. Mem. at 28-31). Although Plaintiff has failed to oppose [*38] Defendant's motion for summary judgment on this claim, (see Pl. Mem. in Opp. at 16-17) (opposing summary judgment on alleged sexually hostile work environment only), this Court retains an obligation to "assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004)* ("Where the non-moving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.") (internal quotations omitted).

> 12   Although the Second Circuit has yet to explicitly recognize a hostile work environment claim based on disability, see *Bonura v. Sears Roebuck & Co., 62 Fed. Appx. 399, 400 n. 3, 2003 U.S. App. LEXIS 8440 (2d Cir. 2003)* ("The Second Circuit has yet to determine whether the ADA gives rise to a cause of action for hostile work environments . . . ."), at least two other Circuit Courts, *Fox v. GMC, 247 F.3d 169, 176 (4th Cir. 2001); Flowers v. Southern Reg'l Physician Servs., Inc., 247 F.3d 229, 232-35 (5th Cir. 2001)* and several District Courts in this Circuit, including this Court, *Johnson v. City of New York, 326 F. Supp. 2d 364, 371 (E.D.N.Y. 2004)* (Feuerstein, J.), have recognize the viability of such claims.

[*39]   Plaintiff's Amended Complaint appears to claim she was subjected to a hostile work environment based upon her disability because (1) upon her return as a part-time employee, she was not assigned to her former office space, (Am. Cmplt. P 35), (2) she was subjected to increased supervision and "treated differently than similarly situated employees," (id. P 38), (3) she was allegedly excluded from meetings, (id. P 39), and (4) advised to be prepared for questions regarding her part-time status. (Id. P 47).

These allegations are insufficient to establish the severe and pervasive conduct required to establish a hostile work environment claim. Defendant has provided evidence that (1) Plaintiff was not assigned her former office because, while working part-time, she was no longer performing the functions of a Section Chief, (Def/Pl. 56.1 Stmt. PP 194-196), (2) Plaintiff was subjected to increased supervision because she was no longer working in a supervisory position, and her "non-supervisory

projects . . . required supervision . . . .," (Def. Mem. at 29; Df/Pl. 56.1 Stmt. PP 199-200), (3) the single meeting identified by Plaintiff from which she was excluded [*40] was held during the portion of the workday during which Plaintiff was not at work, (Def. Mem. at 29; Def/Pl. 56.1 Stmt. PP 201-04) and, in any event, her absence was not noted in any of her evaluations or reviews, (Def/Pl. 56.1 Stmt. P 205), and (4) Safrey's comment during a mock interview was simply his observation that the positions for which Plaintiff was applying were full-time and that she might expect questions regarding her ability to work full-time. (Id. P 207). [13] Furthermore, it is undisputed that Safrey had "no role and no involvement in the selection of a candidate" for the position at issue. (Id. P 208). Thus, Plaintiff has failed to demonstrate that she was subjected to sufficiently pervasive or severe conduct, and her hostile work environment claim is dismissed.

> 13   Although Plaintiff also alleges that her 'CA-1' injury claim was not timely filed in November 1999, (Am. Cmplt. P 54), this claim, either on its own or in aggregation with the other allegedly improper conduct, is insufficient to establish the type of pervasive and severe actions that are necessary to support a hostile work environment claim.

[*41]   Insofar as Plaintiff appears to assert claims sounding in retaliation based on these allegations, Plaintiff has offered no evidence indicating that Defendant's proffered legitimate, non-discriminatory explanations are pretextual.

C. Sex-Based Discrimination

Plaintiff contends that the allegedly harassing behavior by the outside contractors, as well as Safrey's response to her complaints about this alleged harassment, created a hostile work environment based upon gender discrimination. A plaintiff asserting a hostile work environment claim must establish (1) "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Feingold, 366 F.3d at 149* (internal quotations and citations omitted), and (2) there exists "a specific basis for imputing the conduct creating the hostile work environment to the employer." Id. Title VII requires a plaintiff to "prove that discriminatory harassment occurred with respect to 'terms, conditions, or privileges' of employment.'" *Kotcher v. Rosa & Sullivan Appliance Ctr., 957 F.2d 59, 62 (2d Cir. 1992)* (quoting, in part, *42 U.S.C. § 2000e-2(a)(1)* [*42] ). "A court should consider the offensiveness of the defendant's conduct, its pervasiveness, and its continuous nature . . . . The incidents must be repeated and continuous; isolated acts or

Case 2:09-cv-04400-ADS -WDW   Document 29-19   Filed 05/16/11   Page 25 of 43

Page 11
2006 U.S. Dist. LEXIS 96040, *

occasional episodes will not merit relief." *Kotcher, 957 F.2d at 62.*

Plaintiff has failed to establish that the October 19, 2000 incident and Safrey's alleged response altered the "compensation, terms, conditions, or privileges" of her employment. *42 U.S.C. § 2000e-2(a)(1).* Plaintiff has conceded that neither Safrey nor any other employee ever engaged in any sexually harassing behavior on any other occasion. (Def/Pl. 56.1 Stmt. PP 241-42). It is well-established that "isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atl., 385 F.3d 210, 223 (2d Cir. 2004)*; see also *Holtz, 258 F.3d at 75.* Because the comment was an isolated instance and at most "merely offensive," *Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*, it does not support a hostile work environment claim. Plaintiff's claim is therefore dismissed.

