**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
JOHN WELCH,

                Plaintiff,

      -against-

UNITED PARCEL SERVICE INC., d/b/a UPS,

                Defendant.
---------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
09-cv-4400 (ADS)(WDW)

**APPEARANCES:**

**Frank & Associates, P.C.**
*Attorneys for the Plaintiff*
500 Bi-county Boulevard
Suite 112N
Farmingdale, NY 11735
      By:    Neil Frank, Esq.,
              Rashmee Sinha, Esq., of Counsel

**Day Pitney, LLP**
*Attorneys for the Defendant*
One Jefferson Rd.
Parsippany, NJ 07054
      By:    Wendy Johnson Lario, Esq.,
              Kristy L. Grazioso, Esq., of Counsel

**SPATT, District Judge.**

The Plaintiff in this case, John Welch, alleged that his employer, the Defendant United

Parcel Service, Inc. ("UPS"), discriminated against him on the basis of his disability, and also

retaliated against him for complaining about that discrimination. Based on these allegations, the

Plaintiff asserted (1) federal claims under the Americans with Disabilities Act ("ADA"), (2) state

claims under the New York State Human Rights Law ("NYSHRL"), and (3) city law claims

under the New York City Human Rights Law ("NYCHRL"). A trial was held and a mixed

verdict was rendered.  Presently before the Court are several post-trial motions filed by both parties.

## I.  BACKGROUND

### A. <u>Factual Background</u>

This case was initiated by the Plaintiff John Welch in 2009 against his employer, the Defendant UPS.  Welch was hired by UPS in March 1987 as a part-time package loader at its facility in Brooklyn, New York.  Throughout the Plaintiff's long tenure with UPS, only a portion of which is relevant for the legal disputes in this case, the Plaintiff went through a number of transfers to various positions in UPS. These positions included: (1) in March 2005, the Plaintiff was a preload supervisor for UPS's Foster Avenue Facility; (2) in mid-2005, the Plaintiff worked as a P.M. supervisor at the Greenpoint Center; (3) in or about October 2005, the Plaintiff was transferred to Comprehensive Health and Safety Program ("CHSP") Supervisor for its Long Island City facility; (4) in or about October 2006, the Plaintiff was transferred to a position on the Nassau preload; (5) in or about June 2007, the Plaintiff was returned to a position as CHSP Supervisor; (6) in or about June 2008, the Plaintiff conducted driver safety training out of UPS's Nassau facility and was also transferred back to the Nassau preload; and (7) on or about September 6, 2010, the Plaintiff accepted and commenced the preload assist supervisor ("PAS") position, which is the position he held at the time of the trial.

The Plaintiff suffers from various medical conditions, including: (1) hypertrophic cardiomyopathy ("HCM"); (2) bipolar disorder; (3) hiatal hernia; (4) restless leg syndrome ("RLS"); (5) sleep apnea; and (6) depression with post-traumatic stress disorder ("PTSD"). Because of these alleged disabilities, namely the HCM and sleep apena, the Plaintiff made various requests for accommodation under UPS's American Disabilities Act ("ADA")

accommodation policy. His requests for accommodation were as follows: (1) on or around August 23, 2005, the Plaintiff requested an accommodation of no lifting over 30 pounds, light duty, and avoiding extremes of exertion, which UPS claims was satisfied when he was moved to the position of CHSP supervisor in or about October 2005; (2) in 2007, the Plaintiff again requested an accommodation of no lifting over 40 pounds; working shifts of 8 hours or less; and no overnight shifts due to his HCM and sleep apnea, which UPS claims was satisfied when they again returned him to the position of CHSP supervisor in or around June 2007; and (3) in 2010, the Plaintiff requested a third accommodation of no lifting over 20 pounds; no operation of heavy machinery; and no driving of heavy trucks, which UPS claims was satisfied when they put him in the Preload Assist Supervisor ("PAS") position, which he remains in today.

According to the Plaintiff, the numerous transfers, requests for accommodation, and discussions between him and his employer, led to various instances of retaliation and failures to accommodate his disabilities.

**B. Procedural History**

On May 16, 2011, the Defendant moved for summary judgment dismissing all of the Plaintiff's claims, on the grounds that (1) portions of the Plaintiff's claims were barred by the relevant statute of limitations, (2) the Plaintiff did not have a disability (or record of disability) under the ADA, (3) the Plaintiff was not otherwise qualified to perform the essential functions of his job, and (4) the Defendant accommodated the Plaintiff's disability at all times. The Court found there to be genuine issues of material fact in all aspects of the case. Therefore, on September 2, 2011, the Court denied the Defendant's motion for summary judgment.

The trial commenced on September 7, 2011. At the trial, which lasted more than one week, the Plaintiff presented various witnesses in support of his claims. The Plaintiff testified

himself; as well as Dr. Mark Sherrid, John Guest, Rashmee Sinha, Dr. Marcia Knight, and Michael Ridolfi. After the conclusion of the Plaintiff's case, the Defendant moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 50(a), with respect to the Plaintiff's claims of failure to accommodate and retaliation. (See 9/13/11 Tr., 658:9–677:6.) The Court reserved decision on this motion. The Defendant also moved to dismiss the Plaintiff's claim for punitive damages, which the Court denied. The Defendant then presented its case, offering the testimony of various UPS employees; including Irene Gordon, Robert Rizzo, Beverly Riddick, James Kirk, Kevin DiLibero, Christopher Travaglia, David Mazzola, Steven Wiederhold, and Joseph Mero.

On September 23, 2011, the jury rendered a verdict. With regard to the Plaintiff's disability claims, the jury found that: (1) the Plaintiff did not prove that he was an individual with a "disability" within the meaning of the ADA, namely that he had an impairment which substantially limited a major life activity; (2) the Plaintiff did prove that he was an individual with a "disability" within the meaning of the NYSHRL and the NYCHRL; (3) the Plaintiff did prove he was a "qualified individual" within the meaning of the terms as instructed by the Court; (4) UPS failed to accommodate the Plaintiff with regard to his disability and required him to work in a significantly more difficult work area which would adversely affect his physical conditions; but that (5) UPS proved by a preponderance of the evidence that it made a good faith effort to identify and provide the Plaintiff with a reasonable accommodation that would allow him to work within his restrictions. Therefore, the Defendant UPS was successful in defending the Plaintiff's failure to accommodate claims under the ADA, NYSHRL, and NYCHRL.

With regard to the Plaintiff's retaliation claims, the jury found that: (1) the Plaintiff proved that the Defendant required him to work in a significantly more difficult work area which

4

would adversely affect his physical conditions, after he sent a letter to Kevin DiLibero at UPS; had a letter sent to Kevin DiLibero by his attorney; and filed his EEOC complaint; and that (2) the Plaintiff proved that there was a causal connection between the letters sent to DiLibero and the filing of the EEOC complaint and the requirements to work in significantly more difficult work areas. Thus, the Plaintiff was successful under his NYSHRL and NYCHRL retaliation causes of action. As a result, the jury awarded the Plaintiff $200,000 for compensatory damages and no punitive damages.

On October 21, 2011, the Defendant filed the instant motion for judgment as a matter of law and/or a new trial, and the Plaintiff filed a motion for a new trial as well as a motion for attorneys' fees and costs.

## II. DISCUSSION

### A. Legal Standards

#### 1. The Renewed Motion for Judgment as a Matter of Law

In substance, Fed. R. Civ. P. 50(b) provides that if a jury returns a verdict for which there is not a legally sufficient evidentiary basis, the District Court may either order a new trial or direct the entry of judgment as a matter of law. In order to grant a motion for JMOL, there must be a "'complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [and women] could not arrive at a verdict against [it].'" Concerned Area Residents for Environment v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994) (quoting Song v. Ives Lab., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992)); Mattivi v. South African Marine Corp. "Huguenot", 618 F.2d 163, 168 (2d Cir. 1980).

"The same standard that applies to a pre-trial motion for summary judgment pursuant to

Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50." Piesco v. Koch, 12 F.3d 332, 341 (2d Cir. 1993); see also the Advisory Committee Note to the 1991 Amendment of Fed. R. Civ. P. 50. This Rule is well and clearly explained in the seminal case of This Is Me, Inc. v. Elizabeth Taylor, 157 F.3d 139 (2d Cir. 1998). In Taylor, the Court commented that the then recent adoption of the term "judgment as a matter of law" to replace both the term "directed verdict" and the term "judgment N.O.V." was intended to call attention to the close relationship between Rule 50 and 56. 157 F.3d at 142. The Court then went on to explain the basis for granting a post-verdict Rule 50 motion, as follows:

> A district court may not grant a motion for a judgment as a matter of law unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154–55 (2d Cir. 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)) (internal quotation marks omitted). Weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that "a reasonable juror would have been compelled to accept the view of the moving party." Piesco, 12 F.3d at 343.

Id.; see also Fabri v. United Techs. Int'l Inc., 387 F.3d 109, 119 (2d Cir. 2004) (same); Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).

When ruling on a motion for JMOL, the court must "'consider the evidence in the light most favorable to the [non-moving party] and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence.'" Concerned Residents for the Env't v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994), cert. denied, 514 U.S. 1082, 115 S. Ct. 1793, 131 L. Ed. 2d 721 (1995), (quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988)). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S. Ct. 2097 (2000); Meloff v. New York Life Ins. Co., 240 F.3d

138, 145 (2d Cir. 2001). Accordingly, when ruling on a motion brought pursuant to Rule 50, the court may not rule on the credibility of the witnesses or the weight of the evidence. Caruso v. Forslund, 47 F.3d 27, 32 (2d Cir. 1995). Rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury. See Williams v. Cnty. of Westchester, 171 F.3d 98, 101 (2d Cir. 1999).

A JMOL is thus "proper only if 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Fiacco v. City of Rensselaer, 783 F.2d 319, 329 (2d Cir. 1986) (quoting Simblest, 427 F.2d at 4). Such motions "should be granted cautiously and sparingly." 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524, at 252 (1995); Japan Airlines Co. Ltd. v. Port Auth. of New York & New Jersey, 178 F.3d 103, 112 (2d Cir. 1999).

**2. The Motion for a New Trial**

Under Federal Rule of Civil Procedure 59 ("Fed. R. Civ. P. 59" or "Rule 59"), a court "may, on motion, grant a new trial on all or some of the issues — and to any party — . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "'A motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998) (quoting Song v. Ives Labor, Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)). The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive. 12 Moore's Federal Practice, § 59.13[1] at 59-43 (3d Ed. 2005).

In comparison to a Rule 50 motion for judgment as a matter of law, the Second Circuit has held that the standard for a Rule 59 motion in some respects is less onerous for the moving party in two ways: first, "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." <u>DLC Mgmt. Corp</u>, 163 F.3d at 134. Second, in deciding a Rule 59 motion "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." <u>Id.</u> However, the granting of a new trial is an extraordinary relief, and one that "is properly granted only upon a showing of exceptional circumstances." <u>Id.</u> at 391.