[*43] D. Intentional Infliction of Emotional Distress

"Federal employees are restricted to Title VII when complaining of employment discrimination." *Annis v. County of Westchester, 36 F.3d 251, 255 n. 4 (2d Cir.*

*1994) (citing Brown v. General Services Admin., 425 U.S. 820, 835, 96 S. Ct. 1961, 48 L. Ed. 2d 402 (1976)).* Plaintiff, who did not oppose Defendant's motion for summary judgment on this claim, is precluded as a federal employee from asserting employment discrimination claims under state law. See *Rivera v. Heyman, 157 F.3d 101, 105 (2d Cir. 1998)* (applying Brown to Rehabilitation Act claims). Plaintiff's state law claim therefore is dismissed.

IV. Conclusion

For the reasons stated above, Defendant's motion for summary judgment is GRANTED. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Sandra J. Feuerstein

United States District Judge

Dated: June 14, 2006

Central Islip, New York

# Exhibit 80



*JOHN WELCH*
*0366165*
*PACKAGE INSIDE*
*SUPERVISOR*

**Position:**

Operations Supervisors/Managers/unless otherwise listed
Operations Supervisor/Manager

I.E. Supervisor/Manager

**Essential Job Functions:**

**NO** Meet D.O.T. requirements and/or be CDL qualified as required by job assignment
Bend, sit, stoop, crouch, squat, crawl, climb, stand, walk and turn/pivot
Part-time: up to 5 ½ hours per day, 5 days per week
*Yes* Full-time: 9-10 hours per day, 5 days per week — *9hour restriction. No overnight shifts.*
**NO** extended hours may be required as service needs dictate
Report to work on a regular and timely basis
**NO** Ability to work varying shifts and extended hours as business needs dictate
Must be able to travel by car and plane to attend meetings at other locations and call on non-UPS
locations and customers
Must be able to supervise and train employees effectively
Perform office tasks using simple hand grasping, fine hand manipulation and reach associated with
assigned tasks such as paperwork, typing, and/or use of a computer, filing, calculating and use of
telephone
**NO** Lift, lower, push, pull, leverage and manipulate equipment and/or packages weighing up to 70 pounds
**NO** Assist in moving packages weighing up to 150 pounds
**NO** Grasp, reach, and demonstrate activities associated with delivering, loading and unloading packages
including operation of the Delivery Information Acquisition Device (DIAD), the DIAD Vehicle Adapter
(DVA), the In-Vehicle Information System (IVIS) and other hand-held scanning devices – *This task requires*
**?** Meet all requirements to be Power Industrial Truck Operations (PITO) certified *repetitious lifting.*
– Lift packages to heights above the shoulder and lower to foot level as appropriate
Have a sufficient ability to communicate, through sight, hearing, and/or otherwise, to perform assigned
tasks and maintain proper job safety conditions
– Work in an environment with:
variable temperatures and humidity
exposure to dust, dirt, and noise
enclosed work area
outside inclement weather
elevated heights and uneven work surfaces
Work cooperatively in a diverse work environment
– Demonstrate cognitive ability to:
follow directions and routines
work independently with appropriate judgment
exhibit spatial awareness
read words and numbers
concentrate, memorize, and recall
identify logical connections and determine sequence of response
processing up to 2-3 steps ahead

*These are
tasks relegated
to bargaining
unit employee.*

- 52 -

*1/1/2008*


RECEIVED 4/12/10

D01032

# Exhibit 81



William E. Violette, Plaintiff-Appellant, v. International Business Machines Corporation, Defendant-Appellee.

No. 96-9078

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

*1997 U.S. App. LEXIS 13823*

June 12, 1997, Decided

**NOTICE:** **[*1]** RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**   Reported in Table Case Format at: *116 F.3d 466, 1997 U.S. App. LEXIS 20230.*

**PRIOR HISTORY:**   Appeal from the United States District Court for the District of Vermont. This cause came on to be heard on the transcript of record from the United States District Court for the District of Vermont (Murtha, C.J.) and was submitted.

**DISPOSITION:**   AFFIRMED.

**COUNSEL:** APPEARING FOR APPELLANT: Richard J. Whitaker, Franklin, New York.

APPEARING FOR APPELLEE: Heather Briggs, Downs Rachlin & Martin, PC, Burlington, Vermont.

**JUDGES:** PRESENT: Hon. John M. Walker, Jr., Hon. Joseph M. McLaughlin, Hon. Fred I. Parker, Circuit Judges.

**OPINION**

**SUMMARY ORDER**

ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of said district court be and it hereby is AFFIRMED.