## B. <u>As to the Defendant's Motion for Judgment as a Matter of Law</u>

### 1. **NYCHRL Claims**

#### a. **Whether a Rule 50(b) Motion as to the NYCHRL Claims is Proper**

As an initial matter, the Plaintiff argues that UPS is procedurally barred from raising a Rule 50(b) motion in connection with the Plaintiff's NYCHRL claims because the Defendant did not raise this issue in its initial Rule 50(a) motion. According to the Plaintiff, UPS was required to raise the objection that the evidence was insufficient to establish a claim under the NYCHRL at the charging conference, or at the very least, prior to the jury being charged. <u>See</u> <u>Thorsen v. Cnty. of Nassau</u>, 722 F. Supp. 2d 277, 287 (E.D.N.Y. 2010).

In response, the Defendant argues first, that it did raise the applicability of the NYCHRL to the Plaintiff's claims prior to the start of the trial. (9/7/2011 Tr., 11:14–24.) The Court specifically reserved judgment as to the particular issue. Also, the Defendant points out that the Court *sua sponte* raised the issue of whether the NYCHRL could apply to the Plaintiff's allegations, given the fact that the majority of his work for UPS during the relevant time period took place on Long Island. Second, the Defendant asserts that because the applicability of the

NYCHRL to the Plaintiff's claims is a legal question, it is a recognized exception to the bar under Rule 50(b) for failure to preserve a claim. Third, the Defendant claims that declining to rule on this issue would result in a manifest injustice because UPS will be held liable under a law that does not apply to its conduct.

Rule 50(a) provides that, prior to submission of a case to a jury, if a court that "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [a given] issue," it may enter judgment as a matter of law on that issue. Rule 50(a)'s language thus permits a party to make a motion for judgment as a matter of law prior to submission of the case to the jury. Rule 50(b) provides that a party may renew this motion after a verdict. Thus, Rule 50(b) implies that a motion for judgment as a matter of law must be renewed at the close of all the evidence if the moving party wants to obtain such relief should the jury bring in a verdict against him. See Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1155 (2d Cir. 1994) ("The rule is well established that a motion for [judgment as a matter of law] at the close of all the evidence is a prerequisite for [judgment as a matter of law]." (second brackets in original; citation and internal quotation marks omitted)); Pittman by Pittman v. Grayson, 149 F.3d 111, 120 (2d Cir. 1998) ("[T]o be timely, the motion for judgment as a matter of law must be made 'before submission of the case to the jury.'" (quoting Fed. R. Civ. P. 50(a)(2)), cert. denied, 528 U.S. 818, 120 S. Ct. 59, 145 L. Ed. 2d 51 (1999). "But neither the rule nor the note discusses the consequences of failure to comply strictly with the rule." Szmaj v. Am. Tel. & Tel. Co., 291 F.3d 955 (7th Cir. 2002).

Here, it is undisputed that the Defendant did, at a minimum, raise the issue before the jury was instructed and deliberated. It was not presented to the Court as a formal Rule 50(a) motion, but rather, as a motion *in limine*. Specifically, the Defendant's Counsel stated the

following before the Court at a hearing on September 7, 2011, prior to the commencement of the trial:

> The third aspect of this is I understand this discrimination failure to accommodate claim is based on the ADA, the New York State Human Rights Law and the New York City Human Rights Law. However, Mr. Welch worked in New York City only in 2010. Anything prior cannot be covered jurisdictionally by the New York City Human Rights Law. So as a result, that claim has to be limited to the time Mr. Welch was working in Manhattan.…
>
> Again, but I want to be clear, clearly it's in the statute as well as the case law in that regard.

(9/1/2011 Tr., 11:14–22; 12:3–5.) However, the Court reserved judgment on the issue. (See 9/7/2011 Tr., 11:23-24 ("THE COURT: But I'm not going to that now, that will all come later, of course. . . . When I give instructions to the jury, we will get into that.").)

On one hand, the Court could find that the Defendant is not procedurally barred from now asserting this argument again by a Rule 50(b) motion because the arguments were somewhat raised prior to deliberations and it was the Court's decision to not explore the merits at that time. Cf. Roberts v. Nat'l R.R. Passenger Corp., Nos. 04 Civ. 1318, 04 Civ. 1622, 04 Civ. 2195, 2006 WL 2621733, at *4 (D. Conn. Sept. 12, 2006) ("Amtrak is not precluded by the asserted failure to move at the end of the case. It noted its intent to move as required by Rule 50 of the Federal Rules of Civil Procedure, and the Court noted its awareness of the basis for the motion and reserved judgment. The lack of a detailed recitation of the grounds for the motion was due to the Court's intervention, to which O & G took no exception."); Skrundz v. Pabey, No. 05 Civ. 188, 2009 WL 1704687, at *1 (N.D. Ind. June 17, 2009) ("Rule 50 allows a court to enter judgment as a matter of law when the motion is first offered or to reserve judgment on the motion until after a jury has returned its verdict."); John M. Floyd & Assocs., Inc. v. Ocean City Home Bank, No. 03 Civ. 1473, 2008 WL 4534079, at *2 (D.N.J. Oct. 2, 2008) ("Once the Court

denies or reserves judgment on the initial motion under Rule 50(a), the party may renew its

motion after the jury has returned a verdict.  Fed. R. Civ. P. 50(b).").  As explained by Judge

Block:

> A Rule 50(b) motion "is limited to those grounds that were specifically raised in the prior [Rule 50(a) motion]."  <u>Tolbert v. Queens College</u>, 242 F.3d 58, 70 (2d Cir. 2001).  Pursuant to this specificity requirement, the Rule 50(a) motion "must at least identify the specific element that the defendant contends is insufficiently supported."  <u>Galdieri-Ambrosini v. National Realty & Dev. Corp.</u>, 136 F.3d 276, 286 (2d Cir. 1998).  The purpose of the specificity requirement is "so that the responding party may seek to correct any overlooked deficiencies in the proof."  <u>Id.</u> (quoting Fed. R. Civ. P. 50 Advisory Committee Note (1991)).

<u>Drake v. Delta Air Lines, Inc.</u>, No. 94 Civ. 5944, 2005 WL 1743816, at *1 (E.D.N.Y. July 21,

2005).  Therefore, it is possible to view the Defendant's *in limine* motion as a vehicle through

which it identified the specific element that it believed would be unsupported and provided the

Plaintiff with an opportunity to correct this asserted deficiency in proof at the trial.

On the other hand, the Defendant's counsel raised the issue at the commencement of the

trial, without any formal motion based on the insufficiency of evidence as a matter of law at the

close of the Plaintiff's case.  <u>Cf. Siracuse v. Program for the Dev. of Human Potential</u>, No. 07

Civ. 2205, 2012 WL 1624291, at *2 (E.D.N.Y. Apr. 30, 2012) ("Satisfying the requirements of

Rule 50(a), defendant specified that it sought to have the action 'dismiss[ed] for insufficiency of

the evidence as a matter of law' . . . , and detailed the facts that it contended supported such a

judgment. . . .   In regard to plaintiff's NYCHRL claim specifically, defendant argued that

'there's insufficiency of evidence in general to support that her health was a reason [for the non-

promotion], because the defendant has put forth a legitimate reason.' . . . Accordingly,

defendant's Rule 50(b) motion currently pending before this Court is procedurally proper").  In

the Court's view, this conduct does not technically comply with the letter of Rule 50.

Many circuits have taken a forgiving view of certain violations of the renewal requirement.  See, e.g., Giles v. General Electric Co., 245 F.3d 474, 481-83 (5th Cir. 2001); Taylor Publishing Co. v. Jostens, Inc., 216 F.3d 465, 472-73 (5th Cir. 2000); Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 129 (2d Cir. 1999); Alcatel USA Inc. v. DGI Technologies, Inc., 166 F.3d 772, 781 (5th Cir. 1999); Singer v. Dungan, 45 F.3d 823, 829 (4th Cir. 1995); Keisling v. SER-Jobs for Progress, Inc., 19 F.3d 755, 759 (1st Cir. 1994); Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1173-74 (3d Cir. 1993).

For instance, one district court in Virginia clarified that it had effectively excused the Defendant from formally making a Rule 50(a) motion at the close of all the evidence, because it had been made clear upon ruling on Plaintiff's motion for a directed verdict at the close of all the evidence, that the matter contained sufficient factual concerns for the jury to consider.  See Cretella v. Kuzminski, 640 F. Supp. 2d 741, 755 (E.D. Va. 2009).  In other words, there are certain courts that have found that the "spirit of the procedural requirements were met" (see id.), so that it was proper to review a subsequent Rule 50(b) motion, despite a failure to comply with the procedural requirements of raising a formal motion at the close of all evidence.  See Singer v. Dungan, 45 F.3d 823, 829 (4th Cir. 1995).

However, not all courts have been so lenient.  In 2009, the Tenth Circuit found that because the Defendant did not assert its arguments in a Rule 50(a) motion at the close of the Plaintiff's case-in-chief, it was precluded from relying on them as a basis for Rule 50(b). See M.D. Mark, Inc. v. Kerr–McGee Corp., 565 F.3d 753, 762–65 (10th Cir. 2009).

This case presents a somewhat unusual situation.  Typically, cases to have addressed whether the procedural requirements of a Rule 50(b) motion have been met, have dealt with the situation where a Rule 50(a) motion was made but either (1) the Judge reserved decision; or (2) it

did not contain the same arguments that are raised in the subsequent Rule 50(b) motion. As to (1), the Second Circuit has held that "where the trial judge has indicated that renewing a previously made motion for judgment as a matter of law at the close of all the evidence was not necessary, and where the opposing party could not reasonably have thought that the motion was dropped, then judgment as a matter of law may be sought post-verdict." See Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008). As to (2), it is clear in this Circuit that "[a] Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a JMOL argument based on the latter." Lore v. Cit of Syracuse, 670 F.3d 127, 152 (2d Cir. 2012). Here, this case represents a combination of these concepts: this Court did reserve decision as to the applicability of the NYCHRL claims, but that applicability was not raised in an initial Rule 50(a) motion. Thus, the question presented is what the Court should do when the arguments were raised to the Court before the case is submitted to the jury but not by a formal Rule 50(a) motion.

The rationale behind the renewal requirement is to provide "the requisite opportunity to cure any perceived deficiency in her proof before the case was submitted to the jury." Lore v. City of Syracuse, 670 F.3d 127, 153 (2d Cir. 2012) ("The principal purpose of the requirement that any such motion be made before the case is submitted to the jury is 'to assure the responding party an opportunity to cure any deficiency in that party's proof.'") (quoting Piesco v. Koch, 12 F.3d at 340).

Here, the Court finds that pursuant to the letter of Fed. R. Civ. P. 50(b) and the relevant case law, because the Defendant only raised the issue of the applicability of the NYCHRL at a pre-trial conference and again in the middle of jury deliberations (9/22/11 Tr., 1533-1536), but did not raise the issue in its Rule 50(a) motion, the present 50(b) is procedurally improper. Cf.

Bracey v. Board of Educ. Of City of Bridgeport, 368 F.3d 108 (2d Cir. 2004) (not addressing the Rule 50(b) motion on appeal because the Board never filed a Rule 50(a) motion, but also appeared to not have raised the arguments in any other vehicle). It is an unfair result and contravenes the purposes of Rule 50 to allow the Defendant to raise an issue before the Plaintiff has even put on his case, and then not renew that contention regarding the sufficiency of the evidence after the Plaintiff has actually presented his proof. Such a finding would undermine the requirement that a Defendant identify the specific element that is unsupported and question the sufficiency of the evidence that was presented; and then afford the Plaintiff an opportunity to remedy any defect.