Plaintiff-appellant William E. Violette appeals from the district court's order dismissing his amended complaint against defendant-appellee International Business Machines Corporation ("IBM"). We review *de novo* the grant of a motion to dismiss. *PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1197 (2d Cir. 1996).*

Appellant argues that **[*2]** the district court erred in determining that he was not a "qualified individual with a disability" as defined in the Americans with Disabilities Act ("ADA"). *See 42 U.S.C. § 12111(8).* We agree with the district court that appellant is not a "qualified individual" within the ADA. Appellant contends, *inter alia,* that his causes of action under the ADA accrued on March 8, 1993 and September 19, 1994. (Appellant's Br. at 8.)

According to appellant's amended complaint, on March 8, 1993 he received a performance evaluation indicating that he "met some or all the requirements" of his job and "improvement may be necessary." (Pl.'s Am. Compl. P 78.) Appellant argues he should have received a higher rating on this particular evaluation. The ADA does not compel an employer to give an employee a particular performance evaluation. *See Wernick v. Federal Reserve Bank of New York, 91 F.3d 379, 384 (2d Cir. 1996)* (discussing reasonable accommodations under

the ADA). IBM "only had an obligation to treat [appellant] in the same manner that it treated other similarly qualified candidates." *Id. at 384-85.* Moreover, appellant's amended complaint states that he was working the eight [*3] hour shift he desired when he received the March 8, 1993 evaluation and that he later received the desired performance evaluation. (Pl.'s Am. Compl. PP 87, 96.) The district court correctly concluded that appellant's amended complaint failed to state a cause of action based on the March 8, 1993 evaluation.

The cause of action based on the alleged "refusal to accommodate" his disability on September 19, 1994 is also defective. His amended complaint states that the appellant "could no longer perform" the essential requirements of his job because of the shift change instituted on September 19. (Pl.'s Am. Compl., Causes of Action PP 4, 5.) This shift change allegedly resulted in appellant's being unable "to pursue any type of employment" and "made it impossible [for appellant] to function in the work place." (Pl.'s Am. Compl. PP 115, 117.) A "qualified individual with a disability" under the ADA is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8).* Since appellant's amended complaint states that he is unable to

perform the essential [*4] elements of his job and is unable to work, he is unable to show that he is "qualified" under *42 U.S.C. § 12111(8).* We agree with the district court that his allegations are inconsistent with maintaining an action under the ADA. *See Wernick, 91 F.3d at 384.*

Appellant does not challenge the district court's determination that if his federal claims were properly dismissed under the ADA, his statutory claims under Vermont law were also properly dismissed. Thus, there is no need for us to separately discuss his state statutory claims because of our agreement with the district court with respect to his federal claims. Appellant's common law claim that defendant created a hostile work environment was properly dismissed by the district court because no cause of action exists at common law. *See Winney v. Ransom & Hastings, Inc., 149 Vt. 213, 214, 542 A.2d 269 (1988)* ("where a statute confers a remedy unknown to common law, and prescribes the mode of enforcing it, that mode alone can be resorted to") (internal quotations omitted).

We have considered all of appellant's contentions on this appeal and have found them to be without merit. For the reasons set forth above, the judgment of the district [*5] court is hereby AFFIRMED.

# Exhibit 82



**DARRYL GODFREY, Plaintiff, -against- NEW YORK CITY TRANSIT AUTHOR-ITY, Defendant.**

02-CV-2101

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 60985*

**August 25, 2006, Decided**
**August 28, 2006, Filed**

**SUBSEQUENT HISTORY:** Vacated by, Remanded by *Godfrey v. N.Y. City Transit Auth., 2007 U.S. App. LEXIS 28674 (2d Cir., Dec. 11, 2007)*

**COUNSEL:** [*1] For Darryl Godfrey, Plaintiff: David George Gabor, Gabor & Gabor, Garden City, NY; Kevin C. Palmeri, Ewing & Palmeri, LLC, Westbury, NY.

For New York City Transit Authority, Defendant: Victor Mitchell Levy, New York City Transit Authority, Brooklyn, NY.

**JUDGES:** DORA L. IRIZARRY, United States District Judge.

**OPINION BY:** DORA L. IRIZARRY

**OPINION**

**MEMORANDUM AND ORDER**

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Darryl Godfrey brings this action against the New York City Transit Authority ("TA") pursuant to the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12112 et seq.;* Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.;* and the New York State Executive Law *§ 296* ("New York State Human Rights Law") alleging that he was discriminated against when his application for a position as a revenue collecting agent was put on medical hold for twelve weeks due to a hearing impairment which is correctable by a hearing aid. Presently before this court is defendant's motion for summary judgment. For the reasons set forth below, defendant's motion for summary judgment is granted.

**[*2] Background**

Plaintiff applied for the position of revenue collecting agent with the TA in the year 2000. (Levy Decl. Ex. C 27-31.) A revenue collecting agent is an armed security guard whose duties include collection and transportation of revenue and revenue related items, driving armored cars engaged in the transportation of such revenue, and providing security for TA workers engaged in the repair of Metro-Card vending machines. (Levy Decl. Ex. C 12-13.) Plaintiff was interviewed by Henry D'Amato who found plaintiff qualified to proceed through the other phases of the application process. (Levy Decl. Ex. C 28-30.) At the time of the interview, Mr. D'Amato was aware that the plaintiff wore a hearing aid. (Levy Decl. Ex. C 34-35; Ex. D 63.)