However, the Second Circuit has created an exception, holding that a court "may grant judgment as a matter of law where no Rule 50 motion was made, if necessary to prevent 'manifest injustice.'" Stephenson v. Doe, 332 F.3d 68, 76 (2d Cir. 2003) (citing Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 129 (2d Cir. 1999); Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 164 (2d Cir. 1998)). Hence, this Court may nevertheless grant judgment as a matter of law to prevent "manifest justice" when the jury's verdict is "wholly without legal support". See Scott v. Rosenthal, 53 Fed. App'x 137, 140 (2d Cir. 2002). The cases have provided little guidance on what constitutes "manifest injustice" in this context, but rather appear to focus on the specifics of each fact pattern. Id. Of course, a defendant may not merely argue that the procedural bar should be waived because they should win on the underlying motion. "Such an argument would, of course, obviate the need for the procedural requirement in the first place." Health Alliance Network, Inc. v. Continental Cas. Co., 245 F.R.D. 121, 124 (S.D.N.Y. 2007). However, "where the argument presents a question of law and there is no need for additional

fact-finding", and manifest injustice may arise, then exercise of this discretion is warranted. See Malmsteen v. Berdon, LLP, 369 Fed. App'x 248, 251 (2d Cir. 2010).

Here, because the Court finds that manifest injustice would occur if a verdict as to the NYCHRL is permitted to stand, as explained further below, then this a basis under which the Court may permit the filing of a Rule 50(b) motion. See Ramos v. Co. of Suffolk, 707 F. Supp. 2d 421, 426 (E.DN.Y. 2010) (Spatt, J.) ("As discussed above, the Second Circuit has held that a failure to move for judgment as a matter of law prior to submission to the jury is not a per se bar to a later motion for the same relief."). This is not the type of situation where the Court has concerns that it "must give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses. . . ." Kinneary v. City of New York, 601 F.3d 151, 155 (2d Cir. 2010) (quoting Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008)). There are no factual disputes or credibility determinations whatsoever as to the applicability of the NYCHRL. Rather, the plain issue is whether the Plaintiff's claimed contact with New York City is sufficient, as a matter of law, to warrant recovery under the NYCHRL. In the Court's view, it would result in manifest injustice if UPS is held liable under a law which, based upon the evidence, does not apply to its conduct. Moreover, it would result in manifest injustice if the Plaintiff is permitted to recover damages and fees under a law under which he is not entitled to recovery. Accordingly, the Court will now rule on this aspect of the Defendant's Rule 50(b) motion.

### b. NYCHRL Retaliation

The Defendant contends that even if it is assumed that the Plaintiff was retaliated against in violation of the NYCHRL, the Defendant is nevertheless entitled to judgment as a matter of law in connection with the NYCHRL claims because the Plaintiff was never assigned to a more

difficult work environment within the five boroughs during the relevant statutory time period. Quite simply, UPS argues that the record is devoid of any factors or evidence that could support a finding that Welch felt the impact of UPS's alleged retaliation within the five boroughs.

Title 8 of the New York City Administrative Code makes it unlawful for an employer to discharge from employment, or to discriminate against in compensation or in the terms, conditions or privileges of employment, any person based on their "actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status". N.Y.C. Admin. Code § 8–107(1)(a). To succeed on a claim under the NYCHRL, a plaintiff must prove that the defendant discriminated against him "within the boundaries of New York City". Shah v. Wilco Sys., Inc., 27 A.D.3d 169, 175, 806 N.Y.S.2d 553, 558 (1st Dep't 2005); Fried v. LVI Servs., Inc., No. 10 Civ. 9308, 2011 WL 4633985, at *12 (S.D.N.Y. Oct. 4, 2011) ("The NYCHRL expressly limits the applicability of its protections to acts that occur within the boundaries of New York City.") (citing N.Y.C. Admin. Code § 2–201). "[T]o determine the location of the discrimination under the NYCHRL, courts look to the location of the impact of the offensive conduct." Curto v. Med. World Commc'ns, Inc., 388 F. Supp. 2d 101, 109 (E.D.N.Y. 2005). As the New York Court of Appeals recently held, "the impact requirement is relatively simple for courts to apply and litigants to follow, leads to predictable results, and confines the protections of the NYCHRL to those who are meant to be protected — those who work in the city." Hoffman v. Parade Publ'ns., 15 N.Y.3d 285, 290–91, 907 N.Y.S.2d 145, 933 N.E.2d 744 (2010) (emphasis added).

Here, it is undisputed that the Plaintiff is a non-resident of New York City. Thus, the Plaintiff necessarily needed to establish at the trial that he felt the impact of the Defendant's alleged retaliation within the boundaries of New York City.

In the Plaintiff's opposition papers, he does not specifically argue that there was any evidence presented at trial that would establish that he felt the impact of the Defendant's alleged retaliation within New York City. Rather, his post-trial memorandum merely recounts the following facts elicited from Welch's testimony. From January to October 2006, prior to the relevant time period, the Plaintiff worked as a supervisor in the comprehensive health and safety program ("CHSP") in Maspeth, Queens. (9/7/2011 Tr, 131; 138; 9/8/2011 Tr., 253:8–19.) In October 2006, Welch was reassigned to work as a supervisor at the Nassau preload. (9/7/2011 Tr., 139.) Then from July to December 2007, he worked as a supervisor in the CHSP in Melville, New York. (9/7/2011 Tr., 146–47.) Thus, the only instances of the Plaintiff conceivably feeling the impact of the Defendant's alleged retaliation are: (1) at a meeting in Brooklyn on June 20, 2008, DiLibero, UPS' employee relations manager, told Welch that his allegations of discrimination were "false" (9/8/2011 Tr., 169:9–17) and that he was going to be "reassigned to the preload operation, the very operation [Welch] was taken from prior to that because it did not meet [his] restrictions" (9/8/2011 Tr., 170:5–24); and (2) that the Plaintiff worked at the Foster Avenue facility in Brooklyn for two days during the Jewish holidays in September 2009, during which time he delivered packages that exceeded the weight restrictions imposed by his physicians (9/8/2011 Tr., 192:1–18.)

As for the June 2008 meeting, as previously stated, it is the impact of the adverse action, not the location where acts leading to the discrimination occur, that gives rise to a claim under the NYCHRL. See Shah, 27 A.D.3d at 176, 806 N.Y.S.2d at 558 ("[T]he locus of the decision to terminate here is of no moment. What is significant is where the impact is felt. Thus, even if the termination decision had been made in New York City, the NYCHRL would not apply since its impact on her occurred in New Jersey, not within the five boroughs."); Salvatore v. KLM Royal

Dutch Airlines, No. 98 Civ. 2450, 1999 WL 796172, at *16 (S.D.N.Y. Sept. 30, 1999) ("The fact that certain acts leading to discrimination may occur in New York City will not necessarily give rise to a claim under the [NYCHRL].").

Although the decision to reassign the Plaintiff was communicated to him at a meeting that was held within the boundaries of New York City, Welch felt the impact of this retaliation through the actual reassignment to Nassau County. See Duffy v. Drake Beam Morin, Harcourt Gen., Inc., No. 96 Civ. 5606, 1998 WL 252063, at *11 (S.D.N.Y. May 19, 1998) ("To hold otherwise would be to expand the [NYCHRL] to cover any employee who is fired pursuant to a decision handed down by an employer from its New York City headquarters, no matter where the employee in question actually works."); Lightfoot v. Union Carbide Corp., No. 92 Civ. 6411, 1994 WL 184670, at *5 (S.D.N.Y. May 12, 1994) (dismissing NYCHRL claim where the employer's early retirement plan was "approved at a meeting in New York City," because "[i]ts impact on [plaintiff] ... occurred while he was employed in Connecticut"), aff'd, 110 F.3d 898 (2d Cir. 1997).

The meeting in Brooklyn is simply insufficient, as a matter of law, to demonstrate that the impact of the retaliation occurred within the confines of New York City. See Fried v. LVI Servs., Inc., No. 10 Civ. 9308, 2011 WL 4633985, at *13 (S.D.N.Y. Oct. 4, 2011) ("Plaintiff's admission that he worked five days a week out of the Westport Office during the time of the events in question is dispositive. Fried's argument to the contrary — that he attended meetings in New York City, made regular phone calls to New York City, and secured contracts for LVI in New York City . . .—is unavailing.").

As for the two day working period during the Jewish holidays, the main alleged instances of retaliation made by the Plaintiff were the reassignment to the Nassau preload in June 2008 and

the peak season assignments at the Roosevelt Field Mall in Long Island. These reassignments were to facilities outside of the boundaries of New York City. It would be tenuous to an absurd degree to find that because the Plaintiff testified that he covered for other workers observing a religious holiday for two days, that is sufficient to recover under the NYCHRL. Cf. Regan v. Benchmark Co., LLC, No. 11 Civ. 4511, 2012 WL 692056, at *13 (S.D.N.Y. March 1, 2012) (sustaining the plaintiff's NYCHRL claims because even after she was transferred to a New Jersey office, "she remained affiliated with the New York City office to the extent possible. In particular, Regan continued to service New York City-based clientele and remained under the management and supervision of Benchmark's New York City office. . . .Therefore, although Regan was physically working out of Jersey City, all other aspects of her employment connected her to Benchmark's New York City office"). More importantly, this extremely brief coverage in light of other employees' absences was not alleged to have been part of the retaliation by the Defendant in the complaint or part of his theory for recovery.

Therefore, the Court finds that the Defendant's motion for judgment as a matter of law dismissing the Plaintiff's NYCHRL retaliation claims must be granted.

### c. NYCHRL Failure to Accommodate

Similarly, the Defendant also contends that even if it is assumed that it failed to accommodate the Plaintiff in violation of the NYCHRL, the Defendant is nevertheless entitled to judgment as a matter of law in connection with the NYCHRL claims because the Plaintiff was not impacted by this lack of accommodation within the five boroughs during the relevant statutory time period. Ultimately, the jury found in favor of the Defendant's good faith defense as to this cause of action. However, because the Court finds that the NYCHRL would be

inapplicable to any failure to accommodate claims, the Court need not address below whether the good faith defense was proper in connection with the NYCHRL.

The only argument that the Plaintiff makes as to how the impact of the failure to accommodate under the NYCHRL was felt in New York City is that Welch was working in Manhattan in an administrative position in the industrial engineering department, which accommodated his disabilities, when he was reassigned to a position in Long Island that did not accommodate his disability. However, it is illogical for Welch to assert that his position in New York City accommodated his disability, but then simultaneously claim that the impact of UPS' failure to accommodate was felt while he was in that position. Thus, the Court agrees with the Defendant that there is insufficient evidence, as a matter of law, to demonstrate that the Plaintiff is entitled to recovery under the NYCHRL for failure to accommodate.

In sum, the Court finds that the jury's verdict must be set aside in connection with the NYCHRL claims and that judgment be entered as a matter of law in favor of the Defendant dismissing these causes of action. In light of this finding, the Court need not address the Defendant's contention that the jury's verdict is a miscarriage of justice because of the addition of the NYCHRL claims on the eve of trial.

### 2. Retaliation Claims

The next major issue raised by the Defendant in its post-trial motions involves the jury's verdict in connection with the Plaintiff's retaliation claims. Here, UPS claims that it is entitled to judgment as a matter of law on the Plaintiff's retaliation cause of action because there is a complete absence of evidence supporting the jury's verdict.