Plaintiff claims that the hearing aid corrects his hearing impairment to the extent that he can perform all the essential functions of revenue collecting agent. (Levy Decl. Ex. C 125-126.) Plaintiff has stated that he has worked as a security guard, armed courier, air courier, and driver and, since the filing of this motion, has been employed as a security guard for the Port Authority. (Levy Decl. Ex. d 21-30.) Plaintiff asserts that wearing [*3] a hearing aid has never interfered with his ability to do any of these jobs. (Levy Decl. Ex. D at 125.)

After D'Amato interviewed plaintiff, TA supervisor Valerie Blakes helped plaintiff apply for a New York City pistol license. (Levy Decl. Ex. C. 30; 34-35; Ex. D 65.) After two months had elapsed without word from the TA, plaintiff contacted Ms. Blakes who informed

Case 2:09-cv-04400-ADS -WDW   Document 29-19   Filed 05/16/11   Page 33 of 43

Page 2
2006 U.S. Dist. LEXIS 60985, *

him that there was a problem with his pistol application. (Levy Decl. Ex. D 67.) Apparently, the plaintiff, in his attachments to his application, alluded to being terminated from a prior job based upon an accusation that he had engaged in employee theft. (Levy Decl. Ex. D 67-71.) Both Mr. D'Amato and Ms. Blakes met with the plaintiff for a second interview and asked him to submit a letter explaining the circumstances of his previous termination. (Levy Decl. Ex. D 71-76.)

Approximately one month after plaintiff received his pistol license, he received a letter from the TA instructing him to appear at the TA medical department to provide a urine sample for a drug screening. (Levy Decl. Ex. D 79-82.) After plaintiff passed the drug test, the TA instructed him to return to the medical department to complete his medical examination. [*4] (Levy Decl. Ex. D 83.) Plaintiff appeared for this examination and was given a variety of tests which included a hearing exam. (Levy Decl. Ex. D 83-85.) Since the TA does not have the equipment to perform a hearing test for an individual wearing a hearing aid, the TA informed the plaintiff that he needed to have his own audiologist conduct the hearing test (Levy Decl. Ex. I 23-34; M; D 86-89; 95-96). On March 1, 2001, the plaintiff was placed on medical hold until the results of his aided hearing test could be evaluated to determine whether he met the medical standards for a revenue collecting agent. (Levy Decl. Ex. D 83; 89.)

At the time plaintiff was applying for the revenue collecting agent position, the TA was in the process of developing a job profile detailing the physical requirements needed for the position. (Levy Decl. Ex. I 14-15.) On March 5, 2001, plaintiff brought the results of his aided hearing test to the TA medical center. (Levy Decl. Ex. D 101.) However, despite the results of the aided hearing test, the plaintiff was kept on medical hold while the TA Medical Department determined whether it needed to conduct a practical field test (done in an actual work setting) [*5] to determine whether the plaintiff's hearing impairment would create a danger to him or the public or affect his ability to perform the duties of a revenue collecting agent. (Levy Decl. Ex. I 27-28; Clarke-Belgrave Aff. 4-5.) On May 24, 2001, after being on medical hold for approximately twelve weeks, the TA concluded that the job profile for a revenue collecting agent was not likely to be approved soon and therefore deemed the plaintiff medically qualified on May 24, 2001. (Ex. G.)

Although plaintiff was deemed medically qualified, he was required to take a second drug test because the first test was no longer valid--thirty days had passed since it was conducted. (Levy Decl. Ex. I 54.) The TA left the plaintiff several telephone messages in late May and early June notifying him that he needed to report to the TA medical center for a second drug test. (Levy Decl. Ex. D 115-117; Ex. F.) The TA also sent plaintiff a letter on June 12, 2001 requesting that he report to the TA medical center on June 25, 2001. (Levy Decl. Ex. H; Ex. D 118-120.) The plaintiff failed to respond. In early September, plaintiff was again contacted by the TA and was asked to report to take another drug test. [*6] (Levy Decl. Ex. D 121-124.) However, despite the efforts of the TA to conduct a second urine test, the plaintiff failed to show up and did not try to contract the TA. (Levy Decl. Ex. D 117-123.) At no time was the plaintiff ever told that he was medically unfit for a position with the TA. (Levy Decl. Ex. D 125.)

On June 18, 2001, plaintiff filed a charge with the New York State Division of Human Rights ("SDHR") alleging that the TA discriminated against him based on his hearing disability (Levy Decl. Ex. B.) On May 15, 2002, the case was dismissed by the SDHR, at the plaintiff's request, for administrative convenience. (Levy Decl. Ex. E.) On October 24, 2002, the United States Equal Employment Opportunity Commission issued plaintiff a right to sue letter. (Levy Decl. P 21.) On April 8, 2003, the plaintiff filed this action under the ADA, Title VII, and the New York States Human Rights Law alleging disability discrimination. (Levy Decl. Ex. A.)