"ADA [and NYSHRL] retaliation claims are . . . analyzed under a burden-shifting analysis — first, the plaintiff must make a prima facie showing of retaliation; then, the burden

shifts to the employer to articulate a legitimate, non-[retaliatory] reason for the adverse action; lastly, the plaintiff must provide evidence demonstrating that the proffered reason is merely a pretext for [retaliation].  Shepheard v. N.Y. City Correctional Dep't, 360 Fed App'x 249, 251 (2d Cir. 2010).  In order for a plaintiff to make its initial prima facie showing of retaliation, "the plaintiff must demonstrate that (1) he was engaged in an activity protected by the NYSHRL and/or the NYCHRL; (2) the employer was aware of the activity; (3) an employment action adverse to the plaintiff occurred; and (4) there was a causal connection between the protected activity and the adverse employment action."  Stephan v. W. Irondequoit Cent. Sch. Dist., 450 Fed App'x 77, 80 (2d Cir. 2011).

This Court instructed the jury that the first two prongs of the Plaintiff's *prima facie* case were undisputed; namely, that the Plaintiff engaged in a protected activity and that UPS knew about the activity.  Only prongs three and four — whether UPS took an adverse employment action against Welch and whether a causal connection existed between the protected activity and the adverse action — were submitted to the jury.  The Defendant now argues that the evidence at trial simply did not establish those prongs.

### a. As to Whether the Evidence Established that the Plaintiff's Job Reassignment was an Adverse Employment Action

An adverse employment action is a "'material adverse change' in the terms and conditions of employment."  Sanders v. New York City Human Resources Admin., 361 F.3d 749, 755 (2d Cir. 2004) (quoting Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999)).  Such an action is "more disruptive than a mere inconvenience or an alteration of job responsibilities."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quoting Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993)).  Materially adverse changes encompass "termination of employment, a demotion

evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. (quoting Crady, 993 F.2d at 136). "Actions are materially adverse if they are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks omitted).

At the trial, the Plaintiff contended that he was transferred in June 2008 to the Nassau preload in retaliation for: (1) a written complaint of discrimination he made to Kevin DiLibero on April 20, 2008, which Welch testified he sent because he "felt there was an ongoing pattern of discrimination, retaliation, gross negligence on account of [his] illness and treatment, and [he] just wanted to be taken care of"; and (2) a letter sent to DiLibero from his attorneys on June 12, 2008. (9/8/11 Tr., 165:17-21; 170:1-14.) In addition, the Plaintiff's complaint to the EEOC in 2008 was alleged to be another instance of protected activity.

There is no dispute that Welch did not attempt to demonstrate at the trial that the transfer to the Nassau preload in 2008 resulted in a demotion or reduction in his pay or benefits. Rather, the Plaintiff asserted that the reassignment to the Nassau preload required him to work in violation of his medical restrictions, and consequently this constituted an adverse employment action. Welch testified at the trial that he was required to lift in excess of his medical restrictions in this position and now argues that the jury credited this testimony. For instance, when asked by counsel "At the Nassau preload, were you lifting packages that exceeded the weight limitations that had been recommended by your physicians?", Welch responded "Yes, I was." (9/8/2011 Tr., 170–71) He now contends that with this testimony, he presented sufficient

evidence for the jury to conclude that his transfer to the preload could have dissuaded a reasonable employee in his position from complaining of unlawful discrimination.

On the other hand, the Defendant claims that this reassignment to the Nassau preload was made for the precise purpose of accommodating his disability. In particular, the Defendant claims that the evidence demonstrates that it transferred Welch with the specific instruction to not lift any packages in excess of his weight restriction. Thus, although the Plaintiff may have refused to follow this edict at times, this does not change the terms of his reassignment. In this regard, DeLiberto testified at the trial as follows:

> Q: Did you have any reservation about assigning Mr. Welch to be a preload supervisor given his restrictions?
>
> A: No.
>
> Q: Why not?
>
> A: It is definitely something that could [fit] his accommodations. My concern was that, and I made this very clear in the meeting several times, that John had to understand it was his responsibility to adhere to these restrictions.
>
> I mean, we can definitely accommodate you. You don't have to drive a UPS vehicle. We can work you nine hours. You don't have to lift packages over 30, 40 pounds. And no repetitive movement of those packages.
>
> Q: What did you mean by conveying to Mr. Welch that it would be his responsibility?
>
> A: Well, we had issues with him in the past where he was not working within his restrictions in the past when we accommodated him, and I wanted to make it very clear that we couldn't accept this any longer; that we're giving you the accommodations and it is your responsibility to ensure that you do follow them and adhere to them.

(9/15/2011 Tr., 965–66.)

First, there is no question that if the reassignment was to a position that no longer accommodated his disability, that could theoretically constitute an adverse employment action.

See Vinson v. N.Y. City Dep't of Corrections, No. 01 Civ. 6900, 2006 WL 140553, at *7

(E.D.N.Y. Jan. 17, 2006) ("plaintiff is correct that a transfer resulting in a denial or withdrawal of a reasonable accommodation can be considered an adverse employment action."); Honey v. Cnty. of Rockland, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002) (stating that if the plaintiff demonstrated that her supervisor had refused to continue to accommodate her disability because she had filed an EEOC complaint, that action would be considered an adverse employment action); Adams v. New York State Thruway Auth., No. 97 Civ. 1909, 2001 WL 874785, at *15 n.11 (N.D.N.Y. March 22, 2001) (stating in dicta that a "denial of a request for a reasonable accommodation can be an adverse employment action").

Second, merely making accommodations for the Plaintiff's disability on paper, but not actually accommodating him for such a disability in reality, would not prevent this reassignment from constituting an adverse employment action. If that were the case, then any employer could escape liability by simply theoretically accommodating or failing to retaliate without actually doing so. Thus, the jury was entitled to conclude that despite the Defendant's testimony regarding its attempts to accommodate his disability, Welch's disability was not accommodated in practice and this had a sufficiently material negative impact on the terms and conditions of Welch's employment with UPS to constitute an adverse employment action for purposes of a retaliation analysis.

Third, the Court is certainly aware of the Second Circuit's admonition that, in determining a Rule 50 motion, a court "must give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses. . . ." Kinneary v. City of New York, 601 F.3d 151, 155 (2d Cir. 2010) (quoting Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008)). In the Court's view, the jury's verdict strongly indicates that

they did found the Plaintiff to be credible, and the Court is hesitant to intrude on this determination by entering judgment that directly contradicts such an express finding.

Therefore, the Court finds that based upon Welch's testimony, the evidence at trial was sufficient to establish that his job reassignment to the Nassau preload in 2008 was an adverse employment action.

### b. As to Whether the Evidence Established a Causal Connection

In addition to disputing whether there was sufficient evidence to establish an adverse employment action suffered by Welch, the Defendant contends that the evidence at the trial did not establish a causal connection between the Plaintiff's protected activities and the alleged adverse employment action.

First, the Defendant asserts that the assignment to the Nassau preload occurred on June 10, 2008, which was prior to June 12, 2008, when the Plaintiff's attorneys sent a letter to UPS and the filing of the EEOC complaint. However, even taking that as true, that does not warrant judgment as a matter of law. There was sufficient evidence in the record to warrant a finding of retaliation as to the April 20, 2008 complaint that the Plaintiff made directly to DiLibero.

Second, according to UPS, the evidence at the trial established that UPS assigned the Plaintiff to the Nassau preload as early as October 2006, which was twenty months prior to the Plaintiff's April 20, 2008 letter to DiLibero and June 12, 2008 letter to DiLibero from the Plaintiff's attorneys. UPS argues that "[a]ssignment to the same position after plaintiff lodged an internal complaint cannot constitute retaliation. (Reply Mem. at 8) (citing Young v. Westchester Co. Dep't of Social Servs., 57 Fed App'x 492, 495 (2d Cir. 2003). In other words, because the Plaintiff's theory of the case was that UPS had a long history of repeatedly assigning him to job

positions that did not confirm to his medical restrictions, the 2008 reassignment to the Nassau preload did not change or worsen after his complaints of discrimination.

In <u>Young v. Westchester Co. Dep't of Social Servs.</u>, 57 Fed App'x 492, 495 (2d Cir. 2011), the Second Circuit affirmed the district court's granting summary judgment in favor of the county. In particular, the Court noted that:

> Young has not submitted any evidence to suggest that there is a causal relationship between her requests to return to work, or to transfer, and the disciplinary measures and delayed transfers to which she alleges she was subjected. Ordinarily, causality can be inferred from the fact that "'the protected activity was closely followed in time by the adverse action.'" <u>Lovejoy-Wilson</u>, 263 F.3d at 224 (quoting <u>Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001)). However, where the adverse action was already ongoing at the time of the protected activity, or is very similar to another adverse action that was taken before the protected activity, with no other change in relevant circumstances, logic precludes any inference of causation. <u>See Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 95 (2d Cir.2001). Young had already had a transfer request pending since March of 1997 at the time she requested her accommodations. Absent evidence that suitable positions were unavailable during that period, but available during late 1998 and 1999, it is hard to see how any failure to transfer Young could have been related to her protected activities. . . .Young offers no evidence, other than relative nearness in time, to link the allegedly adverse actions to her protected activities. Under these circumstances, we conclude, there is no reasonable inference that the two sets of events were causally related.

<u>Id.</u> at 495.

As a general matter, the Defendant is correct that if the adverse action was already ongoing at the time of the protected activity, or is very similar to another adverse action that was taken before the protected activity with no other change in relevant circumstances, logic precludes any inference of causation. However, in the Court's view, under the unique facts of this case, this broad principle is inapplicable. Certainly, the subject of the retaliation — the assignment to the Nassau preload—was a position that was previously held by Welch prior to his protected activity. However, certain significant events took place in the interim. In particular, the Plaintiff had made a request for an accommodation and was transferred from the Nassau

preload to the CHSP. Thus, it is not the case that the activity was consistently ongoing. Nor is it logical to view the fact that it was similar to another adverse action taken before the protected activity in a vacuum. The fact that Welch had been previously accommodated by being transferred out of the Nassau preload in 2006 lends credence to the notion that being transferred back to the Nassau preload was retaliatory. As Welch testified at the trial, DiLibero told Welch that he was going to be "reassigned to the preload operation, the very operation [he] was taken from prior to that because it did not meet [his] restrictions." (9/8/11 Tr., 170.) Accordingly, the Court denies the Defendants' motion for judgment as a matter of law as to the Plaintiff's retaliation claims.

### 3. Failure to Accommodate Claims

Next, UPS contends that it is entitled to judgment as a matter of law in connection with the Plaintiff's failure to accommodate cause of action because there is a complete absence of evidence to support the jury's verdict. As an initial matter, there is no practical impact if this Court were to reverse the jury's finding that UPS failed to accommodate him with regard to his disability under the NYSHRL because ultimately, the jury found in favor of the Defendant on the disability discrimination causes of action. Nevertheless, for purposes of comprehensiveness, the Court will proceed to rule on the Defendant's motion in this regard.