Discussion

Summary Judgment is appropriate "where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and [*7] that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The court must view all facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (citing *Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-159, 90 S. Ct. 1598, 26 L. Ed 2d 142 (1970)*). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson, 477 U.S. at 247-248.*

Although Defendant's summary judgment motion is unopposed and the facts stated in the Defendant's Local Rule 56.1 statements are deemed admitted for the purpose of this motion, the moving party must still meet its burden of demonstrating that no material issue of fact exists. *Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 1998)* (citing *Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*). Additionally, each of the facts in Defendant's 56.1 statement [*8] must also be followed by citation to evidence which would be admissible, as required by *Fed. R. Civ. P. 56(e). See also,*

*E.D.N.Y. Local Civ. R. 56.1(d)*. "Thus, it is clear that even when a non-moving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 1998)*. "Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statements of undisputed facts contained in the moving party's Rule 56.1 statement." *Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241 (2d Cir. 2004)*. If the evidence in support of the summary judgment motion does not meet this burden, summary judgment must be denied *"even if no opposing evidentiary matter is presented." Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 1998)* (emphasis in original).

### [*9] I. Disability Discrimination Claim

The ADA prohibits discrimination against qualified individuals with a disability. *Sutton v. United Air Lines, 527 U.S. 471, 476, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)*. A plaintiff who alleges employment discrimination under the ADA bears the initial burden of showing a prima facie case. *See Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869 (2d Cir. 1998); Wernick v. Federal Reserve Bank of N.Y., 91 F.3d 379, 383 (2d Cir. 1996)*. To establish a prima facie case of discrimination under the ADA a plaintiff must show: (1) the employer is subject to the ADA (2) he is an individual with a disability within the meaning of the ADA; (3) he is otherwise qualified to perform the essential functions of the job; and (4) he suffered an adverse employment action because of the disability. *See Ryan, 135 F.3d at 869-870; Wernick, 91 F.3d 379 at 383; Miller v. Taco Bell Corp., 204 F.Supp.2d 456, 458 (E.D.N.Y 2002)*. Defendant argues that it is entitled to summary judgment because plaintiff is not disabled under the ADA and has not suffered an adverse employment [*10] action.

### A. Disability under the ADA

The ADA defines "disability" as either: (A) a physical or mental impairment that substantially limits one or more of an individual's major life activities; (B) a record of such impairment; or (C) being regarded as having such impairment. *42 U.S.C. § 12102(2); Sutton, 527 U.S. at 478*.

### 1. Impairments that Substantially Limit Major Life Activities

In the present case, the plaintiff's impairment did not substantially limit a major life activity. When determining whether a plaintiff suffers a disability under the first subsection of the ADA's definition, the court must use a three step approach. *See Bragdon v. Abbot, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998); Colwell v. Suffolk County Police Department, 158 F.3d 635, 641 (2d Cir.1998)*. The court must first determine whether the plaintiff suffers from an impairment. *Id.* Second, the court must ascertain whether the life activity identified by the plaintiff constitutes a "major life activity". *Id.* Third, the court must determine whether the plaintiff's impairment "substantially limits" the major [*11] life activity he has identified. *Id.*

In the present case the plaintiff's hearing condition is a physical impairment. Under the ADA, "impairment" includes any physiological disorder or condition that affects the body systems, including the special sense organs. *29 C.F.R. § 1630.2(h)(1); see Taco Bell, 204 F.Supp. 2d at 459*. The plaintiff's hearing deficiency is a physiological disorder which affects a special sense organ (the ear) and is therefore considered an "impairment" under the ADA.

It is also apparent that hearing is considered a "major life activity" under the ADA. The EEOC regulations define "major life activity" to include functions such as caring for oneself, performing manual tasks, seeing, *hearing,* speaking, breathing, learning, and working. *29 C.F.R. § 1630.2(i); see Sutton, 527 U.S. at 480* (emphasis added).

Whether a plaintiff's impairment "substantially limits" a major life activity is a fact-specific inquiry. *Colwell, 158 F.3d at 643*. The term "substantially limits" means either that a person is unable to perform a major life activity that the average person [*12] in the general population can perform or that a person is significantly restricted as to the condition, manner, or duration under which the activity may be performed when compared with the condition, manner or duration under which the average person in the general population can perform the same life activity. *29 C.F.R. § 1630.2(j)(1)*. Some factors that courts consider when determining whether a limitation is substantial are the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact resulting from the impairment. *29 C.F.R. § 1630.2(j)(2); See also Ryan, 135 F.3d at 870-72* (applying the three factors). When determining whether an individual is disabled under the ADA, the court must consider his condition as he functions with the use of corrective and mitigating measures. *See Sutton, 527 U.S. at 475* (holding that when determining whether vision impairment is a deficit the determination should be made with reference to eyeglasses and contact lenses); *Taco Bell, 204 F.Supp.2d at 463* (holding that the court must consider plaintiff's condition [*13] as she functions with the use

of lip reading and her hearing aid). In *Taco Bell,* the court held that there was a triable issue of fact as to the issue of substantial limitation when the plaintiff's treating physician offered evidence that the plaintiff could not hear complete words or sentences even with the help of her hearing aids and lip reading. *204 F.Supp. 2d at 463.*