The issue arises once again as to whether it is proper for the Defendant to raise this in a Rule 50(b) motion. In its initial motion for judgment as a matter of law, the Defendant raised several issues, including: (1) whether Welch is a disabled individual under the ADA, an issue as to which the Defendant ultimately prevailed at the trial (9/13/2011 Tr., at 658); (2) whether Welch engaged in protected activities and whether there was a causal connection with regard to the retaliation claims, discussed above (9/13/2011 Tr., at 666–67); and (3) whether punitive

damages were applicable, which the jury ultimately did not award (9/13/2011 Tr., at 676–77.)

Thus, the Court may only consider the Defendant's current arguments as to the failure to

accommodate claims if there is a manifest injustice. However, as set forth below, the Court does

not find there to be any danger of injustice based upon the jury's verdict and the Defendant's

renewed motion for judgment as a matter of law as to the failure to accommodate claims is

denied.

### a. As to Whether the Evidence Established Welch is a Qualified Individual under NYSHRL

UPS argues that the Plaintiff did not demonstrate at trial that he was a "qualified

individual" under the terms of the NYSHRL. At trial, Welch had the burden to establish that: (1)

the Defendant was subject to the NYSHRL; (2) that he was disabled within the meaning of this

law; (3) he was otherwise qualified to perform the essential functions of his job, with or without

reasonable accommodation; and (4) that he suffered an adverse employment action because of

his disability. See Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001). The

question is whether the evidence demonstrated that Welch was otherwise qualified to perform

the essential functions of his job with or without reasonable accommodation.

The Second Circuit has stated that "[t]he term 'essential functions,' which is not defined

in the statutes themselves, is generally defined in ADA regulations promulgated by the Equal

Employment Opportunity Commission ('EEOC') to mean the 'fundamental' duties to be

performed in the position in question, but not functions that are merely 'marginal.'" Stone v.

City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(1)); see

Reville v. Niagara Frontier Transp. Auth., 04 Civ. 0258, 2009 WL 5167645, at *8 (W.D.N.Y.

Dec. 20, 2009) ("The employer's written job description, especially, is given substantial weight"

in determining a job's essential functions) (internal citations and quotations omitted). "Evidence

of whether a particular function is essential includes, but is not limited to the employer's judgment as to which functions are essential, the written job description, the amount of time spent performing the function, the consequences of not requiring the employee to perform the function, the work experience of past employees in the position, and the current work experience of employees in similar positions." Sharp v. Abate, 887 F. Supp. 695, 699 (S.D.N.Y. 1995).

UPS now argues that the evidence at trial plainly established that the Plaintiff could not meet the essential functions of the preload supervisor or CHSP positions. In particular, it claims that Welch was unable to meet the essential job functions because he could not lift in excess of, first 40, then 20 pounds, or to work the requisite 9–10 hours per day, or the varying shifts or extended hours as necessary. Moreover, UPS contends that although it may have waived numerous essential job functions, this does not render those job functions non-essential.

The Court agrees with UPS as to this general principle of law. See Uhl v. Home Depot U.S.A., Inc., No. 08 Civ. 3064, 2010 WL 3282611, at *5 (E.D.N.Y. Aug. 13, 2010) ("Home Depot crafted a 'light duty' position that enabled him to work while excusing him from some undisputed essential functions of a Sales Associate position. But, contrary to Mr. Uhl's belief, this does not mean that Home Depot previously gave him a 'reasonable accommodation,' that it must afford him again. Instead, it supports that Home Depot previously exceeded its legal obligations, by affording him a more than reasonable accommodation. Home Depot's prior, voluntary effort to accommodate Mr. Uhl in excess of its legal obligations is admirable. But it does not compel Home Depot to continue to accommodate him beyond what the law requires."); see also Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1528 (11th Cir. 1997); Walton v. Mental Health Ass'n. of Southeastern Pennsylvania, 168 F.3d 661, 671 (3d Cir. 1999). This is

because "[a] reasonable accommodation can never involve the elimination of an essential function of a job." Shannon v. New York City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003).

The Plaintiff claims that the CHSP and PAS positions did not require him to lift or work excessive hours. (See 9/7/2011 Tr., 81–82 (testimony by Welch that he was not required to do any lifting or work excessive hours in his PAS position); 134–35 (testimony by Welch that he was not required to do any lifting or work excessive hours in CHSP position); 9/8/2011: 198.)  In any event, the Plaintiff contends that whether lifting and working long hours was "essential" to the supervisor position, as opposed to a "marginal" function, was a question of fact for the jury. Given that the Plaintiff's duty was to supervise a number of loaders and thus not to move packages himself, Welch argues that a reasonable jury could find that lifting was "marginal" to the position. See Russo v. Sysco Food Servs. of Albany, L.L.C., 488 F. Supp. 2d 228, 237 (N.D.N.Y. 2007) (finding a question of fact as to whether truck driving was an essential function of the transportation supervisor position, in light of the written job description and the frequency with which an employee must perform a function).

Notably, the "essential functions" of a job is a fact specific inquiry. See Hall v. United States Postal Service, 857 F.2d 1073, 1079–80 (6th Cir. 1988) (reversing a grant of summary judgment on the basis that there was a genuine issue of material fact as to whether a 70–pound lifting requirement was an essential function of a Postal Service distribution clerk, despite the fact that the job description and an affidavit from an employment supervisor stated that it was an essential part of the job.).  Determining "whether physical qualifications are essential functions of a job requires the court to engage in a *highly fact-specific inquiry*. . . . Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." Id. at 1079 (emphasis

added); see also Henchey v. Town of North Greenbush, 831 F. Supp. 960, 966–67 (N.D.N.Y. 1993) (finding a question of material fact to exist as to whether heavy lifting is an "essential function" of the job of a "laborer" for the town's Highway Department, despite a written job description stating that the worker must have the "ability to lift heavy weights").

The Defendant points to Exhibit I and Welch's testimony regarding a note from Dr. Sherrid, dated March 11, 2010, which was in connection with Welch's final request for an accommodation. At this time, the Plaintiff could not lift more than 20 pounds or operate heavy machinery and commercial or heavy vehicles. As part of this evidence, there was a list of supposed "essential job functions" he was doing at the time, on which Welch wrote "no" next to a function if he could not do it. Welch marked "no" next to several alleged essential job functions, including (1) "assist in moving packages weighing up to 150 pounds"; (2) "extended hours may be required as service needs dictate"; and (3) "ability to work varying shifts and extended hours as business needs dictate." (9/12/2011 Tr., 341.)

In short, the Defendant emphasizes that the Plaintiff appeared to admit in this document that he could not perform what are listed as several essential job functions. However, this does not end the relevant inquiry, especially in the post-trial context. Cf. Violette v. IBM, No. 96 Civ. 9078, 1997 U.S. App. LEXIS 13823, at *4 (2d Cir. 1997) (finding that because an amended complaint stated that the plaintiff was unable to perform the essential elements of his job and was unable to work, he was unable to show that he is "qualified"). The Plaintiff testified as to whether he needed to perform certain functions such as lifting excessive weight and described his role as a supervisor within the company. The jury was instructed to consider whether: (1) the reason the position exists is to perform that function; (2) there are a limited number of employees available, among whom the performance of that job function can be distributed; and (3) the job

function is highly specialized, and the person in that position is hired for his expertise or ability to perform that particular job function. The jury was entitled to credit Welch's testimony and make the highly fact specific determination that lifting beyond a certain weight and working excess hours was not an essential function of his CHSP or PAS positions. Thus, the Court sees no reason to disturb the jury's verdict as to the finding that he was "qualified".

### b. As to Whether the Evidence Established that UPS Discharged its Duty to Provide Welch With Reasonable Accommodations

The jury was asked, "Based on all the evidence presented, did the plaintiff John Welch prove that United Parcel Service, Inc., failed to accommodate him with regard to his disability and required him to work in a significantly more difficult work area which would adversely affect his physical conditions?", to which they answered "Yes". There were two main accommodations that were at issue in this case: that Welch not be required to lift in excess of his weight restriction or work longer shifts than his hours restriction.

According to the Defendant, the evidence established at trial proves that UPS offered the Plaintiff numerous accommodations of his disability, and that under relevant Second Circuit case law, once a reasonable accommodation has been made, an employer has fulfilled its statutory obligation. See Fink v. N.Y. Dep't of Personnel, 53 F.3d 565, 567 (2d Cir. 1995.) In particular, UPS claims that it demonstrated that it accommodated Welch in several ways, including when: (1) it assigned Welch to the position of CHSP in 2006, which does not require lifting and UPS waived the requirement for excessive hours (9/8/2011 Tr., 284:25–285:3); (2) it then reassigned Welch as a full-time supervisor on the Nassau preload waiving any lifting or excessive hours requirements; (3) it then reassigned Welch back to a CHSP position in June 2007 when the Nassau preload no longer met his medical restrictions (9/7/2011 Tr., 145:14–21); and (4) it reassigned Welch once again as a full-time supervisor on the Nassau preload waiving any lifting

or excessive hours requirements, when Welch requested to be moved out of the CHSP position. Finally, UPS created the position of driver safety training provider to accommodate his disability in 2010.

In particular, UPS claims that the assignment to the CHSP position in June 2007 fully accommodated his disability, but that it was Welch himself who requested to be removed from this position. Thus, UPS argues that the evidence plainly establishes that once Welch rejected this reasonable accommodation, UPS's legal obligation expired. The Plaintiff is correct in its assertion that this verdict cannot be overturned unless there was a manifest injustice; namely, that the verdict was wholly without legal support.

However, if the Court looks at only a portion of the allegations, namely the transfer to the Nassau preload in 2006, it is not a manifest injustice for the jury to find that Welch had been accommodated in the CHSP position for ten months but was subsequently transferred out to the Nassau preload not upon his request. Welch testified that he liked the position at the CHSP— that he "loved it." (9/7/2011 Tr., 134.) When asked directly whether he asked anyone to transfer him from CHSP to the preload, Welch answered "No." (9/7/11 Tr., 138.) Thus, the jury was entitled to credit Welch's testimony and find that, in spite of the Defendant's assertion that he rejected the CHSP accommodation in 2006, he in fact was only accommodated in a temporary fashion. Certainly, "[o]nce a reasonable accommodation has been made, a defendant has fulfilled its obligation to make an accommodation." Kemer v. Johnson, 900 F. Supp. 677, 686 (S.D.N.Y. 1995). However, this rule of law stands for the idea that an employer need not accept the employee's preferred accommodation, even if reasonable, if another accommodation had already been made. It does not mean that an employer may simply put an employee in a different position to accommodate his disabilities and then ten months later, transfer him back to

the previous unaccommodating position. Therefore, putting aside any subsequent events, this piece of the timeline alone supports the jury's finding that UPS failed to accommodate the Plaintiff.

In addition, UPS argues that the moves to the Nassau preload with lifting and hours restrictions in place accommodated Welch's disability, even if those restrictions were unsuccessful. However, as set forth above, merely accommodating an employee in theory but not in practice is insufficient to escape liability.

Therefore, the Court does not find there to be a manifest injustice so as to vacate the failure to accommodate jury finding.

## C.  As to the Defendant's Motion for a New Trial

As another source of contention raised in the Defendant's post-trial papers, it claims that even if the Court denies UPS' motion for judgment as a matter of law, it requests a new trial because of the claim that the jury verdict is a miscarriage of justice.