In the present case, the plaintiff's hearing impairment does not substantially limit his ability to hear since his impairment is corrected with a hearing aid. This case is distinguishable from *Taco Bell* because the plaintiff does not present any medical evidence that his ability to hear is substantially limited with his use of a hearing aid. Plaintiff has actually represented that by using a hearing aid his life is not substantially limited. Plaintiff states that his hearing impairment has never interfered with his ability to perform the job functions required by his various security jobs (Levy Decl. Ex. D 125-126). Indeed, plaintiff currently works as a security guard for the Port Authority where his responsibilities include reporting suspicious activity and listening to the police radio. (Levy [*14] Decl. Ex. D 22-23). Not only is the plaintiff able to work as a security guard but in 2003 and 2004 he was able to work extensive amounts of overtime in that capacity. (Levy Decl. Ex. D 26-27). In addition to his job with the Port Authority, the plaintiff also works a second part time job every other weekend for a private security service. (Levy Decl. Ex. D 25-30). As an armed guard, plaintiff also described his previous job responsibilities as including the ability to maintain communication with eyes and ears in order to prevent an ambush (Levy Decl. Ex. D 35-36). Therefore, there is no triable issue of fact as the whether the defendant's hearing impairment substantially limits the major life activity of hearing. It simply does not.

## 2. Record of Impairment

Plaintiff may have a claim if he can show that an employer relied upon plaintiff's past record of an impairment to discriminate against him. *See 42 U.S.C. § 12102(2)(B)*; *Colwell, 158 F.3d at 645.* This standard is satisfied if a past record indicates that the plaintiff has or had an impairment that would substantially limit one or more major life activities. *Id.* In this case, [*15] plaintiff fails to present any evidence that the TA relied on a past record of plaintiff's disability when it placed him on medical hold. The basis of the TA's medical hold was the result of a hearing test administered by the TA and an aided hearing test administered by the plaintiff's own doctor. (Levy Decl. Ex. D 83-85; 89; 95-96.) Therefore, plaintiff has failed to show that the TA relied on a past record of disability establishing an actionable discrimination claim under the ADA.

## 3. Regarded As Impaired

An employer's perception of whether a plaintiff is disabled can also establish a viable disability claim under the ADA. *Colwell, 158 F.3d at 646.* The employer must have regarded the plaintiff as disabled, that is, as having had an impairment that substantially limits a major life activity. *Id.* In this context the ADA applies in two situations: (1) when an employer mistakenly believes that a person has a physical impairment that substantially limits a major life activity, or (2) when an employer mistakenly believes that an actual non-limiting impairment substantially limits a major life activity. *Sutton, 527 U.S. at 489.* In other words [*16] it is not enough for the employer to believe that a plaintiff is impaired. An employer must also believe that the plaintiff has an impairment that substantially limits a major life activity.

Although working is considered a major life activity, a plaintiff must show that he was perceived to be incapable of working in a "broad range of jobs" in order to prove that he was "substantially limited" in this major life activity. *Sutton, 527 U.S. at 491*; *Murphy v. United Parcel Service, 527 U.S. 516, 523, 119 S. Ct. 2133, 144 L. Ed. 2d 484 (1999)*; *Colwell, 158 F.3d at 647*; *Ryan, 135 F.3d at 872.* Thus to be regarded as substantially limited in the major life activity of working, a plaintiff must be regarded as unable to perform more than one particular job. *Sutton, 527 U.S. at 492*; *Murphy, 527 U.S. at 523.* If other employment opportunities utilizing an individual's skills are available, the individual is not precluded from a broad range of jobs and therefore is not regarded as having an impairment that substantially limits its major life activity. *Sutton, 527 U.S. at 492.* [*17]

Although the plaintiff was put on medical hold, this does not create a genuine issue of material fact as to whether he is regarded as disabled. The TA never medically disqualified the plaintiff from the position of revenue collecting agent. (Levy Decl. Ex. D 125.) The plaintiff was merely put on medical hold while the TA determined whether it was necessary to give him a practical field test, as it does for other TA positions that are sought by people with hearing impairments. (Levy Decl. Ex. I 27-29; 43.) In the end, plaintiff was not required to take a practical field test and he was deemed medically qualified for the position of revenue collection agent. (Levy Decl. Ex. G.) Plaintiff was never offered the revenue collecting agent position only because he never took his final drug test despite repeated requests from the TA that he do so. (Levy Decl. Ex. D 121-124.) The TA's release of the medical hold on plaintiff's application indicates that the TA did not regard him as substantially limited in his ability to work as a revenue collecting agent.

## B. Adverse Employment Action

Assuming arguendo that the plaintiff is disabled under the ADA, his claim would still fail because [*18] he

did not suffer an adverse employment action. Since the ADA is part of the same broad framework as other anti-discrimination acts, such as the ADEA and Title VII, it is subject to the same analysis. *Picinich v. United Parcel Service, 2005 U.S. Dist. LEXIS 38212, at *81 n.6 (N.D.N.Y. Dec. 23, 2005)* (citing *Miller v. Public Storage Management, Inc., 121 F.3d 215, 218 (5th Cir. 1997)*).