After the verdict in this case, the Defendant notified the Court that the jury's verdict in its favor on the good faith defense was inconsistent with its finding of retaliation. In particular, as to Question 6, the jury answered "Yes" to the question: "Did UPS prove by a preponderance of the evidence, that it made a good faith effort to identify and provide the plaintiff with a reasonable accommodation that would allow him to work within his restrictions?" However, in response to Question 8, the jury responded "Yes" to the question: "Did the plaintiff John Welch prove that there was a causal connection between the letters sent to Kevin DiLibero and the plaintiff's filing of the EEOC complaint and the requirements to work in significantly more difficult work areas which adversely affected his physical condition?" The Defendant asserts that the jury could not simultaneously find that with regard to the two assignments in question

that formed the basis for the retaliation and accommodation claims—the transfer to the Nassau preload in June 2008 and the transfer to the Roosevelt Field Mall in September 2008—that UPS in good faith made an effort to accommodate the Plaintiff's medical restrictions while also finding those assignments to be retaliatory. However, in light of the unique factual circumstances of this case, the Court disagrees.

The Second Circuit has held:

> If [an] inconsistency between special verdict answers is noticed prior to the dismissal of the jury, the trial court has the discretion to resubmit the issues to the jury with a request for clarification, whether or not the parties themselves request clarification. If the court elects not to seek clarification from the jury, or if the inconsistency is not noticed until after the jury has been dismissed, the court must take one of two actions. [1] It is the duty of the court to attempt to harmonize the answers, if it is possible under a fair reading of them. Thus, where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. [2] If there is no way to harmonize the jury's answers, the court must order a new trial.

Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 891 (2d Cir. 1988) (citations, quotation marks, and alterations omitted).

There is, in the Court's view, a reasonable interpretation of the verdict sheet that would harmonize these two answers. Importantly, it was certainly reasonable for the jury to find that Welch's transfers to CHSP and to the PAS position constituted a good faith effort to identify and provide the plaintiff with a reasonable accommodation that would allow him to work within his restrictions. However, it was also reasonable for the jury to find that one of these accommodations, although made in good faith by UPS, was removed in retaliation for Welch's protected activities. In other words, the jury could have found that a good faith effort was made in connection with certain assignments, but that transfer to the Nassau preload was retaliatory. Certainly, if the jury were to find that the Nassau preload assignment was a good faith accommodation effort and simultaneously retaliatory, that would be inconsistent and illogical.

However, because it is the duty of the court to harmonize the answers and give them a fair reading, and because this reading is the logical one, the Court does not find the verdict to be inconsistent.  See Sharon v. Time, 575 F. Supp. 1162 (S.D.N.Y. 1983) ("the court does not presume the jury, as reasonable reader, wholly wanting of common sense and simple logic.").  In short, these answers involved different assignments during the relevant time period.  Thus, it was conceivable for the jury to find that certain assignments were made in good faith to accommodate the Plaintiff while other assignments were made in a retaliatory fashion.

The Defendant also argues that it is entitled to a new trial because the language and interrogatories on the verdict sheet were improper, significantly prejudicial, and resulted in a miscarriage of justice.

For example, in connection with the accommodation causes of action, question 5 in the Verdict Sheet read: "Based on all the evidence presented, did [the] plaintiff John Welch prove that United Parcel Services Inc. failed to accommodate him with regard to his disability and required him to work in a significantly more difficult work area which would adversely affect his physical conditions?"  The Defendant asserts that this question did not allow the jury to find that, for instance, although the Nassau preload position may not have accommodated his disabilities, the Plaintiff's rejection of the CHSP position discharged UPS's obligation to provide him with a reasonable accommodation.

As another example, in connection with the retaliation causes of action, question 7 asked, "Did the plaintiff John Welch prove that the defendant United Parcel Services Inc. required him to work in a significantly more difficult work area which would adversely affect his physical conditions . . .?"  The Defendant argues that this impeded the jury's fact-finding and improperly prejudiced UPS.  Here, instead of asking whether the Plaintiff suffered a materially adverse

employment action, the Court directly asked whether the Plaintiff proved the specific materially adverse employment action presented by the circumstances in this particular case. At the charge conference, the Defendant's Counsel objected to this language, stating that if the Court were to phrase the materially adverse effect issue in this manner, it would persuade the jury that as a matter of law, there was an adverse employment action. In other words, the Defendant argued then, and again now, that this language effectively gave the jury their legal conclusion. (9/19/2011 Tr., 1167.)

"Where the court's instruction misleads the jury as to the correct legal standard or where it fails to adequately inform the jury on the law, it will be deemed erroneous." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 115 (2d Cir. 2000).

However, to the extent that these arguments were preserved, the Court does not see any language in the jury charge or the verdict sheet that could be considered improper or prejudicial. The Court's choice of words was sufficiently broad and fairly covered what were the disputed issues of fact at trial. With this question, the jury had the opportunity to find that UPS did not fail to accommodate him and require him to work in a significantly more difficult work area. This question posed directly what was at issue in this case. Moreover, the jury could have found that the precise allegation of retaliation in this case — that Welch was required to work in a significantly more difficult work area which would adversely affect his physical conditions — was not proven.

Therefore, the Court denies the Defendant's motion for a new trial based upon alleged errors in the verdict sheet.

**D. As to Whether the Court Should Reduce the Compensatory Damage Award**

In the event that the Court does not grant judgment as a matter of law or a new trial, UPS asserts that remittitur of the compensatory damages award is necessary. According to the Defendant, a $200,000 award for compensatory emotional distress damages is excessive and well beyond what can be sustained in the record. UPS asserts that the jury failed to give adequate consideration to the fact that Welch's emotional distress stemmed, in large measure, from factors not chargeable to UPS, such as his time in the Marine Corps and his unpleasant upbringing. In addition, UPS points out that at the time of the alleged retaliation, the Plaintiff was undergoing a contentious divorce and child custody dispute, as well as facing tremendous financial pressure.

A conditional order for remittitur under Rule 59 if granted by the Court, requires a plaintiff to choose between accepting the reduction of a verdict found to be excessive, or of submitting to a new trial. See Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 165 (2d Cir. 1998). Remittitur is "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." Cross v. N.Y. City Transit Auth., 417 F.3d 241, 258 (2d Cir. 2005) (quoting Eral v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir. 1990); see also Lightfoot v. Union Carbide Corp., 110 F.3d 898, 914–15 (2d Cir. 1997) (noting that a court may not "reduce the damages without offering the prevailing party the option of a new trial" (internal citations omitted)). A trial judge has the discretion to overturn a jury award for excessiveness, and to order a new trial if the successful plaintiff refuses to agree to the reduced award. Id.

"A plaintiff is not permitted to throw himself on the generosity of the jury. If he wants damages, he must prove them." Douglass v. Hustler Magazine, Inc., 769 F.2d 1128, 1144 (7th Cir. 1985). In determining whether the jury reached a "seriously erroneous" result, the district court "is free to weigh the evidence and 'need not view [the evidence] in the light most favorable

to the verdict winner.'" Farrior v. Waterford Bd. of Educ., 277 F.3d 633, 634 (2d Cir. 2002)

(quoting DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998)).

Under federal law, an award will not be disturbed unless it is "so high as to shock the

judicial conscience and constitute a denial of justice." Ismail v. Cohen, 899 F.2d 183, 186 (2d

Cir. 1990); accord Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir. 1998). However, this rule

of federal law is not applicable in this case, because the compensatory damages at issue were

awarded to the Plaintiff on the basis of his NYSHRL retaliation claim. Rather, the relevant rule

of law is the New York standard under C.P.L.R. § 5501(c). See Cross v. New York City Transit

Auth., 417 F.3d 241, 258 (2d Cir. 2005); Ruhling v. Newsday, Inc., No. 04 Civ. 2430, 2008 U.S.

Dist. Lexis 38936, at *20-21 (E.D.N.Y. May 13, 2008). C.P.L.R. § 5501(c) provides, in relevant

part, that "an award is excessive or inadequate if it deviates materially from what would be

reasonable compensation." N.Y. C.P.L.R. § 5501(c). The New York "deviates materially"

standard is less deferential to a jury verdict than the federal "shock the conscience" standard.

See Town of Hempstead v. State Div. of Human Rights, 233 A.D.2d 451, 649 N.Y.S.2d 942 (2d

Dep't 1996) (awarding $500,000 for "pervasive and relentless" sexual harassment of a former

victim of child sex abuse under New York state law under the "deviates materially" standard).

In determining whether an award "materially deviates", this Court must consider awards

in analogous cases for injuries similar to those sustained by the Plaintiff. Indeed, "[t]he practice

of assessing awards by comparing them to awards made in similar cases stems from the

recognition that although judges are in no better position than jurors to place a monetary value on

a person's pain and suffering, by reviewing case law they can provide some uniformity and

predictability in damage awards." Bick v. City of New York, No. 95 Civ. 8781, 1998 U.S. Dist.

LEXIS 5543, 1998 WL 190283, at *22 (S.D.N.Y. Apr. 21, 1998).

The Defendant cites to <u>Raione v. Potter</u>, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005), where this Court previously described the spectrum for emotional damages in the employment discrimination context, as follows:

> At the low end of the continuum are what have become known as "garden-variety" distress claims in which district courts have awarded damages for emotional distress ranging from $ 5,000 to $ 35,000. "Garden-variety" remitted awards have typically been rendered in cases where the evidence of harm was presented primarily through the testimony of the plaintiff, who describes his or her distress in vague or conclusory terms and fails to describe the severity or consequences of the injury. . . .

> The middle of the spectrum consists of "significant" ($ 50,000 up to $ 100,000) and "substantial" emotional distress claims ($ 100,000). These claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony or evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses.

> Finally, on the high end of the spectrum are "egregious" emotional distress claims, where the courts have upheld or remitted awards for distress to a sum in excess of $ 100,000. These awards have only been warranted where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly affected.

<u>Id.</u> at 122-23.

As for a "garden variety" type case, an example is <u>Norville v. Staten Island University Hosp.</u>, No. 96 Civ. 5222, (E.D.N.Y. Oct. 20, 2003), aff'd, 112 Fed. App'x. 92 (2d Cir. 2004). In <u>Norville</u>, the plaintiff nurse sued her hospital employer alleging that it discharged her because of her race, age, and disability. The jury found for the plaintiff on her disability claim and awarded $575,000 for past and future pain and suffering, mental anguish, and loss of enjoyment of life. The evidence at trial showed that as a result of her termination the plaintiff had difficulty sleeping, experienced panic attacks, and spent most of her days crying or watching television. She also suffered from a nervous stomach and became socially reclusive and aggressive to her friends. The plaintiff's story was corroborated by her sister, who testified that she was "sad all

the time." However, the plaintiff never sought treatment from a psychiatrist. She only offered the testimony of a licensed clinical social worker with a Ph.D., whom she visited once. The doctor stated that the plaintiff suffered from clinical depression and posttraumatic stress disorder. In addition, the doctor concluded that the plaintiff's depression was better than it was after the termination, but would require one to three years of additional psychotherapy in order to fully heal. The District Court remittitur order, which was affirmed by the Second Circuit in 2004, reduced the jury's compensatory damages award from $575,000 to $30,000. Id.