A plaintiff suffers an adverse employment action when there is a materially adverse change in the terms and conditions of employment. *Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002).* The Second Circuit has defined an adverse employment action broadly to include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001)* (quoting *Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)).* However, not every unpleasant incident is an adverse employment action. *Ongsiako v. City of New York, 199 F.Supp 2d 180, 186 (S.D.N.Y. 2002)* (internal quotations and citations omitted). A minor stumbling **[*19]** block toward securing future employment is not an adverse employment action. *See Wanamaker v. Columbian Rope Company, 108 F.3d 462, 466 (2d Cir. 1997)* (finding that barring a terminated employee from using an office and phone to conduct a job search is a mere stumbling block). Courts have also held that a mere delay in the terms or conditions of employment is insufficient to establish an adverse employment action. *See Galabya v. New York City Board of Education, 202 F.3d 636, 640 (2d Cir. 2000)* (delay in reassignment does not constitute an adverse employment action); *see also Davis v. City University of New York, 1996 U.S. Dist. LEXIS 6345 (S.D.N.Y. 1996)* (defendant's delay in granting plaintiff tenure was insufficient to establish an adverse employment action when the plaintiff eventually received the promotion).

In *Rivera v. The City of New York, 392 F.Supp. 2d 644, 654 (S.D.N.Y. 2005)*, the court stated that there was no adverse employment action when the New York City Police Department found a plaintiff psychologically disqualified for police work but later reinstated him as an eligible police officer candidate **[*20]** three years later. The present case is analogous to *Rivera* because, in both cases, the plaintiff was temporarily denied a job but was eventually found to be qualified. However, the present claim is weaker than that in *Rivera* because here the plaintiff was never actually medically disqualified and was only placed on medical hold for twelve weeks. (Levy Decl. Ex. D 125.) At worst, the twelve-week medical hold was a minor stumbling block and not an adverse employment action on plaintiff's way toward obtaining a position as a TA revenue collecting agent. Moreover, the only obstacle preventing plaintiff from obtaining the position was the administration of a drug

urine test, which plaintiff did not take despite the TA's repeated requests that he do so.

## II. Improper Medical Examination Claim

The plaintiff also claims that the TA's requirement of a medical examination violates the ADA which prohibits a covered entity from requiring a medical examination and making inquiries regarding the nature or severity of an employee's disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity. *42 U.S.C. § 12112 (d)(4)(A)* **[*21]** .

In proving business necessity, an employer cannot show simply that an inquiry is beneficial to its business, but rather must demonstrate that the alleged "business necessity" is vital to the business. *Conroy, 333 F.3d 88, 97.* The Second Circuit noted in *Conroy* that the "employer must also show that the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary. The employer does not need to show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal." *Id at 98.*

In *Shannon v. New York City Transit Authority, 332 F.3d 95, 101 (2d Cir. 2003)*, the court held that when determining whether the requirement of a medical examination violates the ADA "[c]ourts must consider an employer's description of a job's essential functions, including pertinent medical standards." The *Shannon* court found that in the context of driving a bus the ability to differentiate between colors may be deemed essential because a bus driver is responsible **[*22]** for the safety of all of his passengers. *332 F.3d at 103. Shannon* held that employment decisions may be made in the public interest and that the physical qualifications of the transit authority in that case serve that interest. *332 F.3d at 103.*

In the present case the TA's medical examination is job-related and is consistent with business necessity. A revenue collection agent carries a firearm and is charged with protecting TA revenue and personnel. (Levy Decl. Ex. C 12-13.) Therefore, a lot of a revenue agent's time is spent in and around subway stations that are frequently crowded with many passengers and can often be extremely noisy, making it very difficult to hear. This case is similar to *Shannon* because a revenue collection agent with a hearing impairment may be a danger to the public. (Levy Decl. Ex. I 28.) Therefore, it was reasonable for the TA to consider hearing as an essential function of a collecting agent because this would advance its interests in securing the safety of its passengers. (Levy Decl. I 28.) Plaintiff proffered no evidence to show that the

hearing test is more intrusive than necessary. Therefore the TA's requirement **[*23]** of a medical examination does not violate the ADA.

### III. Title VII Disability Claim

Title VII makes it unlawful to refuse to hire an individual because of his race, color, religion, sex or national origin. *42 U.S.C. § 2000e-2(a)(1)*. However, Title VII does not prohibit discrimination based upon disability. *See Julian v. New York City Transit Authority, 857 F.Supp. 242, 250 (E.D.N.Y. 1994)*; *Prince v. Westchester County Department of Health, 1992 U.S. Dist. LEXIS 7717 at *10 (S.D.N.Y. May 27, 1992)*. Therefore, the court dismisses the plaintiff's disability discrimination claim under Title VII.

### IV. State-Law Claim

Under New York law, "disability" is defined more broadly than under federal law. For example, under New York law a plaintiff need not show that his disability "substantially limits a major life activity." *Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001)*. The Second Circuit has held that "'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York." *Id.* In light of the dismissal of all of the plaintiff's **[*24]** claims under federal law, the court declines to exercise supplemental jurisdiction over his New York state law claims. *Id. at 754-55*. Accordingly, the court dismisses plaintiff's state law claim without prejudice to pursuing that claim in state court.