As for the middle of the spectrum, "courts have awarded damages for emotional distress in the sum of $100,000 only in cases where the employer's discriminatory conduct has caused plaintiff stress which manifested itself in the form of severe emotional or physical reactions." Cucuzza, supra, at 445. For example, in Bick v. City of New York, No. 95 Civ. 8781, 1998 WL 190283, at *20 (S.D.N.Y. Apr. 21, 1998), a female sergeant succeeded against the New York City Police Department on her claims of harassment, gender discrimination, and retaliation. The jury awarded the plaintiff $750,000 in compensatory damages. The evidence at trial included testimony from the plaintiff, her therapist, and a supervising officer, who all suggested that her distress was "far more than minimal injury." Id. at *23. In fact, the corroborated testimony showed that the plaintiff was "devastated" and at times "hysterical." The Plaintiff also received treatment from a certified social worker trained in psychotherapy and medication from a psychiatrist. She was diagnosed as suffering from anxiety, depression and feelings of powerlessness and "suicidal ideation." Id. at *24. In addition, at the time of trial the plaintiff continued to receive treatment, although she was described as improved. Based on this evidence, the court reduced the jury award from $750,000.00 to $100,000.00.

As for the high end of the spectrum, i.e., awards that are well in excess of $100,000, these are cases that generally contain evidence of debilitating and permanent alterations in lifestyle. See, e.g., Ramirez v. Off-Track Betting, 112 F.3d 38 (2d Cir. 1997) (award of $500,000 appropriate where the plaintiff's psychiatric difficulties had become so severe after his discharge that he was unemployable); Shea v. Icelandair, 925 F. Supp. 1014, 1021 (S.D.N.Y. 1996) (awarding damages of $175,000 for mental anguish exacerbated by Parkinson's disease and a heart condition). The Southern District has noted that emotional damages in this realm tend to "involve particularly egregious conduct on the part of defendants, such as deliberate, highly offensive, wanton, or violent actions and threats, or situations where the plaintiff's emotional distress is so severe that he exhibits multiple objective physical manifestations ordinarily substantiated by expert testimony." Kinneary v. City of New York, 536 F. Supp. 2d 326, 331 (S.D.N.Y. 2008) (citations omitted).

Here, as an initial matter, there is no doubt that the testimony presented at trial could lead the jury to believe that Welch suffered severe emotional distress due to UPS' actions. When asked if his experience at UPS affected him emotionally, Welch responded "I feel like I can never do enough. The only way I can do enough is to die. What is enough?" and that he walks into work every day like he is "going into the executioner." (9/8/2011 Tr., 208, 209.) In particular, Welch testified that he has gone into a "dark place" in his life where he has distanced himself from people, and has been affected physically, emotionally, and mentally. He also stated that he felt that his circumstances were "physical[ly] and mentally draining [him] to the point where [he] had no solace whatsoever." (9/8/2011 Tr., 204.)

The Plaintiff's expert witness, Dr. Marcia Knight, testified that "he was mostly sad" (9/13/2011 Tr., 591), and that she "would say he is sad, and some of his symptoms would consist

of him being depressed. But not to the point from where he couldn't function." (Id. at 593.) In particular, she testified that she did not see him as having any psychosis. Her diagnosis was "a mood disorder consistent with fears of depression. But it wasn't [a] specific mood disorder, just that he was prone to get depressed when he is under stress in his life." (Id. at 595.) Dr. Knight went on to say that Welch's mood disorder "gets to where he can't function" when there "are stressors in his life, which became most acute around 2008 when he was very worried about his health because he was working so many hours, and lifting so much weight, and working overnight". (Id. at 597.) However, she noted that there were "other issues in his life at that time as well", such as his divorce. (Id.) Moreover, when asked if she took those other personal circumstances beyond Mr. Welch's experiences at UPS into account in forming her opinion, Dr. Knight responded with "Yes." Dr. Knight also noted that the personal issues made him unable to deal with trying to accommodate on his own and that because his heart condition was getting worse around the relevant time period, he was concerned he would die because of the way he was working.

Based upon Welch's and Dr. Knight's testimony, there is no doubt that there was enough proof in the record for Welch's emotional suffering to constitute, at least, more than a garden variety type of case.

However, to fall into the category of cases that are beyond the garden variety case, this stress would necessarily need to manifest itself in the form of severe emotional or physical reactions. As for whether there have been physical manifestations of his emotional difficulties, Welch testified that he had a "feeling of nervousness" and "a feeling of mind racing". (9/8/2011 Tr., 209.) Of importance in regard to these emotional distress damages, when probed further, Welch stated that this affected his ability to be creative; his ability to eat; his ability to sleep; and

his ability to drive a vehicle. He testified that he experienced "[s]hortness of breath, palpitations, dizziness, chest pain, nausea, fear, fear of the results of the continued lifting of heavy packages and the consequences of still having a job at UPS." (9/8/11 Tr. at 192:15-18.)

Certainly, a portion of the physical ailments complained of by Welch were the direct result of his physical conditions, and thus not based upon violations of the NYSHRL. Nevertheless, Welch did testify that some of his physical symptoms were undeniably caused by the actions of UPS. In this regard, he testified that he experienced difficulty sleeping, and elaborated upon this serious daily problem as follows:

> This roller coaster ride of hours being changed, of waiting for someone to help me, of requests being heard, three years or so of me not wondering or wondering when this is going to end, resulted in constant fear of the fact this would not be resolved. . . .

> There became a period that, a few days where my mind was racing and I did not lay down. I did not close my eyes for three straight days . . . I felt dizzy and I was very — I was ready to just fall asleep walking.

(9/8/11 Tr. at 177-78.) Of importance, it is undisputed that the Plaintiff was admitted to the VA Hospital from August 25 to September 19, 2008 following this incident. (9/8/11 Tr. at 174:16-17.) Thus, there is no doubt here that Welch's stress manifested itself in the form of severe emotional or physical reactions, for which he sought medical and hospital treatment.

Therefore, the court disagrees with Defendant's characterization of the Plaintiff's emotional distress damages claim as merely "garden variety." It is well-established that a "garden variety" emotional distress damages claim exists where "'the evidence of harm was presented primarily through the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms and fails to describe the severity or consequences of the injury.'" See, e.g., Rainone v. Potter, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005) (quoting Michelle Cucuzza,

Evaluating Emotional Distress Damage Awards to Promote Settlement of Employment Discrimination Claims in the Second Circuit, 65 Brook. L. Rev. 393, 427-28 (1999)).

Here, the Plaintiff presented more with the testimony of Dr. Knight. Some of the Plaintiff's testimony as to his emotional distress was corroborated by Dr. Knight, such as Welch's fear of death because of the manner in which he was working. Moreover, the Court finds that Dr. Knight was able to provide testimony as to the severity of the emotional distress suffered by the Plaintiff. Cf. e.g., McIntosh v. Irving Trust Co., 887 F. Supp. 662, 664–65 (S.D.N.Y. 1995) (granting motion for new trial or remittitur where plaintiff "did not testify in any detail with respect to the magnitude or the duration of any mental distress[,] did not testify that his life activities were curtailed in any way [, and] there was no evidence that the plaintiff sought any medical or psychological help except for one visit [.]"); see also Borja–Fierro v. Girozentrale Vienna Bank, No. 91 Civ. 8743, at *4 (S.D.N.Y. May 27, 1994) (reducing award based solely on plaintiff's testimony and comparing it to other cases where courts remitted "jury awards based on similarly vague and conclusory testimony regarding mental anguish").

It is true that Welch failed to seek regular psychiatric help for his emotional anguish, beyond the outpatient psychological treatments he receives for his bipolar disorder. See Manhattan & Bronx Surface Transit Operating Auth. v. N.Y. State Exec. Dep't, 220 A.D.2d 669, 632 N.Y.S.2d 642, 644 (2d Dep't 1995) (reducing damages for emotional pain and suffering from $30,000 to $7,500 in part because petitioner did not seek medical or psychiatric assistance for his emotional turmoil). However, "[t]his failure to obtain professional psychiatric care, while undermining the plaintiff's case to some extent, does not place it on a par with the garden variety emotional distress cases relied on by the defendant." Shea v. Icelandair, 925 F. Supp. 1014, 1028 (S.D.N.Y. 1996).

With regard to whether this case more appropriately falls into the middle of the spectrum or towards the higher end of the spectrum, is a more difficult inquiry. As one judge observed, damages arising out of an emotional distress claim are not always easily translated into a dollar amount, and the law does not provide a precise formula for reducing such injuries to a monetary value. Sulkowska v. City of New York, 129 F. Supp. 2d 274, 308 (S.D.N.Y. 2001) (citing Mathie v. Fries, 121 F.3d 808, 814 (2d Cir. 1997)). However, analogous cases are instructive.

In Reiter v. Metropolitan Transportation Authority of New York, No. 01 Civ. 2762, 2003 WL 22271223 (S.D.N.Y. Sept. 30, 2003), the court reduced the jury's award of $140,000 to $10,000 where the evidence of the plaintiff's emotional distress consisted of the plaintiff's testimony that he felt "[n]ervous, anxious, tense [and] on edge." Id. at *5. Reiter also testified, however, that he had experienced no difficulty eating or sleeping and that he never saw a doctor regarding his distress.

As another point of contrast, in Kim v. Dial Service International Inc., No. 96 Civ. 3327, 1997 WL 458783 (S.D.N.Y. Aug. 11, 1997), the court reduced the jury's verdict from $300,000 to $25,000 in light of the plaintiff's evidence of distress which consisted of plaintiff's testimony that he felt "gloomy," had difficulty sleeping, and had lost 20 pounds as a result of diminished appetite. Id. at *14. The only other evidence of mental distress was when the plaintiff's wife testified that the plaintiff no longer enjoyed socializing, had difficulty sleeping, took sedatives and drank.

On the other hand, there are a number of precedents that demonstrate that the amount awarded here does not materially deviate from damages awarded in the labor context. See, e.g., Shea v. Icelandair, 925 F. Supp. 1014 (S.D.N.Y. 1996) (upholding award of $175,000.00 for emotional distress where plaintiff-employee was demoted and suffered both physically and

emotionally, and this suffering was, in part, due to the defendant's discriminatory conduct). This is especially so where the mental anguish is not based upon a discrete episode but rather multiple acts over a period of time, as in this case. See Smith v. Tiffany & Co., No. 1B–E–CS–84–97230, at 308 (State Div. of Human Rights, Aug. 11, 1995), aff'd, 224 A.D.2d 332, 638 N.Y.S.2d 454 (1st Dep't 1996) (finding that the complainant, who was a subject of repeated and continuous sexual harassment and religious discrimination, testified that "[s]he felt degraded, tortured and brutalized", developed a "severe narcissistic injury or blow to her self-esteem, [and] experienced severe depression, anxiety, agitation, occasional anorexia and insomnia", so that accordingly, the Appellate Division upheld an award of $300,000). In Phillips v. Bowen, 278 F.3d 103, 111–12 (2d Cir. 2002), the Second Circuit upheld an award of $400,000 where the evidence, including testimony by the plaintiff, her boyfriend, co-workers and the defendants themselves, demonstrated continuing harassment over a 5-year period which resulted in plaintiff's daily crying; her feeling sick to her stomach to the extent that every night after work she would spend 2 to 3 hours in the bathroom; her inability to handle the pressure of dealing with her work supervisors; and her reduced enjoyment of life, to the extent that she no longer participated in recreational activities she once enjoyed. Id. at 108-109. Similarly, in New York City Transit Authority v. State Division of Human Rights, 181 A.D.2d 891, 581 N.Y.S.2d 426 (2d Dep't 1992), the court upheld an award of $400,000 for emotional distress arising from the Transit Authority's refusal to grant several medically-necessary requests for restricted duty to a pregnant employee who thereafter miscarried one pregnancy and was forced to take unpaid leave for the duration of a subsequent pregnancy. Id. at 427-28. The court found that the complainant had suffered anguish, guilt, depression and anger during and after each of the four separate discriminatory incidents.