### Conclusion

For the reasons set forth above, the court grants defendant's motion for summary judgment on plaintiff's ADA and Title VII claims. The court dismisses the remaining state law claim without prejudice.

DATED: Brooklyn, New York

August 25, 2006

DORA L. IRIZARRY

United States District Judge

# Exhibit 83

COPY

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------------X

JOHN WELCH,

                  Plaintiff,


        -against-


UNITED PARCEL SERVICE GENERAL SERVICE

CO., d/b/a UPS,

                Defendant.

Civil Action No. 2:09-4400 (ADS)

-------------------------------------------X


              500 Bi-County Boulevard
              Farmingdale, New York

              February 15th, 2011
              10:07 a.m.


           DEPOSITION of UNITED PARCEL SERVICE GENERAL

SERVICE CO., d/b/a UPS, by IRENE GORDON, a NON-PARTY

WITNESS herein, taken pursuant to the Federal Rules of

Civil Procedure, and Order, held at the above time and

place before Bridget Barbaro, a stenotype reporter and

Notary Public of the State of New York.

# EMERALD-ASSOCIATED REPORTERS, INC.
### 3375 PARK AVENUE
### WANTAGH, NEW YORK 11793
### (516) 783-4311

1                              IRENE GORDON

2    bit more specific than package inside supervisor.

3    Preload supervisor.

4                  If UPS determines that that employee has a

5    temporary disability, what options does the employee have

6    available to him or her?

7         A     Many times they will work within their own

8    restrictions on a temporary basis.  It's not encouraged.

9    We prefer that the employee stays on disability until

10   they can come back to their essential job function.  And

11   in the event that they can't they, you know, want to

12   return to work and they're willing to, on a very limited

13   basis, perhaps -- and again, there are so many different

14   parts of the job.  Are you talking hours restriction, are

15   you talking lifting restriction?  What are you talking?

16   Because there can be so many different things.

17        Q     Okay, lifting restriction.

18        A     Lifting restriction, as in John's case, was

19   not ever going to change.  So specific to John, that was

20   never going to change, it never will change.  So he will

21   always have that restriction, and that was granted.

22        Q     That was granted in 2005?

23        A     Yes.

24        Q     There wouldn't be any consideration of

25   residual duty or short-term disability because this

IRENE GORDON

1

2      supervisor "I've done my eight hours and I have to go

3      home now, I have a restriction."

4            Q      You said that before.  When you say it's

5      the employee's responsibility, does UPS have any

6      responsibility towards the employee to ensure his or her

7      restrictions are being accommodated?

8            A      I would imagine they have to allow that, if

9      they have the restrictions in place.

10                  I really don't know too many people that

11     would make somebody work 14 hours when they physically

12     only can work eight.

13           Q      Besides the employee, who else is

14     responsible to ensure that the restrictions are being

15     accommodated?

16           A      Once it's approved, if it's an ADA

17     accommodation, it really is the employee's responsibility

18     to follow through with that.

19           Q      How is that communicated to the employee?

20           A      They are aware many times in meetings with

21     their immediate supervisors or managers, they are

22     reminded to work within their job descriptions, within

23     their restrictions, sorry, their ADA restrictions.

24                  And I know for a fact that that was often

25     related to John, from his center manager and his division

```
 1                        IRENE GORDON

 2           A     It was the 2010 ADA request.

 3           Q     On behalf of whom?

 4           A     John Welch.

 5           Q     Do you know whether this request was

 6     granted?

 7           A     I do.

 8           Q     And was it?

 9           A     Ultimately, yes.  They ultimately found him

10     a position.

11           Q     Turn to page D01011.  That's the second

12     page.

13                 (The witness complied.)

14           Q     Whose initials appear throughout the

15     document?

16           A     Mine.

17           Q     It says in the upper left-hand column under

18     "activity," "request received by Irene Gordon," correct?

19           A     Correct.

20           Q     Below that it says "see prior file."  What

21     does that mean?

22           A     That means I had already sent out a request

23     to him and it closed, because he didn't respond timely.

24           Q     If you turn to page Bates stamped D01017?

25           A     This one (indicating)?
```

```
 1                        IRENE GORDON
 2           A      Okay.
 3           Q      Does your handwriting appear on this
 4    document?
 5           A      Yes.
 6           Q      Where does it appear?
 7           A      In the comments.  And I closed the file on
 8    3-4-2010.  I have my initials next to "3-4-2010," I
 9    closed the file.
10           Q      Did you reopen the file?
11           A      Yes.
12           Q      How did it come about that you reopened the
13    file?
14           A      John's paperwork showed up one day, I
15    believe.
16           Q      Did you inform him that you were reopening
17    the file?
18           A      Through his attorneys.  Everything went
19    through the attorneys at that point.
20           Q      Is there a procedure to reopen a file, an
21    ADA file?
22           A      Just get the process started again.
23           Q      From where it left off?
24           A      Yes.  I start a new log.
25           Q      And the comments that appear on 3-10-2010,
```