The Court acknowledges that Welch's evidence of emotional distress is arguably more akin to that involved in <u>Reiter</u>, <u>Rainone</u> and <u>Norville</u>, as opposed to <u>Phillips</u> or <u>Transit Authority</u>. However, the key distinguishing circumstance in this case is the severity of Welch's emotional distress. The allegations against UPS, as attested to by Welch at the trial, demonstrated to the jury that Welch was fearful of losing his life as a result of his working conditions. Welch testified that beyond the physical problems he experienced, such as shortness of breath, chest pain, dizziness, and light-headedness associated with the physical consequences of UPS' actions, he also had "the fear of what could happen to [him] should [he] be met with the circumstances that [his] brothers met", (9/7/2011 Tr., 115), as both died from the same HCM condition that Welch suffered from. As Welch also stated, "[i]t wasn't just I'm doing a few lifting of packages and I'm having some symptoms. This was the time that I really became afraid." (9/7/2011 Tr., 140.) The Plaintiff directly stated, on the record, "I was afraid to die." (9/8/2011 Tr., 172.)

Certainly then, it was reasonable for the jury to find that lifting heavy packages and working hours in excess of his medical restrictions, when one had a life-threatening heart condition, could cause someone severe emotional distress. Welch's fear of death was buttressed not only by his testimony, in which he described the death of his two brothers and father to the same disease, but by his treating cardiologist as well. Dr. Mark V. Sherrid testified as to the Plaintiff's heart condition hypertrophic cardiomyopathy ("HCM"). (9/13/2011 Tr., 534). Sherrid accounted how he had provided documentation to UPS on a number of occasions that the Plaintiff's work should be restricted from heavy lifting and repetitive lifting, so as not to trigger a life-threatening arrhythmia. This testimony reasonably led the jury to believe Welch's testimony that UPS' alleged failures to accommodate his medical restrictions caused him anxiety that put him in legitimate "constant fear" of his life. (9/8/11 Tr., 173:8–12.) Thus, cases analogous to

such a circumstance are also instructive.  In <u>Spielberg v. American Airlines, Inc.</u>, 105 F. Supp. 2d 280 (S.D.N.Y. 2000), the court upheld an award of $150,000 for emotional damages for "fear of dying" caused by the traumatic experience of severe turbulence on an airplane.  While obviously a plane crash presents different factual circumstances than the case at hand, the failure to accommodate Welch's heart condition, as testified to by his cardiologist, placed him in a position where he could legitimately be fearful for his life.

As a practical matter, it is unlikely that the stress suffered by the Plaintiff during the relevant time period and manifested in physical symptoms is wholly attributable to what was happening at work.  The Court understands that the Plaintiff's financial issues, divorce, and child custody concerns must have contributed, at least in some degree, to the Plaintiff's stress. Nevertheless, the Court specifically instructed the jury that to award damages for emotional distress, it was only to compensate the Plaintiff for emotional injuries he suffered "as a direct result of the acts of the defendant."  Moreover, the Court instructed the jury that it could not award damages to the Plaintiff for emotional distress by other factors such as his medical conditions which are unrelated to the acts of the Defendant or his matrimonial problems.  There is no basis for the Court to find that the jury did not follow this instruction.  See <u>Blueford v. Arkansas</u>, __ U.S. __, 132 S. Ct. 2044 (2012) ("A jury is presumed to follow its instructions.") (quoting <u>Weeks v. Angelone</u>, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000)).

In sum, because the instant award of $200,000 for past emotional distress brought on by the failure to accommodate is within the range of similar New York verdicts for past emotional distress brought on by traumatic events and/or work place discrimination, it cannot be said that the jury's verdict "deviates materially from what would be reasonable compensation."

Therefore, the Defendant's motion for remittitur to reduce the damages for emotional distress is denied.

**E.  <u>As to the Plaintiff's Motion for a New Trial</u>**

The Plaintiff has also filed a motion for post-trial relief, specifically for a new trial on damages pursuant to Fed. R. Civ. P. 59 and for injunctive or other equitable relief.

**1.  As to Whether There is a Good Faith Defense to the NYSHRL**

At the trial, the Plaintiff ultimately did not recover for the failure to accommodate causes of action under the state and city discrimination laws because the jury found that the Defendant proved that it had a good faith affirmative defense.  However, according to the Plaintiff, this defense is not available under state and city human rights law, and that the Court erred in failing to respect the differences between the state and city human rights laws and their federal counterparts.  Based upon the Court's judgment as a matter of law with regard to the NYCHRL causes of action as set forth above, the relevant question becomes whether the affirmative good faith defense is applicable to the NYSHRL.

The Court agrees with the Plaintiff that claims under the NYCHRL should be viewed independently from and "more liberally" than their federal and state counterparts.

> As a result of [the Restoration Act], the City HRL now explicitly requires an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language. The independent analysis must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's "uniquely broad and remedial" purposes, which go beyond those of counterpart state or federal civil rights laws.... As New York's federal and state trial courts begin to recognize the need to take account of the Restoration Act, the application of the City HRL as amended by the Restoration Act must become the rule and not the exception....
>
> [T]he Restoration Act notified courts that (a) they had to be aware that some provisions of the City HRL were textually distinct from its state and federal counterparts, (b) all provisions of the City HRL required independent construction to accomplish the law's uniquely broad purposes, and (c) cases that had failed to respect these differences were being legislatively overruled. ____

Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009). However, as there are no viable claims under the NYCHRL, the Plaintiff's arguments in this regard may be properly disregarded.

As for the NYSHRL, it is true that there is no comparable provision in the text of the NYSHRL. Moreover, the Court acknowledges that the NYSHRL should not be treated as a carbon copy of the ADA. Nevertheless, the Court finds that this defense should be applicable to the NYSHRL. See Vig v. N.Y. Hairspray Co., L.P., 67 A.D.3d 140, 145, 885 N.Y.S.2d 74 (1st Dep't) (noting that case law interpreting the ADA provides "interpretative guidance" with respect to claims under the NYSHRL and NYCHRL). Neither the Second Circuit, nor any other case for that matter, has ever held otherwise. All of the reasons cited by the Plaintiff to support its contention relate solely to the NYCHRL and the Restoration Act.

Putting aside the NYCHRL, many of same theories underlie the NSYHRL and the ADA, and this includes the idea that defendants "engage in a good faith interactive process that assesses the needs of the disabled individual and the reasonableness of the accommodation requested," as required under the New York State Human Rights Laws. See Phillips v. City of New York, 66 A.D.3d 170, 176, 884 N.Y.S.2d 369 (2009) ("The intended purpose of the State HRL cannot be achieved without requiring that employers, in every case, consider the requested accommodations by engaging in an individualized, interactive process"); Miloscia v. B.R. Guest Holdings LLC, 33 Misc.3d 466, 474, 928 N.Y.S.2d 905, 913 (Sup. Ct. N.Y. Co., 2011) ("Under either state or local law, therefore, 'the first step in providing a reasonable accommodation is to engage in a good faith interactive process that assesses the needs of the disabled individual and the reasonableness of the accommodation requested'. . . Engagement in an individualized interactive process is itself an accommodation, and, generally, the failure to so engage is a

violation of the state and city statutes.").  Thus, interpreting the NYSHRL to contain a good faith affirmative defense comports with this rationale.

Furthermore, the Court agrees with the Defendant that "the aims of the NYSHRL . . . are not thwarted, nor are the protections diminished, by application of the good faith defense" because the statute "seek[s] to eradicate discrimination based on disability and encourage employers to work with employees to find reasonable accommodations."  (Def. Opp. at 7.)

Therefore, the Court rejects the Plaintiff's contention that the good faith defense is inapplicable to the NYSHRL and thus the Plaintiff's motion for a new trial on this ground is denied.

### 2.   As to Whether Injunctive Relief is Warranted

The Plaintiff also urges the Court to award equitable relief consistent with the jury's verdict.  N.Y. Exec. Law 297(9) provides that any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages . . . and such other remedies as may be appropriate.  A permanent injunction is appropriate where the party seeking the injunction has succeeded on the merits and "show[s] the absence of an adequate remedy at law and irreparable harm if the relief is not granted."  Roach v. Morse, 440 F.3d 53, 56 (2d Cir. 2006) (internal quotation marks omitted).  However, "[i]njunctive relief should be narrowly tailored to fit specific legal violations."  Patsy's Brand III, 317 F.3d at 220 (internal quotation marks omitted);

Here, the Plaintiff has failed to make any showing as to why he is entitled to injunctive relief.  Significantly, he has not demonstrated any irreparable harm if the relief is not granted or how, despite the compensatory damages awarded, there is an absence of an adequate remedy at law.  Furthermore, the Plaintiff has acknowledged that his current position at UPS which was

created for him by the company does accommodate his disability. (9/8/2011 Tr., 205-206.) The Plaintiff claims that the irreparable harm is that if the Defendant does not continue to accommodate him in the future, he is at risk of death due to his heart condition. However, this speculative assertion is insufficient to warrant the strict remedy of permanent injunctive relief.

Therefore, the request of the Plaintiff for permanent injunctive relief is denied.

## F. As to the Plaintiff's Motion for Attorneys' Fees and Costs

As a final matter, the Plaintiff is seeking an award for reasonable attorneys' fees in the amount of $396,425.00 and costs in the amount of $22,930.14 pursuant to the New York City Administrative Code §8-502(f). However, as the Court has found that the Defendant is entitled to judgment as a matter of law in connection with the New York City Human Rights Law claims, this provision under which the Plaintiff is seeking fees is inapplicable. See Bonner v. Guiccione, 178 F.3d 581, 595 (2d Cir. 1999) ("While plaintiff was the prevailing party on her NYSHRL cause of action for sexual harassment, New York law does not provide for attorney's fees"); Beebe v. New York Times Co., 666 F. Supp. 2d 321, 330 (E.D.N.Y. 2009) (noting that punitive damages and attorneys' fees are not available under NYSHRL). For this reason, the Plaintiff's request for statutory attorneys' fees and costs is denied.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Defendants' renewed motion for judgment as a matter of law as to the NYCHRL claims is granted; **and it is further**

**ORDERED** that the Defendants' renewed motion for judgment as a matter of law as to all other claims is denied; **and it is further**

**ORDERED** that the Defendant's motion for a new trial is denied; **and it is further**

**ORDERED** that the Defendant's request for **a** remittitur as to the damages award is denied; **and it is further**

**ORDERED** that the Plaintiff's request for a new trial is denied; **and it is further**

**ORDERED** that the Plaintiff's request for attorneys' fees and costs is denied; **and it is further**

**ORDERED** that after the entry of the judgment, the Clerk of the Court is directed to mark this case as closed.

.

**SO ORDERED.**

Dated: Central Islip, New York
June 30, 2012

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge